PHILLIP A. TALBERT
United States Attorney
VINCENTE A. TENNERELLI
Assistant United States Attorney
2500 Tulare Street, Suite 4401
Fresno, CA 93721
Telephone: (559) 497-4000
Facsimile: (559) 497-4099

Attorneys for United States

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA and STATE OF CALIFORNIA, ex rel. Rebecca Handal, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>CENTER FOR EMPLOYMENT TRAINING, *et al.*,<br><br>Defendants. | CASE NO. 2:13-CV-1697 KJM-KJN<br><br>**UNITED STATES' STATEMENT OF INTEREST IN RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>HEARING DATE: September 22, 2017<br>TIME: 10:00 a.m.<br>COURT: Hon. Kimberly J. Mueller<br>TRIAL DATE: March 26, 2018 |

## I.      INTRODUCTION

The United States submits this Statement of Interest to address certain arguments in Defendants' Motion for Summary Judgment. First, this Court's holding that the express false certification theory of False Claims Act liability applies in this matter is law of the case; in arguing to the contrary—citing no new facts or new authority—Defendants improperly ask this Court to revisit an issue the parties have fully litigated and the Court has expressly decided. Second, Defendants' argument that the Department of Education regulations which Defendants allegedly violated are not material fails under *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S.Ct. 1989, 2016 WL 3317565 (2016), and the controlling authority in this circuit that preceded and survived *Escobar*. Third, the Supreme Court did not hold in *Escobar*, as Defendants contend, that a defendant is immune from False Claims Act

liability under the implied certification theory if its claims do not contain specific representations regarding services provided.  Finally, Defendants' exceedingly narrow view of corporate knowledge finds no support in Ninth Circuit precedent. The United States does not take a position on the other issues and arguments raised in Defendants' motion, or on the overall merits of the motion.

## II.     PROCEDURAL HISTORY

Relators filed the operative First Amended Complaint in this *qui tam* action pursuant to the False Claims Act, 31 U.S.C. §§ 3729-33, and the California False Claims Act, Cal. Gov. Code § 12651 *et seq.*, against Defendants[1] on March 26, 2014.  The First Amended Complaint alleges that Defendant Center for Employment Training ("CET") and certain of its current and former employees violated the False Claims Act because CET broke its promises to the United States Department of Education to comply with certain regulations as a condition of receiving federal funds.  (*See generally* Dkt. No. 7).  The regulations at issue required CET to give each prospective student certain information about CET—focusing on how much CET would end up costing the student and whether the student could realistically hope to get a job in her field upon graduation—and prohibited CET from lying to prospective students to convince them to enroll.  (*See id.*); 34 C.F.R. § 600.6(a)(1)-(6); 34 C.F.R. § 668.71(b)-(c)).  The United States declined to intervene in this action pursuant to 31 U.S.C. § 3730(b)(4)(B).  (Dkt. No. 24.)

Although the United States has not intervened in this case and is not a formal party, it remains the real party in interest.  *United States ex rel. Eisenstein v. City of New York, New York*, 556 U.S. 928, 930 (2009). The False Claims Act is the United States' primary tool used to redress fraud on the government.  As such, the statute should be read broadly to reach all fraudulent attempts to cause the government to pay out sums of money.  *United States v. Neifert-White*, 390 U.S. 228, 233 (1968).  Thus, the United States has a keen interest in the development of the law in this area and in the correct application of the law in this, and similar, cases.  Accordingly, pursuant to 28 U.S.C. § 517,[2] the United States respectfully submits this Statement of Interest.

---

[1] On December 21, 2015, Relators dismissed Defendant Gamez without prejudice.  (Dkt. No. 33.)

[2] This provision authorizes the Attorney General of the United States to attend to the interests of the United States in any action in federal or state court.

UNITED STATES' STATEMENT OF INTEREST IN
RESPONSE TO DEFENDANTS' MSJ                         2

### III. ARGUMENT

#### A. This Is an Express False Certification Case.

Defendants contend that this is not an express certification case, notwithstanding that this Court expressly rejected that argument in its August 9, 2016 Order on Defendants' motion to dismiss ("the August 9 Order"), (Dkt. No. 61). Defendants have already unsuccessfully litigated this issue, and they raise no new facts or controlling authority now. Because the August 9 Order is law of the case, and because the Court's holding in that Order was correct, Defendants' argument should be rejected.

"The doctrine of the law of the case generally precludes a court from reconsidering an issue previously decided in the same case by the same court or a higher court." *U.S. ex rel. Eitel v. Reagan*, 35 F.Supp.2d 1151, 1154 (D. Ariz. 1998) (citing *Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993)). "Although this doctrine is discretionary, the Ninth Circuit has found reconsideration of a previously decided issue appropriate only when there has been an 'intervening change of controlling authority, new evidence has surfaced, or the previous disposition was clearly erroneous and would work a manifest injustice'." *Eitel*, 35 F.Supp.2d at 1154 (citing *Leslie Salt Co. v. U.S.*, 55 F.3d 1388, 1393 (9th Cir. 1995); *see also Strigliabotti v. Franklin Resources, Inc.*, 398 F.Supp.2d 1094, 1098 (N.D. Cal. 2005) (holding that denial of defendant's motion to dismiss prior complaint was law of the case where defendants raised "same case law and advance the same general attack" in seeking dismissal of amended complaint).

Defendants and the United States fully briefed whether the express certification theory applies when Defendants moved to dismiss the First Amended Complaint. Defendants raised the issue in their Motion, (Dkt. No. 43-1 at 12), the United States then explained, in a Statement of Interest, why Defendants' position was legally incorrect, (Dkt. No. 52), and Defendants responded, (Dkt. No. 54 at 3.)

In ruling on Defendants' motion, the Court analyzed the issue extensively and agreed with the United States' position. The Court noted, "as a precondition to receiving any Title IV funds, an institution must enter into a PPA with the DOE." (Dkt. 61 at 8 (citing 20 U.S.C. § 1094(a), 34 C.F.R. § 668.14(a)(1)). The Court further noted, "In entering the PPA, an institution certifies that it will comply with the PPA and relevant regulations as part of participating in Title IV grant funding programs." (Dkt. 61 at 8). The Court then outlined the regulations that form the basis for Relators' False Claims Act

allegations, noting, "Based on express certifications of compliance with these requirements, CET receives Title IV funds." *Id.*  The Court then held, "Relators' claims are based on CET's express false certifications." (*Id.* at 9).

Defendants support their argument with just one factual assertion, namely that "[t]he PPA in this case was signed in 2009, prior to any of the alleged regulatory violations and prior to the enrollment of Relators." (Dkt. No. 85-1 at 9).  Those facts are not new; Defendants asserted them in their Motion to Dismiss.  (Dkt. No. 43-1 at 7 n.1).  Moreover, Defendants cite no controlling authority decided after the August 9 Order.  Given that the issue has already been litigated and decided, and given that the Court correctly decided the issue in the August 9 Order, this is an express certification case.

### B. Defendants Mischaracterize the Supreme Court's Holding in *Escobar* and Wrongly Contend that *Escobar* Overruled Prior Ninth Circuit Precedent on Materiality.

Defendants also reiterate their failed argument, focusing on *Escobar*, that even if they violated the governing regulations, those regulations were not material to the government's payment decision.  This Court was aware of the *Escobar* decision when it previously rejected Defendants' materiality arguments.  (Dkt. 58 (Def's 2d Not. Suppl. Auth.)).  As this Court properly recognized in its Order, *U.S. ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166 (9th Cir. 2006), continues to control the materiality inquiry in Title IV False Claims Act cases in the Ninth Circuit.  (*See* Dkt. 61 at 11-12.)  In previously rejecting Defendants' materiality arguments, this Court recognized that Relators allege Defendants violated regulatory provisions that are "prerequisites of federal funding."  (*Id.* at 14.)  This Court also explained, "If CET had not agreed to comply with these conditions [in the PPA], it would not have been paid . . . . Certification is not a mere assertion by CET that it has not broken the law yet, but also that it promises not to break the law during the term of the PPA."  (*Id.* (citation omitted)).

Contrary to Defendants' contentions, *Escobar* did not "replace" all preceding Ninth Circuit jurisprudence on False Claims Act materiality.  (*See* Dkt. 85-1 at 5).  Instead, *Escobar* simply added clarity the Ninth Circuit's standard.  As the Ninth Circuit has recognized, and as *Escobar* reaffirmed, "material," under the False Claims Act, means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  *U.S. v. Bourseau*, 531 F.3d 1159, 1171 (9th Cir. 2008); *Escobar*, 136 S. Ct. at 2002.  A matter is material if:  (1) a reasonable person would attach

importance to it in determining a choice of action, or (2) the defendant knew or had reason to know that the recipient of the representation attaches importance to the specific matter in determining his choice of action, regardless of whether a reasonable person would do so. *Escobar,* 136 S. Ct. at 2002-03.

In *Escobar,* The Supreme Court clarified that a variety of factors are relevant to the materiality inquiry and stressed that no one factor is automatically dispositive. 136 S. Ct. at 2001 (citing *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 39 (2011)). For example, the Court explained, "[a] misrepresentation cannot be deemed material *merely because* the government designates compliance with a particular statutory, regulatory or contractual requirement as a condition of payment." *Id.* at 2003 (emphasis added). But while designation as a condition of payment is "not automatically dispositive," the Court recognized that it is relevant to the materiality inquiry. *Id.*

In addition, the Supreme Court identified at least three other factors bearing on the materiality inquiry, including whether the violation goes to the "essence of the bargain," *Escobar*, 136 S. Ct. at 2003 n. 5 (quoting *Junius Constr. Co. v. Cohen*, 178 N.E. 672, 674 (1931)), whether the violation is significant or "minor or insubstantial," *id.*, and whether the government routinely continues paying claims despite actual knowledge of the same or similar violations, *id.* at 2003-04.

Defendants focus their materiality argument on only one question, namely whether the Department of Education typically terminates a school's Title IV participation for violating the provision at issue here. (Dkt. No. 85-1); 136 S. Ct. at 2003-04. *Escobar*, however, requires consideration of multiple materiality factors, and those factors make clear that Relators have alleged violations by CET of regulations that are material under the False Claims Act.

*First*, *Hendow* leaves no doubt that the first *Escobar* factor, whether the United States has characterized the operative regulations as a prerequisite to receiving federal funds, strongly favors materiality. Each school's eligibility for Title IV funds "is explicitly conditioned, in three different ways, on compliance with" the regulatory provisions listed in each PPA, including the provisions Relators contend Defendants violated. *See Hendow*, 461 F.3d at 1175. Those regulations are "'the *sine qua non*' of federal funding, for one basic reason: if the University had not agreed to comply with them, it would not have gotten paid." *Id.* at 1176. While, under *Escobar*, designation as a condition of payment is no longer dispositive on materiality, such designation remains highly probative. 136 S. Ct. at

1  2003.  Thus, although *Escobar* identified additional factors relevant to the materiality inquiry, it did not
2  overrule *Hendow*, a case that strongly supports the materiality of the regulatory provisions at issue.
3      *Second*, the operative regulations go to the "essence of the [Department of Education's] bargain"
4  with schools like CET.  *Escobar*, 136 S. Ct. at 2003 n.5.  The Federal Direct Loan Program was
5  designed to benefit prospective students and their parents.  *See* 34 C.F.R. § 685.100.  The gainful
6  employment disclosure regulation serves that purpose by "better inform[ing] prospective students" of
7  information like program cost, graduation and placement rates, job-related information for individual
8  academic programs, and debt levels of graduating students.  75 FR 34806-01.  Regulations prohibiting
9  misrepresentations to prospective students serve a similar purpose, that of protecting prospective
10 students from being duped into enrolling in schools based on false information.  Accordingly, these
11 regulations ensure that the Title IV program serves its intended purpose and go to the essence of CET's
12 bargain with the Department.
13     *Third*, the regulatory violations Relators allege were significant rather than "minor and
14 insubstantial."  *Escobar*, 136 S. Ct. at 2003.  The First Amended Complaint alleges that the printed
15 materials that CET provided to Relators—and presumably other prospective students as well—did not
16 include key disclosures required in the Department's regulations.  (Dkt. 7 at ¶¶ 50-62.)  Further, Relators
17 contend that CET misrepresented the job prospects of its graduates, the qualifications of its instructors,
18 the content of its educational programs, the quality of its facilities, the availability of job placement
19 assistance, and the scope of CET's financial charges.  (*Id.* at ¶¶ 63-122.)  These multiple alleged
20 nondisclosures and misrepresentations are substantial.
21     *Fourth*, and contrary to Defendants' assertions, the Department of Education's actions support
22 materiality.  Defendants contend that a regulation can only be material if the Department of Education
23 regularly terminates schools from the Title IV program for violating it.  (*Id.* at 6-8.)  *Escobar* in no way
24 supports this position.  The Supreme Court in *Escobar* held:

> Likewise, proof of materiality can include, but is not necessarily limited to,
> evidence that the defendant knows that the Government consistently refuses
> to pay claims in the mine run of cases based on non-compliance with the
> particular statutory, regulatory, or contractual requirement. Conversely, if
> the Government pays a particular claim in full despite its actual knowledge
> that certain requirements were violated, that is very strong evidence that

UNITED STATES' STATEMENT OF INTEREST IN
RESPONSE TO DEFENDANTS' MSJ                                   6

> those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material

136 S. Ct. at 2003. Nowhere in this passage, or elsewhere in *Escobar*, did the Supreme Court equate a provision's materiality with an agency's willingness to bar violators from receiving ***any future*** federal funds. Instead, under *Escobar*, one factor in assessing materiality is how an agency processes claims *while* it knows that the payee is violating a given provision. Defendants have not identified any instances in which the Department knew about a school's ongoing non-compliance with the operative regulations at the time it acted on payment requests. In other words, Defendants cannot point to a single instance in which the Department knew about ongoing noncompliance but paid claims anyway.

What the evidence does show, however, is that the Department actively investigates whether institutions are complying with the regulations at issue and has imposed significant penalties—including refusing to recertify multiple institutions for continued participation in the Title IV program—based in part on violations of those requirements. Exhibit 1 to the Declaration of Vincente A. Tennerelli, attached hereto, contains numerous Department of Education communications in which the Department has taken stern action, including denying multiple schools' requests for recertification to participate in Title IV programs, based in part on the schools' omission or misrepresentation of information in violation of Department regulations. (*See generally* Tennerelli Decl. ¶ 3, Ex. A). Notably, while the Department produced these communications to CET, and while CET leans heavily on its expert in arguing against materiality, CET's expert did not review any of these communications in formulating his opinion. (*Compare* Dkt. No. 87, Ex. A at A-23-26 with Tennerelli Decl. ¶ 3, Ex. A at USA SOI 1, 18, 34, 87, 96, 107, 117, 132, 146, 150.)

**C.     *Escobar* Did Not Establish a Two-Part Test for Implied False Certification.**

In asserting that a false claim cannot trigger liability under the implied false certification theory unless it "makes specific representations about the goods or services provided," Defendants misread *Escobar*. (Dkt. 85-1 at 11.) In *Escobar*, the Supreme Court stated that it "need not resolve whether all claims for payment implicitly represent that the billing party is legally entitled to payment," because it found that the claims in that case "d[id] more than merely demand payment." *Escobar*, 136 S. Ct. at

2000. The Court then noted "that the implied certification theory can be a basis for liability *at least where*" the defendant's false claim makes specific representations and the defendant's failure to disclose noncompliance makes those representations misleading half-truths." *Id.* at 2001 (emphasis added). While the Court made clear that the two conditions it identified were *sufficient* for application of the implied certification theory, it had no need to resolve, and therefore did not resolve, whether they were *necessary* because the allegations in that case met the two conditions. *Id.* at 2000. In short, *Escobar* did not call into question, much less overrule, decisions by this Court and others that previously adopted the implied certification theory without requiring any "specific representations" in the claims for payment. *See, e.g.*, *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010); *U.S. v. Science Applications Int'l Corp.*, 626 F.3d 1257, 1269 (D.C. Cir. 2010); *see also United States ex rel. Rose v. Stephens Institute*, Case No. 09-cv-05966-PJH, 2016 WL 5076214, at *5 (N.D. Cal. Sept. 20, 2016), *interlocutory appeal docketed*, No. 17-15111 (9th Cir. Jan. 20, 2017).

### D. Defendants Mischaracterize the Standard for Scienter Under the False Claims Act.

Defendants' narrow characterization of the scienter requirement in the False Claims Act has no legal support. Defendants argue that a corporate defendant only acts with scienter if "the person responsible for making the claims for payment acted with knowledge that the claim was false, acted in deliberate ignorance of the falsity of the claim, or acted in reckless disregard of the truth or falsity of the claim." (Dkt. No. 85-1 at 12.) This is not correct. Instead, under the False Claims Act, an employer knows what its employees know, provided those employees are acting for the corporation's benefit and within the scope of employment. *U.S. v. Anchor Mortgage Corp.*, 711 F.3d 745, 747-48 (7th Cir. 2013) ("Corporations 'know' what their employees know, when the employees acquire knowledge within the scope of their employment and are in a position to do something about that knowledge." (citation omitted)); *Grand Union Co. v. U.S.*, 696 F.2d 888, 891 (11th Cir. 1983) ("[I]n cases brought under the False Claims Act that the knowledge of an employee is imputed to the corporation when the employee acts for the benefit of the corporation and within the scope of his employment." (citations omitted)).

The two cases Defendants cite do not support their argument. (Dkt. 85-1 at 12). Indeed, both cases merely note that for False Claims Act liability to attach, a corporation must possess the requisite scienter when it certifies compliance to the United States. *U.S. ex rel. Lee v. Corinthian Colleges*, 655

F.3d 984, 996-97 (9th Cir. 2011), and *U.S. ex rel. Hochman v. Nackman*, 145 F.3d 1069, 1074 (9th Cir. 1998). Neither case even discusses *whose* knowledge within the corporation can be imputed to the corporation itself. *Id.* Defendants do not accurately characterize scienter under the False Claims Act.

Dated: September 15, 2017

Phillip A. Talbert
United States Attorney

By: /s/ Vincente A. Tennerelli
Vincente A. Tennerelli
Assistant U.S. Attorney

UNITED STATES' STATEMENT OF INTEREST IN
RESPONSE TO DEFENDANTS' MSJ

9