PHILLIP A. TALBERT
United States Attorney
VINCENTE A. TENNERELLI
Assistant United States Attorney
United States Courthouse
2500 Tulare Street, Suite 4401
Fresno, California 93721
Telephone:  (559) 497-4000
Facsimile:   (559) 497-4099

Attorneys for the United States

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA and STATE OF CALIFORNIA, ex rel. Rebecca Handal, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> CENTER FOR EMPLOYMENT TRAINING, *et al.*, <br><br> Defendants. | CASE NO. 2:13-cv-1697-KJM-KJN <br><br> **DECLARATION OF VINCENTE A. TENNERELLI IN SUPPORT OF STATEMENT OF INTEREST IN RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

I, Vincente A. Tennerelli, pursuant to 28 U.S.C. § 1746, declare:

1.      I am an Assistant United States Attorney for the Eastern District of California and the attorney of record for the United States in the above entitled action.  I have personal knowledge of the matters set forth herein, and if called upon to testify, could and would competently testify thereto.

2.      I submit this declaration in support of the United States' Statement of Interest in Response to Defendants' Motion for Summary Judgment.

3.      Attached as Exhibit 1 hereto is a true and correct copy of certain documents produced by the Department of Education in response to the January 31, 2017, subpoena issued by Defendants' counsel to Susan Crim, Department of Education, Director of Financial Student Aid, Administrative

1    Action & Appeals Service Group.  Bates numbers have been subsequently added for ease of reference.

2         I declare under penalty of perjury that the foregoing is true and correct.

3         Executed on September 15, 2017.

4

5                                                    /s/ Vincente A. Tennerelli

6                                                    Vincente A. Tennerelli

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT 1**



AUG 2 2 2014

Mr. Jack Massimino
Chairman & CEO                          Sent Overnight Via UPS
Corinthian Colleges, Inc.               # 1Z A87 964 01 9413 7313
6 Hutton Centre Drive, Suite 400
Santa Ana, CA 92707

Re:    Denial of Recertification Application to Participate in the Federal Student
       Financial Assistance Programs--Everest Institute, 5514 Big Tyler Road, Cross
       Lanes, WV 25313-1304
       OPE-ID:  01035600

Dear Mr. Massimino:

The U.S. Department of Education (Department) has reviewed Everest Institute's application for
recertification to continue to participate in the student financial assistance programs authorized
by Title IV of the Higher Education Act of 1965, as amended, 20 U.S.C. §§ 1070 *et seq.* (Title
IV, HEA programs).  Everest Institute consists of a main location in Cross Lanes, West Virginia,
an additional location in Eagan, Minnesota (Everest Eagan), and a former additional location at
2460 Wesley Chapel Road, Decatur, Georgia (Everest Decatur).  In the normal course, Everest
Institute's Program Participation Agreement (PPA) would have expired on December 31, 2013.
Because Everest Institute timely submitted its recertification application, however, the
Department extended Everest Institute's previous PPA on a month-to-month basis while the
Department reviewed the application and related matters. *See* 34 C.F.R. § 668.13(b)(2).

In addition to the recertification application materials, the Department reviewed, among other
things, documentation submitted by Everest Institute's owner, Corinthian Colleges, Inc. (CCI), to
the Department and to Everest Institute's accreditor, the Accrediting Commission of Career
Schools and Colleges (ACCSC).  Pursuant to paragraph VI.E. of the Operating Agreement
executed by the Department and CCI, and effective July 8, 2014, the Department also considered
materials provided by CCI regarding Everest Institute on July 31, 2014  (Everest Statement).  As
set forth below, the information the Department obtained and reviewed establishes that Everest
Institute breached its fiduciary duty to the Department by failing to comply with Title IV, HEA
program requirements.  Specifically, Everest Institute submitted false placement data to ACCSC
to maintain the accreditation of Everest Decatur and disclosed false placement data to current
and prospective students.  Everest Institute's misconduct will not be tolerated by the Department,
and therefore, its recertification application is denied.  As a result of this denial, the institution

Federal **Student** Aid
*An OFFICE of the U.S. DEPARTMENT of EDUCATION*

USA SOI 001

can no longer participate in the Title IV, HEA programs, as of August 31, 2014. *See* 34 C.F.R. § 668.13(b)(2).[1]

In particular, as of August 31, 2014, Everest Institute will no longer be eligible to participate in the following Title IV, HEA programs:  Federal Pell Grant (Pell Grant), Federal Supplemental Educational Opportunity Grant (FSEOG), Teacher Education Assistance for College and Higher Education (TEACH) Grant, Federal Work-Study (FWS), Federal Perkins Loan (Perkins Loan), and William D. Ford Federal Direct Loan (Direct Loan).  The Direct Loan program includes the Federal Direct Stafford/Ford Loan Program, the Federal Direct Unsubsidized Stafford/Ford Loan program, the Federal Direct PLUS Program, and the Federal Direct Consolidation Loan program.  The FSEOG, FWS, and Perkins Loan programs are known as campus-based programs.

## EVEREST INSTITUTE BREACHED ITS FIDUCIARY DUTY TO THE DEPARTMENT BY FAILING TO COMPLY WITH TITLE IV, HEA PROGRAM REQUIREMENTS

On February 10, 2011, you signed Everest Institute's current provisional PPA with the Department, which stated that Everest Institute would comply with all Title IV, HEA program requirements, as well as any conditions specified by the Department in the PPA. 20 U.S.C. § 1094(a)(1); *see generally* 34 C.F.R. § 668.14.  Everest Institute's PPA encompassed Everest Decatur and Everest Eagan. 34 C.F.R. § 668.14(a)(2).  By entering into the PPA with the Department, Everest Institute, and its officers, accepted the responsibility to act as fiduciaries in the administration of the Title IV, HEA programs.  As fiduciaries, Everest Institute and its officers are subject to the highest standard of care and diligence in administering the Title IV, HEA programs and in accounting to the Secretary for the funds received. 34 C.F.R. §§ 668.82(a) and (b).

If the Department determines that an institution has not met the fiduciary standard of conduct, either through its failure to comply with applicable Title IV, HEA program standards and requirements, or through acts of affirmative misconduct, a denial of the institution's recertification application is warranted.[2] *See* 34 C.F.R. § 668.13.  As outlined below, the Department has determined that Everest Institute failed to meet the fiduciary standard of conduct through misrepresentations regarding job placements to its accreditor and to current and

---

[1] To the extent that this letter does not recite each and every finding that the Department previously set forth in its "Fact Sheet" dated July 24, 2014, this should not be viewed, in any way, to suggest that the Department disclaims any of those findings.  Rather, for the sole purpose of proceeding with this recertification denial, the Department articulates in this letter findings that form a sufficient basis for the Department's determination.

[2] In its Everest Statement, CCI argued that the Department's investigative findings focus largely on "information from the 2008-2010 cohorts," and stated that such findings from past years do not constitute "a valid basis for denying current recertification for the currently existing Everest Institute." (Everest Statement at 1.) As this recertification denial letter demonstrates, however, the conduct at issue here consists of misrepresentations made by Everest Institute at least into 2012.  Furthermore, the Department emphasizes that, as stated in its Fact Sheet, CCI acted in disregard of its fiduciary duty with respect to Everest Institute. (Department's Fact Sheet, dated July 24, 2014, at 1.) As discussed further at page 16, the Title IV regulations require that an institution "must *at all times* act with the competency and integrity necessary to qualify as a fiduciary," 34 C.F.R. § 668.82(a) (*emphasis* added), and a breach of this duty at *any* time, including in past years, is grounds for denial of recertification.

prospective students, in violation of Title IV, HEA statutory and regulatory requirements. Everest Institute's recertification application is therefore denied.[3]

**A. Everest Decatur created false placements and misrepresented Everest Decatur's job placement rates to its accreditor in an attempt to maintain its eligibility for Title IV, HEA program funds.**

As stated above, Everest Institute, which currently includes its main location in Cross Lanes, West Virginia, and its one remaining additional location in Eagan, Minnesota, is accredited by ACCSC, which is recognized by the Secretary of Education in accordance with the provisions of 34 C.F.R Part 602.  Through its ACCSC accreditation, Everest Institute and its additional locations—both current and former—qualify as an eligible proprietary institution of higher education for purposes of the Title IV, HEA programs.  *See* 34 C.F.R. §§ 600.5(a)(6), 600.2.  To maintain ACCSC accreditation (itself a requirement of eligibility for the Title IV, HEA programs), an institution must meet ACCSC's standards in several substantive areas.  And, to meet ACCSC's standard regarding student achievement, an institution must demonstrate that it maintains acceptable rates of graduation and employment in the career fields for which the school provides education.[4]

Therefore, each year, ACCSC requires the institutions it accredits to submit an Annual Report that includes a Graduation and Employment Chart completed for each of its educational programs that discloses the graduation and employment rates for the time period specified, as well as the number of students in each of the categories that are used to calculate the rate.  Each chart includes spaces for institutions to enter the number of students classified by the institutions as "Graduates-Available for Employment" and spaces for the institutions to enter the number of students classified by the institutions as "Graduates – Employed in Field."  An institution's employment rate, defined by ACCSC as the school's "official rate of graduate job attainment for each cohort and for the program for the reporting period," is then determined by dividing the "Graduates-Employed in Field" number by the 'Graduates-Available for Employment" number. ACCSC's "Guidelines for Employment Classification" define what constitutes an employed

---

[3] CCI suggested that the denial of Everest Institute's recertification would be inappropriate because the bulk of the abusive conduct that the Department found occurred at Everest Decatur, an additional location of Everest Institute that CCI closed. (*See, e.g.,* Everest Statement at 1, 14.)  That is immaterial.  Everest Institute and CCI officials engaged in the conduct discussed herein, and their acts and omissions bear directly on the issue of whether Everest Institute should be recertified to participate in the Title IV, HEA programs.  In particular, the Department regulates Title IV compliance through the institution that has an assigned OPE-ID number.  A main location and branch locations with a single OPE-ID number constitute a single institution.  It is pursuant to an OPE-ID number that an institution, including its additional locations, receives Title IV funds, and it is based upon actions attributable to that OPE-ID number that the Department determines the propriety of continued receipt of Title IV funds.  The Department promotes integrity in the Title IV programs by holding main locations responsible for the actions of their additional locations.  As ACCSC likewise stated in a letter dated December 5, 2012 to Everest Institute, "the main school, Everest Institute (Everest-Cross Lanes) located in Cross Lanes, West Virginia is fully responsible for the operation of the branch campus and the school's compliance with accrediting standards."   The Department further notes that it was CCI, not the Department or ACCSC, that chose to associate Everest Cross Lanes, Eagan, and Decatur as an institution.

[4] ACCSC Standards of Accreditation (SOA), at 93 (Apr. 15, 2012).

graduate and how the institution is to justify that classification.[5]  Among other things, the
employment must be for a reasonable period of time and be considered sustainable.  The
institution must be able to support its reported rates through student transcripts, verifiable records
of initial employment of its graduates, or other verifiable documentation.[6]

ACCSC establishes and publishes *minimum* benchmark graduation and employment rates based
on information submitted in the Annual Reports of its accredited schools.[7]  On May 10, 2010,
ACCSC established a minimum benchmark employment rate of 70% based on Annual Report
data from 2006 through 2008.[8]  On June 29, 2012, ACCSC reduced the minimum benchmark
employment rate to 66% based on data reported for the period 2009 through 2011.[9]  ACCSC-
accredited schools demonstrate successful student achievement when graduation and
employment rates meet or exceed the established minimum benchmarks.[10]

On December 8, 2010, ACCSC's Executive Director, Michale S. McComis, sent a letter to
Everest Decatur's then-President, Barbara Holliman, notifying her that ACCSC had voted to
direct the school to show cause as to why its accreditation should not be withdrawn.  ACCSC
explained that the school's efforts over a five-year period had not yielded sustainable
improvements, and that it could not disregard Everest Decatur's "long history of poor student
achievement rates."  ACCSC directed that Everest Decatur submit by March 8, 2011, among
other things, a Graduation and Employment Chart for the eight-month Medical Administrative
Assistant, the eight-month Medical Assistant, the eight-month Medical Insurance Billing and
Coding, the nine-month Massage Therapy, and the 24-month Respiratory Care programs offered
by the school, using an April 2011 report date, for ACCSC's review.[11]

Everest Decatur initially submitted a response to meet ACCSC's March 8, 2011 deadline, but on
April 22, 2011, Everest Decatur, through CCI's Director of Accreditation and Licensing, Pan
Fuchs, submitted a document entitled "Update to the Response to Show Cause Directive Issued
on December 8, 2010," that purportedly demonstrated that its employment rates, while still
below the minimum benchmark rates, were improving.  This April 2011 report listed the
following placement rates for Everest Decatur programs:

---

[5] ACCSC Accreditation Alert (Jan. 5, 2011).  *See also* ACCSC SOA, Appendix VIII, at 111 (Apr. 15, 2012).

[6] ACCSC SOA, at 93 (Apr. 15, 2012).

[7] *Id.*

[8] ACCSC Alert (June 29, 2012).

[9] *Id.*

[10] ACCSC SOA, at 93-94 (Apr. 15, 2012).

[11] The "report date" specified by ACCSC is the date the institution must use to calculate the cohort of students
whose placement percentages are being reported in the required submission.  In some cases, as in this circumstance,
the "submission date" may precede the "report date."

| Program | Employment Rate for 4/11 Report Date |
|---|---|
| Dialysis Technician | 47% |
| Medical Admin Assistant | 48% |
| Medical Assistant | 45% |
| Med. Insurance Billing/Coding | 60% |
| Massage Therapy | 43% |
| Electrician | 54% |
| HVAC | 41% |
| Respiratory Care | N/A |

After reviewing Everest Decatur's responses to the December 8, 2010 show cause letter, ACCSC's Executive Director noted in a letter dated June 8, 2011, that the outcomes reports contained in the responses again showed that employment rates for seven of Everest Decatur's 13 programs, specifically the Dialysis Technician; Electrician; Heating, Ventilations and Air Conditioning; Massage Therapy; Medical Administrative Assistant; Medical Assistant; and Medical Insurance Billing & Coding programs, continued to fall significantly below ACCSC's minimum student achievement benchmark rates during the reporting timeframe. ACCSC therefore continued the show cause directive and provided Everest Decatur with an additional opportunity to present evidence of compliance with ACCSC's accrediting standards. ACCSC directed that Everest Decatur submit by September 8, 2011, among other things, a Graduation and Employment Chart for all of the programs offered at Everest Decatur, using a July 2011 report date, along with supporting summary information for each chart. Everest Decatur submitted its response to the show cause directive on September 8, 2011.

CCI's September 8, 2011 response reported the following placement rates:

| Program | Employment Rate for 7/11 Report Date |
|---|---|
| Dialysis Technician | 53% |
| Medical Admin Assistant | 55% |
| Medical Assistant | 66% |
| Med. Insurance Billing/Coding | 71% |
| Massage Therapy | 52% |
| Electrician | 72% |
| HVAC | 73% |
| Respiratory Care | 71% |

In a footnote in the response, Everest Decatur also stated it had identified problems with its reporting on the 2008 and 2009 calendar year cohorts. Everest Decatur stated that after receipt of a subpoena dated *April 11, 2011* from the Department's Office of the Inspector General, it had identified approximately 112 "potentially questionable placements" in the 2008 and 2009 cohorts. Everest Decatur also claimed that it would submit corrected Graduation and Employment Charts for any previously-submitted annual reports that may have been affected by the invalid placement data under separate cover.

On October 11, 2011, David Luce, CCI's Assistant Vice President, Accreditation and Licensing, followed up on the footnote with a letter to ACCSC providing revised employment rates for

Everest Decatur's 2009 and 2010 Annual Reports that reflected removal of "potentially inappropriate placements" from the Medical Assistant, Medical Administrative Assistant, and Medical Insurance Billing and Coding programs. According to the letter, these placements had been identified after an internal investigation at the neighboring Everest Institute located in Jonesboro, Georgia disclosed falsification of placement documentation at that school. CCI alleged to ACCSC and the Department that former employees created fictitious employers in order to falsely report that students had been placed at that location. The placement rates were revised as follows:

| Program | 2009 Original Employment Rate | 2009 Revised Employment Rate | 2010 Submitted Employment Rate | 2010 Revised Employment Rate |
|---|---|---|---|---|
| Dialysis Technician (8 months) | 52% | 52% | 66% | 48% |
| Massage Therapy (9 months) | 78% | 83% | 46% | 46% |
| Medical Administrative Assistant (8 months) | 73% | 36% | 73% | 70% |
| Medical Assistant (8 months) | 77% | 54% | 73% | 67% |
| Medical Insurance Billing and Coding (8 months) | 66% | 54% | 85% | 80% |
| Respiratory Care (21 months) | 57% | 64% | 67% | 67% |

In the October 11, 2011 letter, CCI represented that it had "diligently reviewed" the placements submitted in the Show Cause Order response recently submitted to ACCSC as well as placements to be submitted in the upcoming 2011 ACCSC Annual Report. CCI represented that it had "validated the data and was confident that it was accurate as represented, thereby reflecting only graduates who had been placed in sustainable positions in their field of training."

On October 20, 2011, CCI submitted an update to its September 8, 2011 response to ACCSC's show cause order. In this submission, CCI presented adjusted employment information for the two Everest Decatur continuing programs[12]—the Medical Administrative Assistant and Medical Assistant programs—that it had reported as not achieving the required 70% employment in the September 8, 2011 submission. CCI's update indicated that that these programs in fact had surpassed that 70% requirement. Everest Decatur represented that, as a result of the intense activity by the career services staff, and management and regional support, strong partnerships with employers in the community had developed which would help sustain positive placement activity. Everest Decatur provided updated Graduation and Employment Charts for its Medical Administrative Assistant and Medical Assistant programs, along with detailed supporting reports that listed, among other things, the student's employer, job title, and date of the student's placement.

The employment rates disclosed were as follows:

---

[12] Everest Decatur had previously ceased enrolling new students in the Dialysis Technician and Massage Therapy programs.

| Program | Employment Rate for 7/11 Report Date |
|---|---|
| Dialysis Technician | 53% |
| Medical Admin Assistant | 70% |
| Medical Assistant | 71% |
| Med. Insurance Billing/Coding | 71% |
| Massage Therapy | 52% |
| Electrician | 72% |
| HVAC | 73% |
| Respiratory Care | 71% |

In November 2011, Everest Decatur submitted its 2011 Annual Report to ACCSC.  The placement rates Everest reported were as follows:

| Program | Employment Rate for 7/11 Report Date |
|---|---|
| Dialysis Technician | 54% |
| Medical Admin Assistant | 69% |
| Medical Assistant | 70% |
| Med. Insurance Billing/Coding | %[13] |
| Massage Therapy | 52% |
| Electrician | 71% |
| HVAC | 70% |
| Respiratory Care | 71% |

On December 22, 2011, ACCSC's Executive Director notified the school that during ACCSC's November 2011 meeting, it had reviewed, among other things, Everest Decatur's response to its June 8, 2011 show cause order, Everest Decatur's October 11, 2011 notification regarding graduate placement discrepancies, and Everest Decatur's October 20, 2011 updated response to the June 8, 2011 show cause order.  ACCSC noted that the supplemental documentation provided in support of the revised reported rates of graduate employment raised questions.  For instance, ACCSC noted that the documentation indicated that an inordinately large number of students who had completed the Medical Assistant program during 2009 and 2010 had been placed at their employers during July 2011, many months after they had graduated.  On its face, so many placements after such a long time during a one-month period triggered ACCSC's concern.

Because of these questionable placements, ACCSC continued its show cause order and directed Everest to submit an independent third-party review and verification of the school's graduate employment records and rates as reported in the 2011 Annual Report, and a Graduation and Employment Chart for all programs offered at the school, using a January 2012 report date, along with supporting summary information.  ACCSC also required Everest Decatur to submit documentation demonstrating the implementation of CCI's policy regarding the placement of ten or more graduates with one employer, pursuant to which CCI's "Placement Verification Team" purportedly contacted both students and employers to verify employment and required local

---

[13] The placement percentage rate was missing from this report.

campus leadership to visit the employer, inspect the premises, and confirm that students were actually employed.

Everest Decatur's response to ACCSC was due on or before March 23, 2012. On March 1, 2012, CCI provided ACCSC with official notification that CCI intended to close Everest Decatur.

On April 4, 2012, CCI filed its response to the December 22, 2011 continuing show cause order. CCI represented that it had conducted an intensive review of placements. CCI stated that the review included interviews of campus employees, employers, graduates and campus leadership by Human Resources and outside counsel and that CCI fired a number of employees. CCI stated that its review determined in January 2012 that, although the vast majority of the placements at Everest Decatur were "most likely valid," there was an absence of the "necessary, complete verification paperwork for multiple placements and other placements that may not have satisfied CCI's and/or ACCSC's requirements for placements." CCI, however, was apparently relieved of the requirement to provide ACCSC with an independent, third-party, review and verification of Everest Decatur's graduate employment records and rates as reported in the 2011 Annual Report, or any of the rest of the information ACCSC had required in order to substantiate the truthfulness of that Report, because of its closure of the Decatur campus.

CCI's April 4, 2012 response reported the following placement rates:

| Program | Employment Rate for 1/12 Report Date |
|---|---|
| Dialysis Technician | 43% |
| Medical Admin Assistant | 63% |
| Medical Assistant | 63% |
| Med. Insurance Billing/Coding | 62% |
| Massage Therapy | 47% |
| Electrician | 77% |
| HVAC | 68% |
| Respiratory Care | 70% |

The Department has determined that far more was wrong with Everest Decatur's reported job placement information than the "failure to provide and maintain proper documentation" that CCI reported to ACCSC, as CCI's leadership well knew. Evidence shows that the driving force behind Everest Decatur's spike in reported placements of graduates during the very short period of time between late June and August 2011 (as reflected in its September 8, 2011 and October 20, 2011 reports) were CCI-designed programs through which Everest Decatur paid employers to hire its graduates. Through these programs, variously called the "Cavalry Initiative" or "Everest Stands Behind Its Graduates Initiative," employers were promised $2,000 for each Everest graduate whom the employer hired between June 27 and August 31 with a pledge to retain them for 30 days. However, Everest Decatur was, in fact, knowingly counting placements that consistently offered nowhere near 30 days of employment, and were failing to provide the "sustainable" employment required by Everest Decatur's accreditor.

McKesson Institute
Everest Institute
Page 9

CCI's corporate office was substantially involved in designing and managing the Cavalry Initiative. That office developed and approved the "Local Employer Affiliation Agreement" in June 2011. Furthermore, on Monday, June 20, 2011, Robert Jehling, CCI's Director of Career Services, Everest South Division, sent an email to, among others, David Whiteford, CCI's President of Everest, South Division, Tony Rios, CCI's Regional Vice President of Operations, Barbara Holliman, CCI's President Everest Decatur, Toni Heuer, CCI's Director of Career Services, Southeast Region, Rose Horton, CCI's Regional Director of Career Services-East, and Wendy Cullen, CCI's Vice-President of Employer Development, with a subject line entitled "Decatur CS [Career Services] Project: Day 1 Recap." This email established cohort/project task teams, among them, Team #6, for local employer development. In the email, Jehling stated that the "Local Employer Development Incentive Defined and Completed."

The next day, Jehling authored an email to the same individuals with the subject line entitled "Decatur CS Project: Day 2 Recap." The email stated among other things that the "Staffing Agency subsidization models and Employer Development Subsidy models finalized and forwarded to CSC [CCI's Corporate Campus Support Center located in Santa Ana, California][14] for agreement drafting." The Department interviewed former Everest Decatur Career Services staff who indicated that over 300 Everest Decatur graduates were temporarily hired through incentivized-placement program.

However, after ACCSC voted to continue the show cause directive in December, 2011, expressing questions about Everest Decatur's reported improvement in its placement rates, CCI's corporate office prepared draft declarations in February 2012 for these staff members to sign. The declarations stated, among other things, that the employee had never been asked by "management or anyone at the School" to "engage in any acts that [the employee] would consider unethical, illegal, or contrary to any law, rule, regulation or School policy." The declarations further stated that the employee was "unaware of any improper conduct by any employee at the School." Former staff members told the Department that they were called individually to meetings with school management and CCI counsel, where they were told that staff who refused to sign a declaration would be terminated, while those who agreed to sign would receive a bonus. Several staff members told the Department that they refused to sign the affidavit because they could not truthfully represent that there had been no illegal or unethical conduct at the school, and that they were terminated because of their refusal.

In its Everest Statement, CCI defended its payments to employers by suggesting that they were a vehicle to secure "bona fide, sustainable position[s]" (Everest Statement at 10), alleging that its activities were similar to what certain law schools have done (see Everest Statement at 10-11), and claiming that they were implemented with the imprimatur of its accrediting agency's Executive Director. (*See* Everest Statement at 11, 12.)

Contrary to CCI's claims, the Department's investigation revealed that what students received through the school's employer-incentivized placement program bore no resemblance to bona

---

[14]CCI's Campus Support Center (CSC) is located in Santa Ana, California. According to a slide presentation by CCI in 2010, it is the operational base for CCI's Executive Offices, Legal Department, Human Resources, Finance/Accounting, Marketing, Curriculum, IT, Real Estate, Purchasing, Academic Affairs, Call Center, and Audit.

USA SOI 009

fide, sustainable positions. The Department reviewed "First Day Employment Confirmation" forms from employers taking part in such a program that CCI produced at the Department's request. These forms showed employers stating that Everest Decatur graduates were scheduled for less than half time, and often less than one day per week of employment at wages typically ranging from $8 to $11 per hour, and in many cases, the forms failed to list any hours scheduled per week or any rate of pay at all. (*See* JB00162946-00162958, JB00163173, JB00163197, JB00163230, JB00163241, JB00163263-64, JB00163281, JB00163283, JB00163299, JB00163323-24, JB00163330, JB00163349, JB00163362, JB00163366, JB00163377, JB00163381, JB00163395, JB00163404, JB00163410, JB00163416, JB00163420-21, JB00163423-24, JB00163426, JB00163429, JB00163435, JB00163477, JB00163521.[15]) These forms demonstrate that Everest Decatur knew from the outset that these students were not going to receive sustainable employment and resulted in CCI paying *more* money to the employers than the employers paid to Everest Decatur graduates. Nonetheless, CCI reported these students as properly placed to its accreditor and in its placement rate disclosures to students.

In addition, the Department has taken the testimony of more than 20 students who were allegedly placed in employment during this time. These students affirmed, without exception, that they either received no employment of any kind, or if they did obtain some minimal employment, it was often unpaid, and lasted, if at all, for a matter of days, if not mere hours.[16] (Enclosure A.[17]) Notably, all these students' placements were included by CCI in its final submissions to ACCSC regarding its July 2011 report date cohort or its January 2012 report date cohort.

CCI also claimed that certain law schools have also paid part of their first-year graduates' salary. *See* Everest Statement at 10-11. CCI's source for this argument is an article in the Economist, which criticized that practice to the extent that in some cases it may not have resulted in employment that lasted longer than *one* year. (Everest Statement, Exhibit 4 (from "The Price of Success," *The Economist,* March 15, 2014).) Here, of course, CCI's efforts were purportedly designed to seek employment for a mere 30 days, and, as described above, in actuality secured far less than that. Thus, CCI's employer initiatives compare unfavorably to the law schools' programs, which themselves are the subject of criticism for masking the actual employment challenges law school graduates face.[18]

---

[15] These numbers represent Bates stamp numbers on documents CCI produced in response to a subpoena from the Office of the Inspector General of the Department.

[16] Everest Decatur graduates stated, among other things, that while they may have interviewed for jobs that Everest Decatur's documents represent they obtained, they were not hired; that they sat at a table at a single Health Fair for two days, did no work, and were not paid; that they were sent to one doctor's office for two days but never received another assignment despite their pleas for work; and that they met a contractor who took them to houses to remove siding and carpet, but did not bother to show on the third day. And, yet, although CCI claimed to have carefully scrubbed its placement reports to remove all invalid placements, its reports thus remain replete with students whom Department staff interviewed and for whom no sustainable employment ever occurred.

[17] Enclosure A consists of a summary of the testimony provided by former Everest Decatur students who CCI reported to ACCSC as properly placed compared to the claim offered by CCI regarding their employment status.

[18] *See* "The Price of Success," *id.; see also* "The Law-School Scam," *The Atlantic,* September, 2014, 62, 65 (Regarding the practice of some law schools to pay for short-term jobs for their first-year graduates, "[i]n essence,

Everest Institute
Page 11

Finally, as for ACCSC's alleged support of these initiatives, CCI has produced no proposals that it provided to its accreditor or written approvals that it received. In contrast to CCI's claim that these initiatives were supported by ACCSC's Executive Director, that individual advised the Department that while he may have had a single, brief, verbal exchange with CCI in this regard, at no time did he or ACCSC give its consent to CCI's employer initiatives, and ACCSC never was presented with any such proposals to evaluate. CCI's indication to the contrary is misleading, and its claim that ACCSC's Executive Director "was supportive of the idea and even provided suggestions for improvement, which the institution incorporated" (Everest Statement at 11), is contradicted by ACCSC itself.[19]

Notably, CCI made no mention of these initiatives in its April 4, 2012 response to ACCSC. The explanation CCI offered for its previous falsely reported placements at three schools in the Atlanta area[20] was that: "[i]n December 2009, CCI instituted a company-wide incentive program for Career Services employees." CCI stated that it "believed that such an incentive program could be appropriately implemented and did not anticipate rogue employees circumventing these controls and behaving inappropriately." CCI claimed that "on June 30, 2011, the financial incentive program …ended and by this date other changes were made to CCI's internal controls to prevent the reoccurrence of improper behavior."

Title IV regulations define misrepresentation as, among other things, any false, erroneous or misleading statement an eligible institution makes directly or indirectly to a student, prospective student or any member of the public, or to an accrediting agency, to a State agency, or to the Secretary. A misleading statement includes any statement that has the likelihood or tendency to deceive. 34 C.F.R. § 668.71(c) (definition of "misrepresentation"). A substantial misrepresentation is any misrepresentation on which the person to whom it was made could reasonably be expected to rely, or has reasonably relied, to that person's detriment. 34 C.F.R. § 668.71(c) (definition of "substantial misrepresentation.") An eligible institution is deemed to have engaged in substantial misrepresentation when the institution makes a substantial misrepresentation about the nature of its educational program, its financial charges, or the employability of its graduates. 34 C.F.R. § 668.71(b). The Department has determined that CCI's statements made in its responses to ACCSC's show cause orders and in its Annual Reports to ACCSC constituted substantial misrepresentations to its accreditor regarding the employability of its graduates.

---

the schools are requiring current students to fund temporary jobs for new graduates in order to produce deceptive employment rates that will entice potential future students to enroll.").

[19] In a conversation with the Department on August 6, 2014, ACCSC's Executive Director, Michale McComis, stated that when the notion of paying employers to facilitate placements was raised by CCI on one occasion, the idea was "fairly inchoate." He stressed that there was nothing formally presented which he could evaluate, nor was ACCSC ever asked to opine on a specific proposal. Mr. McComis' only advice was that before any such incentive program was adopted, CCI would need to show that the program was "unassailable," "thoroughly documented," and "capable of satisfying any scrutiny." (CCI never provided ACCSC with such documentation.) Mr. McComis also stated that he was unaware of any other institution that ACCSC accredited that had adopted a program to pay employers to place its students.

[20] The third school is the Everest College located in Marietta, GA, along with Decatur and Jonesboro.

**B. Everest Institute misrepresented job placement rates to current and prospective students.**

Effective July 1, 2010, an institution must make available to any enrolled or prospective students through appropriate publications, mailings, or electronic media, information concerning the placement of, and types of employment obtained by, graduates of the institution's degree or certificate programs. 34 C.F.R. § 668.41(d)(5). The information may be gathered from the institution's placement rate for any program, if it calculates such a rate, or other relevant sources. 34 C.F.R. § 668.41(d)(5)(i). The institution must identify the source of the information, as well as any timeframes and methodology associated with it. 34 C.F.R. § 668.41(d)(5)(ii). The institution must disclose any placement rates it calculates. 34 C.F.R. § 668.41(d)(5)(iii). An institution may satisfy the requirement to disclose the information required under 34 C.F.R. § 668.41(d) to enrolled students by posting the information on an internet website or an intranet website that is reasonably accessible to the individuals to whom the information must be disclosed; and to prospective students by posting the information on an internet website. 34 C.F.R. §§ 668.41(b)(1) and (2).

In addition, beginning July 1, 2011, an institution that offers an educational program that prepares students for gainful employment in a recognized occupation, and that is required by its accrediting agency or State to calculate a placement rate on a program basis, must disclose the rate and identify the accrediting agency or State agency under whose requirements the rate was calculated. 34 C.F.R. § 668.6(b). The institution must include the information required under 34 C.F.R. § 668.6(b)(1) in promotional materials it makes available to prospective students and post this information on its website, prominently provide the information in a simple and meaningful manner on the home page of its program web site, and provide a prominent and direct link on any other Web page containing general, academic, or admissions information about the program to the single Web page that contains all the required information. 34 C.F.R. § 668.6(b)(2). All of Everest Decatur's programs were subject to the provisions of 34 C.F.R. § 668.6(b).

Further, by entering into a PPA with the Department, an institution agrees, among other things, that:

> In the case of an institution that advertises job placement rates as a means of attracting students to enroll in the institution, it will make available to prospective students, at or before the time that those students apply for enrollment…the *most recent* available data concerning employment statistics, graduation statistics, and any other information necessary to substantiate the truthfulness of the advertisements; and…relevant State licensing requirements of the State in which the institution is located for any job for which an educational program offered by the institution is designed to prepare those prospective students.

34 C.F.R. § 668.14(b)(10) (emphasis added).

Everest Institute consistently ignored this essential requirement of its Title IV eligibility. Although it had warranted that it would provide prospective students with the "most recent

Mc Jack Massimino
Everest Institute
Page 13

available [placement] data" in order to become eligible to participate in the Title IV programs, it failed to do so. Everest Institute thus demonstrated that its Title IV eligibility must not continue.

With its Everest Statement, CCI claimed that Everest Institute should not be held responsible for meeting its contractual and regulatory responsibilities because ACCSC mandated that Everest Institute repeatedly update its placement rates, which would have been "unduly burdensome" to share with its students. (Everest Statement at 15.) CCI further stated that the provision of updated information to Everest Institute's students would have been "misleading and confusing" because its placement rates were in such a constant state of flux. (*Id.*) These arguments are without merit.

The language in the regulations and the PPA is without ambiguity. It is undisputable that most institutions need only provide an update to students regarding placement rates on an annual basis because they have not been cited by their accrediting agency or state licensing body for inaccuracies or falsifications regarding such rates, or for rates that fall below the required standards. The fact that Everest Decatur's accreditor required it to do more because of its unacceptable performance does not exempt it from its federal legal requirements. If anything, Everest Decatur's "long history of poor student achievement rates"-- as ACCSC noted in December 2010 -- created a heightened need for Everest Institute to be robust with its student disclosures.

To suggest that students would be confused by changing rates is equally perplexing as long as the applicable reporting period for the rates was accurately identified. Contrary to CCI's suggestion, it can be expected that the more information current, and especially prospective, students received regarding Everest Decatur's placement rates, the better positioned they would have been to evaluate the potential worth of the training and better able to make meaningful determinations concerning whether to enroll, or to continue enrollment, in their program of instruction. Surely, it was much more "misleading and confusing" for students to act in reliance upon placement numbers that CCI acknowledges were incorrect.

In particular, Everest Decatur's 2010 Annual Placement Disclosure provided the following placement rates, and stated that they were the most recent placement statistics submitted to ACCSC.

| Programs | Placement |
|---|---|
| Dialysis Technician (8 months) | 52% |
| Massage Therapy (9 months) | 78% |
| Medical Administrative Assistant (8 months) | 73% |
| Medical Assisting (8 months) | 77% |
| Medical Insurance Billing and Coding (8 months) | 66% |
| Electrical (9 months) | N/A |
| RHVAC (9 months) | N/A |
| Respiratory Care (24 months) | N/A |

Mr. Jack Massimino
Everest Institute
Page 14

| | |
|---|---|
| Respiratory Care (21 months) | 57% [21] |

As set forth above, however, on October 11, 2011, CCI informed ACCSC that it had revised these placement rates as a result of an internal review necessitated by an investigation by the Department's Office of Inspector General that had disclosed "questionable placements of the same nature as discovered at the Jonesboro campus." As previously noted, the Jonesboro campus is another CCI Everest institute in the Atlanta, Georgia area. Although the placement rate for the Everest Decatur Medical Insurance Billing and Coding program decreased from 66% to 54%, the placement rate for the Medical Administrative Assistant program decreased from 73% to 36%, and the placement rate for the Medical Assistant program decreased from 77% to 54%, no indication exists that Everest Decatur disclosed *any* of these revised rates to prospective or enrolled students.

On or about July 1, 2011, CCI published "Program Integrity Rate (PIR) Disclosures" on Everest Decatur's website, as required by 34 C.F.R. § 668.6(b)(iv). These Disclosures reported the following employment rates:

| Program | Employment Rate |
|---|---|
| Dental Assistant | N/A |
| Medical Admin Assistant | 70% |
| Medical Assistant | 67% |
| Med. Insurance Billing/Coding | 80% |
| Electrician | N/A |
| HVAC | N/A |

The Disclosures on CCI's website for Everest Decatur displayed rates that were inaccurate, inflated, and out of date. Specifically, as of July 1, 2011, the most recent rates that Everest Decatur had calculated and reported to ACCSC for the Medical Assistant, Medical Administrative Assistant, and Medical Insurance Billing and Coding programs were 45%, 48%, and 60%, respectively, which were materially less than those reported in the website Disclosure. These Disclosures also did not reveal the 41% rate already calculated by Everest Decatur for the HVAC program and the 54% rate for the Electrician program. Rather, Everest Decatur put "N/A" for those programs, as if the programs had not been in existence long enough for a rate to be calculated. This was a material misrepresentation.

Furthermore, although Everest Decatur was required to disclose the time frames and methodology used to arrive at its reported rates, it provided only general information in the Disclosures. Specifically, a footnote in the Disclosures stated that ACCSC outcomes are calculated by program length, and by tracking start cohorts from their start date through graduation; and that to determine the cohort date range, the ACCSC calculation counts

---

[21] In a Deferral Response that CCI submitted through Pan Fuchs to ACCSC, dated March 19, 2010, and using a February 2010 report date, CCI identified placement rates for Everest Decatur's Respiratory Care (21 month), Medical Insurance Billing and Coding, and Massage Therapy programs of 64%, 58%, and 47%, respectively. These percentages were more recent than the 2009 Annual Report placement rates for these programs, which were calculated using a July 2009 report date, and were used in Everest Decatur's 2010 Annual Placement Disclosure.

backwards from the report date as follows: program length times 1.5 plus 3 months for placement activity. However, because, among other things, the report date used in the Everest Decatur Disclosure was not specified, the Disclosure failed to identify the timeframe with sufficient clarity. For instance, using a July 2011 report date for the 8-month Medical Administrative Assistant program, the cohort of students are those who began their educational programs between April 2009 and March 2010. Current students and prospective students could not reasonably determine this fact based only upon the information in the Disclosure.

Everest Decatur also failed to disclose placement rates calculated subsequent to July 1, 2011 to its students. Because Everest Decatur failed to adequately disclose the timeframe for which it calculated the placement rate, the fact that the rates shown in Everest Decatur's July 1, 2011 PIR Disclosure were outdated, and no longer accurate, was not apparent. Everest Decatur should have updated its placement rate disclosures within a reasonable time after the employment rates were calculated and submitted to ACCSC, but it did not. Although CCI has stated that it did not update Everest Decatur's placement rate disclosures because of its decision to close Everest Decatur, as there were no longer any prospective students at the school, Everest Decatur did not cease enrolling students until February 29, 2012. Further, 34 C.F.R. § 668.14(b)(10) and 34 C.F.R. § 668.41(d) require disclosures of the *most recent* placement rates to not only prospective, but also to *current* students.

CCI's failure to update the required PIR Disclosures was not limited to Everest Decatur. The Department's review of the program disclosures for Everest Institute's main location in Cross Lanes and at Everest Eagan, revealed that Everest Institute's PIR Disclosures for July 1, 2013 reported exactly the same placement rates as those reported in its July 1, 2012 PIR Disclosures.

As stated in section A, the Title IV regulations define a substantial misrepresentation as any misrepresentation on which the person to whom it was made could reasonably be expected to rely, or has reasonably relied, to that person's detriment. 34 C.F.R. § 668.71(c) (definition of "substantial misrepresentation"). The Department has concluded that current and prospective students of CCI could reasonably be expected to rely to their detriment upon CCI's statements identified here, because those statements overstated the employment prospects for graduates of Everest Institute's programs. Therefore, the Department has determined that these statements constituted substantial misrepresentations by Everest Institute.

*****

If the Secretary determines that an eligible institution has engaged in substantial misrepresentation, the Secretary may, among other things, deny an institution's application for recertification. 34 C.F.R. § 668.71(a)(3). Pursuant to this authority, because of Everest Institute's substantial misrepresentations to its accreditor and to current and prospective students described above, the Department has determined to deny Everest Institute's application for recertification to participate in the Title IV, HEA programs. [22]

---

[22] In an email dated August 13, 2014, Linda Buchanan, CCI Vice President for SFA Compliance, notified the Department of twelve CCI institutions that failed the requirement that they generate at least 10% of their revenue from non-Title IV student aid sources (the "90/10 requirement") for the fiscal year ended June 30, 2014, including a

Through its misrepresentations to ACCSC and students, Everest Institute has failed in its fiduciary duty to the Department.[23] Everest Institute and CCI also failed to correct CCI's and Everest Institute's placement rate disclosures to students, as described above. This had a direct impact upon the Title IV funds received by Everest Institute, and many students are now without the jobs they were led to believe they would get when they enrolled in Everest Institute.

CCI has argued that the "[u]se of years-old information relating to a branch campus closed eighteen-months ago" is "inappropriate and contrary to the regulations" and does not justify the decertification at issue in this letter. Letter from Jack Massimino, CCI, to Robin Minor, FSA, dated July 31, 2014, and accompanying CCI's Everest Statement. CCI further describes what it claims to be substantial improvements in its placement verification processes that it states it has been making since 2005. However, the Title IV regulations require that an institution "must *at all times* act with the competency and integrity necessary to qualify as a fiduciary." 34 C.F.R. § 668.82(a) (*emphasis* added.) When it fails to do so, even for a discrete period, it forfeits its opportunity to remain a Title IV eligible institution. Thus, the fact that CCI claims that it has improved its behavior, even if true, would not affect the need to deny recertification based upon the violation of the fiduciary standard of conduct at a previous time. Furthermore, given the extensive investigation that is required to reveal deceptive practices of this nature, the Department's findings will always apply to a prior period of time. In this case, that period of time extends at least as recently as 2012. The Department will not look away from such findings merely because the responsible party claims that it has now mended its ways.

Should Everest Institute have factual evidence to dispute the Department's findings, and demonstrate their inaccuracy, Everest Institute may submit that evidence via overnight mail to me at the following address:

> Administrative Actions and Appeals Service Group
> U.S. Department of Education
> Federal Student Aid/Program Compliance
> 830 First Street, NE (UCP-3, Room 84F2)
> Washington, DC  20002-8019

---

report that Everest Institute Cross Lanes failed the 90/10 requirement for the second consecutive year. The consequences of the reported second consecutive 90/10 failure for this institution will be addressed in a separate letter.

[23] The Department notes that Everest Institute and CCI did not voluntarily inform the Department of what happened at Everest Decatur or any other Everest campus with respect to false placements. *See* 34 C.F.R. §§ 668.6(b)(1)(iv), 668.14(b)(10), 668.41(d)(5), and 34 C.F.R. Part 668, Subpart F. Instead the Department has had to piece together events through required document production and subpoenas issued against CCI. Although CCI has continued to assert that it "self-reported" its placement abuses (*see, e.g.*, Everest Statement at 1, 18), CCI has provided no evidence to corroborate its assertion that an initial disclosure was made to the Department's Office of the Inspector General (the "OIG") pursuant to a "presentation" on August 26, 2011. The OIG was unable to locate any records of such a presentation. The closest thing to a "previous disclosure" the Department can identify is a letter from CCI's counsel to the OIG and the U.S. Attorney's Office in Atlanta, Georgia dated March 16, 2012, in response to an OIG subpoena. Even self-reporting would not excuse the multiple misrepresentations detailed in this letter; furthermore, assertions of "self-reporting" ring hollow if the Department was only advised of Everest Decatur's malfeasance after its suspect records were demanded.

USA SOI 016

Case 2:13-cv-01697-KJM-KJN    Document 94-1    Filed 09/15/17    Page 20 of 157

This denial of recertification is effective August 31, 2014.[24]  If Everest Institute chooses to submit material for the Department's consideration, it must be received within two weeks of the date of this letter.  Any such material will be reviewed by the Department, and Everest Institute will be notified whether the recertification denial will be modified, rescinded, or left in place.  If the denial of recertification is left in place, the San Francisco/Seattle School Participation Division will then contact you concerning the proper procedures for closing out Everest Institute's Title IV, HEA program accounts.

In the event that Everest Institute submits an application to participate in the Title IV, HEA programs in the future, that application must address the deficiencies noted in this letter.  If you have any questions about this letter, you may contact Kathleen Hochhalter at (303) 844-4520.

Sincerely,

Mary E. Gust
Director
Administrative Actions and Appeals Service Group

Enclosure

cc:    Michale S. McComis, Executive Director, ACCSC, via mccomis@accsc.org
       Larry Pogemiller, Commissioner, Minnesota Office of Higher Education, via
       larry.pogemiller@state.mn.us
       Clarence Pennington, Chair, WV Council for Community and Technical College
       Education
       Bill Crews, Executive Director, Georgia Nonpublic Postsecondary Education
       Commission, via billc@npec.state.ga.us

---

[24] Note that, due to Everest Institute's recently admitted failure of the 90/10 requirement for two consecutive fiscal years, the effective date of the institution's loss of eligibility to participate in the Title IV, HEA programs is July 1, 2014.  The Department will establish this effective date through a separate letter the Department will send to CCI regarding the consequences of its 90/10 failure.

USA SOI 017



April 14, 2015

Jack D. Massimino                                    UPS Tracking #
President/Chief Executive Officer                    1ZA879640192788623
Corinthian Colleges, Inc.
6 Hutton Circle Drive, Suite 400
Santa Ana, CA  92707

RE: Notice of Intent to Fine Heald College, OPE-ID:  00723400

Dear Mr. Massimino:

This is to inform you that the United States Department of Education (Department) intends to fine Heald College, San Francisco, California, $29,665,000 based upon the violations set forth in this letter. Heald College participates in the federal student financial assistance programs authorized under Title IV of the Higher Education Act of 1965 (HEA), as amended, 20 U.S.C. §§ 1070 *et seq.* and 42 U.S.C. §§ 2751 *et seq.* (Title IV, HEA programs). The Department is taking this fine action pursuant to 20 U.S.C. § 1094(c)(1)(F) and 34 C.F.R. § 668.84.

This fine action is based upon the results of the Department's analysis of documentation submitted by Heald College's owner, Corinthian Colleges, Inc. (CCI), to the Department regarding Heald College's placement rates, and upon the findings of a program review conducted by the San Francisco-Seattle School Participation Division at Heald College's Stockton location and Heald College's Salinas location. As discussed in detail below, the Department's findings demonstrate that Heald College failed to meet the fiduciary standard of conduct by misrepresenting its placement rates to current and prospective students and to its accreditors, and by failing to comply with federal regulations requiring the complete and accurate disclosure of its placement rates. Therefore, as described below, I have determined that due to the serious violations committed by Heald College, a fine in the amount of $29,665,000 is warranted.

## HEALD COLLEGE FAILED TO ADHERE TO A FIDUCIARY STANDARD OF CONDUCT

On January 4, 2010, CCI purchased the Heald chain of schools (Heald), which then participated in the Title IV, HEA programs as individual entities with their own OPE–ID numbers.[1] The Heald chain comprised Heald Concord (OPE-ID 02187500); Heald Fresno (OPE-ID 00809300); Heald Hayward (OPE-ID 00853200), with additional location Heald Modesto (OPE-ID 00853202); Heald Milpitas (San Jose) (OPE-ID 02593200); Heald Rancho Cordova (OPE-ID

---

[1] The OPE-ID is the institution's Office of Postsecondary Education Identification Number. This is an eight-digit number assigned to an institution upon application to participate in Federal Student Aid programs. It is used throughout multiple systems to identify a school entity (the first six digits) and its individual locations (the last two digits).



Jack D. Massimino
Corinthian Colleges, Inc.
Page 2

00747700); Heald Roseville (OPE-ID 02593100); Heald Salinas (OPE-ID 03034000); Heald San Francisco (OPE-ID 00723400), with additional locations Heald Honolulu (OPE-ID 00723401) and Heald Portland (OPE-ID 00723402); and Heald Stockton (OPE-ID 02593300). Heald and the Department executed temporary Program Participation Agreements (PPAs) for each of the Heald schools, effective February 22, 2010, and upon the Department's approval of CCI's application for ownership, executed provisional PPAs for each of these schools, effective May 4, 2010. On June 24, 2013, Heald and the Department executed Heald College's current provisional PPA, which merged the participating Heald schools into one participating entity under OPE-ID 00723400. Hereinafter in this letter, "Heald College" and "Heald" are used interchangeably to refer to the Heald chain of schools before and after the Department's approval of the merger.

By entering into a PPA with the Department, an institution and its officers accept the responsibility to act as fiduciaries in the administration of the Title IV programs. As fiduciaries, an institution and its officers are subject to the highest standard of care and diligence in administering the Title IV, HEA programs. 34 C.F.R. §§ 668.82(a) and (b). In order to meet its fiduciary responsibilities to the Department, an institution must comply with all Title IV statutory and regulatory requirements. 34 C.F.R. § 668.16(a). As described below, Heald College and its officers have failed to adhere to a fiduciary standard of conduct with regard to the calculation and disclosure of its job placement rates.

## HEALD COLLEGE FAILED TO COMPLY WITH THE REGULATIONS GOVERNING DISCLOSURE OF ITS JOB PLACEMENT RATES

Effective July 1, 2010, institutions participating in the Title IV, HEA programs are required to make available to enrolled or prospective students, through appropriate publications, mailings, or electronic media, information concerning the placement of, and types of employment obtained by, graduates of the institution's degree or certificate programs. 34 C.F.R. § 668.41(d)(5). The information can be gathered from the institution's placement rate for any program, if it calculated such a rate, or other relevant sources. 34 C.F.R. § 668.41(d)(5)(i). The institution is required to identify the source of the information, as well as any timeframes and methodology associated with it. 34 C.F.R. § 668.41(d)(5)(ii). An institution is required to disclose any placement rate it calculates. 34 C.F.R. § 668.41(d)(5)(iii). An institution may satisfy the requirement to disclose the information required under 34 C.F.R. § 668.41(d) to enrolled students by posting the information on an internet website or an intranet website that is reasonably accessible to the individuals to whom the information must be disclosed; and to prospective students by posting the information on an internet website. 34 C.F.R. §§ 668.41(b)(1) and (2). Note that this regulatory provision applies to all types of institutions, not simply those which offer "gainful employment" programs.

All of Heald College's programs are gainful employment programs subject to the provisions of 34 C.F.R. § 668.6(b). Beginning July 1, 2011, an institution that offers an educational program that prepares students for gainful employment in a recognized occupation, and that is required by its accrediting agency or State to calculate a placement rate on a program basis, must disclose the rate and identify the accrediting agency or State agency under whose requirements the rate was

USA SOI 019

Jack D. Massimino
Corinthian Colleges, Inc.
Page 3

calculated. 34 C.F.R. § 668.6(b). The institution must include the information required under 34 C.F.R. § 668.6(b)(1) in promotional materials it makes available to prospective students, post this information on its website, prominently provide the information in a simple and meaningful manner on the home page of its program website, and provide a prominent and direct link on any other Web page containing general, academic, or admissions information about the program to the single Web page that contains all the required information. 34 C.F.R. § 668.6(b)(2).

By entering into a PPA with the Department, an institution agrees, among other things, that:

> In the case of an institution that advertises job placement rates as a means of attracting students to enroll in the institution, it will make available to prospective students, at or before the time that those students apply for enrollment…the most recent available data concerning employment statistics, graduation statistics, and any other information necessary to substantiate the truthfulness of the advertisements; and…relevant State licensing requirements of the State in which the institution is located for any job for which an educational program offered by the institution is designed to prepare those prospective students.

34 C.F.R. § 668.14(b)(10).

On January 23, 2014, the Department sent a letter to CCI in which the Department requested that CCI provide a copy of school performance disclosure documents for every CCI location, including Heald College institutions, for the calendar years 2010, 2011, 2012, and, when available, 2013. The Department also asked that CCI provide the evidence upon which CCI relied to derive each of the placement rates cited in the disclosures, including a list of all students either placed or omitted from the placement calculation due to any type of waiver, and the academic, employment, and/or waiver information specified by the Department. The Department provided CCI 30 days to submit the required documentation and information, and sent reminder letters to CCI on April 11, 2014, April 22, 2014, May 13, 2014, June 12, 2014, July 23, 2014, and August 25, 2014.

Eventually, in its responses to the Department's requests, CCI assured the Department that CCI and its institutions "take pains to track and accurately report job placements." Letter to Martina Fernandez-Rosario and Gayle Palumbo, p. 2 (Apr. 15, 2014). CCI stated that, because many of its institutions' institutional and programmatic accreditors required annual reporting of placement outcomes in order to measure the school's or program's outcomes against a benchmark, CCI and its institutions had developed a robust process to confirm, and re-verify, the accuracy of the reported placement results. CCI represented that it went to great lengths in an effort to ensure that its internal and external reporting of placement statistics was accurate and reliable. *Id. See also* Letter to Robin Minor, p. 2 (February 11, 2014), Letter to Charles Engstrom (Feb. 1, 2013). Despite CCI's representations, the Department has found that CCI and Heald College failed to fully and accurately disclose its placement rates and the methodology used to calculate them in its school performance disclosure documents.

USA SOI 020

Jack D. Massimino
Corinthian Colleges, Inc.
Page 4

1. **Heald College's placement rate disclosures omitted essential and material information concerning the methodology Heald used to calculate the rates.**

In response to the Department's requests for Heald College's school performance disclosure documents and backup documentation, CCI provided, for each of its institutions, documents entitled "2010 Annual Placement Disclosure," documents entitled "Program Disclosures," carrying an effective date of July 1, 2011, and documents entitled "Program Disclosures," carrying a publication date of July 1, 2012.

In the documents entitled "2010 Annual Placement Disclosure," which had neither a publication date nor an effective date, each Heald institution disclosed that, because it was accredited by the Accrediting Commission for Community and Junior Colleges of the Western Association of Schools and Colleges (WASC-Jr), and WASC-Jr had no prescribed placement rate methodology, it was the institution that determined the formula used to calculate its placement statistics. These disclosures each stated that the placement rates reported therein were the placement statistics for the most recent complete calendar year, and that Heald outcomes are calculated by calendar year, tracking graduate cohorts from January 1-December 31. These disclosures also stated that employment is calculated by taking the total number of graduates placed in the field and dividing this number by the total number of graduates less the number of graduates deferred for employment because of continuing education, military, health, incarceration, moving outside of the U.S., non-citizenship, or death.

Heald College also provided for each institution documents entitled "Program Disclosure," carrying an effective date of July 1, 2011, which affirmatively stated that the program disclosures contained therein were provided pursuant to federal regulations, effective July 1, 2011. These Program Disclosures also stated, in a footnote entitled "Institutional Accreditor," that, because WASC-Jr had no prescribed methodology for calculating placement outcomes, the methodology used was at Heald's discretion. In each case, the Program Disclosure stated that placement rates were calculated as follows: "Heald College placement rate is calculated by taking the total graduates placed in the field, divided by the total number of graduates, minus graduates deferred for employment because of continuing education, military, health, incarceration, moving outside of the U.S., ineligibility to work in the U.S., or death. Time Frame: the cohort used are those graduates of a calendar year. Employment statuses are recorded up until June 30th of the following year." These Program Disclosures also stated that "Placement Rate NA" meant that there was no data to disclose because the program was too new or the placement rate was not required to be calculated.

Heald College further provided for each institution Program Disclosures with a publication date of July 1, 2012, which similarly stated that the program disclosures contained therein were being provided pursuant to federal law. These Program Disclosures also represented, in a footnote entitled "Institutional Accreditor," that because WASC-Jr had no placement rate methodology, Heald College determined the placement rates. These Program Disclosures stated that Heald determined its placement rates by taking the total graduates placed in the field, divided by the total number of graduates, minus graduates deferred for employment because of continuing education, military, health, incarceration, moving outside of the U.S., ineligibility to work in the

USA SOI 021

Jack D. Massimino
Corinthian Colleges, Inc.
Page 5

U.S., or death; that the cohort used was the graduates of a calendar year; and that the employment statuses were recorded up until June 30th of the following year.

The Department has determined that in late 2013, Heald College switched to a web-based placement disclosure format. The web-based disclosures Heald College posted on its website contained the following language: "The job placement rate for students who completed this program in 2012-2013 is [] %." The placement rate disclosures also contained a link that stated "For further information about this job placement rate, click here." The link led to the following box:



After review of Heald's program disclosure documents and backup documentation, the Department has determined that Heald omitted from its school performance disclosure documents essential and material information concerning the timeframe and methodology used to determine its placement rates. Even more serious, Heald did not adhere to the methodology that it did set forth in those disclosures.

a. **Heald College failed to disclose in its 2013/2014 web-based disclosures that its placement rates excluded students it classified as having deferred employment.**

The Department has determined that Heald's 2013/2014 web-based placement disclosures[2] failed to disclose that students whom the institution deemed to have deferred employment were excluded from the placement rate calculations. This information was material, and Heald College's omission of it was misleading, because the supporting documentation provided by Heald disclosed that Heald in fact classified high percentages of its graduates as having deferred employment. The Department has determined that Heald represented with regard to many of its programs that it placed 100% of its graduates in jobs, when in fact many of the graduates decided to continue their education, or been determined by Heald to be unavailable for employment prior to the end of the tracking period for one reason or another. For instance, Heald Portland's disclosure for the Criminal Justice AA program stated that the placement rate was 100%. And

---

[2] Heald College updated its web-based placement disclosures in early 2014.

Jack D. Massimino
Corinthian Colleges, Inc.
Page 6

yet 58% of the graduates for that program were unavailable for employment. The Department has concluded that Heald's failure to disclose the exclusion of students determined to have deferred employment in its 2013/2014 web-based disclosures was particularly egregious because Heald disclosed this aspect of its methodology in its prior placement rate disclosure documents and thus clearly understood how to properly describe its methodology.

**b. Heald College falsely represented in its 2013/2014 web-based disclosures that its placement rates were supported by attestations.**

In its 2013/2014 web-based disclosures, Heald College stated in answer to the question, "How were completers tracked," that "confirmation of graduate employed is obtained from the employer and/or graduate via attestation." The Department's review of Heald College's backup documentation, however, revealed that this was not the case. In many instances, the only documentation Heald produced to substantiate the graduate's employment consisted of a standardized Heald form, HC-CSV-120, with a section entitled "Employment Validation and Verification Contact Info," which was signed only by Heald College Career Services personnel and did not document any attestation by the employer or the student. In other instances, the only documentation provided was a screen shot from Heald's CampusVue system purportedly representing that the student had been placed.

**c. Heald College failed in all of its placement rate disclosures to identify with specificity the cohort whose results were being reported.**

In the 2013/2014 web-based placement disclosures, Heald stated that the report covered "....students who completed the program in 2012-2013," then indicated in its answer to the question, "Who is included in the calculation of this rate?," that the cohort consisted of "Graduates through 6/30/13 placed in field." And then, in answer to the question, "When were the students employed," stated, "Schools can place graduates until June 30th for graduates of the preceding calendar year." It is not possible to discern from these statements the beginning and ending dates of the cohort of Heald graduates whose results were being tracked and reported in the disclosure.

The same is true with regard to Heald College's July 1, 2011 and July 1, 2012 Program Disclosures, and its 2010 Annual Placement Disclosure. In particular, although the timeframe specified is a calendar year, none of these disclosure indicates *which* calendar year's graduates were being covered in the disclosure. This is in contrast to the descriptions in the July 1, 2011 and July 1, 2012 Program Disclosures regarding the programmatic, as opposed to institutional, placement rates disclosed in those documents. For example, the July 1, 2012 Program Disclosure specified, with respect to the placement rates calculated for the Commission on Accreditation of Allied Health Education Programs (CAAHEP)/Medical Assisting Education Review Board (MAERB), a timeframe of July 1, 2009 through June 30, 2010, and the July 1, 2011 Program Disclosure specified, with respect to the placement rate calculated for the Commission on Dental Accreditation (CODA), that the most recent statistics covered those students who were scheduled to complete their programs in 2009.

USA SOI 023

Jack D. Massimino
Corinthian Colleges, Inc.
Page 7

> d. **Heald College failed in all of its placement disclosures to state that it counted as placed graduates whose employment began prior to graduation, and in some cases even prior to the graduate's attendance at Heald.**

The Department has determined that in all of its placement disclosures, Heald failed to disclose that it counted as placed graduates who had obtained their jobs prior to graduation from the school, and in some cases, graduates who had obtained their jobs prior to the date they commenced their studies at Heald. With respect to the 2013/2014 web-based disclosures, Heald referred only to "Graduates…placed in the field" and "completers hired for jobs within the field." Similarly, in the July 1, 2011 and July 1, 2012 Program Disclosures, Heald referred only to the "percentage of graduates securing employment" and the "total graduates placed in the field."

The fact that Heald counted graduates who had obtained their employment prior to graduation as having been "placed" by the institution in its placement rates is material, and omission of this information is therefore misleading, because it is an indication that a Heald credential may not have been necessary in order for the graduate to secure the employment used to categorize the individual as having obtained employment in the field. The Department thus considers these placement rates to be false and misleading statements. *See* 34 C.F.R. § 668.71(c) (definition of "misrepresentation").

Of additional concern, however, is that the Department's review of Heald's backup documentation disclosed that while some previously-employed Heald graduates signed documents indicating that they were waiving placement assistance because they were already working in the field, other previously-employed graduates' placement documents simply reflected verification by Heald Career Service personnel of the student's employment, with no indication that the students had waived placement services and were content with their prior job. Of even more concern is that follow-up interviews conducted with some of the previously-employed graduates revealed that although Heald staff made cursory notations on the employment validation forms to support their conclusion that the graduates were employed in the field, the graduates' jobs were not related to their field of study, nor had the students received promotions or increased responsibilities or otherwise progressed in those jobs because of their Heald education.

The number of graduates who obtained the jobs used to characterize them as placed prior to graduation was considerable and therefore also material to the placement rates. The Department's analysis of Heald's backup documentation revealed that, according to CCI's own data for 2012 graduates, over one-third (33.8%) of the graduates reported to have been "placed in field" started their jobs prior to January 1, 2012, and over one-quarter (25.5%) started their jobs prior to January 1, 2011.

> e. **Heald paid temporary agencies to hire its graduates to work at unsustainable temporary jobs at its own campuses and counted these graduates as placed.**

Jack D. Massimino
Corinthian Colleges, Inc.
Page 8

Follow-up interviews conducted with Heald graduates in order to determine the accuracy of
Heald's reported placement rates and supporting documentation revealed that in some instances,
Heald paid temporary agencies to hire Heald graduates and place them at temporary jobs at
Heald locations, in order to allow Heald to falsely and misleadingly count these graduates as
placed in their field of study in its placement rate disclosures. Heald failed to disclose this
information when it published its placement rates, and the Department considers this to be a
misleading statement that has the likelihood or tendency to deceive. 34 C.F.R. § 668.71(c)
(definition of "misrepresentation").

In particular, the Department determined that during 2011, Heald paid agencies named Aerotek
and Ultimate Staffing to place ten graduates from Heald's IT-Network Systems Administration
(IT-NSA) programs in brief, temporary positions at its Fresno campus. Heald then counted these
graduates as "placed in field" in its placement statistics. These ten graduates represented 35% of
the total 28 graduates of the IT-NSA program at Fresno that Heald represented were placed in
field. When interviewed, one of these graduates confirmed that he was employed for just two
days moving computers, organizing cables, and replacing network cables, and another graduate
confirmed that Aerotek employed him for less than two weeks.

   f.  **Heald College counted placements that were clearly out of the student's field, as in-
       field placements in its placement statistics.**

Although Heald claimed in all of its placement rate disclosures that the students reported as
placed were employed in their field of study, the Department has determined through student
interviews that in fact, Heald routinely and misleadingly characterized out-of-field placements
jobs as in-field placements. Examples of this are as follows:

> Heald Honolulu classified a 2011 graduate of an Accounting program as employed in the
> field based upon a food service job at Taco Bell, where she started working in June 2006.
> The graduate stated that her job was to provide food service to customers, that she had
> not received a promotion or pay increase as a result of her Heald degree, and that the
> position was not in her field of study. Yet Heald counted her as placed in her field of
> study, based upon the employment validation form signed by Career Services personnel.
> Heald provided no documents substantiating that the student had waived placement
> services based upon her employment at Taco Bell.

> Heald Hayward counted a 2011 Business Administration graduate as placed in the field
> based upon a retail grocery position at Safeway, which the graduate stated was not in his
> field of study, and Heald substantiated the in-field placement by stating that the
> graduate's program's major skills were a component of his "primary job function or used
> at least half the time" by listing, as program skills, among other things, "providing
> customer service and problem-solving skills, knowledge of store's product and be
> approachable (sic)." The back-up documentation included an internal email chain, in
> which Heald Career Services staff forwarded information concerning the graduate's
> employment obtained through the work number to Heald's Corporate Director of Career

USA SOI 025

Jack D. Massimino
Corinthian Colleges, Inc.
Page 9

Services, who replied: "Not sure if this will fly. See what he does as a Courtesy Clerk – Money Transactions, etc..."

Heald Hayward counted another 2011 Business Administration graduate as placed in the field based upon a seasonal clerk position she obtained in Macy's Shipping and Receiving Department during November 2010, which the student stated ended prior to her graduation. The student also stated that she requested job placement assistance from Heald in order to find a job in her field of study, but was unsuccessful, and that Heald stopped returning her calls for assistance. Heald's backup documentation regarding the placement consisted of an employment validation signed by Heald Career Services personnel that justified the in-field placement by stating she "uses business software, apply accounting concepts balancing till and ringing up purchases, collecting money, merchandise the products and upsale (sic)."

2. **Heald Stockton misrepresented the job placement rates for its medical assistant program to its programmatic accreditor**

Heald Stockton advertised in its catalogs that "The Medical Assisting program is accredited by the Commission on Accreditation of Allied Health Education Programs (CAAHEP) upon the recommendation of the Medical Assisting Education Review Board (MAERB)."[3] MAERB requires that approved programs report annual placement rates of its medical assisting graduates. A program review conducted by the Department at Heald Stockton from July 29, 2013 to August 2, 2013 revealed that in its 2012 Annual Report to MAERB, which Heald Stockton submitted to MAERB on November 21, 2012, Heald Stockton reported that, of the 359 medical assisting students who graduated between January 1, 2007 through December 31, 2011, 281 students were placed, resulting in a 78.27% placement rate, which exceeded the MAERB minimum placement rate of 60%.

Upon review of documentation obtained during the program review, however, the Department determined that as an initial matter, Heald Stockton's backup data reflected only 209 placements rather than 281. In addition, of those 209 placements, (1) Heald Stockton reported as placed at least 23 students who had in fact completed Heald Stockton's diploma program in Medical Assisting, which is not accredited by MAERB, rather than the 98 credit-hour Associates in Applied Science (AAS) program; (2) Heald Stockton counted 13 students twice, and counted one student three times;[4] (3) although Heald Stockton's 2012 Annual Report was only to include those students placed between January 1, 2007 and December 31, 2011, Heald Stockton claimed 70 placements that occurred after December 31, 2011; and, (4) according to notations made on the backup data, Heald Stockton reported four students as placed when in fact they had waived placement. The Department's recalculation revealed that the correct number of placements was only 109, rather than 281, and that the correct number of graduates was 333, rather than 359.

---

[3] This accreditation entitles an individual to take the state medical assisting test without first obtaining two years of medical assisting experience.
[4] A number of these students were either in the unaccredited program or were placed after the end of the cohort period (December 31, 2011). The net duplications represent over-reporting of three placements.

Jack D. Massimino
Corinthian Colleges, Inc.
Page 10

The correct placement rate was thus only 32.7%, far below MAERB threshold of 60%. Heald Stockton therefore misrepresented the 2012 programmatic placement rate for its Medical Assisting program to MAERB.

### 3. CCI and Heald's backup documentation did not support its claimed placement rates

The failure of Heald's backup documentation to support the placement rates that Heald disclosed for its educational programs was not limited to the programmatic placement rate that Heald Stockton reported to the MAERB. The Department's review of the backup documentation revealed numerous instances wherein, even if all of the placements were accepted as bona fide in-field placements, the data still do not support the placement rates that Heald calculated and disseminated. The placement data were missing key fields, most notably the level of the student's program of study, and contained numerous duplicates. Enclosure A contains examples of placement rates that were not supported by Heald's backup data, and the actual rate that Heald's backup data did support.

Title IV regulations define misrepresentation as, among other things, any false, erroneous or misleading statement an eligible institution makes directly or indirectly to a student, prospective student or any member of the public, or to an accrediting agency, to a State agency, or to the Secretary. A misleading statement includes any statement that has the likelihood or tendency to deceive. 34 C.F.R. § 668.71(c) (definition of "misrepresentation"). A substantial misrepresentation is any misrepresentation on which the person to whom it was made could reasonably be expected to rely, or has reasonably relied, to that person's detriment. 34 C.F.R. § 668.71(c) (definition of "substantial misrepresentation.") An eligible institution is deemed to have engaged in substantial misrepresentation when the institution makes a substantial misrepresentation about the nature of its educational program, its financial charges, or the employability of its graduates. 34 C.F.R. § 668.71(b).

The Department has determined that Heald's inaccurate or incomplete placement rate disclosures were misleading or false; that they overstated the employment prospects of graduates of Heald's programs; and that current and prospective graduates of Heald could reasonably have been expected to rely to their detriment upon the information in Heald's placement rate disclosures. Therefore, the Department has determined that the statements in these disclosures constituted substantial misrepresentations by Heald.

Congress enacted the statutory consumer information requirements, and misrepresentation provisions, in order to ensure that institutions fully disclose information needed by students to inform their decision whether to attend an institution, and to hold institutions accountable for false information that they provide. Heald College's substantial misrepresentations concerning its placement rates evidence a blatant disregard for the statutes and regulations governing the Title IV, HEA programs.

Jack D. Massimino
Corinthian Colleges, Inc.
Page 11

As of October 2, 2012,[5] the Title IV, HEA program regulations permit a fine of up to $35,000 for each violation of any provision of Title IV, or of any regulation or agreement implementing that Title. 34 C.F.R. § 668.84(a). In determining the amount of a fine, the Department considers both the gravity of the offense and the size of the institution. 34 C.F.R. § 668.92. Pursuant to the Secretary's decision in *In the Matter of Bnai Arugath Habosem*, Dkt. No. 92-131-ST (Aug. 24, 1993), the size of an institution is based on whether an institution is above or below the median funding levels for the Title IV, HEA programs in which it participates. Thus, if the institution's funding levels for the Title IV, HEA programs in which it participates is below the median amount for institutions participating in those programs, the institution will be considered small.

In the case of Heald College, the latest year for which complete funding data is available is the 2013-14 award year. According to Department records, students enrolled at Heald College received $66,944,957 in Federal Pell Grant funds, $139,462,899 in Direct Loan program funds, and $3,713,508 in campus-based program funds during the 2013-14 award year. The latest information available to the Department indicates that the median funding level for schools participating in the Federal Pell Grant program for the 2013-14 award year is $1,571,915; for institutions participating in the Direct Loan programs, it is $2,964,093, and for institutions participating in the campus-based programs, it is $266,597. Accordingly, Heald College is not a small institution, because its Federal Pell Grant, Direct Loan, and campus-based funding levels exceed the median funding levels.

The violations involved in this case are severe, and the potential harm to the government and to students is also severe. After considering the gravity of the violations and the size of Heald College, I have set the fine amount as follows:

For Heald's dissemination of program disclosure documents that did not meet regulatory requirements concerning disclosure of the institution's methodology, and which disclosed rates that were false or misleading, as set forth in this letter, I have set the fine amount at $27,500 for each of the 464 placement rates discussed in this letter that were disclosed in the documents disseminated prior to October 2, 2012, and $35,000 for each of the 482 placement rates discussed in this letter that were disseminated after October 2, 2012, totaling $29,630,000.[6] The Department requires that institutions fully disclose the method used to calculate its placement rates, count only bona fide placements in its placement rates, and accurately calculate those rates.

For Heald Stockton's misrepresentation of its job placement rates for its medical assistant program to its programmatic accreditor, I have set the fine amount at $35,000. Heald's failure to provide MAERB with accurate placement data deprived MAERB of important information required to evaluate the success of Heald Stockton's program.

---

[5] See 77 Fed. Reg. 60047 (2012), http://www.gpo.gov/fdsys/pkg/FR-2012-10-02/pdf012-24248.pdf. The amount was previously $27,500.

[6] The amounts per violation represent the maximum amounts allowed under the HEA for the time periods in question. See n.5 and accompanying text, *supra*.

USA SOI 028

Jack D. Massimino
Corinthian Colleges. Inc.
Page 12

The fine of $29,665,000 will be imposed on May 5, 2015, unless by that date the Department receives a request for a hearing or written material indicating why the fine should not be imposed. Heald College may submit both a written request for a hearing and written material indicating why the fine should not be imposed. If Heald College chooses to request a hearing or to submit written material, you must write to me, via overnight mail, at:

> Administrative Actions and Appeals Service Group
> U.S. Department of Education
> Federal Student Aid/PC/SEC
> 830 First Street, NE
> Room 84F2
> Washington, DC 20002-8019

If Heald College files a timely request for a hearing, the case will be referred to the Office of Hearings and Appeals, which is a separate entity within the Department. That office will arrange for assignment of Heald College's case to an official who will conduct a hearing. Heald College is entitled to be represented by counsel at the hearing and otherwise during the proceedings. If Heald College does not request a hearing, but submits written material instead, I shall consider that material and notify Heald College of the amount of the fine, if any, that will be imposed.

**Any request for a hearing or written material that Heald College submits must be received by May 5, 2015; otherwise, the $29,665,000 fine will be imposed on that date.**

Heald College has applied for recertification to continue to participate in the student financial assistance programs authorized pursuant to Title IV of the Higher Education Act of 1965, as amended, 20 U.S.C. §§ 1070 *et seq.* (Title IV, HEA programs). Heald College's PPA will continue to operate on a month-to-month basis while the Department considers the application for recertification in light of the findings addressed in this letter, along with pending program reviews. *See* 34 C.F.R. § 668.13(b)(2).

If Heald has any questions or desires additional explanation of Heald College's rights with respect to this action, please contact Kathleen Hochhalter of my staff at 303/844-4520.

Sincerely,

Robin S. Minor
Acting Director
Administrative Actions and Appeals Service Group

Enclosure

cc:  Dr. Mary Ellen Petrisko, President, WASC Senior College and University Commission, via mepetrisko@wascsenior.org

Jack D. Massimino
Corinthian Colleges, Inc.
Page 13

> Bobbi Lum-Mew, Program Administrator, Hawaii Post-Secondary Education Authorization Program, via Bobbi.Lum-Mew@dcca.hawaii.gov
> Juan Báez-Arévalo, Director of Private Post-secondary Education, Office of Degree Authorization, Oregon Office of Student Access and Completion, via juan.baez-arevalo@ode.state.or.us
> Department of Defense, via osd.pentagon.ousd-p-r.mbx.vol-edu-compliance@mail.mil
> Department of Veteran Affairs, via INCOMING.VBAVACO@va.gov
> Consumer Financial Protection Bureau, via CFPB_ENF_Students@cfpb.gov

USA SOI 030

Enclosure A

PLACEMENT RATES BASED ON CCI'S DATA

| Grad. Year | Campus Name | Program | No. of Grads | Reported Campus Placement Rate | Adjusted Placement Rate from CCI's Data |
|---|---|---|---|---|---|
| 2010 | Heald San Jose | Medical Insurance Billing and Coding (AA Degree) | 60 | 100% | 64% |
| 2010 | Heald Concord | Business Administration - Software Technologies Emphasis (AA Degree) | 3 | 100% | 66% |
| 2010 | Heald Concord | Medical Insurance Billing and Coding (AA Degree) | 33 | 100% | 66% |
| 2010 | Heald Concord | Office Skills (Certificate) | 8 | 100% | 71% |
| 2010 | Heald Hayward | Medical Insurance Billing and Coding (AA Degree) | 43 | 100% | 75% |
| 2010 | Heald San Francisco | Office Skills (Certificate) | 7 | 67% | 50% |
| 2010 | Heald Portland | Medical Assisting (AA Degree) | 61 | 73% | 57% |
| 2010 | Heald Rancho Cordova | Office Skills (Certificate) | 5 | 75% | 60% |
| 2011 | Heald Hayward | Medical Office Administration (AA Degree) | 48 | 100% | 38% |
| 2011 | Heald Hayward | Paralegal (AA Degree) | 33 | 100% | 63% |
| 2011 | Heald Rancho Cordova | Medical Office Administration (AA Degree) | 38 | 100% | 70% |
| 2011 | Heald Concord | Pharmacy Technology (AA Degree) | 22 | 100% | 73% |
| 2011 | Heald San Francisco | Medical Office Administration (AA Degree) | 29 | 100% | 75% |
| 2011 | Heald Rancho Cordova | Medical Insurance Billing and Coding (AA Degree) | 27 | 100% | 78% |
| 2011 | Heald Concord | IT Network Systems Administration (AA Degree) | 11 | 100% | 80% |
| 2011 | Heald Hayward | IT Network Systems Administration (AA Degree) | 34 | 100% | 82% |
| 2011 | Heald Fresno | Office Skills (Certificate) | 4 | 67% | 50% |
| 2011 | Heald San Jose | Paralegal (AA Degree) | 26 | 100% | 83% |

Enclosure A

## PLACEMENT RATES BASED ON CCI'S DATA

| Grad. Year | Campus Name | Program | No. of Grads | Reported Campus Placement Rate | Adjusted Placement Rate from CCI's Data |
|---|---|---|---|---|---|
| 2011 | Heald Honolulu | Business Administration - Sales/Marketing Emphasis (AA Degree) | 18 | 100% | 83% |
| 2011 | Heald Rancho Cordova | Paralegal (AA Degree) | 20 | 100% | 85% |
| 2012 | Heald Hayward | IT Network Systems Administration (AA Degree) | 30 | 100% | 73% |
| 2012 | Heald Salinas | Business Administration - Entrepreneurship Emphasis (AA Degree) | 5 | 75% | 50% |
| 2012 | Heald Roseville | IT Network Security (AA Degree) | 45 | 100% | 85% |

### INSTITUTIONAL RATES

| Grad. Year | Campus Name | Program | No. of Grads | Reported Institutional Placement Rate | Adjusted Rate from CCI's Data |
|---|---|---|---|---|---|
| 2010 | Heald Hayward and Modesto | Medical Insurance Billing and Coding (AA Degree) | 43 | 100% | 75% |
| 2010 | Heald San Francisco, Honolulu, and Portland | Criminal Justice (AA Degree) | 66 | 80% | 62% |
| 2010 | Heald Hayward and Modesto | Medical Office Administration (AA Degree) | 47 | 93% | 82% |
| 2010 | Heald Hayward and Modesto | Business Administration - Sales/Marketing Emphasis (AA Degree) | 12 | 100% | 89% |
| 2011 | Heald Hayward and Modesto | Medical Office Administration (AA Degree) | 48 | 100% | 38% |
| 2011 | Heald Hayward and Modesto | Paralegal (AA Degree) | 34 | 100% | 63% |
| 2011 | Heald San Francisco, Honolulu, and Portland | Medical Office Administration (AA Degree) | 65 | 100% | 68% |
| 2011 | Heald Hayward and Modesto | IT Network Systems Administration (AA Degree) | 34 | 100% | 82% |

Enclosure A

## PLACEMENT RATES BASED ON CCI'S DATA

| Grad. Year | Campus Name | Program | No. of Grads | Reported Institutional Placement Rate | Adjusted Rate from CCI's Data |
|---|---|---|---|---|---|
| 2011 | Heald San Francisco, Honolulu, and Portland | Business Administration - Sales/Marketing Emphasis (AA Degree) | 18 | 100% | 83% |
| 2011 | Heald San Francisco, Honolulu, and Portland | IT Network Systems Administration (AA Degree) | 64 | 100% | 86% |



## DEC 19 2016

Mr. Chidi Ogene
President
Charlotte School of Law
201 South College Street, Suite #400
Charlotte, NC 28244

Sent Via UPS
Tracking #: 1Z37X7Y30198482316

Re: Denial of Recertification Application to Participate in the Federal Student Financial
Assistance Programs – Charlotte School of Law, 201 South College Street, Suite #400,
Charlotte, NC 28244; OPEID 04143500.

Dear Mr. Ogene:

The U.S. Department of Education (Department) has reviewed the application for recertification
submitted by Charlotte School of Law (CSL) to continue to participate in the student financial
assistance programs authorized pursuant to Title IV of the Higher Education Act (HEA) of 1965,
as amended, 20 U.S.C. §§ 1070 *et seq*. (Title IV programs). CSL's most recent Program
Participation Agreement (PPA) expired on June 30, 2015. CSL, however, timely submitted its
recertification application prior to that date. As a result, the Department extended CSL's PPA on
a month-to-month basis while evaluating the application and related matters. *See* 34 C.F.R. §
668.13(b)(2). This notice is to inform you that the Department has concluded its review and
hereby denies CSL's application for continued participation. CSL's participation in Title IV
programs will therefore conclude at the end of this month, on December 31, 2016.

For purposes of evaluating a recertification application, the Department reviews an institution's
performance as a participant in the Title IV programs and must ensure that the institution has met
the standards of administrative capability and financial responsibility, has complied with Title IV
program requirements, and has operated under the high standards of care, trust, and diligence
required of a fiduciary. A denial of an institution's recertification application is warranted if the
Department determines that the institution does not meet all requirements and standards set forth
in Title IV and regulations issued thereunder. HEA § 498, 20 U.S.C. § 1099c; 34 C.F.R. §
668.13.

In reaching a decision on CSL's recertification application, the Department reviewed all
materials submitted by CSL in support of its application. The Department also reviewed other
relevant documents and information, including but not limited to the institution's history as a
participant in the Title IV programs and documents associated with the actions taken by the
Council of the Section of Legal Education and Admissions to the Bar of the American Bar



Mr. Chidi Ogene
Charlotte School of Law
Page 2

Council of the Section of Legal Education and Admissions to the Bar of the American Bar Association (the Council) and the Accreditation Committee of the Council (Committee). Collectively, the Council and the Committee will be referred to herein as the ABA.

CSL was founded in 2004 as a member institution of The InfiLaw System, a consortium of for-profit law schools that includes Florida Coastal School of Law and Arizona Summit Law School. Each of the three InfiLaw schools is owned by InfiLaw Holding, LLC. According to the InfiLaw schools, nearly all of the voting units of InfiLaw Holding, LLC are held by Sterling Capital Partners, L.P. The ABA provisionally approved CSL in 2008 and granted full approval in 2011. CSL first began participating in the Title IV programs through its execution of a provisional PPA in February 2009. CSL executed its most recent PPA in July 2011.

As a participating institution in Title IV, HEA programs, CSL drew $ 65,238,752 in Title IV funds during the 2014-15 award year and $48,537,250 for the 2015-16 award year. With respect to the 2015-16 award year, those funds included $29,434,902 in Direct, Graduate PLUS loans and $19,102,348 in Direct Stafford Unsubsidized loans. During this same award year, CSL enrolled 946 students who received Title IV aid. For purposes of its participation in Title IV programs, the school is approved only to offer a juris doctor program.

As described below, the ABA has determined that CSL is, and has been, out of compliance with certain ABA standards and that this noncompliance was "substantial" and "persistent." CSL also made substantial misrepresentations regarding the nature of its academic program in violation of the prohibition on substantial misrepresentations. 34 C.F.R Part 668, Subpart F. For the reasons discussed below, CSL's noncompliance with its accreditor's standards constitutes an independent basis for the Secretary to deny CSL's application for recertification, as does each of CSL's substantial misrepresentations. *See* generally HEA § 498, 20 U.S.C. § 1099c; 34 C.F.R. § 668.13.

Due to this denial, CSL is no longer eligible to participate in the Title IV programs, effective December 31, 2016. *See* 34 C.F.R. § 668.13(b)(2). This includes all Title IV programs listed on CSL's most current Eligibility and Certification Approval Report, including: Federal Work-Study (FWS), Federal Perkins Loan (Perkins Loan), and William D. Ford Federal Direct Loan (Direct Loan) programs. The Direct Loan program includes the Federal Direct Unsubsidized Stafford/Ford Loan program and the Federal Direct PLUS Program.

## CSL Violated the HEA, the Department's Regulations and its PPA by Failing to Meet the Requirements Established by its Nationally Recognized Accreditor

As a condition of eligibility to participate in Title IV programs, an institution must be accredited by an accreditor recognized by the Secretary. HEA §§ 101, 102(a)(1)(A), 102(b)(1)(D), 20 U.S.C. §§ 1001, 1002(a)(1)(A), 1002(b)(1)(D). *See also* 34 C.F.R. § 600.5(a)(6). In addition to that eligibility requirement, as a separate condition of initial and continued participation, an institution must "meet the requirements established by" its accreditor. HEA § 487(a)(21), 20 U.S.C. § 1094(a)(21). Under Part H of Title IV, all accrediting agencies are required to have, apply, and enforce standards for accredited institutions of higher education. *See* HEA §§ 496(a)(4)-(6), 20 U.S.C. §§ 1099b(a)(4)-(6) (including the requirement that accrediting agencies

Mr. Chidi Ogene
Charlotte School of Law
Page 3

standards for an institution of higher education or program to be accredited"). *See also* 34 C.F.R. § 668.14(b)(23) (noting that "[b]y entering into a program participation agreement, an institution agrees that ... [i]t will meet the requirements established pursuant to part H of Title IV of the HEA by the Secretary and nationally recognized accrediting agencies"). In its PPA, CSL expressly agreed to this latter condition, certifying that it would meet the requirements set by its accreditor pursuant to Part H of Title IV. PPA at 5 ¶ 23.

Between March 16 and 19, 2014, an ABA "site team" conducted an on-site Three-Year Interval evaluation of CSL. During the course of this site visit, the team met with Rick Inatome (CEO of InfiLaw Holding, LLC), Jay Conison (Dean of CSL), Don Lively (then-President of CSL), numerous CSL administrators, members of the institution's accreditation self-study Committee, CSL faculty, CSL staff, and CSL students. Members of the site team also visited a significant majority of the classes taught during its visit.

On September 15, 2014, the ABA provided CSL with a 72-page Inspection Report (Report) and invited the school to provide comments and note factual errors. The ABA informed CSL that the Report would provide the basis for its determination on whether CSL's programs were operating in compliance with the ABA Standards for the Approval of Law Schools (Standards). Among its topics, the Report discussed CSL's program of legal education (pp. 6-24), students (including both admissions qualifications and output metrics, including a discussion of bar passage statistics) (pp. 34-49), and financial operations (pp. 67-71). In October 2014, CSL responded in writing to the Report.

At its January 2015 meeting, the Committee reviewed both the Report and CSL's written response. Following that meeting, the Committee issued a decision (the "First Committee Decision") announcing that it had "reason to believe" that CSL had "not demonstrated compliance" with certain ABA standards. The Committee also "request[ed] additional information to make a determination" as to CSL's compliance with additional standards and interpretations, including Standards 301(a), 501(a), and 501(b), and Interpretation 501-1, which are foundational to the educational enterprise and the nature of the educational program offered by CSL.[1] Those additional standards and interpretation are:

> **Standard 301(a):** "A law school shall maintain a rigorous program of legal education that prepares its students, upon graduation, for admission to the bar and for effective, ethical, and responsible participation as members of the legal profession."

[1]  As discussed *infra*, compliance with these standards is materially important to students and prospective students. Moreover, we note that versions of current Standards 301 and 501 have been in effect since the ABA first adopted and published the Standards and Rules of Procedures in 1973. Even as the ABA has amended its standards and interpretations, such amendments have highlighted the importance of these particular standards. For example, in a recent revision of Standard 301(a), effective for the 2014-15 year, the ABA moved the word "rigorous" from an interpretation to a standard (as it now exists in the language above) to "place[]upfront" the importance of the program of legal education. *See* ABA Section of Legal Education and Admission to the Bar Explanation of Changes (April 2014) (*available at* http://www.americanbar.org/content/dam/aba/administrative/legal_education_and_admissions_to_the_bar/201404_s rc_meeting_materials_proposed_standards.authcheckdam.pdf). In that same revision, the ABA also expanded the scope of former Interpretation 501-3 and renumbered it as current Interpretation 501-1 (shown above), highlighting the importance of this particular interpretation.

USA SOI 036

Mr. Chidi Ogene
Charlotte School of Law
Page 4

>**Standard 501(a):** "A law school shall maintain sound admission policies and practices consistent with the Standards, its mission, and the objectives of its program of legal education."
>
>**Standard 501(b):** "A law school shall not admit an applicant who does not appear capable of satisfactorily completing its program of legal education and being admitted to the bar."
>
>**Interpretation 501-1:** "Among the factors to consider in assessing compliance with this Standard are the academic and admission test credentials of the law school's entering students, the academic attrition rate of the law school's students, the bar passage rate of its graduates, and the effectiveness of the law school's academic support program."

In December 2015, CSL provided the additional information requested by the Committee. On February 3, 2016, the Committee issued its second decision regarding CSL (the "Second Committee Decision"). In this decision, the Committee made twenty factual findings, thirteen of which pertained to the Committee's request for additional information to determine CSL's compliance with Standards 301(a), 501(a), and 501(b) and Interpretation 501-1. Although the Committee concluded that CSL was in compliance with the particular standards that previously led the Committee to assert its "reason to believe" that CSL was noncompliant with those standards, the Committee concluded that CSL was "not in compliance" with other standards, specifically with:

>Standards 301(a), 501(a), 501(b), and Interpretation 501-1, in that the Law School has not demonstrated that it is maintaining a rigorous program of legal education that prepares its students, upon graduation, for admission to the bar and for effective, ethical, and responsible participation as members of the legal profession; maintaining sound admissions policies and practices consistent with the Standards, its mission, and the objectives of its program of legal education; or is admitting applicants who do not appear capable of satisfactorily completing its program of legal education and being admitted to the bar.

Second Committee Decision at 6 (citing Findings of Fact 8-20).

In the Second Committee Decision, the Committee also requested that CSL provide additional information consisting generally of "all relevant information necessary to demonstrate compliance" with Standards 301(a), 501(a), and 501(b), as well as specific information about students "between and including the fall 2010 entering class and the spring (May) 2016 entering class" that would show, with respect to individual students who had LSAT scores or undergraduate GPAs at or below CSL's 25th and 50th percentiles, enrollment status (including attrition information) and bar passage information.[2] The Committee also requested that CSL's

---

[2]    ABA Interpretation 501-1 establishes that academic and admission test credentials, attrition rates, and bar passage rates are among the factors considered when the ABA assesses compliance with Standard 501.

Mr. Chidi Ogene
Charlotte School of Law
Page 5

President and Dean appear before its June 2016 hearing, the purpose of which was "to determine whether to impose sanctions in connection with the Law School's noncompliance with the Standards." Second Committee Decision at 7.

In May 2016, CSL submitted a 62-page report, later described by CSL as "very comprehensive,"[3] accompanied by 29 pages of student-specific information, which, taken together, the school claimed "show[s] that the School of Law is in compliance with Standards 301(a), 501(a), and 501(b), and Interpretation 501-1." On June 23, 2016, the Committee held a hearing at which you and Dean Jay Conison appeared, along with CSL's Associate Dean for Academics, Associate Dean for Enrollment Management, and Shared Services Director of Bar Preparation.

Following that hearing, in July 2016, the Committee issued another decision (the "Third Committee Decision") again finding CSL to be out of compliance with Standards 301(a), 501(a), and 501(b) and Interpretation 501-1. In this decision, the Committee also announced its conclusion that "the issues of non-compliance with Standards 301(a), 501(a), and 501(b), and Interpretation 501-1 *are substantial and have been persistent.*" Third Committee Decision at 12 (emphasis added). The Committee also found that CSL's "plans for bringing itself into compliance with the Standards have not proven effective or reliable." *Id.*

The Third Committee Decision was expressly based on 44 factual findings, on topics such as admissions, programming for admitted students, mentoring and related opportunities, the writing program, academic support, faculty, summer and intersession changes, attrition, bar preparation during law school, post-graduation bar preparation, and bar examinations. Among its factual findings, the Committee concluded:

- With respect to CSL's admissions policies, "[i]t was not clear to the Committee how [CSL's] admission practices demonstrate that applicants with low academic and admission test credentials appear capable of completing the Law School's program of legal education and being admitted to the bar." (Finding 11)

- "Attrition for the 25th and 50th percentile LSAT individuals for those who started in 2010 was 13%. It rose to 14% for those who started in 2011; 15% for those who started in 2012; 20% for those who started in 2013; 35% for those who started in 2014; and 24% for those who started in 2015. At the hearing, the Associate Dean for Academics indicated that 74 first-year students out of a class of 223 (33%) that began studies in the fall of 2015 were academically attrited in December 2015. In May 2016, 26 students attrited, with 21 of them being spring semester starts of the entering class of 77 (27%). *This attrition is substantial and suggests that the Law School's admissions process is not*

---

[3]    *See* June 23, 2016 ABA Committee Hearing Transcript at 9:10-11 (Conison).

Mr. Chidi Ogene
Charlotte School of Law
Page 6

> *as predictive of academic success as it might be.* The attrition target range for 2016-17 is
> 13%-17%" (Finding 23) (emphasis added).[4]

- "The Law School's bar passage rates … remain *low, often significantly so.*" (Finding 41)
  (emphasis added).

- "For the February 2016 bar examination in North Carolina, the state first-time pass rate
  for first-time takers was 51.1%. The Law School's first-time February 2016 rate was
  *34.7%* (75 takers), which placed it fifth in the state. This deviation is *more than 15 points*

---

[4]    This finding is consistent with data made public by the ABA, which requires institutions to report attrition
each year and to categorize the type of attrition. In the reports submitted to, and made publicly available by, the
ABA, CSL reported that:

- 49.2% (or 174 out of 354 students) of first-year CSL students left due to attrition as reported for 2016. As
  reported for 2015, 44.6% (or 203 out of 455 students) of first-year CSL students left due to attrition.

- Of the 174 first-year CSL students who attrited as reported for 2016, 130 students (or more than 36% of the
  entering class) left due to academic attrition. Similarly, as reported in 2015, of the 203 first-year CSL
  students who attrited, 121 students (or more than 25% of the entering class) left due to academic attrition.

- Of the 208 law schools accredited by the ABA as reported for 2016, CSL has the largest number (130) and
  highest percentage (36.7%) of first-year students attriting for academic reasons. (The school with the
  second highest number of first-year students leaving for academic reasons was InfiLaw's Florida Coastal
  School of Law with 77 students.) CSL also had the largest number (174) and highest percentage (49.2%)
  of total first-year attrition.

*See* Standard 509 Information Report for Charlotte School of Law & "All Schools Data" compilation report for 2015
& 2016. (Available at http://www.abarequireddisclosures.org). In addition to the 2015 & 2016 figures, data
submitted to and made publicly available by the ABA establishes that both the total attrition percentage and the
academic attrition percentage of CSL students have been increasing in recent years. According to the ABA:

| ABA REPORT YEAR | CSL 1ST YEAR TOTAL ATTRITION % | CSL 1ST YEAR ACADEMIC ATTRITION % |
|---|---|---|
| 2016 | 49.2% | 36.7% |
| 2015 | 44.6% | 26.6% |
| 2014 | 32.1% | 18.3% |
| 2013 | 22.6% | 8.34% |

*See* Standard 509 Information Reports for Years 2013-2016 (available at http://www.abarequireddisclosures.org/).
The ABA's reports show the percentage of total attrition and raw numbers of the various types of attrition. The
percentage of first year academic attrition was calculated by applying the percentage of academic attrition to the
total attrition percentage. Academic attrition is defined by the ABA as referring to "those students who discontinued
their education at a time when they were not in good academic standing (typically a g.p.a. below 2.0). It includes
both students who have been dismissed because they did not satisfy the minimum standards of progress established
by the law school in order to continue their legal studies at that school, and students who discontinued their
enrollment at the school at a time when their g.p.a was below that required for good academic standing as of the end
of the first year." 2016 Annual Questionnaire Instructions Part II Admissions & Enrollment Information (available
at
http://www.americanbar.org/content/dam/aba/administrative/legal_education_and_admissions_to_the_bar/governan
cedocuments/2016_aq_part2.authcheckdam.pdf).

Mr. Chidi Ogene
Charlotte School of Law
Page 7

> *below the average first-time bar passage rates* for graduates of ABA-approved law
> schools taking the bar examination in these same jurisdictions." (Finding 42) (emphasis
> added).[5]

- The Law School's ultimate bar passage rates were in compliance for 2011, 2012, and
  2013. The school "may be in compliance for 2014, but the 17% missing or never passed
  could affect that compliance. It is *not in compliance for 2015 at this point, with 43%
  either missing or never [having] passed the bar*." (Finding 44) (emphasis added).

In the Third Committee Decision, the Committee also directed CSL to take a series of remedial
actions, including developing and submitting, by September 1, 2016, a plan to come into
compliance with the Standards. The Committee further required CSL to supply the Committee
with additional data and information, required CSL to disclose the Committee's decision to
students and the public, and provided for the appointment of a fact finder to review an array of
topics, including CSL's admissions policies, academic rigor, bar examination results, student
loan default rates, and graduate employment outcomes.

In August 2016, CSL appealed aspects of the Third Committee Decision to the Council and, on
October 21, 2016, the Council held a hearing at which you and Dean Conison testified on CSL's
behalf. At that hearing, Dean Conison testified that CSL is "not appealing that conclusion of
noncompliance with Standards 301 and 501," despite the school's "disappointment" with the
conclusion. Oct. 21, 2016 Council Hearing Transcript at 7:2-6 (Conison). CSL did, however,
through Dean Conison, make four requests of the Council, that the Council (1) overturn the
Committee's finding that CLS's noncompliance was "substantial and persistent"; (2) eliminate
the requirement that CSL publicly disclose the findings of noncompliance or, in the alternative,
delay such disclosure for one year; (3) start the two-year remediation period in July 2016, rather
than in February 2016; and (4) provide "greater clarity" as to what was expected of CSL. *Id.* at
17:11-25.

On November 14, 2016, the Council issued a decision (the "Council Decision") informing CSL
that it had reviewed the Third Committee Decision, all material considered by the Committee in
rendering that decision, the August 2016 appeal letter, a subsequent submission made by CSL on
October 4, 2016, and the transcript of the October 21, 2016 hearing. After reviewing that record,
the Council concluded, for the same reasons stated by the Committee, that CSL was "not in
compliance" with Standards 301(a), 501(a), and 501(b), that the issues of noncompliance with
these standards "are substantial and have been persistent," and that CSL's "plans for bringing
itself into compliance with the Standards have not proven effective or reliable." The Council

---

[5]        Here too, the ABA's findings are consistent with publicly available data. For example, in July 2016, 45.2%
of CSL graduates who took the North Carolina bar exam for the first time passed. The statewide average, including
CSL and repeat takers who were unsuccessful on their first attempt, was 65.9%, almost 50% higher. *See*
http://www.charlottelaw.edu/gainful-employment-aba-required-disclosures.html (last visited December 1, 2016).
The Department also notes that, although CSL's first-time bar passage rates for the North Carolina Bar increased
between February and July 2016, the rates have trended downward since July 2010, and the July 2016 first time
passage rate remains below the July 2015 rate.

Mr. Chidi Ogene
Charlotte School of Law
Page 8

ordered remedial actions, including public disclosure, and placed CSL on probation, effective November 14, 2016.[6]

The facts recited above make clear that on three separate occasions, in February 2016, July 2016, and November 2016, the ABA announced its determination that CSL was out of compliance with ABA Standards 301(a), 501(a), and 501(b), and Interpretation 501-1. CSL has conceded the noncompliance findings and certain remedial requirements. Per ABA Rule of Procedure for Approval of Law Schools No. 4, the ABA Appeals Panel does not have authority to consider an appeal of the Council Decision, thus rendering that decision final. Each of these decisions was made after the ABA provided CSL notice and an opportunity to submit evidence. The decisions announced in July 2016 and November 2016 were made after CSL officials presented testimony to the Committee and Council, respectively.

In reviewing this matter, the Department carefully considered the extent of process that the ABA afforded the institution when making its determinations, including the numerous opportunities CSL was given to present evidence and provide testimony. The Department also considered the particular accreditation standards that CSL was found to be noncompliant with, *see supra* 3-4 & n.1, the nature of those standards, the fact that the ABA found the noncompliance to be both "substantial" and persistent," the fact that the ABA found CSL's "plans for bringing itself into compliance with the Standards have not proven effective or reliable," the fact that ABA believed the noncompliance to be so severe as to merit placing the institution on probation,[7] corroborative evidence of the noncompliance, *see supra* at n.4 – n.5, and the institution's administrative capability and fiduciary conduct.

After concluding the review, and based on the particular facts set out herein, the Department finds that CSL's statutory, regulatory, and contractual failure to "meet the requirements" established by the ABA is of sufficient severity to merit the denial of recertification.[8]

---

[6]    *See* Letter from B. Currier, ABA Managing Director of Accreditation and Legal Education to C. Ogene & J. Conison (Nov. 14, 2016), attaching the Council Decision. The Council Decision is publicly available at http://www.americanbar.org/content/dam/aba/administrative/legal_education_and_admissions_to_the_bar/PublicNoticeAnnouncements/2016_november_charlotte_probation_public_notice.pdf.

[7]    Not only is the probation sanction the most severe sanction that can be imposed by the ABA, short of withdrawal of accreditation, *see* ABA Standards & Rules of Procedure for Approval of Law Schools at Rule 16(b)-(c), the Department is unaware of any instance in the last 10 years which the ABA has placed an accredited law school on probation.

[8]    The Department's denial of CSL's application for recertification should not be read to suggest that the Department will reach the same conclusion each time an accreditor finds an institution noncompliant with the accreditor's standard. As it did in this case, the Department will continue to review, in the context of a recertification application, any finding of noncompliance by an institution's accreditor in light of the specific facts regarding that finding, other relevant facts regarding the institution under review, and the appropriate statutory and regulatory standards.

Mr. Chidi Ogene
Charlotte School of Law
Page 9

**CSL Breached its Fiduciary Duty to the Department and Demonstrated a Lack of Administrative Capability by Substantially Misrepresenting the Nature of its Educational Program**

Through its PPA, CSL agreed to comply with all conditions specified therein, including compliance with all Title IV, HEA program requirements. *See also* 20 U.S.C. § 1094(a)(1); 34 C.F.R. § 668.14. By entering into the PPA, CSL and its officers also accepted fiduciary responsibility in the administration of the Title IV programs. 34 C.F.R. § 668.82(a). As fiduciaries, an institution and its officers must act with the highest standard of care and diligence in administering the Title IV programs and in accounting to the Secretary for the funds received. 34 C.F.R. §§ 668.82(a), (b). This standard of care and diligence includes prohibitions against substantial representations by an institution's officers or employees. *See e.g., In re Warnborough College*, Dkt Nos. 95-164-ST, 96-60-SF (Aug. 9, 1996) (finding an institution in violation of the required fiduciary standard due to its failure to properly oversee an employee who made substantial misrepresentations to students, and holding the institution responsible that employee's misrepresentations). Additionally, in order to "continue participating" in any Title IV program, a school must be "capable of adequately administering that program." 34 C.F.R. § 668.16. A school is not considered to have such administrative capability if it fails to "administer[] the Title IV, HEA programs in accordance with all statutory provisions of or applicable to Title IV of the HEA" and "all applicable regulatory provisions prescribed under that authority." 34 C.F.R. § 668.16(a).

Under the Department's regulations, "[s]ubstantial misrepresentations are prohibited in all forms," 34 C.F.R. § 668.71(b), and the Department may deny institutional participation applications, including recertification applications, when it determines that an institution has engaged in a substantial misrepresentation. 34 C.F.R. § 668.71(a)(3). A "misrepresentation" is:

> [a]ny false, erroneous or misleading statement an eligible institution, one of its representatives, or any ineligible institution, organization, or person with whom the eligible institution has an agreement to provide educational programs, or to provide marketing, advertising, recruiting or admissions services makes directly or indirectly to a student, prospective student or any member of the public, or to an accrediting agency, to a State agency, or to the Secretary. A misleading statement includes any statement that has the likelihood or tendency to deceive. A statement is any communication made in writing, visually, orally, or through other means.

34 C.F.R. § 668.71(c).

A "substantial misrepresentation" is "any misrepresentation on which the person to whom it was made could reasonably be expected to rely, or has reasonably relied, to that person's detriment." *Id.* Substantial misrepresentations include misrepresentations made by the institution itself, or one of its representatives, regarding the nature of the institution's academic programs or the employability of its graduates. 34 C.F.R. § 668.71(b). Substantial misrepresentations involving

Mr. Chidi Ogene
Charlotte School of Law
Page 10

the nature of an institution's education program include misrepresentations concerning the "nature and extent" of the institution's accreditation and the "availability, frequency, and appropriateness of its courses and programs to the employment objectives that it states its programs are designed to meet." 34 C.F.R. §§ 668.72(a), (g). Substantial misrepresentations regarding the employability of an institution's graduates include misrepresentations regarding "requirements that are generally needed to be employed in the fields for which training is provided." 34 C.F.R. § 668.74(f). Each substantial misrepresentation serves as an independent ground for the Department to deny an institution's recertification application.

The Department's review established that CSL substantially misrepresented to students and prospective students the "nature and extent" of CSL's accreditation and the "appropriateness of its courses and programs to the employment objectives that it states its programs are designed to meet." 34 C.F.R. §§ 668.72(a), (g). As set forth above, since February 2016, CSL has been found to be out of compliance with ABA Standards 301(a), 501(a), and 501(b), and Interpretation 501-1. These standards are foundational to the educational enterprise insofar as they speak to whether the school "maintain[s] a rigorous program of legal education that prepares its students, upon graduation, for admission to the bar and for effective, ethical, and responsible participation as members of the legal profession," (Standard 301(a)); whether the school "maintains sound admission policies" that are "consistent with the Standards, [the school's] mission, and the objectives of [the school's] program of legal education" (Standard 501(a)); and whether the school refrains from admitting applicants "who do not appear capable of satisfactorily completing its program of legal education and being admitted to the bar" (Standard 501(b)).

In February 2016, the ABA first concluded that CSL was out of compliance with the standards and interpretation discussed above. However, neither CSL nor the ABA publicly disclosed this fact until November 2016, when the ABA first announced that CSL was being placed on probation. Prior to the ABA's November 2016 announcement, the Department was unaware of *any* public statements that would have informed a student or prospective student that the ABA had found the school to be out of compliance with the Standards, or that the ABA had determined that CSL had "not demonstrated that it is maintaining a rigorous program of legal education that prepares its students, upon graduation, for admission to the bar and for effective, ethical, and responsible participation as members of the legal profession." Second Committee Decision at 6, Third Committee Decision at 12, Council Decision at 2. Nor is the Department aware of any statement or disclosure during that period by CSL that the ABA had determined that the school was "admitting applicants who do not appear capable of satisfactorily completing its program of legal education and being admitted to the bar." *Id.*

In contrast, beginning no later than February 2016 and continuing at least until December 2016, CSL made public statements to students and prospective students that constitute misrepresentations regarding the nature of the educational program that CSL offered.

*First*, CSL promoted, and continues to promote, on its website that it "has been awarded full accreditation" by the ABA in 2011, which required the school to "ha[ve] established *full compliance with each of the ABA's standards,* including standards *relating to bar passage,* job

Mr. Chidi Ogene
Charlotte School of Law
Page 11

placement and diversity."[9]  In the same section, CSL promoted, and continues to promote, that, although it had received only provisional approval by the ABA in 2008, the Council had determined in June 2011 that CSL was "in full compliance with the ABA Standards for Approval of Law Schools." A student or prospective student could reasonably read these statements and conclude that the 2011 finding of "full compliance" by the ABA was the final word as to the institution's compliance with the ABA's accreditation standards. This is particularly true because the school disclosed prior accreditation events, such as its initial "provisional" approval. Accordingly, beginning in February 2016, when the Committee determined that CSL was "not in compliance" with Standards 301(a), 501(a), and 501(b) and Interpretation 501-1, the above-mentioned statements were misleading insofar as they had the likelihood or tendency to deceive reasonable students and prospective students about the current status, nature, and extent of CSL's accreditation. The misrepresentation became even more pronounced in July 2016 when the Committee again notified CSL of its noncompliance and also found that the noncompliance was "substantial" and "persistent." Although the school appealed the July 2016 determination as to the findings of the "substantial" and "persistent" nature of the noncompliance, the school did not appeal the finding of noncompliance itself. Nonetheless, the school did not amend, update, or otherwise correct its continuing and misleading representation on its website.

*Second*, CSL promoted, and continues to promote, on its website to students and prospective students (under the heading "Practical Preparation is Critical") that it "created" a "rigorous curriculum … to ensure that [CSL] students are equipped with practical skills that will allow them to thrive in a professional setting." *See* Enclosure 1. This statement appears directly beneath the section of the webpage in which CSL promotes its "full compliance" with ABA standards, which includes Standard 301(a), which provides that law schools should maintain a "rigorous program of legal education that prepares its students, upon graduation, for admission to the bar and for effective, ethical, and responsible participation as members of the legal profession." In this context, CSL's promotion of its "rigorous curriculum" is misleading insofar as: (1) as described above, the ABA has specifically and repeatedly concluded that CSL has not maintained a "rigorous" program of legal education, that its failures in this regard are "substantial" and "persistent," and that CSL's plans to come into compliance with that standard have not proven effective or reliable; and (2) the positioning of CSL's description of its curriculum as "rigorous" directly beneath the discussion of compliance with the ABA standards (which use the word "rigorous" to describe what is expected of a compliant program) has the likelihood or tendency to leave students and prospective students with the false impression that CSL was compliant with that very requirement by the ABA.

Each of these misleading statements constitutes a substantial misrepresentation because students and prospective students could reasonably be expected to rely on each of these statements to their detriment. 34 C.F.R. § 668.71(b). Indeed, CSL argued to the ABA that if students and prospective students were aware of the ABA's findings of noncompliance, that would have a "profound impact on admissions" because: (1) knowledge of the ABA's findings would make

---

[9]    *See* http://www.charlottelaw.edu/our-mission.html (last visited Dec. 16, 2016) (attached hereto as Enclosure 1) (emphasis added).

USA SOI 044

Mr. Chidi Ogene
Charlotte School of Law
Page 12

applicants "much less likely to enroll;"[10] and (2) such a disclosure would "effectively tell applicants to beware of attending the Charlotte School of Law." [11] In addition, CSL argued to the ABA that public disclosure of its noncompliance would "have an adverse impact on [CSL's] ability to retain high-performing students," because it would "inevitably create anxiety on the part of high-performing students and make their transfer more likely." *Id.* Thus, under CSL's own arguments, the truth about its noncompliance would have impacted the decisions made by prospective students and current students to either enroll or continue their studies at CSL.

CSL's assertion that knowledge of noncompliance would be material to student admissions and retention decisions was not conjecture. Indeed, in the Third Committee Decision, the Committee ordered CSL to disclose to its admitted students and the public, via its webpage, a statement disclosing the ABA's noncompliance findings and required remedial actions. As part of its appeal of this requirement, CSL commissioned (and provided to the ABA) a market study that tested the impact of disclosure on CSL applicants. The study analyzed the views of individuals with LSAT scores above 142 who had applied to one or more of the InfiLaw schools. These individuals were asked to assess the impact on the likelihood of their respective enrollment at a particular law school if acceptance materials from that school included a statement that the school failed to meet accreditation standards dealing with admissions, educational programs, and bar passage. The study concluded that approximately 3 in 4 applicants (or 74%) stated that they would be "much less likely to enroll" after reading such a statement – establishing that reasonable students were highly likely to rely on the disclosure of information regarding the accreditation failures that CSL sought to keep from public view.

    *Finally,* the Department finds that CSL substantially misrepresented the bar passage rates of CSL graduates in an interview you had with the Charlotte Business Journal published on November 30, 2016.[12] In that interview, you stated that "[i]f you look at bar pass rates between 2009 and 2013, we were consistently *at or above* the state bar average rate. That is an incredible feat for a new school." (emphasis added). However, bar passage data published on CSL's website shows that, out of the nine sittings of the North Carolina bar exam (between July 2009 and July 2013), CSL's first-time bar passage rate was actually *below* the state average *five times* (with a maximum differential of -13.33%) and above the state average only four times (with a maximum differential of 7.4%).[13] Thus, your statement was false and/or misleading, particularly when you were making representations as a law school president responding to questions about an accreditor's finding of the school's substantial and persistent failures to prepare students for admission to the bar. Substantial misrepresentations about the success that CSL graduates have on bar examinations constitute substantial misrepresentations about both the "appropriateness of [CSL's] courses and programs to the employment objects that [CSL] states

---

[10]    Letter from J. Conison & C. Ogene to G. Murphy, Chair, Council of the ABA Section of Legal Education & Admissions to the Bar (Oct. 4, 2016).

[11]    Letter from J. Conison to G. Murphy (Aug. 22, 2016) (enclosing Appeal) & Appeal at 11.

[12] Jennifer Thomas, *Charlotte School of Law president talks probation, considers nonprofit status,* CHARLOTTE BUS. J., Nov. 30, 2016 *available at* 2016 WLNR 36711693 (Nov. 30, 2016).

[13] Bar passage data published at: http://www.charlottelaw.edu/gainful-employment-aba-required-disclosures.html.

Mr. Chidi Ogene
Charlotte School of Law
Page 13

its programs are designed to meet," 34 C.F.R. § 668.72(g), and the schools' success in training its students to meet "requirements that are generally needed to be employed in the fields for which the training is provided," 34 C.F.R. § 668.74(f). You either knew or reasonably should have known that this interview was to be made public and could be viewed by current or prospective students.[14] Because a reasonable student or prospective student would have understood your comments to be misleading in its representation of CSL graduates' prior success on the bar examination, these statements constituted substantial misrepresentations in violation of 34 C.F.R. § 668.71.

\*      \*      \*      \*

The denial of recertification will be effective on December 31, 2016. Should CSL have factual evidence to dispute the Department's findings and demonstrate their inaccuracy, CSL may submit that evidence via overnight mail to me at the following address:

> Administrative Actions and Appeals Service Group
> U.S. Department of Education
> Federal Student Aid/Enforcement
> 830 First Street, NE (UCP-3, Room 84F2)
> Washington, DC 20002-8019

If any such material is received by *January 3, 2017*, the Department will review it and notify CSL whether the recertification denial will be modified, rescinded, or left in place. If the recertification denial remains in effect following the Department's review of such submission, or if CSL opts not to make such a submission, the Multi-Regional School Participation Division will contact CSL concerning the proper procedures for closing out CSL's Title IV program accounts.

In the event that CSL submits an application to participate in the Title IV, HEA programs in the future, that application must address the deficiencies noted in this letter. If you have any questions about this letter, you may contact Mitch Cary of my staff at (303) 844-3145.

Sincerely,

Susan D. Crim
Director
Administrative Actions and Appeals Service Group

Enclosure

cc:    Rick Inatome (InfiLaw), via rinatome@infilaw.com
       Jonathon Glass (Cooley LLP), via jglass@cooley.com

---

[14] Notably, the question immediately preceding the question that elicited your statement about bar passage rates was: "What's the message to current students?"

Mr. Chidi Ogene

Charlotte School of Law
Page 14

> Barry A. Currier, Managing Director, Accreditation and Legal Education, ABA Section of Legal Education and Admissions to the Bar, via barry.currier@americanbar.org
>
> Dr. Tim Gallimore, Associate VP for Academic Planning and State Authorization, The University of North Carolina – General Administration, via tagallimore@northcarolina.edu
>
> Department of Defense, via osd.pentagon.ousd-p-r.mbx.vol-edu-compliance@mail.mil
>
> Department of Veteran Affairs, via INCOMING.VBAVACO@va.gov
>
> Consumer Financial Protection Bureau, via CFPB_ENF_Students@cfpb.gov

# ENCLOSURE 1

USA SOI 048

ABA Required Disclosures and Gainful Employment

≡



**CHARLOTTE**
**SCHOOL** *of* **LAW**

REQUEST INFO     APPLY ONLINE     CONTACT US

Search Website          | GO

🏛 CORPORATE COMPLIANCE CENTER

Home | About | Academics | Programs | Admissions | Campus | Career Services | Alumni

# Our Mission



**Request Information**          **Apply For Admission**

**Make An Appointment**          **Financial Assistance**

## Our History

Charlotte School of Law has been awarded full accreditation by the American Bar Association. The action was approved by the Council of the ABA's Section of Legal Education and Admissions to the Bar during the Council's quarterly meeting in Salt Lake City, Utah, on June 10, 2011. The Council determined through its accreditation process that Charlotte School of Law is in full compliance with the ABA Standards for Approval of Law Schools.

The ABA Accreditation Committee gave Charlotte School of Law a positive recommendation to the Council in May 2011. The ABA granted provisional approval to the School in 2008, concluding it was in compliance with ABA standards and had a plan to bring itself into full compliance. A law school must be provisionally approved for at least two years before it is eligible to apply for full approval. In order to be granted full approval, a School must demonstrate that it has established full compliance with each of the ABA's standards, including standards relating to bar passage, job placement and diversity. The ABA's Chicago Headquarters is located at 321 North Clark Street, Chicago, IL, 60654.

## Practical Preparation is Critical

A rigorous curriculum has been created to ensure that our students are equipped with practical skills that will allow them to thrive in a professional setting. Students are taught not only the traditions and theory of law, but also how to apply this learning through critical thinking and analytical skill sets. We address what using a law degree in "real life" can mean to an individual both personally and professionally.

### Admissions Office

**Hours:**
Mon-Fri: 8:30 a.m. - 5:30 p.m.

**Address:**
201 S. College St, Ste 400,
Charlotte, NC 28244

**Email:**
admissions@charlottelaw.edu

**Phone:** (704) 971-8500
**Fax:** (818) 386-5699

### Law Library

**Library User Experience
(LUX) Desk Hours:**

**Mon-Thurs:** 8:00 a.m. - 8:00 p.m.
**Fri:** 8:00 a.m. - 6:00 p.m.
**Sat:** Noon - 5:00 p.m.
**Sun:** 2:00 p.m. - 8:00 p.m.
*Library Hours are subject to change.*

**Address:** 201 S. College St, Ste 400,
Charlotte, NC 28244

**Email:** libreference@charlottelaw.edu

**Library User Experience (LUX) Desk:**
704-971-8573

USA SOI 049

View Programs

## We are student outcome focused

Our faculty is driven by a desire to motivate and energize the student community in every aspect of the Charlotte School of Law experience. Professors are accessible mentors who take an active role in the development of students and help them to embrace their legal education and capitalize on the opportunities within the school and community network of resources. Student success is of the utmost importance to everyone at the institution, on every level.

View Our Faculty

## It is essential to serve our community

The Charlotte School of Law believes strongly that tomorrow's leaders must reflect and interact effectively with an eclectic collective of people and cultures. Consequently, the school places strong emphasis on serving the underserved through community service and pro bono work in an inclusive environment that fosters a demanding yet supportive educational setting for a diverse community.

View Community Service

**Share This Page**

### Learn More

We've provided access to tools & resources that help you meet your educational goals.

**TRANSFER TO CSL**

**SCHEDULE A TOUR**

**REQUEST MORE INFORMATION**

**COURSE DESCRIPTIONS**

**FAST FACTS**

---

**Student Testimonials ▾**

**Sally S.**
*"The biggest advantage CSL gave me was making me practice-ready. I made use of the school's resources and landed four different internship opportunities, one of which has lead to a full-time associate position post graduation."*



 More

**Charlotte School of Law Blog ▾**

Learn More About Our Corporate Compliance Certificate

Regular LUX Desk Hours Will Resume January 8, 2017

Fall Fashion from .gov; A New Look for the Library of Congress and a New View of Government Open Source Projects

The Charlotte School of Law Trial Team Does It Again!

Practice Ready Resources in the Library; North Carolina Lawyers Weekly

### EXPLORE CHARLOTTE LAW

- **About**
- **Programs**
- **Campus**
- **Academics**
- **Admissions**
- **Career Services**

**Upcoming Events ▾**

**View Full Event Calendar**

USA SOI 050




· **Alumni**    · **CSL Pro Bono Blog**
· **Contact Us**    · **CSL Civil Rights Blog**





© 2016 Charlotte School of Law | **Terms of Use** | **Privacy Policy** | **Disclosures**    ◆ avweb designs

USA SOI 051



January 27, 2016

Mr. Robert Paul                                    Sent Via UPS
President                                          Tracking No:
DeVry University                                   1ZA879640199403383
3005 Highland Parkway
Downers Grove, IL 60515                            OPE ID: 01072700

Re:   **NOTICE OF INTENT TO LIMIT:** *Placement Rate and Employability*
      *Advertisements and Representations for DeVry University, 3300 N. Campbell*
      *Avenue, Chicago, IL 60618* (OPE ID 01072700)

Dear Mr. Paul:

Pursuant to 20 U.S.C. § 1094(c)(1)(F), 34 C.F.R. § 668.86, and 34 C.F.R § 668.93, the United
States Department of Education ("Department") is hereby providing notice of its intent to impose
limitations, effective February 16, 2016, on the participation by DeVry University (OPE ID:
01072700) ("DeVry") in programs authorized pursuant to Title IV of the Higher Education Act
of 1965 as amended ("HEA"), 20 U.S.C. § 1070 *et seq*.

As described more fully below, starting in at least 2008 and continuing until at least August
2015, DeVry made representations to students and prospective students regarding the post-
graduation employment outcomes of students who graduated from DeVry over a cumulative
period stretching more than 30 years.  The specific representation that forms the basis of this
action was highlighted in DeVry's *We Major in Careers* campaign, a 2008 "career-focused brand
marketing campaign" that sought to position DeVry as an institution that helped its graduates
achieve career success.  That campaign, which reflected more than a year's worth of in-depth
consumer, marketplace, and brand research by DeVry, represented a conscious decision by
DeVry to make certain representations to students and prospective students for marketing and
recruitment purposes.  Yet with respect to certain representations that were made by DeVry as
part of that campaign and which continued to be made until at least August 2015, DeVry is
unable to substantiate the truthfulness of those representations, as is required by federal law.

Accordingly, as a condition of its continued participation in the Title IV programs and consistent
with existing statutory and regulatory requirements, the Department is hereby notifying DeVry
that neither it nor its agents or employees may make any representations, in advertisements or
otherwise, that include statistics consisting of or based upon the post-graduation employment
outcomes of students who graduated during the time that DeVry has conceded it does not possess
graduate-specific information, *i.e.*, the type of information that is necessary to substantiate the
truthfulness of any post-graduation employment claims.  Nor may DeVry make any
representations that include or are based upon post-graduation employment statistics regarding



Mr. Robert Paul
DeVry University
Page 2

other time periods that cannot be substantiated with graduate-specific information.  Moreover, for a period of five years following the effective date of this action, DeVry must subject all such representations to review by an independent auditor prior to the utterance (*i.e.*, oral, written, or otherwise) of such representations.  The Department is also requiring DeVry to contact third parties who are repeating or re-publishing DeVry's unsubstantiated representations and demand that those entities cease doing so, to retain records used to develop and substantiate certain advertisements, to notify the Department of any legal claims, investigations, subpoenas or other inquiries regarding its post-graduation employment representations, and to notify its students of this limitation.  DeVry's failure to comply with these limitations could subject DeVry to further actions pursuant to 34 C.F.R. Part 668, Subpart G, up to and including termination from its participation in Title IV programs.

## PROCEDURAL BACKGROUND

On August 28, 2015, the Department sent DeVry a letter requesting information about representations made by DeVry regarding the employability of its graduates, including, *inter alia*, the following assertion made by DeVry in marketing and promotional materials:

> "Since 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation."  (the "Since 1975 Representation" or "Representation").[1]

*See* Exh. A. In addition to requesting a detailed description of the methodology used to derive the statistic contained in the Since 1975 Representation, the Department also requested that DeVry produce all summary charts and spreadsheets summarizing student-by-student information developed or maintained by DeVry which DeVry believes is sufficient to substantiate the statistics for graduates for a 15-year component of the Since 1975 Representation (between 1975 and 1990).  The Department also requested that DeVry produce all evidence, organized by year and graduate, on which DeVry relies to substantiate job placement rates for all individuals who graduated from DeVry between 1975 and 1981.

On September 18, 2015, Thomas Babel of DeVry Education Group responded on behalf of DeVry by providing a narrative description (hereinafter "Response"), documents bearing bates

---

[1] For purposes of this letter and action, the Department considers the "Since 1975 Representation" to include variations that convey a similar message to an individual hearing or reading the representation. For instance, in 2010, DeVry provided a copy of materials to the U.S. Senate which contains the representation that "Since 1975 …[o]ver 90% of graduates active in the job market were employed in career-related positions within six months of graduation."  *See* Exh. B at 10.  The Department considers this representation, and other similar representations regarding the employment rates of DeVry graduates since 1975, to be within the scope of the phrase "Since 1975 Representation."

Although this Notice is based only on findings relating to the Since 1975 Representation, we note for the purposes of completeness that the August 28 letter also sought information regarding two other assertions made by DeVry.

Mr. Robert Paul
DeVry University
Page 3

numbers DVG-ED-0000001 to DVG-ED-0002258, and additional information in a cover letter transmitting the Response and documents (hereinafter "Cover Letter").  At the Department's request, additional materials were produced on October 23, 2015 (DVG-ED-0002259 to DVG-ED-0002424) and on October 30, 2015 (DVG-ED-0002425 to DVG-ED-0113744).

## STATUTORY AND REGULATORY REQUIREMENTS

Under the HEA, institutions that participate in the Title IV programs and that advertise job placement rates as a means of attracting students to enroll must make available to prospective students, at or before the time of application, the most recent available data concerning employment statistics and any other information necessary to substantiate the truthfulness of the advertisements.  20 U.S.C. § 1094(a)(8).  *See also* 34 C.F.R. § 668.14(b)(10).  Institutions that choose to participate in the Title IV programs also must agree to administer the programs in accordance with all statutory provisions of or applicable to Title IV of the HEA, *see* 34 C.F.R. § 668.16, and to act as a fiduciary in the administration of the Title IV programs, thereby administering those programs subject to the highest standard of care and diligence, *see* 34 C.F.R §§ 668.82(a)-(b).  Participating institutions must also "[e]stablish[] and maintain[] records required under [Part 668] and individual Title IV, HEA program regulations," 34 C.F.R. § 668.16(d)(1), and must provide access to such records to the Secretary, 34 C.F.R. § 668.24(f).

## FACTUAL FINDINGS

1. Starting in at least February 2008,[2] DeVry was using the Since 1975 Representation in marketing and advertisements in the national media.  *See e.g.*, Exh. C (JET Magazine excerpt (Feb. 11, 2008) (full version *available at* https://books.google.com/books?id=6TwDAAAAMBAJ)) (advertising that 90% of DeVry University undergraduate graduates system-wide in the active job market since 1975 were employed in their fields within 6 months of graduation).[3]

---

[2] According to DeVry, in 2002, Career Services began a project to create an aggregated rate dating back to 1975.  Response at 17.

[3] As noted at the outset, the Department understands that the Since 1975 Representation was used as part of DeVry's *We Major in Careers* campaign, launched in early 2008.  *See, e.g.*, Press Release:  *Alumni Success Forms Foundation for DeVry University Brand Campaign* (Feb. 12, 2008) (attached hereto as Exh.  D) (available within: http://investors.devryeducationgroup.com) ("DeVry University's 'We Major In Careers' campaign is based on some impressive achievements….[S]ince 1975 … 90 percent of those in the active job market were employed in career-related positions within six months of graduation.") (last visited January 19, 2016).  This campaign, which was "developed by Chicago-based global brand-building powerhouse The Marketing Store, reflect[ed] more than a year's worth of in-depth consumer, marketplace and brand research[.]"  *Id.*  The Department also understands that the Since 1975 Representation also appeared at various times on the main page at www.devry.edu.  *See* Exh. E (http://web.archive.org/web/20080218200808/http://www.devry.edu/ (showing what purports to be the www.devry.edu page as of February 18, 2008) & http://web.archive.org/web/20110403191942/http://www.devry.edu/ (same, as of April 3, 2011)).

Mr. Robert Paul
DeVry University
Page 4

2. The Since 1975 Representation conveyed to prospective students that since 1975, 90% – or some close variation thereof, depending on the specific utterance – of DeVry graduates actively seeking employment in their field of study were employed within 6 months of graduation. *See, e.g.*, Exh. A (compilation of representations).

3. DeVry made the Since 1975 Representation in order to demonstrate the value of a DeVry degree and to provide information to prospective students in order to assist with their evaluation of DeVry relative to other education options or institutions. *See* Exh. F (DVG-ED-0002259); Exh. D (describing the inclusion of the representation in the *We Major in Careers* brand for DeVry).

4. The Since 1975 Representation was published by DeVry *at least* until January 23, 2014 (*i.e.*, the date by which DeVry claims it had discontinued its use of the Representation). The Since 1975 Representation remained in promotional materials available on DeVry's website until shortly after DeVry received the Department's August 28, 2015 letter requesting information about the Representation.[4] Versions of the representation remain present today on websites controlled by DeVry. *See, e.g.*:

    i. http://newsroom.devry.edu/news/devry-university-announces-new-alhambra-location.htm (Exh. H at 1) (last visited January 19, 2016);

    ii. http://newsroom.devry.edu/news/devry-university-announces-new-anaheim-location.htm (Exh.  H at 3) (last visited January 19, 2016);

    iii. Press Release: DeVry Inc. Announces Fiscal 2009 Third-Quarter Results; Record revenues driven by favorable enrollment trends (Apr. 23, 2009) available within http://investors.devryeducationgroup.com (attached hereto as Exh. I)  (last visited January 19, 2016)

    iv. Press Release: Alumni Success Forms Foundation for DeVry University Brand Campaign (Feb. 12, 2008) (Exh. D)

5. The Since 1975 Representation was used repeatedly as part of DeVry's brand marketing campaign. *See,e.g.*, Exhs. A, B at 10, G & H.  *See also, e.g.*, DVG-ED-0107525; DVG-ED-0055686 (March 26, 2009 Radio Script, Titled "Good Idea") ("Well, because since 1975, 90% of all DeVry graduates seeking employment had careers in their fields within 6 months of graduation."); DVG-ED-0024408 at 1:07 ("We ask people to spend their

---

[4] Although DeVry claims that the representation ceased being made at an uncertain date before January 23, 2014, in August 2015, the Department independently located the Representation in numerous marketing and recruitment pieces on DeVry's website.  DeVry appears, however, to have removed those pieces from its website shortly after receiving the Department's August 2015 request letter.  In addition, DeVry has also produced to the Department what appears to be a printout dated February 14, 2014 (*i.e.*, *after* January 23, 2014) of a DeVry University website page containing the Since 1975 Representation. *See* Exh. G (DVG-ED-0113737).  Thus, the Department finds DeVry's claim that it ceased making the Representation prior to January 23, 2014 to lack credibility.

Mr. Robert Paul
DeVry University
Page 5

time and money with us. And we give them a return on their investment it would be hard to get anywhere. The simple fact of the matter is, since 1975, 90 percent of our graduates system-wide seeking employment had a career in their fields within six months. 90 percent."); DVG-ED-0011119 (video showing former DeVry University President David Pauldine making the Since 1975 Representation at time stamp 1:55-2:15 and including the Representation as part of DeVry's "Manifesto" at time stamp 8:14); DVG-ED-0024409 (similar, but noting that the return on student investment is one that students "can't get anywhere else" and asserting the veracity of the 90 percent figure "even in a recession"). As a consequence of DeVry's decision to make the Representation, the Representation remains in visible publication today in forms that appear to not be under DeVry's direct or continuing control.[5]

6. DeVry cannot provide the Department with all graduate-specific data that form the basis of the Since 1975 Representation. Specifically, DeVry has stated that it is "unable to locate" student-by-student career services data that forms the basis of the Since 1975 Representation for the period between 1975 and October 1980. *See* Response at 17. With respect to the period between October 1980 and 1990, only "*certain* student-by-student" records exist, suggesting that some records do not exist. *Id.* at 18 (emphasis added). Accordingly, with respect to at least a period of nearly six years, and likely a period of fifteen years, DeVry is unable to produce all student-by-student (or graduate-by-graduate) data that forms the basis of the Since 1975 Representation.

7. The Since 1975 Representation was developed, at least in part, through the compilation and aggregation of annual "By-Campus Rollup Reports" that DeVry asserts were contemporaneously created and which summarized the employment results of each class. Response at 17.

8. DeVry's practices and procedures with respect to reporting graduate employment information and calculating graduate employment statistics are contained in Career Services Policy Manuals. Response at 16. DeVry has only been able to locate such written policies back to 1983, but asserts that "for over 40 years," such policies "controlled" the calculation of the graduate employment rates. *Id.*

9. The practices and procedures used by DeVry to calculate annual graduate employment rates changed, or "evolved," over time. *See* Response at 16. For instance, in August 1989, DeVry changed the methodology by which it calculated (and thus presented) the

---

[5] The Since 1975 Representation is in matters of public record, for example in the record of proceedings of the United States Senate and in filings with the U.S. Securities and Exchange Commission. *See, e.g.*, Written Testimony of Ms. Sharon Thomas Parrott, Senior Vice President, Government and Regulatory Affairs & Chief Compliance Office of DeVry Education before the Senate Committee on Health, Education Labor, and Pensions (June 24, 2010) *available at* http://www.help.senate.gov/imo/media/doc/Parrott.pdf (attached hereto as Exh. B); DeVry University's 8-K, filed July 15, 2010, at Exh. 99.1 *available at* http://www.sec.gov/Archives/edgar/data/730464/000115752310004049/a6361777ex99-1.htm. Moreover, the Representation can be found on third-party websites. *See, e.g.*, Exh. J.

Mr. Robert Paul
DeVry University
Page 6

post-graduation employment rates of its students, with the result of enabling DeVry to "present a much higher percentage of placed students." *See* Exh. K (DVG-ED-0002129).

10. Because the "By-Campus Rollup Reports" were created contemporaneously and annually, and because the practices and procedures used by DeVry changed over time, the methodology underlying the Since 1975 Representation may vary with respect to the component years.

## CONCLUSIONS

1.     Having chosen to advertise job placement rates as a means of attracting students to enroll, and as a participating institution in the Title IV programs, DeVry is required to be able to make available all information necessary to substantiate the truth of advertisements made.  20 U.S.C. § 1094(a)(8); 34 C.F.R. § 668.14(b)(10).  When an institution chooses to use job placement rates as a means of attracting students to enroll, the institution must be able to provide "the most recent available data concerning employment statistics *and … any other information necessary* to *substantiate the truth* of the advertisements."  20 U.S.C. § 1094(a)(8); 34 C.F.R. § 668.14(b)(10) (emphasis added).

2.     An institution is capable of satisfying part of its burden under 20 U.S.C. § 1094(a)(8) and 34 C.F.R. § 668.14(b)(10) if it can produce copies of all graduate-specific data that underlie any statistical representations.[6]  Indeed, DeVry has informed the Department that it has maintained such information with respect to 2012 graduates and has made those records available to the Department.  *See* Response at 12 ("Student-by-student substantiation is available for the class of 2012 should the Department wish to review it.").  But with respect to the Since 1975 Representation, which DeVry chose to make starting in at least 2008, DeVry does not have, or cannot locate, the graduate-by-graduate records necessary to substantiate the veracity of that representation.[7]  Response at 17 ("[W]e have been unable to locate the underlying student-by-student Career Services data relating to [1975-October 1980] despite a diligent, ongoing search.").

---

[6] The mere retention (and ability to produce) graduate-specific data does not suffice to meet the statutory and regulatory requirements.  The information retained must still substantiate the truthfulness of the advertisements.  Moreover, the Department is not suggesting that graduate-specific data should be made available to all prospective students upon request, as such information would contain personally identifiable information, the disclosure of which would be prohibited under 20 U.S.C. § 1232g(b) and other federal laws.  Rather, to be administratively capable of complying with 20 U.S.C. § 1094(a)(8) and 34 C.F.R. § 668.14(b)(10), graduate-specific information must be retained by the institution if the institution opts to advertise job placement rates that are based on the post-graduation employment outcomes of those graduates. *Cf. In re Macomb Community College*, Dkt. No. 91-80-SP (June 28, 1993) ("Undoubtedly, the purposes of Title IV could easily be defeated if institutions could not be taken to task for failure to maintain records which could substantiate that an institution was entitled to the Federal funds that it was given.").  *See also*, *e.g.* 34 C.F.R. § 668.16(d)(1); 34 C.F.R. § 668.24.

[7] Although DeVry reports of having conducted a diligent search for student-by-student materials, DeVry has alternatively claimed that, if such records are available, they are "likely" stored on microfiche/microfilm format at local campuses.

Mr. Robert Paul
DeVry University
Page 7

3.      DeVry asserts that "graduate-specific information is [not] necessary to substantiate its claim." Cover Ltr. at 2.  Instead, DeVry maintains that it has satisfied its statutory and regulatory burden by producing three types of information:  (i) a series of historical "compilation reports" that DeVry asserts were contemporaneously prepared between 1975 and 1990 in the ordinary course of business and which summarize student-by-student information, Response at 17; Cover Ltr. at 2 (citing to DVG-ED-0001656-2254); (ii) "student-by-student data extracted from a legacy database relating to the period 1980 to 1990, which demonstrates the[] reliability" of the compilations for the period between 1980 and 1990, Cover Ltr. at 2; and (iii) recently prepared affidavits from two individuals who were employed by DeVry in career-services related positions at two DeVry campuses between at least 1975 and 1979.  *See* DVG-ED-0001644-1654.

**The Department has reviewed and analyzed DeVry's submissions and has concluded that DeVry has failed to meet the substantiation requirement with respect to the Since 1975 Representation.**

As an initial matter, neither the HEA, 20 U.S.C. § 1094(a)(8), nor the Department's regulations, 34 C.F.R. § 668.14(b)(10), permit a school to "substantiate the truthfulness" of advertisements regarding job placement rates by relying on summary compilations of data without having retained, and without being able to provide to the Department for verification, the backup documentation necessary to substantiate the truth of the compilations (and, by extension, the truth of the advertisements).  Substantiation requires more that the offering of some evidence or support for a proposition.[8]  The reason for this is clear:  prospective students are likely to rely upon claims regarding employment prospects in order to evaluate the relative value of a particular institution.  Generally, prospective students will not be in a position to verify the accuracy of representations made by an institution prior to enrollment, and must therefore rely upon the truthfulness of representations made by the institution.  Institutions must, therefore, be able to "substantiate the truthfulness" of representations they make – *i.e.*, not merely provide some evidence to generally support the representations.

As it relates to the Since 1975 Representation, DeVry is implicitly suggesting that Department (and, by extension, a prospective student) trust that the compilations were made both accurately and in a methodologically sound manner.  Although DeVry has offered argument and affidavits to support its assertion that the compilations are both accurate and methodologically sound, the affidavits do not suffice to "substantiate" the truthfulness of the compilations or the representations made that were based on those compilations. That can only be done with underlying data.

---

[8] *See, e.g.*, Webster's Third New International Dictionary, Unabridged (1979) (defining "substantiate" as "to establish the existence or truth of by proof or competent evidence"); *Godwin v. Sec'y of Health & Human Servs.*, No. 94-CV-72386-DT, 1995 WL 871199, at *5 (E.D. Mich. May 2, 1995) ("*Webster's* … provides that to substantiate is to establish the existence or truth of an object or idea by proof or competent evidence."); Webster's II New Riverside University Dictionary (1984) (defining "substantiate" as "[t]o support *and verify* with proof or evidence") (emphasis added); *Minnesota Lawyers Mut. Ins. Co. v. Larson*, No. 06-CV-074-WDS, 2007 WL 2688443, at *3 (S.D. Ill. Sept. 11, 2007) ("Larson would need more facts to actually 'substantiate' a claim than he would simply to 'support' one.").

Mr. Robert Paul
DeVry University
Page 8

      A.     With respect to DeVry's assertion that the accuracy of, and methodology underlying, the compilation reports are "corroborate[d]" by "student-by-student graduate information … extracted from its earliest legacy computer database" relating to the period from October 1980-1990 which demonstrates the reliability of the historical compilations, including those covering the period between 1975 and October 1980, *see* Cover Ltr. at 2; Response at 19, any such corroboration is limited to the period *after* October 1980. DeVry's assertions that the legacy database corroborates the accuracy of the historical compilation reports do not speak to the accuracy of those compilations from *before* October 1980.

      B.     With respect to the accuracy of, and methodology underlying, the historical compilation reports, DeVry has also provided two recently prepared affidavits from individuals employed by DeVry in the 1970s. *See* DVG-ED-0001644-1654. Assuming the veracity of the statements contained in the affidavits, the affiants only have personal knowledge of certain policies followed by the campuses on which they worked. Neither affidavit speaks to the process by which DeVry's "Home Office" compiled the reports submitted by the individual campuses. For instance, although the first affiant makes certain representation about the processes used by the Kansas City campus of DeVry, he affirmed that the campus "made reports to Home Office" on a periodic basis, and that the "Home Office," *i.e.*, not the Kansas City campus, "compiled these reports in order to prepare a graduate employment statistic every year." DVG-ED-0001646-47 at ¶¶ 20-21. Similarly, although the second affiant was "confident that the statistics reported by DeVry Institute Chicago in the Home Office's yearly summary spreadsheets are accurate," she did not make affirmations about the processes used by other campuses or the generation of the system-wide employment rate by the Home Office. DVG-ED-0001653 at ¶ 31. Accordingly, even accepting the truth of the statements in affidavits for purposes of determining whether DeVry has satisfied 20 U.S.C. § 1094(a)(8) and 34 C.F.R. § 668.14(b)(10), the affidavits do not provide sufficient information.[9]

      C.     With respect to the methodology underlying the compilation reports, information provided by DeVry in response to the Department's request establishes that the compilation reports are insufficient to substantiate the truthfulness of the representations made. As noted above, the practices and procedures used by DeVry to derive annual job placement statistics changed over time. *See* Response at 16. For instance, in August 1989, with the stated result of giving DeVry "the opportunity to present a much higher percentage of placed students," DeVry

---

[9] Nor does the Department consider sufficient to substantiate (or support the substantiation of ) the truthfulness of the Since 1975 Representation the fact that DeVry placed advertisements in the 1970s which advertised, without substantiation, a graduate of employment rate in excess of 90%. *See* Response at 18 & n.33. Nor does the Department find a 1980 Consent Order between the FTC and a DeVry predecessor, Bell & Howell, persuasive evidence that DeVry can substantiate the truthfulness of the Since 1975 Representation. There is no evidence that the FTC ever included within the scope of its investigation an analysis of DeVry's graduate employment rate, apart from a 2015 recollection of a review, by the FTC, of graduate employment rates in 1974. *See* DVG-ED-0001653 at ¶¶ 32-36. But even if that recollection is accurate, (i) that analysis would have been of data that predates the Since 1975 Representation; and (ii) the decision by a federal agency not to take action against a company is certainly not conclusive evidence that the company was making only truthful, and substantiated, representations in its advertising.

Mr. Robert Paul
DeVry University
Page 9

changed the methodology by which it calculated (and thus presented) the post-graduation employment rates of its students. *See* Exh. K (DVG-ED-0002129). Moreover, DeVry has only been able to produce the Career Services Policy Manuals (which contain DeVry's practices and procedures with respect to reporting job placement information and calculating job placement statistics) dating back to 1983. Accordingly, because the compilations were created contemporaneously, the practices changed over time, and DeVry cannot produce the methodologies used before 1983, the Since 1975 Representation may be based on internally inconsistent methodologies. For example, a particular 1979 DeVry graduate may (or may not) not have counted as "employed" for statistical purposes in 1979, a graduate in identical circumstances in 1989 may have counted as "employed," or may have been omitted from the calculation altogether. But the Department has no way to assess whether this is a pure hypothetical, nor does it have any way to assess *at all* the methodology used between 1975-1983.

## LIMITATION

An institution participating in the Title IV programs must, at all times, act in the nature of, and with the competency and integrity necessary to qualify as, a fiduciary in the administration of those programs. 34 C.F.R. § 668.82. As a fiduciary, an institution "is subject to the highest standard of care and diligence in administering [Title IV] programs," 34 C.F.R. § 668.82(b)(1), and the failure by an institution to administer such programs in accordance with that standard may be subjected to, *inter alia*, a limitation on the institution's participation in that program. *See* 34 C.F.R. § 668.82(c). *See also* 20 U.S.C. § 1094(c)(1)(F) (permitting the imposition of a "limitation" by the Secretary whenever the Secretary "has determined, after a reasonable notice and opportunity for hearing, that such institution has violated or failed to carry out any provision" of Title IV). More specifically, the Department "may limit … an institution's participation" in the Title IV programs if an institution "[v]iolates any statutory provision of or applicable to Title IV of the HEA," or "any regulatory provision prescribed under that statutory authority." 34 C.F.R. § 668.86. "A limitation may include, as appropriate to the Title IV, HEA program in question … [any] conditions as may be determined by the Secretary to be reasonable and appropriate." 34 C.F.R. § 668.93(i).

**Because of the facts and conclusions stated above, the Department, consistent with the substantive and procedural requirements in 34 C.F.R. Part 668, Subpart G, is hereby providing notice that the following limitations are being placed on DeVry's continued eligibility to receive Title IV funding. Notwithstanding any other applicable requirements, as a condition of receiving Title IV funds:**

(1) DeVry must immediately cease making any representations that are based, in whole or in part, on graduate employment rates for the period between 1975 and October 1980.

(2) DeVry may not make representations that are based, in whole or in part, on graduate employment rates, unless:

    a. DeVry can substantiate such representations with graduate-specific information, which shall be made available to the Department upon request; and

USA SOI 060

Mr. Robert Paul
DeVry University
Page 10

    b.  with respect to any such representation made during the five (5) years following the effective date of the limitation, DeVry obtains the report of an independent auditor conducting an examination-level attestation engagement of the veracity of such representation. The audit must be performed by the independent auditor in accordance with Generally Accepted Government Auditing Standards ("GAGAS") issued by GAO and attestation standards issued by the American Institute of Certified Public Accountants ("AICPA"). The report of such audit must be issued before a representation is made, and DeVry Education Group must provide the Department with a copy of the report within 60 days of the representation being made.

(3) DeVry must comply with the following student notification requirements:

    a.  Within 60 days of the effective date of this limitation, DeVry must notify all students who are enrolled at DeVry on the effective date of the limitation, that the Since 1975 Representation was not substantiated to the extent required by law. Such notification must be made to each enrolled student at the most recent e-mail address that DeVry has for each of these students. Within 60 days of the effective date of this limitation, DeVry must provide the Department with a copy of the message issued to each student, and a list (with names and email addresses) of all recipients who were provided the message. The e-mail must contain, verbatim, the following language (hereinafter "Disclosure Language"):

> *Following a final Department of Education action effective [INSERT DATE], DeVry was determined to have made marketing representations to current and prospective students that were unsubstantiated to the extent required by law. Specifically, DeVry was not able to adequately substantiate the truthfulness of its marketing claim that, in effect, "Since 1975, 90% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation." Please be advised that DeVry has ceased making such representations and is making outreach efforts to outside entities that made such representations and is requesting those entities to cease repeating DeVry's prior representations.*

    b.  Within 60 days of the effective date of this limitation, and for a period of five (5) years, DeVry must (i) prominently post the Disclosure Language on the home page of its Website in a simple and meaningful manner; (ii) provide a prominent and direct link on any other Web page containing any information or representations about the post-graduation employment outcomes of DeVry students and (iii) prominently include the Disclosure Language in a simple and meaningful manner in all other marketing or recruiting materials containing

Mr. Robert Paul
DeVry University
Page 11

representations about post-graduation employment outcomes. Within 60 days of the effective date of this limitation, DeVry must also provide the Department with proof of its compliance with this limitation, including by providing a document listing all URLs to which the Disclosure Language has been posted and a copy of all other marketing materials to which the Disclosure Language has been included.

c. Effective immediately, and for five (5) years following the effective date of the limitation, DeVry must include the Disclosure Language in any and all enrollment agreements or other such documents memorializing the enrollment of a student at DeVry University.

(4) Within 60 days of the effective date of this limitation, DeVry shall provide to the Department an exact copy of the notice attached hereto as Attachment A, showing the date of delivery, to all persons or entities who DeVry believes (after a reasonable, good faith investigation) to be continuing to publish the Since 1975 Representation to the public, regardless of whether the representation is being made under an arrangement with DeVry. The notice required by this paragraph shall not include any document or enclosures other than those referenced in the notice and may be sent to the principal place of business or registered agent of each entity so identified. In addition, DeVry must provide documentation to the Department of the investigation and methodology it used to identify the recipients of this notice.

(5) Effective immediately, and for five (5) years following the effective date of the limitation, if DeVry makes any representation that is based, in whole or in part, on graduate employment rates, DeVry must preserve the following information in its possession, custody, or control, without regard to whether it was relied upon to develop or to substantiate the representation. Such information must be preserved for a period of five (5) years following the last utterance or publication of the representation.

a. All student files relating to the students or graduates whose graduate employment information serves as a basis for the representation;
b. All documentation relating to the employment of any such student before, during, and after the student's graduation from DeVry;
c. All communications with any such student or graduate regarding post-graduation employment;
d. All documents relating to any audit, survey, or other review by any person or entity affiliated with or retained by DeVry Education Group, of any statistic underlying any representations that are based, in whole or in part, on graduate employment rates;
e. All documents, including, without limitation, Career Services Manuals, that describe, refer, or relate to the methodology used by DeVry to calculate or create a representation based, in whole or in part, on graduate employment rates; and
f. To the extent not included above, all evidence on which DeVry relies to substantiate any representation it makes about the employability of its graduates

Mr. Robert Paul
DeVry University
Page 12

> (including representations that are based, in whole or in part, on graduate
> employment rates).

(6) Effective immediately, and for five (5) years following the effective date of the
limitation, DeVry must submit to the Department, no later than 10 days after the event
described below, written notice of the occurrence of any of the following:

    a. Any adverse action whatsoever, including, without limitation, written warnings,
adverse factual determinations, show cause orders, probation and similar actions,
taken against DeVry by its accrediting agency, State authorizing agencies, a
Federal agency, or a private party relating to representations made by DeVry
regarding the employability of its graduates (including representations that are
based, in whole or in part, on graduate employment rates); or

    b. DeVry's receipt of a subpoena, civil investigative demand, or other inquiry by its
accrediting agency, State authorizing agencies, or a Federal agency, relating to
representations made by DeVry regarding the employability of its graduates
(including representations that are based, in whole or in part, on graduate
employment rates).

## **RIGHTS**

Consistent with 34 C.F.R. § 668.86(b)(1)(ii), the effective date of the above stated limitations
shall be February 16, 2016, unless we receive by that date a request for a hearing or written
material indicating why the limitation should not be imposed. 34 C.F.R. § 668.86(b)(1)(iii).
DeVry may submit either a written request for a hearing or written material indicating why this
limitation action is inappropriate. 34 C.F.R. § 668.86(b)(1)(iii). If DeVry chooses to request a
hearing or to submit written material, you must write to me, via overnight mail, at:

    Administrative Actions and Appeals Service Group
    U.S. Department of Education
    Federal Student Aid/PC
    830 First Street, NE, UCP-3
    Room 84F2
    Washington, DC 20002-8019

If DeVry requests a hearing, the case will be referred to the Office of Hearings and Appeals.
That office will arrange for the assignment of the institution's case to an official who will
conduct an independent hearing. 34 C.F.R. § 668.86(b)(3). DeVry is entitled to be represented
by counsel at the hearing and otherwise during the proceedings. If DeVry does not request a
hearing, but submits written materials instead, I shall consider that material and notify DeVry
whether the limitation will become effective, will be modified, or will be dismissed. 34 C.F.R. §
668.86(b)(2).

Mr. Robert Paul
DeVry University
Page 13

**ANY REQUEST FOR A HEARING OR WRITTEN MATERIAL THAT DEVRY SUBMITS MUST BE RECEIVED BY FEBRUARY 16, 2016.  OTHERWISE THE LIMITATION WILL BE EFFECTIVE ON THAT DATE.**

If you have any questions or desire any additional explanation of the institution's rights with respect to this action, please contact me at (202) 377-4647 or via email at susan.crim@ed.gov.

### **CONCLUSION**

The Department continues to investigate and consider DeVry's use of job placement rates and other employment-related statistics as a means of attracting prospective students.  The Department is also cognizant of other actions and investigations by other governmental agencies regarding DeVry's advertisements.  The action herein stated should not be read as an indication that the Department has concluded that aspect of its investigation, or made any final determinations about the veracity of any advertisement made by DeVry.  Moreover, although DeVry appears to have removed the "Since 1975" representation from recruiting and marketing materials on its website, should DeVry make any representation that is based on unsubstantiated data, including the "Since 1975" representation, the Department may seek to impose additional sanctions.  The Department reserves the right to take additional action against DeVry pursuant to 34 C.F.R. Part 668, Subpart G or other applicable regulations.

Sincerely,

Susan D. Crim, Director
Administrative Actions & Appeals Service Group

Encl.

cc: (w/out exhibits)

Karen Solinski, Executive Vice President for Legal and Governmental Affairs, The Higher
    Learning Commission, via ksolinski@hlcommission.org
Zach Waymer, Coordinator for Legal and Governmental Affairs, The Higher Learning
    Commission, via zwaymer@hlcommission.org
Teri Stanfill, School Compliance Associate, Arizona State Board for Private Postsecondary
    Education, via teri.stanfill@azppse.gov
Yvette Johnson, Enforcement Chief, California Bureau for Private Postsecondary and Vocational
    Education, via Yvette.johnson@bppe.ca.gov
Heather DeLange, Academic Policy Officer, Colorado Department of Higher Education, via
    heather.delange@dhe.state.co.us

Mr. Robert Paul
DeVry University
Page 14

Joey Smith, Operations and Program Manager, Florida Commission for Independent Education, via joey.smith@fldoe.org
Carl Camann, Deputy Director, Georgia Postsecondary Education Commission, via ccam@gnpec.org
Dan Cullen, Deputy Director of Academic Affairs, Illinois Board of Higher Education, via cullenb@ibhe.org
Ross Miller, Executive Director, Indiana Commission on Proprietary Education, via rmiller@che.in.gov
Jay Morgan, Vice President of Academic Affairs, Kentucky Council on Postsecondary Education, via jay.morgan@ky.gov
Tonya Johnson, Executive Associate, Maryland Higher Education Commission, via tonya.johnson@maryland.gov
Mike Beamish, Proprietary School Manager, Michigan Department of Education, via beamishm@michigan.gov
Larry Pogemiller, Commissioner, Minnesota Office of Higher Education, via larry.pogemiller@state.mn.us
Leroy Wade, Deputy Commissioner, Missouri Coordinating Board for Higher Education, via Leroy.wade@dhe.mo.gov
Kelly Wuest, Director, Nevada Commission on Postsecondary Education, via kdwuest@cpe.state.nv.us
Gregg Edwards, Director of Higher Education, New Jersey Commission on Higher Education, via Gregg.edwards@oshe.nj.gov
Leslie Templeman, Director of Higher Education, New York State Education Department, via leslie.templeman@nysed.gov
Terrence Scarborough, Director of Licensure, University of North Carolina General Administration, via trscarborough@northcarolina.edu
John Carey, Chancellor, Ohio Board of Regents, via chancellor@regents.state.oh.us
Glen Johnson, Chancellor, Oklahoma State Regents for Higher Education, via chancellorjohnson@osrhe.edu
Hilda Rosselli, Office of Degree Authorization, Oregon Student Assistance Commission, via hilda.roselli@state.or.us
Wil Del Pilar, Director of Compliance, Pennsylvania Department of Education, via widelpilar@pa.gov
Stephanie Bellard-Chase, Associate Executive Director, Tennessee Higher Education Commission, via Stephanie.bellard@tn.gov
Raymund Paredes, Commissioner, Texas Higher Education Coordinating Board, via raymund.paredes@thecb.state.tx.us
D. Buhler, Commissioner, Utah System of Higher Education, via dbuhler@utah.sbr.edu
Sylvia Rosa-Casanova, Director of Higher Education, Virginia State Council of Higher Education, via sylviarosacasanova@schev.edu
Michael Ball, Director for State Approving Agency and Degree Authorization, Washington Student Achievement Council, via michaelball@wsac.wa.gov
Anna Fosdick, Director of School Administration, Wisconsin Educational Approval Board, via anna.fosdick@eab.wisconsin.gov
Department of Defense, via osd.pentagon.ousd-p-r.mbx.vol-edu-compliance@mail.mil

USA SOI 065

Mr. Robert Paul
DeVry University
Page 15

Department of Veterans Affairs, via incoming.vbavaco@va.gov
Consumer Financial Protection Bureau, via cfpb_enf_students@cfpb.gov

**ATTACHMENT A**

[ON DEVRY EDUCATION GROUP LETTERHEAD]

**IMPORTANT NOTICE ABOUT DEVRY UNIVERSITY'S
ADVERTISING AND MARKETING MATERIALS**

[insert addressee name]
[insert addressee address]


To whom it may concern:

As a result of action taken by the United States Department of Education ("ED"), DeVry University ("DeVry") has been ordered not to make certain representations in advertisements or otherwise concerning the employability of its graduates (including representations regarding graduate employment statistics).

It has come to our attention that your company has been retransmitting a representation previously made by DeVry, but which is being prohibited by ED.  Specifically, that representation is:

*[INSERT PRECISE TEXT OF SINCE 1975 REPRESENTATION USED BY ENTITY]*

That representation is currently being broadcast by your company in the following manner:

*[INSERT WEB URL OR OTHER DESCRIPTION OF WHERE REPRSENTATION IS BEING USED]*

DeVry requests that you stop using or repeating this representation.  This should be done immediately.  DeVry will make revised marketing materials available to you shortly, which do not contain representations that have been prohibited by ED.

Should you have any questions about compliance with this notification, please contact

*[insert contact person]*.


                                              Sincerely,



                                              Robert Paul
                                              President
                                              DeVry University



January 29, 2016

Ms. Julia Lowder
CEO                              Sent Overnight Via UPS
Computer Systems Institute       Tracking Number:  1ZA879640199966347
8930 Gross Point Road
Skokie, IL 60077

Re:    Denial of Recertification Application to Participate in the Federal Student
Financial Assistance Programs—Computer Systems Institute, 8930 Gross Point Road Skokie, IL
60077  OPE-ID:  03416300


Dear Ms. Lowder:

The U.S. Department of Education (Department) has reviewed Computer Systems Institute's
(CSI's) application for recertification to continue to participate in the student financial assistance
programs authorized pursuant to Title IV of the Higher Education Act of 1965, as amended, 20
U.S.C. §§ 1070 *et seq*. (Title IV, HEA programs).  CSI consists of a main location in Skokie, IL,
and additional locations at 318 West Adams, Chicago, IL; 29 E. Madison, Chicago, IL; 5330
Grand Avenue, Gurnee, IL 60031-1735; and 400 Airport Road, Elgin, IL.  Another additional
location in Lombard, IL closed on April 4, 2011.  In the normal course, CSI's provisional
Program Participation Agreement (PPA) would have expired on March 31, 2012.  Because CSI
timely submitted its recertification application, however, the Department extended CSI's
previous PPA on a month-to-month basis while the Department reviewed the application and
related matters.  *See* 34 C.F.R. § 668.13(b)(2).

In addition to the recertification application materials, the Department reviewed, among other
things, the results of the Department's January 2014 program review of CSI, including, but not
limited to, CSI's job placement rate documentation collected during the review, and the
statements of students who completed their programs of study for whom CSI claimed were
placed, as well as their alleged employers.  As set forth below, the information the Department
obtained and reviewed establishes that CSI breached its fiduciary duty to the Department by
failing to comply with Title IV, HEA program requirements.  Specifically, CSI submitted false
job placement data to its accreditor to maintain the accreditation of its schools, and disclosed
false placement data to current and prospective students.  CSI's misconduct will not be tolerated
by the Department, and therefore, its recertification application is denied.  As a result of this



denial, the institution can no longer participate in the Title IV, HEA programs, as of January 31, 2016.  *See* 34 C.F.R. § 668.13(b)(2).

As of January 31, 2016, CSI will no longer be eligible to participate in the following Title IV, HEA programs:  Federal Pell Grant (Pell Grant), Federal Supplemental Educational Opportunity Grant (FSEOG), Iraq and Afghanistan Service Grants (IASG), Teacher Education Assistance for College and Higher Education (TEACH) Grant, Federal Work-Study (FWS), Federal Perkins Loan (Perkins Loan), and William D. Ford Federal Direct Loan (Direct Loan).  The Direct Loan program includes the Federal Direct Stafford/Ford Loan Program, the Federal Direct Unsubsidized Stafford/Ford Loan program, and the Federal Direct PLUS Program.  The FSEOG, FWS, and Perkins Loan programs are known as campus-based programs.

## CSI BREACHED ITS FIDUCIARY DUTY TO THE DEPARTMENT BY CREATING FALSE JOB PLACEMENTS AND MISREPRESENTING ITS JOB PLACEMENT RATE TO ITS ACCREDITOR AND THE DEPARTMENT

To begin and to continue participating in the Title IV, HEA programs, an institution shall demonstrate to the Secretary that it administers the Title IV, HEA programs in accordance with all statutory provisions of, or applicable to, Title IV of the HEA, and all applicable regulatory provisions prescribed under that statutory authority.  34 C.F.R. § 668.16(a).

On June 30, 2009, CSI executed its current provisional PPA with the Department, which likewise stated that CSI would comply with all Title IV, HEA program requirements, as well as any conditions specified by the Department in the PPA.  20 U.S.C. § 1094(a)(1); *see generally* 34 C.F.R. § 668.14.  CSI's PPA encompassed each of the additional locations noted above.  34 C.F.R. § 668.14(a)(2).  By entering into the PPA with the Department, CSI, and its officers, accepted the responsibility to act as fiduciaries in the administration of the Title IV, HEA programs.  As fiduciaries, CSI and its officers are subject to the highest standard of care and diligence in administering the Title IV, HEA programs and in accounting to the Secretary for the funds received.  34 C.F.R. §§ 668.82(a) and (b).

In the case of an institution that advertises job placement rates as a means of attracting students to enroll, it must make available to prospective students, at or before the time that those students apply for enrollment-- (i) the most recent available data concerning employment statistics, graduation statistics, and any other information necessary to substantiate the truthfulness of the advertisements; and (ii) relevant State licensing requirements of the State in which the institution is located for any job for which an educational program offered by the institution is designed to prepare those prospective students.  34 C.F.R. § 668.14(b)(10); 20 U.S.C. § 1094(a)(8).[1]  34 C.F.R. § 668.14(b)(10)(ii) was added through the 1992 amendments to the HEA, and again, is a direct quote from the statute at § 487(a)(8).

---

[1] When these regulatory requirements were adopted, the Preamble to regulations stated that:  "The Secretary regards the statutory requirement on advertising (and some related "consumer information" provisions) as 'self-explanatory' and, thus, not in need of regulatory embellishment."  59 Fed. Reg. 9,526, 9,537 (Feb. 28, 1994).  The ordinary dictionary definition of "advertise" is therefore applicable, and *Merriam-Webster's* dictionary defines "to advertise" as:  "To make public, to make known, to notify, to proclaim, to announce, to call attention to."

Page 3 – Ms. Julia Lowder
Computer Systems Institute

Also, "[i]f the Secretary determines that an eligible institution has engaged in substantial misrepresentation, the Secretary may … [d]eny participation applications made on behalf of the institution…" 34 C.F.R. § 668.71 (a)(3).  A substantial misrepresentation is defined as "any misrepresentation on which the person to whom it was made could reasonably be expected to rely, or has reasonably relied, to that person's detriment," whereas a misrepresentation consists of "any false, erroneous or misleading statement an eligible institution, [or] one of its representatives... makes directly or indirectly to a student, prospective student or any member of the public, or to an accrediting agency, to a State agency, or to the Secretary."  A misleading statement "includes any statement that has the likelihood or tendency to deceive," and a "statement is any communication made in writing, visually, orally, or through other means."  A prospective student is "any individual who has contacted an eligible institution for the purpose of requesting information about enrolling at the institution or who has been contacted directly by the institution or indirectly through advertising about enrolling at the institution."  34 C.F.R. § 668.71(c).

Effective July 1, 2010, an institution must make available to any enrolled or prospective students through appropriate publications, mailings, or electronic media, information concerning the placement of, and types of employment obtained by, graduates of the institution's degree or certificate programs. 34 C.F.R. § 668.41(d)(5).  The information may be gathered from the institution's placement rate for any program, if it calculates such a rate, or other relevant sources. 34 C.F.R. § 668.41(d)(5)(i).  The institution must identify the source of the information, as well as any timeframes and methodology associated with it.  34 C.F.R. § 668.41(d)(5)(ii).  The institution must disclose any placement rates it calculates.  34 C.F.R. § 668.41(d)(5)(iii).  An institution may satisfy the requirement to disclose the information required under 34 C.F.R. § 668.41(d) for enrolled students by posting the information on an internet website or an intranet website that is reasonably accessible to the individuals to whom the information must be disclosed; and to prospective students by posting the information on an internet website.  34 C.F.R. §§ 668.41(b)(1) and (2).

Beginning July 1, 2011, an institution that offers an educational program that prepares students for gainful employment in a recognized occupation, and that is required by its accrediting agency or State to calculate a placement rate on a program basis, must disclose the rate and identify the accrediting agency or State agency under whose requirements the rate was calculated.  34 C.F.R. § 668.6(b).  The institution must include the information required under 34 C.F.R. § 668.6(b)(1) in promotional materials it makes available to prospective students and post this information on its website, prominently provide the information in a simple and meaningful manner on the home page of its program website, and provide a prominent and direct link on any other Web page containing general, academic, or admissions information about the program to the single Web page that contains all the required information.  34 C.F.R. § 668.6(b)(2).

During the program review, the Department requested data from CSI, which included placement rates, graduation rates, and statistical data to verify the employment of students post-graduation. Upon review of the data, the Department found that at least part of the institution's placement data, as CSI presented it to the Accrediting Council for Independent Colleges and Schools

Page 4 – Ms. Julia Lowder
Computer Systems Institute

(ACISC), in order to become accredited by that accreditor,[2] as well as directly to the Department during the program review, contained substantial misrepresentations about the placement of its students who completed their programs of study.   The following examples illustrate these substantial misrepresentations.

### 1.  Home Health Consultants (HHC)

HHC is an "employer," which, according to the placement rate backup data provided by CSI to the Department, employed some 42 students who completed either the Health Care Career program or the Business Career program.  The Department conducted follow-up interviews with several of the 42 students who CSI claimed it placed with this "employer."

Preliminarily, the Department's research and investigation showed that on August 18, 2014, Zoharel Quinn, AKA "Dr. Quinn" or "Quinn" filed an assumed business name application for HHC with the Cook County Clerk's Office (Illinois), which listed a business address of 310 West 116th Street, Chicago, IL 60628.  The website identified that the business purpose of HHC was "to assist seniors and people with disabilities at home."  It is unknown if HHC had been registered prior to the August 18, 2014 filing date.  The structure at 310 West 116th Street, Chicago, IL appears to be a single-family residence.  When visited by the Department, a Cook County business license hung in the front window, which turned out to be Quinn's home.

Department personnel interviewed Quinn on the front porch of his home, through a closed screen door.  Quinn claimed that he started working with CSI in 2013 or early 2014 and that he "matched up" CSI students with home healthcare employers.  Despite that statement, he explained that the students "cook and clean for the elderly."  He said that he did not place "all that many CSI students," but said that he provided a presentation for "around 40 CSI students" at the Chicago location. He said that those CSI students he placed obtained home health worker positions or "marketing" positions.  He maintained that his contact at CSI was a Mr. Dechazalon Bennett, and a CSI vice president, whom he described as a white male, whose name he could not recall. Quinn initially stated that HHC paid CSI graduates that he worked with, but later in the interview, he provided different answers about how CSI graduates were paid.  Quinn stated that HHC did not receive payment from either CSI or the Illinois Department of Aging.  He claimed that he "just did it."  It was "his thing."

Most of the students who were interviewed signed, and swore to, declarations.  In brazen contrast to CSI's misrepresentation, not a single one of the randomly-interviewed students had ever been employed by HHC.  The majority had never heard of this entity.  Two students told the Department that HHC was not a "real" company; rather it was a single individual, a "Dr. Quinn," who "hired" them to hand out flyers to elderly persons on the street for what the students said were "bogus medical services."  Only one of these two students received any monetary

---

[2] CSI's former accreditor, North Central Association – Commission Accreditation and School Improvement (NCA-CASI) lost recognition by the Secretary as an approved accreditor.  The Department provided CSI with an 18-month grace period to find a new accreditor on February 1, 2013.  CSI provided the placement rate data referred to herein to ACICS, in order to become accredited by that accreditor.  ACICS granted CSI accreditation in August 2014, just in time to meet the Department's 18-month deadline.

Page 5 – Ms. Julia Lowder
Computer Systems Institute

remuneration for her efforts.  *See* Student #8, below, who said she was paid $100 for more than 80 hours of work, for an effective hourly rate of only $1.25.

A summary of the interviews with students whom CSI claimed were placed through HHC follows.  CSI claimed in its job placement back-up data that each of these students was placed at HHC, that their "supervisor" was Dr. Quinn, and that the address they worked at was 310 West 116th Street, Chicago Illinois.  Absolutely none of this was true.

Student #1:
In August 2012, this student enrolled at CSI's Chicago location in the Health Care Career program, for training as a medical assistant.  She met with a female recruiter, who told her that 90% of the graduates received jobs.  Her recruiter also said that CSI would prepare her to get a job.  The tuition was $9,500.  She received federal financial aid including both Pell Grant funds and Direct Loan funds.  She received grades of A or B in each of her classes, and received a diploma upon graduating from the program in June 2013.  She passed the Certified Clinical Medical Assistant (CCMA)[3] certification exam for phlebotomy but not for medical assisting.

She has never been hired in the health care field since graduating from CSI, nor has CSI helped her to find any kind of a job.  CSI staff referred her to a man named Mr. Quinn.  She called him, and he said that he wanted her to knock on the doors of elderly people's homes for nursing services for home medical care.  She called him six or seven times a week for over a period of three months to arrange to meet with him, so that he could give her further information, because she did not understand exactly what he wanted her to do.  He would not answer many times, but, if he did, he always put her off by saying he was "too busy" to meet with her.  As a result, she never laid eyes on him.  She finally gave up even trying to call him after she got a job on her own as a security officer for home security for Yale Enforcement.  She has never been to 310 W. 116th Street in Chicago.

This student worked for Yale Enforcement for about a year and a half, making $10.75 an hour, but then she was laid off.  Subsequently, she got a job at CEB Security as a security guard at a Walgreen's Drug Store for $9 an hour, where she worked for about one year.  Recently, she was hired at Kates Security, as a street security officer, making $11 an hour.  She got all of these jobs without any help from CSI, even though she still wants to work in her field of study – medical assisting.  On occasion, she receives an email from CSI providing potential job leads, but when she tries to follow up, each company tells her that it is not hiring.

This student has not been able to make any payments on her loan, because she cannot afford to do so with the meager earnings she has secured.  She laments that she ever enrolled in CSI and would not have done so but for all the false promises that were made to her.

Student #2:
This student enrolled in January 2012 at CSI's Chicago location in the Health Care Career

---

[3] The National Healthcare Association, (NHA) is a private association that administers tests for students to become a Certified Clinical Medical Assistant (CCMA).  NHA's website explains that "[b]ecoming a CCMA with NHA shows that you are knowledgeable and ready to be a valued member of a healthcare team."  CSI students said that most reputable doctors, hospitals, and other medical providers will not hire a student who is not a CCMA.

program, to train as a medical assistant, after she received a call from a female, who enrolled her. This recruiter asked her to "come in for an interview to get started in a job in the health care field." The recruiter explained that CSI would help her get an externship as part of her program of study. She also told her that CSI would provide her with assistance in finding a job, and gave her the impression that she would have no problem finding a job after she graduated. Armed with this information, she enrolled and took out a student loan for $15,000. She completed the program in September 2012, graduating with honors.

This student was very unhappy with the quality of her teachers. Many simply had no idea what they were supposed to be teaching, or acted like they did not care. She could not pass either of the required tests to become certified as a CCMA, which is a prerequisite to working at most medical facilities. She took one of the tests twice at a cost of $120 to retake. She still did not pass, and cannot afford to retake any more tests.

The CSI career service office staff members she knew were "Nicole," "Chazelon," and Rhonda Stephens. That office had a lot of turn over. She was provided with a few job leads, but some of them were miles and miles too far to get to via public transportation, and she does not have a car. A few of the leads also required the applicant to speak Spanish, which she does not. Not a single place she went to, based on leads from CSI, had a job opening for her. Eventually, after a lot of effort on her part at trying to find a job in the medical field, she gave up searching. She eventually found a job at O'Hare Airport at Hudson News, a convenience store, as a cashier in February 2014. After that, she worked at the same airport as a cashier at a McDonald's, for about a month and a half, beginning in February 2015. She then got a job at Cook County Hospital as a janitor.

All of CSI's placement backup data claims that she was placed at HHC, but she asserts that she has never spoken to anyone at HHC, has never worked there, never set foot on the premises, and never heard of "Dr. Quinn." She said that she would have never enrolled in CSI but for all the false promises that were made to her. To this day, she has been unable to afford to make a single payment on her student loan. She said that she is trying to enroll at a community college so that she can finally get a professional job.

Student #3:
This student completed two separate CSI programs. First, from January 2012 through August 2012, she enrolled in the Health Care Career program, specializing in Medical Billing and Coding. She passed the CCMA certification test, but did not pass the coding CCMA certification test. In her second program of study to become a Medical Assistant, she passed all four certification tests. She did not work while attending CSI, and she did not work in any position following her 2012 and 2014 periods of attendance at CSI.

This student is a rare example of one who had at least heard of HHC, because a CSI advisor had called her and discussed a job at HHC with her. But she did not want to work on the streets, and decided against pursuing it. Despite this, CSI listed her as placed with HHC.

Student #4:
This student heard about CSI from her sister, who was enrolled in the Health Care Career program for about three months before this student decided to enroll in the same program;

Computer Systems Institute

however, her sister dropped out about a month after the student enrolled. According to this student, her sister did not like the way the teachers kept leaving CSI, and new teachers would come and teach the same things the students had already learned. The sister believed she was making no progress, and she also did not like how overcrowded the classes were.

This student enrolled in July 2011, and graduated in September 2012. The reason she enrolled is because her recruiter assured her that CSI would find her a job. In fact, the recruiter told her that every graduate received a job in the medical assisting field. She also said that if the student did not get a job within six months, she could qualify for assistance from the school to pay her rent. Based on this information, she enrolled and took out a student loan for $15,000. She has not been able to make any payments on this loan, because she still has no job.

This student received grades of Bs and Cs throughout her program. She took a test for certification for phlebotomy, but failed. She did not try to retake the test, because it cost $150 to retake it, and she did not have the money. She also claims that she did not have a high school diploma or a General Education Development (GED) certificate when she enrolled, nor did her sister. She is, as of right now, in the process of getting her GED, and expects to receive it in May 2016. Her sister still has no high school diploma or GED. [4]

About a month after she graduated, this student returned to CSI to request the job placement assistance she was promised upon enrolling. A female named "Vanessa" from the career office gave her contact information to a Mr. Quinn. Although she called him many times, she never heard from Mr. Quinn. She also kept calling Vanessa, but when she was able to get through to her, Vanessa kept telling her that she would have to wait to hear from Mr. Quinn. Vanessa would not provide her with any other job leads.

This student tried hard to find a job on her own, and eventually applied for an unpaid internship at Saint Bernard Hospital. The nurse at the hospital told her that she would have to have CSI arrange the internship for her. She called Vanessa to request that she arrange the internship, but Vanessa kept telling her that she had to be patient, and that her internship was "in progress." The student called Vanessa every week for two months, and then gave up. Vanessa never called her back, even though she left messages for her when could not reach her.

This student has never been hired in the health care field since graduating from CSI. CSI did not help her find a job, as it had led her to believe it would. Since graduating she has worked at a housekeeping job for a Miss Sudor, who owns her own housecleaning service. She went to individuals' homes to clean, working for her from November 2014 until February 2015. During that same time period, the student also worked at a warehouse that made Ziploc bags and foam cups, which she packed for shipping. She continues to work there on occasion. She gets paid $9.50 an hour, but it is not a full-time job. She works the second shift from 2:30 P.M. until 10:45 P.M. She only works on an on-call basis, every now and then, only about three evenings a month. She continues to search diligently for jobs on her own in the health care field, but she has had no success. She hopes that once she receives her GED, she will be able to get a better

---

[4] In accordance with 34 C.F.R. § 668.32 (e), students are ineligible to receive Title IV funds unless they possess a secondary education credential. Apparently, CSI has also routinely ignored this essential Title IV eligibility requirement.

Page 8 – Ms. Julia Lowder
Computer Systems Institute

job.

Despite CSI's claims that this student was employed by HHC, she has never heard of HHC and has never worked for Mr. Quinn.  She has never been employed at an address at 300 West 116th Street, nor has she ever been to that address.

This student would not have enrolled in CSI considering how she was treated after she graduated.  She was so surprised, because her recruiter told her that if she graduated, she would get a job.  She believes that CSI put no effort into placing her or in assisting her in securing a job.

Student #5:
This student received an unsolicited telephone call from CSI, requesting that she come in for an interview.  Because of this call, during which the CSI person told her that if she enrolled CSI would help her find a job, she went to the school and enrolled in the Medical Career program, specializing in the Medical Assistant program.  She said that CSI made it sound like as soon as a student finished his or her program, CSI would place him or her in a job.  CSI told her that after she completed this program, she could take a test to become a Registered Medical Assistant, if she worked hours for the "CSI work program."  CSI placed her in an unpaid position at a "Professional Eye Center," where she worked for 180 hours performing work unrelated to her program of study.[5]  She could not continue to work without pay, so she quit.  She currently works at a nursing home, where she does not use any of the skills she learned at CSI.  Prior to finding this job without any assistance from CSI, she attended another school, called "National Latino Educational Institute."  This school's program is what landed her the job at which she currently works.  She said that she had never heard of HHC, nor had she ever worked for it.

Student #6:
This student was interested in a medical assistant program.  She called CSI, and CSI set up an interview with the student. The female recruiter, with whom she met, assured the student that after she graduated, she would get a job in the medical assistant field.  Based upon this representation, the student decided to enroll at CSI's Chicago location in the Health Care Career program in 2011-2012.  She completed the program at the end of 2012.

Despite having good grades throughout the program, she failed the certification test, which was her main reason for going to CSI.  Yet, she still received a diploma.  She has never been hired in the health care field since graduating from CSI, and CSI certainly has not assisted her in finding

---

[5]CSI's catalog describes that the ideal learning experiences supplement academic coursework with real-life employment situations.  Therefore, students are encouraged, but not required to for graduation, to participate in externships in order to allow students to engage in employment related to their area of study to the maximum extent possible, given the demands of their academic schedules.  The catalog further describes that CSI's practicum or field experience is an integral part of the education process, but it is not compulsory.  Further, CSI's catalog description regarding externships states that the "Career Development Department maintains a current list of employer contacts and job openings to help students identify opportunities for off-campus employment that relate to their areas of study. All students are provided with career development opportunities that include advice on writing resumes and cover letters, managing the interview process, and networking for success."

a job.  While CSI offered job placement skills, such as how to interview and how to write a resume, they did not help her find employment.

This student has never heard of HHC, or of a Mr. Quinn.  She is not currently employed in her field, although she does housekeeping as part of a program run by the Illinois Department of Human Services.  She said she would not have enrolled in CSI but for all the false promises that were made to her.  She has a Direct Loan for about $10,000 that she cannot repay, which is currently in forbearance.  She said that, "[g]oing to CSI was a waste of time."

Student #7:
In December 2011, this student enrolled at CSI's Chicago location in the Health Care Career program in billing and coding.  She received a small grant, and took out student loans for about $8,000.  She is currently paying $200 a month on these loans.  She completed the program in August 2012 and received a diploma.  She received all As and Bs, except for one C.  She was recruited by a black male, who told her that she would be able to find a job, which was her objective in enrolling.  He told her that the job placement rate was great, which convinced her to enroll.  She has, however, never been hired in the health care field since graduating from CSI.  CSI has not helped her to find a job.

Her recruiter's promises did not pan out.  The student feels as if she went to school for no reason.  No one will hire her without experience, so she considers CSI to have been a complete waste of time.  The recruiter never told her that she could not get a job without experience.  She tried to find a job on her own, without CSI assistance, at Mt. Sinai Hospital.  The hospital would not hire her, but she did volunteer there for about a month.  She received her certification to be a medical administrative assistant by passing the CCMA test.  That certification still did not help her get a job.

"Chaz," a career services representative at CSI, finally called her about six months after she graduated.  He told her about HHC, which he said would pay her about $10.50 an hour.  She called and emailed many times to a male contact, Mr. Quinn, and he never responded.  She never laid eyes on him.  Eventually, his phone number was disconnected.  She never spoke with anyone else about HHC or with anyone at HHC.  The extent of her knowledge of HHC was through Chaz.  She has never held a job at 310 W. 116th Street, in Chicago.  She also never received an opportunity for an externship and never heard from Chaz again.

After she graduated from CSI, this student worked at Walmart for a few months, as an overnight stocker.  Then she was unemployed for a long time before she got a job at Home Depot, as a cashier.  She then worked at Target as an overnight stocker, and then at Ifco, a company that supplies grocery stores with trays for produce.  She cleaned and stacked those trays.  She is about to begin working at Amazon, where she will package up orders to send to customers.

This student said that she would not have enrolled at CSI but for all the false promises that were made to her.  Plus, she has student loans to pay off and no job in her field of study to show for it.  It was a waste of her time and money, she said.  She is also not aware of any of her classmates getting a job.  She would never recommend CSI to anyone.

USA SOI 076

Page 10 – Ms. Julia Lowder
Computer Systems Institute

Student #8:

In September 2012, this student enrolled at CSI's Chicago location in the Health Care Career program, specifically in the Medical Assistant courses, because she was interested in getting a better paying job and in improving her life.  A man named "Patrick" recruited her by telling her that her credits would transfer to any other institution, that she would receive an associate's degree from CSI, and that the education she would receive in the medical assistant program would be the equivalent of those for a licensed practical nurse.  None of these promises were true.  Patrick also told her that CSI guaranteed job placement assistance, and that CSI would place her in a job.  He said that she would be given an internship, which did not occur.

This student completed the program in May 2013.  She received a Pell Grant and a Federal Loan to pay tuition, but she has not been able to make any payments on the loan.  Her recollection was that the tuition was $20,000.  If she got As and Bs during a term, CSI told her that the school would give her $100, as partial payment of her living expenses, but she had trouble with achieving those grades due to her learning disabilities.[6]  She did not receive $100 very often, and even though she needed some tutoring to improve in her coursework, CSI would not provide her with any.

This student also did not receive any help from CSI finding a job after she graduated and received her diploma.  She had to pass the CCMA and RMA (Registered Medical Assistant) tests to receive certification, but she could not pass the RMA, which she had to pay extra to re-take.  She has never been hired in the health care field since graduating from CSI.  CSI has not found her any "real" job.

While this student was briefly employed by HHC, she said that it was not a real company.  It seemed like a scam to her.  Plus, she said she did not go to school to be a street salesperson.  Her supervisor was named Mr. Quinn.  He required her to hand out pamphlets on the street, promising home health care with a nurse or doctor who would come to people's homes.  He wanted her to be sure that any recipient had Medicare before she gave them a pamphlet.  Mr. Quinn paid her $100 for about two weeks' worth of working at least eight hours a day (again, an effective hourly rate of pay of $1.25).

Before she attended CSI, this student worked for eight years as a certified nursing assistant, but she had to be recertified by the state of Illinois, and the state required her to get more schooling.  During those eight years, she primarily worked in Florida with an agency called Nurse's Choice and another called Nurse Staffing at a variety of medical providers.  She would not have enrolled at CSI if not for all the false promises that were made to her.

---

[6] In accordance with 34 C.F.R. § 668.164(e), students are entitled to receive any credit balances that are owed to them within 14 days, as specified in the regulation.  The regulations further allow, at § 668.165(b), that institutions may retain credit balances with a student's written authorization to do so.  However, there are conditions on the authorization process, including required institutional disclosures along with the ability for students to cancel or modify the authorization at any time.  The regulations do not permit withholding a student's credit balance on the basis of a student's grades, provided they are meeting satisfactory academic progress, especially if the student has requested that those funds be disbursed.  This appears to be another area where CSI ignored its regulatory responsibilities and shortchanged its students.

Page 11 – Ms. Julia Lowder
Computer Systems Institute

Student #9:
This student said she saw an advertisement on television about CSI's Chicago location. She wanted to be a medical assistant. She called and was asked to come in to enroll. She met with a man who told her that CSI would find her a job, so she enrolled. She began attending in April 2012, and she graduated in December 2012. She got straight As, except for one B. She had to pass four tests in phlebotomy, clinical medical assistant, CPR, and customer service in order to be certified. She passed all four of them, which granted her CCMA certification.

CSI failed to provide her with any assistance in finding a job. She tried for six months to find a job on her own, but she never even got an interview, even though she was very diligent in her job search. Also, eventually all of her certifications expired.

She finally got a job at UPS as a package handler in October 2014 until the end of December 2014, which paid $9.50 an hour. After that, she was unemployed again until April 2015, when she got a job making $10.25 an hour at O'Hare Airport at Gate Gourmet, a caterer for airline passengers, packing up the food.

This student has never been hired in the health care field since graduating from CSI. She had never heard of HHC, or Mr. Quinn, or an address at 310 W. 116th Street in Chicago. She had no idea why CSI would say that she was placed in a job. She said that such claims "are a total lie." She would not have enrolled in CSI but for all the false promises that were made to her. She believed that at least 50% of what she was told before enrolling was a lie. She wished that she had never gone to CSI. She has a loan to pay back and does not have the job CSI promised her, which is the reason why she enrolled.

Student #10:
This student saw an advertisement in a local newspaper about CSI's Chicago location in the Health Care Career/medical assisting program. She did not have either a high school diploma or a GED, which caught her eye, because the advertisement said that one did not need to have a GED to attend. The advertisement led her to enroll in February 2013, in addition to her own desire to have a professional job and needing the salary earned from such jobs. She eventually got a GED in late December 2014, but it was not until after she graduated from her program at CSI. She said that lots of her classmates did not have a high school diploma or a GED. She completed her studies in late October, but the graduation ceremony did not occur until mid-December 2014.

This student was enrolled by a female recruiter, who told her that she would receive job assistance, and that she could get an internship at a hospital, if she wanted one. The tuition was about $15,000, and she received Pell Grant funds, along with a Direct Loan totaling about $9,500. She has been making payments of $109.34 every month since her loan became due.

If the student received all As and Bs during a month, and did not miss more than one or two days, after the third month of enrollment, she could receive a debit card for $100, as part of the living expenses for her loan. Because she made all As and Bs and had good attendance, she received a card reloaded with $100 five times while attending CSI, for a total of $500. Because

Page 12 – Ms. Julia Lowder
Computer Systems Institute

these funds were her credit balance, again CSI had no right to qualify her access to them in any way.

This student graduated with a 3.7 grade point average. She took the NHA test for certification for phlebotomy, which she passed. But, she was unable to pass the certification test to be a CCMA. She was shocked that she did not pass, given her grades. She has never been hired in the health care field since graduating from CSI. CSI did not help her find a job as she had been led to believe. She did have one interview with a temporary agency called Ajilon, but that company would not hire her without a GED. Because she was not given any help from CSI, she searched hard for jobs on her own, but she had no success.

Six months after she completed the medical assisting program, she finally found a job in March 2015 at a South Chicago sleep lab. Her job duties include scheduling patients, getting insurance authorization, and billing. She said that she did not receive this job as a result of attending CSI. She does not use any of the skills she learned at CSI at this job. Her starting pay was $10 per hour. She is currently making $12 an hour. This is a full-time job.

Despite CSI's claims that she was placed with HHC, she has never heard of it. She did speak to a Mr. Quinn over the phone, but he was busy and asked her to call him back. She stated that Mr. Quinn did not sound professional at all, and was very abrupt with her. Someone named "Chaz" at CSI, who she thought was a career advisor, told her to call Mr. Quinn, and arrange to meet with him to talk about working for him. Chaz said this would be a "marketing" job. It sounded like a scam, and the area code was not familiar to her. She did not call him back again, because it seemed to be a waste of time—his abruptness put her off.

This student said that she would not have enrolled in CSI, considering the outcome. She said that "it was a waste of eight months of my life. I feel that CSI put no effort into placing, or assisting with placing, me in a job."

Student #11:
This student enrolled at CSI's Chicago location in the Health Care Career program, and took courses specifically in the medical assistant program. She enrolled through a female recruiter, who assured her that when she finished the program, the school would find employment for her. On the basis of this promise, she enrolled in June 2012, and completed the program in March 2013. The tuition was $10,000. She received Pell Grant funds and Direct Loan funds totaling about $9,000 to cover the tuition. She has not been able to repay this loan, because she is unemployed. Her loan is in deferment.

Her son also went to CSI about a year before her, and her daughter enrolled along with her. Her son was enrolled in a computer program but did not finish the program. He did not graduate from high school and he never got a GED, so he did not have these basic eligibility credentials before enrolling at CSI.

The student received all As and Bs and graduated on the honor roll. She had to take two tests for certification to be a CCMA. One was in phlebotomy, the other in medical assistance. She barely missed passing both tests, despite her excellent grades.

CSI gave her a piece of paper with the names and numbers of about 10 clinics that CSI claimed were hiring. When she called each one, none was hiring. She called to complain to CSI, and the career counselor said she would send the student another list of potential employers, but she never did. The student called her back at least 15 times. She also went back several times in person. Often her calls were not returned, but when they were, she was just told that she would receive more job leads. But she never received another lead from CSI.

As stated previously, she went to CSI with her daughter, who was in the same program. They graduated together. This student's daughter made the Dean's list at CSI, but she also could not find a job in the medical field. She works at Wendy's. CSI did not help her find a job. Many times the student and her daughter went together to CSI after they graduated, but CSI gave no job assistance to either one of them. Her daughter went even more times than did the student but was no more successful in receiving job placement assistance than her mother was.

This student has not worked in the medical field since graduating from CSI. One of her neighbors had Alzheimer's and asked her to take care of him in June 2013. She took care of his housekeeping, grocery shopping, bathing, paying bills-- all of his basic needs. He had a nurse who provided his medical care. She worked for him until he passed away in December 2013. He paid her $200 in cash each week. Since he passed away, she has not worked. She has tried everything she can think of to find another job, but so far, she has not had any success. She never told anyone at CSI that she had this job working for her neighbor.

CSI has not found her any job, despite the information from CSI claiming that she was placed at HHC. She said that she has never heard of HHC, Mr. Quinn, or an address at 310 W. 116th Street in Chicago.

She would not have enrolled in CSI but for all the false promises that were made to her. She went to school to get a job. She got nothing but a bill for a loan that she cannot repay. She said that "It hurts me that I cannot work. It was my passion to work as a medical assistant, and CSI took that joy from me. It is cruel."

## 2. Dream Team Hope Health Care Services (DTH)

This alleged "employer" purportedly provided jobs for 14 CSI students in 2013, according to the placement rate backup data provided by CSI to the Department. The CSI placement rate backup data claimed that DTH operated out of 70 East 63rd Street, Chicago, Illinois. This address is a large, warehouse-type, structure which contained a large capacity garage on the day it was visited by the Department, and was completely empty inside except for a vehicle and a small office in the northeast corner. No business signs or posted phone numbers on the building related to DTH. No mailboxes were located on the exterior. Three individuals who were inside the structure stated they had never heard of DTH, and that they did not know a Samuel Hunter or a Patrick Hunter, who CSI identified as DTH's "Owner/Operator."

Page 14 – Ms. Julia Lowder
Computer Systems Institute

Shortly after the Department's visit to the address noted above, DTH's supposed "Owner/Operator," Samuel Patrick Hunter, called the Department, and said that he heard that the Department was looking for him.  He claimed that he heard from someone at the garage at 70 East 63rd Street that the Department had come to arrest him.  Despite multiple assurances that he would be free to leave afterward, and after he failed to confirm an arranged in-person interview, Hunter consented to a telephone interview.  During that interview, Hunter claimed he filed paperwork with the State of Illinois and made a down payment, but lost the opportunity to incorporate DTH because he failed to pay the remainder of the incorporation fee.  Because of the above, DTH never operated as a licensed business, but he said that he was still "working on paperwork."  He claimed to be homeless, and said that he splits his time between homeless shelters on the North and South sides of Chicago, which he refused to name.

Hunter claimed that his contact at CSI was a black male named "Chaz," whose last name he did not know.  He claimed that Chaz said he would send CSI students to work for DTH.  Hunter stated that he talked with CSI's vice president, Tom Claxton, on one occasion, although he did not say when.  Hunter said that Claxton told him, that because Hunter did not possess the proper paperwork, CSI could not use DTH to place CSI's graduates.  Hunter also stated that Claxton told him that some CSI students reported as placed with DTH were working as either "homemakers"  or  " in marketing."

Hunter said t h a t  DTH provided no employment in the home healthcare aspect of the business, but rather for "marketing," and that when employed, CSI students worked in marketing for yet another "company," called Ashia Healthcare (Ashia), a company Hunter claimed was owned by his ex-fiance, Kimberly Burton, rather than DTH.  Despite this statement, neither Ashia nor Kimberly Burton is identified as an employer or supervisor on CSI's placement backup data.

When Burton was interviewed by the Department, she stated that she never owned, operated, nor had any affiliation with DTH.  She admitted to working with Hunter who she thought operated DTH.  She stated that she operated Ashia and is an independent contractor.  Burton claimed that Hunter paid trainees out of his own income, and, if they did well, he would send them to another agency for employment.

The Department interviewed the following random students who CSI's backup placement data claimed were placed with DTH.

Student #12:
This student attended CSI during 2012-2013 in the Medical Career program.  Because she did very poorly in the program, she did not receive a certificate or any other credential.  She missed six points on her CCMA certification test, where missing only one point was a failing grade.  She did not work while attending CSI, and she did not work after attending CSI.  At the end of July 2014, more than a year after she stopped attending CSI, she obtained the first job she has held since attending CSI, a position she obtained herself without assistance from CSI.   She neither worked at, nor heard of  DTH, or a Samuel Hunter, despite the fact that CSI claimed that it placed her as a "marketer" at DTH Health Care

Page 15 – Ms. Julia Lowder
Computer Systems Institute

Services, that her supervisor was "Samuel Hunter," and that the address of her employer was 70 East 63rd Street in Chicago.

Student #13:

This student saw advertisements for CSI, which enticed her to visit CSI's Chicago location.  A female enrollment advisor promised her a job in the Business Career field if she enrolled and graduated.  This person convinced her to enroll in the Business Career program on August 21, 2011.  The tuition was about $22,000, which she paid for with Pell Grant funds and Direct Loan funds totaling $9,500.  She is not repaying this loan, because she did not receive a job as a result of attending CSI.  Her loan balance is now up to $15,447.  The student claimed that "CSI was a waste of time.  I wasted a year of my life.  When I go to job interviews, the employers laugh at my diploma and ask me if I printed it myself.  For instance, I went to a job interview at Kirby Vacuum Cleaners, and Office Team, and they said that CSI wasn't a good enough school."

This student said that the majority of her classmates did not have a high school diploma or a GED.  She stated that she had already graduated from CSI before she received her GED in October 2012.

Since graduating from CSI, this student has worked as a cashier at Chi-Town Steak and Lemonade, Speedway Gas Station, and Mabco appliance store.  She maintained that these jobs had nothing to do with her "education" at CSI, she had never been hired in the business career field since graduating from CSI, and that CSI had not helped her to find a job.  She said that she called the career services staff at CSI "a million times asking for employment help.  But I received absolutely no help."

This student was shocked to see that CSI claimed to have placed her with a company called "DTH Health Care Systems."  She has never heard of DTH Health Care Systems, Dream Team Hope, Samuel Hunter, nor has she ever worked at an address at 70 E. 63rd Street, in Chicago.

This student had heard of a Mr. Quinn through a male career advisor at CSI, named Chaz.  Mr. Quinn called her, and she worked for him for four days, nine hours each day, passing out pamphlets for what she described as "lies; tricking old people out of their money."  She said that Quinn told her when they first spoke that she would get paid every Friday, and that she would be his secretary/assistant.  He claimed in these pamphlets that the senior citizens would get for free, a nurse who would come to their homes every day, along with other medical care.  She said that Quinn would then bill these elderly persons.  Quinn told her exactly what to say to them, to draw them in.  He was always with her, doing the same thing during the four days.  At the end of the fourth day, she quit.  She thought she was going to work for a legitimate company as a secretary, not standing outside on the streets.  She said that "It was a scam and I could not do it anymore.  I asked him to pay me.  He said that if the people took him up on his offer, I would get paid.  If not, I wouldn't.  I never heard from him again.  He never paid me."  This student told the same male career services person, Chaz, about her awful experience with Mr. Quinn.  Chaz claimed that he would find her another place of employment, but that never happened.

This student stated that she would not have enrolled at CSI but for all the false promises that were made to her.  She said that she got robbed of a year of her life.

USA SOI 082

Student #14:

This student enrolled at CSI's Chicago location in the Business Career program in or about August 2012.  The purpose of the program, as it was explained to her upon enrolling, was to receive a job in the accounting field.  She completed the program in April 2013.  The recruiter tried to push her into the Medical Assistant program, but she insisted that she was not interested.  The recruiter relented, and told her that when she finished the Business Career program, she would be qualified to work as an accountant in an office.  The recruiter also told her that CSI would get her a job in the accounting field.

To pay for the tuition, this student took out Direct Loan funds in the amount of $10,000 for an eight-month program.  CSI told her that she did not qualify for a Pell Grant.  Even though she understood that the loans were about $2,000 more than the tuition, CSI would not give her the excess money.  CSI required her to pay for books, school supplies, and bus passes with her own funds rather than her Title IV aid disbursements.  Only after many, many student complaints, did CSI provide a stipend of $300, in $75 increments on a debit card, that she could use at most stores.  But, the stipend could not be used to pay her rent, utility bills, and basic living expenses.  All of the students she knew received only this stipend.  She is currently repaying her student loan at a rate of $125 per month.

This student said that students used "QuickBooks" for accounting, and they were taught how to create Excel spreadsheets.  She was a straight A student, except for one C, but she did not receive a certification in either Excel or QuickBooks.  CSI promised to call her to take the tests for certification, which was supposedly included in the price of tuition, and promised her that if she were to fail the tests, she could retake them free of charge.  CSI failed to call her to take the tests.  When she called about taking the tests, she said it was like talking to a brick wall.  The only thing the people at CSI wanted to talk about was whether she had a job.  She finally gave up.  She did tell CSI that she had a job at Old Navy that she got entirely on her own in November 2013, many months after she graduated.  At Old Navy, her job was working in the dressing rooms.  She has never been hired in the Business/Accounting field since graduating from CSI.  CSI has provided her with no job placement.  She currently works as a security guard in a commercial building in downtown Chicago.

This student has never heard of DTH Health Care Systems, Dream Team Hope, or Samuel Hunter, nor has she ever worked at an address at 70 E. 63rd Street, in Chicago.  She maintained that she would have never enrolled in CSI but for all the false promises that were made to her.  As she states, "CSI was only concerned with getting my money."

Student #15:

This student enrolled in CSI's Business Career program in 2012-2013, and earned a diploma.  She was unemployed while she attended CSI, and after completing her studies, she worked at a job which she obtained without assistance from CSI in a field unrelated to her field of study.  She had neither worked at, nor heard of, DTH.  She did not recognize the name Samuel Hunter.  She talked with CSI's career service office after she graduated, and attempted to get a job through that office.  She spoke with a man named Chaz, who tried to get her to work door-to-door soliciting people for medical services.  She stated that she did

not go to school to do "soliciting out of doors," but rather that she expected to work as an administrative assistant, business assistant, or as a data entry person in an office. Nothing like that ever happened for her despite the representations that had been made to her.

<u>Student #16</u>:
This student attended CSI in the Business Career Program, specializing in Medical Billing and Coding during 2011-2012.  She received a diploma upon graduating.  She did not work while attending CSI and has not worked in any job since completing her CSI program of study.  Despite the fact that CSI listed her as being placed as a "marketer," in the field of her studies, with DTH Health Services, and that her supervisor was named "Samuel Hunter," this student has neither worked at, nor heard of, DTH, nor has she ever met, or heard of, Samuel Hunter.

<u>Student #17</u>:
This student said that she enrolled at CSI's Chicago location in the Health Care Career program, specializing in medical billing and coding in September 2012.  She completed the program in either March or April 2013, and received a diploma.  She passed one of the required tests to be certified, but not the second.  She still could have worked in her field, or so CSI told her, but the pay would not have been as high.  But, she said that no employer would hire her.  She received a Pell Grant and took out a loan to pay the tuition, but because she is not working, the loan is in deferment.  She has never been hired in the health care field since graduating from CSI, and CSI has not helped her to find any kind of job.

After she graduated from the Health Care Career program, a CSI employee, Thomas Claxton, sent her a letter later in 2013, asking her to retake the medical coding test.  She took the test two more times, but was unable to pass it.  She reenrolled at CSI in the Business Career program in October 2015, and hopes to graduate in April 2016.  She received a Pell Grant and took out loans to pay for the tuition.

She does not know why CSI would say that she worked for DTH Health Care Services.  In fact, she has never heard of DTH Health Care Services, or of an individual named Samuel Hunter, nor has she ever held a job at an address at 70 E. 63rd Street in Chicago.  She also has never worked for HHC.  She did apply for a job with HHC and they called her for an interview, but she did not get to the interview, because she was frightened of the neighborhood and could not find the location.  She called her contact at CSI's career services, whose name she no longer recalls.  She said that he promised to find her a job closer to her home, downtown, or on the west side of Chicago, but she never heard back from him.

<u>Student #18</u>:
This student attended CSI several times.  She enrolled in the Business Career program in 2009, through a date she can no longer recall, and then again from August 2012 through June 2013 when she graduated with a diploma from that program.  Sometime during the summer 2013 until 2014, she was enrolled in the Medical Career program, specializing in Medical Billing and Coding.  She also graduated with a diploma from that program.

USA SOI 084

Upon enrolling the first time, this student's recruiter told her that CSI would help her build her resume and help her find a job.  After she graduated, a black male CSI career services employee set her up with an interview for a "telemarketing" job.  She went for an interview, and the man who interviewed her did not know how to pay her.  She explained that the interview took place in an auto body shop near the intersection of 53rd Street and Michigan Avenue, in Chicago.  She described this man as "very unprofessional," and kicked his shoes off during the interview.  He wanted the student to sign up senior citizens for health care "things."  He told her to meet him at 79th Street and Cottage Grove Avenue, and that he would take her to Blue Island, a city 16 miles south of Chicago, to talk with senior citizens to sign them up for home health care services.  He also told her that when she was done for the day, he would "have his people pick her up."  She did not feel comfortable with this arrangement, so she declined.

This student did not work while attending CSI and has been unemployed since 2008.  She neither had worked at, nor heard of, DTH or Samuel Hunter.

If the Department determines that an institution has not met the fiduciary standard of conduct, either through its failure to comply with applicable Title IV, HEA program standards and requirements, or through acts of affirmative misconduct, a denial of the institution's recertification application is warranted.  *See* 34 C.F.R. § 668.13.  As outlined above, the Department has determined that CSI failed to meet the fiduciary standard of conduct through misrepresentations regarding job placements to its accreditor, to current and prospective students, and to the Department, in violation of Title IV, HEA statutory and regulatory requirements.  CSI's recertification application is therefore denied.

In addition, as previously mentioned, by entering into a PPA with the Department, an institution agrees, among other things, that:

> "In the case of an institution that advertises job placement rates as a means of attracting students to enroll in the institution, it will make available to prospective students, at or before the time that those students apply for enrollment…the *most recent* available data concerning employment statistics, graduation statistics, and any other information necessary to substantiate the truthfulness of the advertisements; and…relevant State licensing requirements of the State in which the institution is located for any job for which an educational program offered by the institution is deigned to prepare those prospective students."

34 C.F.R. § 668.14(b)(10).  (*emphasis* added.)

CSI has consistently ignored this essential requirement of its Title IV eligibility.  If it had not warranted that it would provide prospective students with the "most recent available [placement] data," CSI would not have been made eligible to participate in the Title IV programs.  When it created false data to illegally bolster its placement rates with reference to fictitious employers, it demonstrated that its Title IV eligibility must not be continued.[7]

---

[7] As discussed in this letter, the Department selected only two identified "employers" to test the accuracy of CSI's placement rate data, and CSI failed any meaningful test of its integrity.  Its duplicity was exposed.  Given CSI's willingness to manufacture job placement data, the Department cannot possibly trust any other information that CSI

Page 19 – Ms. Julia Lowder
Computer Systems Institute

Should CSI have factual evidence to dispute the Department's findings, and demonstrate their inaccuracy, CSI may submit that evidence via overnight mail to me at the following address:

>    Administrative Actions and Appeals Service Group
>     U.S. Department of Education
>     Federal Student Aid/Program Compliance
>     830 First Street, NE (UCP-3, Room 84F2)
>     Washington, DC  20002-8019

If any such material is received by February 12, 2016, it will be reviewed, and CSI will be notified if the recertification denial will be modified, rescinded, or left in place.  If CSI does not submit such material by February 12, 2016, the denial of recertification will be effective as of January 31, 2016.  The Chicago School Participation Division will then contact you concerning the proper procedures for closing out CSI's Title IV, HEA program accounts.

In the event that CSI submits an application to participate in the Title IV, HEA programs in the future, that application must address the deficiencies noted in this letter.  If you have any questions about this letter, you may contact Kathleen Hochhalter at (303) 844-4520.

>    Sincerely,



>    Susan D. Crim
>    Director
>    Administrative Actions and Appeals Service Group

cc:  Albert C. Gray, PhD, President and CEO, Accrediting Council for Independent Colleges and
     Schools (ACICS), via agray@acics.org
     Dr. James L. Applegate, Executive Director, Illinois Board of Higher Education (IBHE), via
     applegate@ibhe.org
     Department of Defense, via osd.pentagon.ousd-p-r.mbx.vol-edu-compliance@mail.mil
     Department of Veteran Affairs, via INCOMING.VBAVACO@va.gov
     Consumer Financial Protection Bureau, via CFPB_ENF_Students@cfpb.gov

---

were to provide it, and the Department has no basis to believe any of the other placement information that CSI has reported.  The Department cannot allow such a dishonest operation to receive continued access to scarce Federal student financial assistance funds or believe that CSI could ever operate as its fiduciary in the future.



FEB   1  2016

Dr. Rashed Elyas
CEO
Marinello School of Beauty
5522 Garfield Avenue
Sacramento, CA 95841

Sent Overnight Via UPS
Tracking No: 1ZA879640191386658

OPE ID # 03094400

Re:  Denial of Recertification Application to Participate in the Federal Student Financial
     Assistance Programs

Dear Dr. Elyas:

The U.S. Department of Education (Department) has reviewed Marinello School of Beauty – Sacramento's (Marinello's) application for recertification to continue to participate in the student financial assistance programs authorized pursuant to Title IV of the Higher Education Act of 1965, as amended, 20 U.S.C. §§ 1070 et seq. (Title IV). In the normal course, Marinello's Program Participation Agreement (PPA) would have expired on September 30, 2013. Marinello, however, timely submitted its recertification application prior to that date. As a result, the Department extended Marinello's PPA on a month-to-month basis while evaluating the application and related matters. See 34 C.F.R. § 668.13(b)(2). This notice is to inform you that the Department has denied Marinello's application for continued participation in the Title IV programs.

For purposes of evaluating a recertification application, the Department reviews the institution's performance during the operation of its previous PPA. The Department must ensure that Marinello meets the Title IV standards of administrative capability and financial responsibility, has complied with Title IV program requirements, and has operated under the high standards required of a fiduciary. In reaching a decision on Marinello's recertification application, the Department has reviewed all of the documentation it has obtained during its review of the institution, including documentation acquired on site in October 2015, and information obtained during student and employee interviews. As outlined below, the Department has concluded that Marinello has failed to adhere to a fiduciary standard of conduct, failed to comply with critical Title IV program requirements, failed to meet Title IV standards of administrative capability, and made numerous misrepresentations to students. Marinello's misconduct in its administration of the Title IV programs will not be tolerated, and therefore, its recertification application is denied.

Federal **Student Aid**
An OFFICE of the U.S. DEPARTMENT of EDUCATION

USA SOI 087

Page 2 – Dr. Rashed Elyas
Marinello School of Beauty

## MARINELLO'S MISCONDUCT CONSTITUTES A SEVERE BREACH OF ITS FIDUCIARY DUTY TO THE DEPARTMENT AND UNDERSCORES ITS INABILITY TO MEET TITLE IV ADMINISTRATIVE CAPABILITY STANDARDS

Before Marinello began participation in the Title IV programs, the institution signed a PPA with the Department stating that Marinello would comply with all Title IV program requirements. These requirements mandate that Marinello use funds received under Title IV solely for the purposes specified in each individual student assistance program, since the funds received under those programs are held in trust for the intended student beneficiaries and the Secretary. 20 U.S.C. § 1094(a)(1); see generally 34 C.F.R. § 668.14. By entering into a PPA with the Department, Marinello, and its officers, accepted the responsibility to act as fiduciaries in the administration of the Title IV programs. As fiduciaries, the institution and officers are subject to the highest standard of care and diligence in administering the Title IV, HEA programs and in accounting to the Secretary for the funds received. 34 C.F.R. § 668.82(a),(b).

In order to meet its responsibilities to the Department, an institution must be capable of adequately administering the Title IV programs. In this regard, an institution must comply with all Title IV statutory and regulatory requirements. 34 C.F.R. § 668.16(a). Further, an institution must administer the Title IV programs in which it participates with adequate checks and balances in its system of internal controls. 34 C.F.R. § 668.16(c)(1). This includes maintaining accurate and complete records supporting its compliance with all Title IV requirements and supporting Title IV payments made to each student. See 34 C.F.R. §§ 668.16(d), 668.24. An institution's maintenance and submission of accurate records is critical to the Department's oversight responsibilities. The Department relies on those records when determining, among other things, student eligibility and compliance with institutional eligibility requirements.

If the Department determines that an institution does not meet all requirements and standards in the Title IV regulations, a denial of the institution's recertification application is warranted. See 34 C.F.R. § 668.13. As outlined below, Marinello falls severely short of meeting those standards.

### A. Marinello Illegally Disbursed Title IV Funds By Fabricating High School Diplomas

Only eligible students may receive Title IV program funds. 20 U.S.C. § 1091; 34 C.F.R. § 668.32. To be eligible, students must be academically qualified to study at a postsecondary level. In this regard, a student must have a high school diploma or its equivalent or be beyond the age of compulsory school attendance and have the ability to benefit from the program of instruction that is being provided. See 20 U.S.C. § 1091; 34 C.F.R. § 668.32(e). Prior to July 1, 2012, a student who did not have a high school diploma or its equivalent could meet this requirement by passing an independently administered ability to benefit (ATB) test prior to receiving Title IV funds. 34 C.F.R.§ 668.32(e)(2) (2011). A student could also meet this eligibility criterion if he/she satisfactorily completed 6 credits or equivalent coursework applicable toward a degree or certificate offered by the institution. 20 U.S.C. § 1091(d)(2008).

Page 3 – Dr. Rashed Elyas
Marinello School of Beauty

If a student did not meet one of these criteria, he/she was ineligible to receive Title IV funds. As relevant here, subsequent to July 1, 2012, a student must have a high school diploma or its equivalent to be eligible for Title IV funds. 34 C.F.R.§ 668.32(e)(2).

During the course of its review, the Department uncovered a scheme created by Marinello to fill the void in student enrollment left when the ATB alternative for student basis of admission was eliminated. As presented to the Department, Marinello partnered with Parkridge Private School (Parkridge) in Long Beach, California, to offer a high school completion program to students wishing to enroll at the institution. Marinello heavily advertised the Parkridge program in its marketing materials and pushed students inquiring about its programs to sign up for the Parkridge program through them. When questioned about the program during the review, Marinello officials assured the Department that the Parkridge program was legitimate and independent from the institution.

The Parkridge program allegedly used by Marinello is called Project Diploma. Parkridge itself provided information regarding this program to the Department in response to a prior program review of Marinello. The Parkridge documentation describes this program as a mechanism for adults to take the remaining coursework needed to reach the required 220 credits necessary to earn a high school diploma. Coursework is completed under the direction of credentialed teachers who meet face to face with students. If distance is a factor, phone or email contact is required, but this is the exception rather than the rule. The documentation provided further states that the curriculum is aligned to California and National standards with a course of study that meets or exceeds college standards. Students are required to take proctored exams once all coursework is completed and evaluated. Parkridge maintains that the length of time for completing the program varies depending on the student, and compares the program to a summer college session which it claims can be completed by a working adult in 6 to 8 weeks.

During the review, Marinello was questioned in depth about the administration of the Parkridge program at the institution. Although staff at the Marinello locations reviewed were initially evasive regarding the specifics of the program, the Department was able to obtain some information from Marinello's Corporate Director of Outreach/High School, Edmund Soto. Mr. Soto acknowledged that Marinello approached Parkridge to establish a relationship so that students wishing to attend the school could obtain the required high school diplomas. There was no written agreement, however, outlining the process to be used to accomplish this task. Mr. Soto went on to state that students who wish to take advantage of the program pay $75 for the program, and Marinello pays the remainder although he was unsure of the total cost. With respect to the process, Mr. Soto stated that Marinello collects the application, high school transcript, and credit card payments from the Parkridge students. Marinello staff then pass out the workbooks for the subjects Parkridge has determined that each student needs to complete in order to earn their high school degree. Marinello staff collect the completed workbooks from the students and send them to Parkridge for evaluation. Mr. Soto also stated that the time for completing the program varies depending on the student and that Marinello staff proctor the necessary tests. Mr. Soto assured the Department that students were provided the option of other programs for obtaining the necessary credentials for Title IV eligibility, including a GED program. This information, and the availability of alternatives to Parkridge to achieve Title IV eligibility, was also confirmed by other Marinello officials.

Page 4 – Dr. Rashed Elyas
Marinello School of Beauty

The representations made by both Marinello and Parkridge officials to the Department with regard to the administration of the Parkridge program at the institution were incomplete and, in some cases, patently false. Although told that all students paid $75 for the program, students interviewed by Department staff stated that the fees for some were as high as $150. The Department is unable to determine why the fees differ among students. Some students interviewed stated that they did not have to pay any fees for the program despite the fact that Mr. Soto had stated that all students were required to pay a portion. It should be noted that when told about the fee structure students were informed by Marinello officials that if they did not enroll or dropped out of Marinello they would have to pay the additional cost of the Parkridge program originally paid by Marinello. Despite assurances by Marinello staff that students were provided options regarding how they could become Title IV eligible students, virtually all of the students interviewed informed the Department that the only option they were provided by Marinello was completion of the Parkridge program. Even where students were provided other options, they were encouraged by Marinello officials to choose Parkridge because the officials claimed it cost less and could be completed quickly.

Contrary to representations to the Department made by Parkridge officials, Marinello students were not provided "coursework" that was completed under the direction of credentialed teachers. In fact, students were not provided interactive coursework at all, but rather small workbooks and/or packets to complete on their own with questions and answers similar to those that would be on the test. Some students were provided review material that had the exact questions and answers that were on the test they had to take. Students that were interviewed repeatedly told Department staff that they had absolutely no interaction with Parkridge staff or officials.

Although the information provided to the Department indicates that the workbooks completed by the students were sent to Parkridge for evaluation by them prior to student testing in that subject, students uniformly told Department staff that they would take the tests the day they turned in the workbooks. The length of time between the student obtaining the workbooks from Marinello staff and the time the student took the test did vary; however, the time frame was significantly shorter than the time it would take "a working adult to complete a summer college session," and much less than the six to eight-week timeframe estimated by Parkridge in its representations to Departmental officials. According to information obtained from student interviews, some students actually took the tests as soon as the day after receiving the books, and most students took the test about a week after receiving the books.

The information provided to the Department regarding the tests was also false or misleading. As confirmed in student interviews, students took the tests on a computer at Marinello, and the test was set up by Marinello staff. Although the information provided by Parkridge to the Department stated that all tests related to the adult diploma program are proctored, and Mr. Soto told Department officials that Marinello staff proctored the test for its students, this was not the case. Virtually all of the students interviewed stated that no Marinello staff stayed in the room while they took the tests. Even if all of the tests had been proctored, the lack of independence in evaluating the results would lead the Department to question the validity of the test results. Additional information that was obtained would support that conclusion.

Page 5 -- Dr. Rashed Elyas
Marinello School of Beauty

Some students stated that they were permitted to use the workbooks and packets while taking the tests or were allowed to use their phones to look up answers, and other students were provided answers by Marinello staff to questions they didn't know. Further, virtually all students interviewed stated that the Marinello employee who pulled up the test on the computer gave them their results immediately after they finished the tests. Students who failed the tests would keep repeating the same test until they passed. All of this information clearly calls into question the veracity of the testing process.

Facts that were obtained regarding the physical diploma also call into question the validity of the entire process. For the vast majority of students, Parkridge sent the students' diplomas to Marinello for distribution rather than sending them directly to the students. Marinello held the diplomas for many of the students until after they completed a set portion of the institution's program of study. In fact, the Department interviewed students who withdrew from Marinello and have still not received their Parkridge diplomas. In addition, some students were actually told that their Parkridge diplomas would be invalidated if they withdrew from Marinello.

The information obtained during the review establishes that Marinello controlled the entire process for issuing the "diplomas" the students received, and that process was far from legitimate. Parkridge was merely used as a front for Marinello in an attempt to legitimize its activities and hide its illegal actions.[1] After analyzing all of the information obtained during the review, the Department has concluded that the Parkridge program, as administered by Marinello, does not provide students with a valid high school diploma which was required in order for these students to be eligible for Title IV aid. Consequently, those students were ineligible to receive Title IV funds. As relevant to this action, Marinello illegally disbursed funds to 308 students who did not possess a valid high school diploma.[2]

It is clear from the information obtained during the review that Marinello established this fraudulent scheme to ensure it would not lose student enrollments as result of the change in the Title IV statute removing ATB as a basis of admission option. Marinello's actions surrounding the Parkridge program fall severely short of the conduct required of a fiduciary of federal funds. Not only did the institution illegally obtain millions of dollars in Title IV funds, Marinello's actions caused undue harm to its students. These students, who trusted the institution, are now faced with the fact that the high school diplomas they were given are worthless. As a result, the students' ability to continue postsecondary education elsewhere are limited or foreclosed as they do not meet the threshold eligibility requirement to embark upon higher education, much less obtain the funding to pay for it. Marinello's actions underscore the need for this denial.

---

[1] It should be noted that Marinello paid Parkridge approximately $1.6 million for diplomas given to students at all locations since the ATB alternative was abolished.

[2] The individual students are identified in the chart included as Attachment A to this action.

Page 6 – Dr. Rashed Elyas
Marinello School of Beauty

## B. Marinello Callously Disregarded Students' Financial Need

The Title IV statute defines the required components an institution must use to construct cost of attendance budgets when calculating a student's eligibility for Title IV funds. In general, these components include tuition and fees, and an allowance for books, supplies, transportation, and miscellaneous personal expenses. See 20 U.S.C. § 1087ll. Schools do not have the authority to limit the amount of Title IV aid an individual student may receive on a categorical basis. 20 U.S.C. § 1087tt; 34 C.F.R. § 685.301(a)(8). Further, institutions may not limit students' Direct Loan borrowing to the amounts needed to cover only institutional costs or to a percentage of direct or indirect costs. The basis for any reduction in a student's award must be provided to the student and documented in the student's file. 34 C.F.R. § 685.301(a)(8)(ii). An institution is prohibited from misrepresenting the nature of its financial charges to its students. 34 C.F.R. § 668.73.

As a fiduciary, an institution must not take action that will cause undue hardship to its students. During the course of its review, the Department discovered that Marinello failed to provide a large percentage of its students the full amount of Direct Loan funds the students were eligible to receive. As a result of this limitation, students have received less Title IV funds than are needed to cover the tuition and fees charged by the institution. In general, the shortage for each student totals a little over $1000, and the students are required to sign an installment contract with the institution for that amount. The contract requires the students to make monthly payments to Marinello while in school. Since the Marinello-imposed limitation results in students not even being able to cover their direct tuition costs, students also do not receive the additional funds they would have received for living expenses had the full loans been awarded and disbursed. There is no documentation in the student files providing a justification for the limitation.

Students routinely informed the Department during interviews that Marinello staff failed to tell them how much Title IV aid they were entitled to receive. To the contrary, Marinello told students that their financial aid did not cover their tuition and fees and that they would need to make monthly payments. Students were threatened with suspension if the monthly payments were not made. Marinello failed to increase student loan awards even when students explained that the payments were causing an extreme financial hardship, or that they needed extra funds for child care or transportation. Several students informed the Department that they had to withdraw because they could no longer make the required payments, or because they did not have funds for child care or transportation.

In the 61 sample files reviewed, the Department discovered under awards for Students 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 25, 26, 27, 28, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 46, 47, 48, 49, 51, 52, 53, 54, 56, 57, 58, 59, 60 and 61. This represents 89% of the sample population.

Marinello's policy of limiting student access to much-needed Title IV loan funds for this economically disadvantaged population underscores the institution's callous attitude towards its responsibilities to both its students and the Department. Marinello's egregious conduct is

Page 7 – Dr. Rashed Elyas
Marinello School of Beauty

magnified by the fact that staff routinely lied to students about their rights as recipients of Title IV funds. Marinello's misconduct cannot be tolerated.

### C. Imposition of Excessive Overtime Charges

To participate in the Title IV programs, an institution must at all times act with the competency and integrity necessary to qualify as a fiduciary. As a fiduciary an institution is subject to the highest standard of care. 34 C.F.R. § 668.82. Marinello's policies surrounding overtime charges are in direct conflict with this standard.

During the course of its investigation, the Department found that Marinello imposed excessive charges for make-up hours on many of its students. Marinello's enrollment agreement sets forth the cost of tuition, fees, books, and kits. The agreement also informed the students that additional overtime charges would be imposed if the student did not complete his/her program of study by a specified date. The agreement provided a three-week grace period after which a student would be charged $11 for each additional hour he/she attended after the specified date and grace period elapsed.

Students interviewed by the Department stated that Marinello would not permit the students to make up missed hours until they had reached the latter part of their program. This policy provided students a tight time frame for completing hours owed before the student began incurring overtime charges. A number of students interviewed by the Department stated that when they were close to their scheduled graduation date Marinello informed them that they were missing a large number of hours. Since it was late in the program, the students did not have sufficient time to make up the missing hours prior to reaching the expected completion date Marinello had established at the beginning of their programs, nor could the missed hours be completed within the established grace period, resulting in large overtime charges. Students reported that Marinello never provided them with a full accounting breakdown of the overtime charges by hour, and in most cases students believed that they had not missed as many hours as Marinello claimed they had based on the amount of the charges. The students' claims are supported by the fact that the attendance scanner was not always functioning, the instructor rolls are discarded after a month, and there is conflicting information in student files and in documentation provided by students.

In the sample files reviewed, the overtime charges as high as $7700. Since Marinello would not allow students to graduate and receive their transcript hours in order to take the state licensing exam if they had a cash balance on their tuition accounts, they were forced to take out an institutional loan which carried additional interest charges, increasing even more the students' overall cost of the program. Excessive overtime charges were assessed for Students 1, 8, 10, 16, 21, 22, 24, 43, 44, 53, and 54.

Marinello's actions surrounding these excessive overtime charges are inconsistent with a fiduciary standard of conduct and underscore the institution's callous disregard for its students. Such behavior further supports the Department's action to deny the institution's application for recertification.

Page 8 – Dr. Rashed Elyas
Marinello School of Beauty

## D. Misrepresentation

Inherent in a fiduciary standard of conduct is the requirement that an institution operate in a forthright and truthful manner when dealing with students. In this regard, institutions are prohibited from making misrepresentations to students, or prospective students, regarding their educational programs, the financial charges assessed by the institution, or the employability of its graduates. 34 C.F.R. §§ 668.71-668.74. Department reviewers discovered that Marinello misled students regarding key elements of their educational programs and financial charges.

The Department discovered through student interviews that Marinello misrepresented its educational programs to prospective students. When students enrolled, Marinello staff promised the students they would receive an exceptional education taught by quality staff. Students were promised in-depth training in all areas of cosmetology, nails, and barbering. The training was to include both theory and hands on work in the clinic; however, students repeatedly informed Department staff that they did not receive the training in all functional areas needed to obtain jobs in the field. Students also stated that Marinello staff would pull them out of theory instruction in order to work on the clinic floor and then would not provide students instruction in the material they missed as a result of their absence from class. Departmental staff interviewed Marinello cosmetology students who supposedly "graduated" yet were unable to cut hair. The Department also spoke with barbering students who could not perform all of the various cuts required to perform successfully in that field. Marinello's failure to ensure students were provided training sufficient to obtain jobs in their field of study provides further evidence that the institution's recertification application should be denied.

Further, students at Marinello were not provided equipment and materials necessary to effectively complete their programs of study. Students attending Marinello were assessed between $2500 and $2750 for books and supplies. Despite this fact, students had to spend hundreds of dollars to purchase supplies needed to learn because the institution failed to provide required items. Students repeatedly informed Department staff that the kits they received were either missing essential items or the equipment included was of inferior quality, and they would have to replace it with their own money. When a student enrolls, there is an inherent expectation that the institution will have the equipment and supplies necessary for the students to learn. It is virtually impossible for students to obtain adequate training without the necessary equipment and supplies. Marinello's failure to provide sufficient equipment and supplies is even more egregious in light of the fact the students were charged thousands of dollars in their tuition for these exact items.

Marinello has failed to adhere to a fiduciary standard of conduct and failed to meet its responsibilities to the Department and its students. Consequently, its application for recertification must be denied.

As a result of this denial of its recertification application, Marinello is no longer eligible to participate in the Title IV programs. See 34 C.F.R. § 668.13(b)(2). In particular, Marinello is no longer eligible to participate in the following Title IV programs: Federal Pell Grant (Pell Grant), Federal Supplemental Educational Opportunity Grant (FSEOG), Teacher Education Assistance for College and Higher Education (TEACH) Grant, Federal Work-Study (FWS),

Page 9 – Dr. Rashed Elyas
Marinello School of Beauty

Federal Perkins Loan (Perkins Loan), and William D. Ford Federal Direct Loan (Direct Loan). The Direct Loan program includes the Federal Direct Stafford/Ford Loan Program, the Federal Direct Unsubsidized Stafford/Ford Loan program, the Federal Direct PLUS Program, and the Federal Direct Consolidation Loan program. The FSEOG, FWS, and Perkins Loan programs are known as campus-based programs.

Should Marinello have factual evidence to dispute the Department's findings, and demonstrate their inaccuracy, Marinello may submit that evidence via overnight mail to me at the following address:

> Administrative Actions and Appeals Service Group
> U.S. Department of Education
> Federal Student Aid/Program Compliance
> 830 First Street, NE (UCP-3, Room 84F2)
> Washington, DC 20002-8019

If any such material is received by February 16, 2016, it will be reviewed and Marinello will be notified if the recertification denial will be modified, rescinded, or left in place. If Marinello does not submit such material by that date, the denial of recertification will be effective February 29, 2016. The Multi-Regional and Foreign School Participation Division will then contact you concerning the proper procedures for closing out Marinello's Title IV program accounts.

In the event that Marinello submits an application to participate in the Title IV programs in the future, that application must address the deficiencies noted in this letter. If you have any questions about this letter, you may contact Kathleen Hochhalter at (303) 844-4520.

Sincerely,



Susan D. Crim
Director
Administrative Actions and Appeals Service Group

cc: Tony Mirando, Executive Director, National Accrediting Commission of Career Arts & Sciences, via amirando@naccas.org
    Joanne Wenzel, Bureau Chief, California Bureau for Private Proprietary Education, via Joanne.Wenzel@dca.ca.gov
    Department of Defense, via osd.pentagon.ousd-p-r.mbx.vol-edu-compliance@mail.mil
    Department of Veteran Affairs, via INCOMING.VBAVACO@va.gov
    Consumer Financial Protection Bureau, via CFPB_ENF_Students@cfpb.gov



**JUL 2 6 2016**

Mr. William Winkowski
President
Medtech College
6612 E. 75th Street
Suite 200
Indianapolis, IN 46250

Sent Via UPS
Tracking #:1ZA879640191695878

Re: Denial of Recertification Application to Participate in the Federal Student Financial
Assistance Programs – Medtech College, 6565 Arlington Boulevard, Falls Church, VA 22042;
OPE-ID: 02588900.

Dear Mr. Winkowski:

The U.S. Department of Education (Department) has reviewed Medtech College's (Medtech's)
application for recertification to continue to participate in the student financial assistance
programs authorized pursuant to Title IV of the Higher Education Act of 1965, as amended, 20
U.S.C. §§ 1070 et seq. ("Title IV programs"). Medtech's most recent Program Participation
Agreement ("PPA") expired on September 30, 2015. Medtech, however, timely submitted its
recertification application prior to that date. As a result, the Department extended Medtech's
PPA on a month-to-month basis while evaluating the application and related matters. *See* 34
C.F.R. § 668.13(b)(2).

For purposes of evaluating a recertification application, the Department reviews an institution's
performance during the operation of its previous PPA. The Department must ensure that an
institution applying for participation in the Title IV programs has met the standards of
administrative capability, has complied with Title IV program requirements, and has operated
under the high standards of care, trust, and diligence required of a fiduciary. In reaching a
decision on Medtech's recertification application, the Department reviewed all materials
submitted by Medtech in support of its application. In addition, the Department reviewed
materials it obtained during its review of Medtech, including documentation acquired during an
assessment of Medtech's job placement rate reporting (the Department's Assessment). A report
containing the findings of the Department's Assessment as to Medtech's placement rate
reporting encompassing students completing programs between January 1, 2013 and December
31, 2013 is attached to this letter as the Enclosure and incorporated by reference herein.



Federal **Student** Aid
*An OFFICE of the U.S. DEPARTMENT of EDUCATION*
Administrative Actions and Appeals Service Group
830 First St., N.E  Washington, D.C. 20002-8019
StudentAid.gov

USA SOI 096

*Mr. William Winkowski*
*Medtech College*
*Page 2*

The Department's Assessment revealed that (1) Medtech significantly overstated the job placement rates it reported to its institutional accreditor in its 2014 Annual Report, (2) Medtech significantly overstated the job placement rates it disclosed to the Department and the public through its Gainful Employment disclosures, (3) Medtech made numerous misrepresentations as to the job placement of individual students, and (4) Medtech contracted with a third-party placement rate verifier and failed to report that contractual arrangement in direct contravention of the Department's regulations. Medtech has failed to adhere to a fiduciary standard of conduct and failed to meet its responsibilities to the Department and its students. Consequently, its application for recertification is denied.

As a result of this denial of its recertification application, effective July 31, 2016, Medtech will no longer be eligible to participate in any Title IV programs. *See* 34 C.F.R. § 668.13(b)(2). Specifically, this includes: Federal Pell Grant (Pell Grant), Federal Supplemental Educational Opportunity Grant (FSEOG), Iraq and Afghanistan Service Grants (IASG), Teacher Education Assistance for College and Higher Education (TEACH) Grant, Federal Work-Study (FWS), Federal Perkins Loan (Perkins Loan), and William D. Ford Federal Direct Loan (Direct Loan). The Direct Loan program includes the Federal Direct Stafford/Ford Loan Program, the Federal Direct Unsubsidized Stafford/Ford Loan program, and the Federal Direct PLUS Program. The FSEOG, FWS, and Perkins Loan programs are known as campus-based programs.

## I.     MEDTECH DEMONSTRATED A LACK OF ADMINISTRATIVE CAPABILITY AND BREACHED ITS FIDUCIARY DUTY TO THE DEPARTMENT BY MAKING NUMEROUS MISREPRESENTATIONS TO ITS ACCREDITOR, TO THE DEPARTMENT, AND TO THE PUBLIC REGARDING THE CAREER OUTCOMES OF ITS GRADUATES.

On November 16, 2012, Medtech executed its most recent PPA with the Department, which stated that Medtech would comply with all Title IV, HEA program requirements, as well as any conditions specified by the Department in the PPA. *See generally*, 20 U.S.C. § 1094(a)(1); 34 C.F.R. § 668.14. By entering into a PPA with the Department, Medtech and its officers accepted the responsibility to act as fiduciaries in the administration of the Title IV programs. As fiduciaries, the institution and officers are subject to the highest standard of care and diligence in administering the Title IV programs and in accounting to the Secretary for the funds received. 34 C.F.R. § 668.82(a), (b).

In order to meet its responsibilities to the Department, an institution must be capable of adequately administering the Title IV programs. In this regard, an institution must comply with all Title IV statutory and regulatory requirements. 34 C.F.R. § 668.16(a). This includes maintaining accurate and complete records supporting its compliance with all Title IV requirements. *See* 34 C.F.R. §§ 668.16(d), 668.24. An institution's maintenance and submission of accurate records is critical to the Department's oversight responsibilities. The Department relies on those records when determining, among other things, student eligibility and compliance with institutional eligibility requirements.

*Mr. William Winkowski*
*Medtech College*
*Page 3*

A denial of an institution's recertification application is warranted if the Department determines that an institution does not meet all requirements and standards set forth in Title IV and regulations issued thereunder. 34 C.F.R. § 668.13. Medtech falls short of meeting those standards.

The Department may deny participation applications made by institutions when it determines that the institution has engaged in a substantial misrepresentation. 34 C.F.R. § 668.71(a)(3). A "misrepresentation" is

> any false, erroneous or misleading statement an eligible institution, one of its representatives, or any ineligible institution, organization, or person with whom the eligible institution has an agreement to provide educational programs, or to provide marketing, advertising, recruiting or admissions services makes directly or indirectly to a student, prospective student or any member of the public, or to an accrediting agency, to a State agency, or to the Secretary. A misleading statement includes any statement that has the likelihood or tendency to deceive. A statement is any communication made in writing, visually, orally, or through other means. Misrepresentation includes the dissemination of a student endorsement or testimonial that a student gives either under duress or because the institution required the student to make such an endorsement or testimonial to participate in a program.

34 C.F.R. §668.71(c).

A "substantial misrepresentation," is "any misrepresentation on which the person to whom it was made could reasonably be expected to rely, or has reasonably relied, to that person's detriment." *Id.*

Each substantial misrepresentation is a sufficient ground for the Department to deny Medtech's recertification application.

### A. Medtech made numerous substantial misrepresentations involving its job placements to its accreditor, to the Department, to its students, and to the public

#### 1. Placement Misrepresentations to the Council on Occupational Education

Medtech's institutional accreditor is the Council on Occupational Education (COE). On April 13, 2015, pursuant to COE's requirements, Medtech submitted to COE a "2014 Annual Report" ("the Annual Report"). For each of Medtech's programs, the Annual Report included a "Total Placement Rate." Specifically, the Annual Report stated, (1) the number of "Graduate Completers" and "Non-Graduate Completers[1]" (collectively, "Total Completers") (2) the

---

[1] COE defined this category as "The total number of students who left a program before graduation but have acquired sufficient competencies for employment in the field of instruction or related field as evidenced by such employment." Medtech only reported two such individuals, both in the Silver Spring Medical Billing and Coding program.

USA SOI 098

*Mr. William Winkowski*
*Medtech College*
*Page 4*

purported numbers of Graduate Completers Waiting to Take a Licensure Exam, Graduate Completers Unavailable for Employment[2], and Graduate Completers Who Refused Employment[3] (collectively, "Waivers"), and (3) the purported number of Total Completers Employed in Positions Related to Field of Instruction[4] ("Completers Employed"). By subtracting the number of Waivers from the number of Total Completers, dividing the number of Completers Employed by that number, and then multiplying by 100, Medtech calculated and reported to COE a purported "Total Placement Rate" for each program. Medtech reported those numbers and rates for students who completed a program between January 1, 2013 and December 31, 2013.

As part of the Department's Assessment, the Department engaged Deva & Associates, P.C. ("Deva"), to perform agreed-upon procedures to assess Medtech's compliance with placement rate reporting requirements. The Department obtained the Annual Report and a list of those students Medtech considered to be Completers Employed and Waivers, along with contact information and employment data for those students, from Medtech for four programs: the Falls Church, Virginia Medical Assistant (Diploma) Program, the Silver Spring, Maryland Medical Assisting Program, the Silver Spring, Maryland Medical Billing and Coding Program, and the Washington, DC Medical Assistant Program (collectively, the "Programs").

The Programs comprise a majority of each campus's enrollment. In the Annual Report, Medtech stated that the Falls Church Medical Assistant (Diploma) program represented 183 of 288 Total Completers at that campus, the Silver Spring Medical Assisting and Medical Billing and Coding Programs collectively represented 281 of that campus's 429 Total Completers, and the Washington, DC Medical Assistant (Degree) program represented all 35 of that campus's Total Completers.

From the population of Total Completers for each of the Programs, Deva generated a random sample (with sample sizes based on the statistical concepts of 90% confidence and 5% precision)[5] and made contact with completers and reported employers from that sample. Deva made contact with a sufficient number of completers and employers to project the extent of non-compliance and the error rates for the placement rates Medtech reported. Using the projected error rates, Deva extrapolated the number of placed and waiver students and recalculated the program's placement rate.

---

[2] COE defined this category as "The number of graduate completers documented to be unavailable for employment because of situations such as pregnancy, other serious health-related issues, caring for ill family members, death, etc."

[3] COE defined this category as "The number of graduate completers for whom the institution has documented evidence that the completers failed to keep interview appointments, enrolled in the program of instruction strictly for personal use, or simply refused an employment offer in the field of instruction."

[4] COE defined this as "Graduates who (1) are employed in the field of instruction pursued, (2) have entered the military, or (3) are continuing their education" plus non-graduate completers.

[5] "Confidence" and "Precision" are statistical terms of art. As used herein, the terms mean that the Department's Assessment included sufficient sampling to determine compliance or non-compliance with 90% confidence that the identified error rates are within five percentage points of the true error rate.

USA SOI 099

*Mr. William Winkowski*
*Medtech College*
*Page 5*

With respect to completers, Deva made telephonic contact using the contact information provided by Medtech. With respect to employers, Deva made telephonic contact and often followed up with a written request via facsimile. Deva followed a similar procedure for students Medtech considered to be Waivers. Deva then combined the results of the placement and waiver validation to analyze the institution's overall compliance with reporting requirements.

### a. Placement Rate Analysis

Deva's methodology was conservative, including its interpretation of COE's guidelines, which Deva relied upon in determining what constituted a Completer Placed and a Waiver, even when this conservative approach led to seemingly-incongruous outcomes. For example, Medtech reported one completer as placed when that completer had a job prior to entering the program, kept that same job after completing the program, and apparently derived no pecuniary benefit from the course of study. Nevertheless, Deva counted the completer as a placement.[6] Moreover, in three cases, former students and putative employers reported different data to Deva. In two of those cases, the employer reported that Medtech's reported placement was false, while the student reported that the placement was correct. In the third case, Deva found the reverse. Deva used none of those three cases in making its determinations, in computing error rates, or in recalculating placement rates.

The Total Placement Rates Medtech reported to COE for each of the tested programs were overstated and therefore constitute substantial misrepresentations. Medtech reported a Total Placement Rate of 73% for each of the Falls Church Medical Assisting Program, the Silver Spring Medical Assisting Program, and the Silver Spring Medical Billing and Coding Program. Medtech asserted a Total Placement Rate of 70% for the Washington, DC Medical Assistant Program. Each of these reported rates were at or barely above the threshold required to avoid potential COE sanctions, which was 70%.

In contrast, the extrapolated Total Placement Rates calculated by Deva were: approximately 56% for the Falls Church Medical Assisting Diploma Program, approximately 54% for the Silver Spring Medical Assisting Program, approximately 49% for the Silver Spring Medical Billing and Coding Program, and approximately 35% for the Washington, DC Medical Assisting Program.

The Annual Report also contained various substantial misrepresentations upon which the four Total Placement Rate misrepresentations are predicated.

### b. Misrepresentations in the Falls Church, Virginia Medical Assistant Diploma Program

Medtech reported to COE 183 Total Completers, 115 Completers Employed, and 26 Waivers. Out of 28 unduplicated contacts[7] with former students and putative employers, the Department's

---

[6] In fact, neither students nor the Department would reasonably view such a student to have been placed as a result of their education.

[7] As used herein, an "unduplicated contact" means that if in the course of the Department's Assessment the Department made contact with the student and the student's putative employer, those contacts together were only

*Mr. William Winkowski*
*Medtech College*
*Page 6*

Assessment revealed six individual instances in which Medtech reported a student as a Completer Employed when in fact that student was not employed as claimed[8]. Likewise, out of six contacts with Falls Church students that Medtech represented as a proper Waiver, one was not. In that student's case, Medtech reported that the student refused placement assistance, but both the student and the school's own documentation belie that assertion. Medtech kept on file a "Placement Assistance Waiver Form" the student purportedly signed on August 1, 2013. Assuming *arguendo* the student actually signed that form (the student has no recollection of doing so and says she was not on campus graduation day, the day of the putative signing), the form states that she would be available to resume her job search in September 2013. Medtech promised on this form that "[i]f/when you are ready to continue your job search efforts and would like Career Services placement assistance, please contact your campus Career Services department immediately, and we will be more than happy to assist you in your endeavors!" However, the student reported that despite seeking the assistance of Medtech's career services, the school failed to assist with her job search and does not return her telephone calls. Nevertheless, Medtech reported this student as a Waiver.

### c. Misrepresentations in the Silver Spring, Maryland Medical Assisting and Medical Billing and Coding Programs

For its Silver Spring campus's Medical Assisting program, Medtech reported to COE 234 Total Completers, 146 Completers Employed, and 33 Waivers. The Department's Assessment into this program made contact with 27 unduplicated student and putative employer contacts from the pool of those students Medtech counted as placed. Of those, five indicated that Medtech's reported placement was incorrect. The Department also spoke to seven students from this program that Medtech reported to COE as Waivers. Of those, four students - a majority - reported that the waivers were not valid. Likewise, for the Silver Spring campus's Medical Billing and Coding program, Medtech reported to COE 47 Total Completers, 19 Completers Employed, and 21 Waivers. The Department made contact with seven unduplicated student and putative employer contacts from the pool of those students Medtech counted as placed and found one student whose purported placement was wholly unsupportable. That student only "worked" as an unpaid extern for one day, and was not employed on the day Medtech reportedly verified the employment. The Department also interviewed nine students from this program whom Medtech counted as Waivers. Of those, three were invalid.

### d. Misrepresentation in the Washington, DC Medical Assisting Program

Finally, at Medtech's Washington, DC campus, Medtech reported to COE 35 Total Completers, 21 Completers Employed, and five Waivers. The Department's Assessment into this program made contact with 10 unduplicated student and putative employer contacts from the pool of those students Medtech counted as placed. Of those, five indicated that Medtech's reported placement

---

considered once. Moreover, if the Department received inconsistent data (i.e., the student confirmed Medtech's reported placement while the employer denied it, or vice-versa), then that contact was not considered invalid for the purpose of the placement analysis.
[8] Summary charts of the unduplicated contacts for allegedly placed students and Waiver students may be found at pages 17 and 18 of the Enclosure.

*Mr. William Winkowski*
*Medtech College*
*Page 7*

was incorrect. In addition, the Department spoke to two students from this program whom Medtech reported to COE as Waivers. Of those, one waiver was not valid.

### e.  **Misrepresentation Trends and Common Issues**

The Department's Assessment uncovered a problematic trend common to each of the Programs. For at least eight of the 72 unduplicated contacts, what Medtech improperly represented to be a job placement was in fact a short-term, unpaid externship that should not have been counted. Medtech mandated those externships as a graduation requirement and was aware of their short-term nature. Nevertheless, in those eight cases, Medtech reported the student as placed on the basis of the externship.[9]

During its assessment, the Department also discovered that Medtech reported at least 13 students as Waivers based upon all of them allegedly missing an interview supposedly set with the same employer on the same day. Specifically, Medtech reported 13 students who allegedly had an interview scheduled with America's Best – a chain of eyeglasses shops – on November 5, 2014. The 13 students were drawn from both the Medical Billing and Coding program and the Medical Assisting program at the Silver Spring, Maryland campus. The Director of Career Services (the Director), asserted that all 13 students were no shows to the "interview," and reported each to COE as a Waiver. The Director signed each of the 13 "Placement Refusal Forms" on November 6, 2014, the day after the alleged "interview."

Before addressing the results of the student interviews arising from these purported Waivers, the Department notes several inconsistencies on the face of the Placement Refusal Forms. First, the position the students supposedly were to interview for was "Front Desk Receptionist" with the job responsibilities of "[a]nswering the telephones, setting medical appointments, filing, recording patient information in the [sic], HIPPA [sic], [and] collection of copays and insurance verifications." It is unlikely that such a position could be considered in-field for students who paid significant sums in tuition for a Medical Assisting or Medical Billing and Coding diploma. Second, the Placement Refusal Forms show that the students' graduation dates were as early as 18 months prior to the purported interview, and that none of the graduation dates were more recent than 11 months prior to the "interview" date. COE allows a school to consider a student a Waiver when documentation shows that the student "failed to keep interview *appointments*…" [emphasis added], not when the school merely alleges that a student failed to keep a single interview appointment 11-18 months after graduation. Finally, in striking contrast to other "Placement Refusal Forms" used by the school, these forms do not have a place for the student's signature, and in fact are not signed by the student. This single, inconsistent "Placement Waiver Form" was all of the waiver-supporting documentation in the students' files.

The Department was able to speak to nine of the thirteen students in the sample who were the subject of these Placement Refusal Forms. Of those, seven had never heard of America's Best. The Department also spoke to the contact at America's Best listed on the Placement Refusal

---

[9] These eight cases are part of, and not in addition to, the 17 total invalid replacements discussed *infra*. In several other cases, students who were externs later became employed at their externship site. In those cases, the Department's Assessment considered the student to be placed.

Form. That individual had no recollection of scheduling thirteen Medtech student interviews on November 5, 2014. The individual hypothesized that that date might have been a job fair he was scheduled to attend on behalf of America's Best, but that job fairs were not interviews, and that at a job fair, at most, he might have accepted resumes from interested students to possibly follow-up with at a later date.

### f. Misrepresentation to COE based upon individual student files

COE's standards stress that an institution must not only submit job placement data, but that such data must be "accurate and verifiable." *COE Handbook of Accreditation,* Standard V, Criterion III. COE reports to the Department that it relies on the accuracy of that data when it samples student-level files and data on its campus visits, as its standards require. COE conducted such a visit to Medtech between October 13th and 16th, 2014. The *Visiting Team Report* from that visit indicates that COE reviewed the files of individual students who were reported as placed. *COE Visiting Team Report 2014.* In addition to the misrepresentations as to job placement rate and the absolute numbers of completers placed, because COE relies upon maintenance of accurate and verifiable student-by-student files and data and reviews those items on-site reviews, it could reasonably be expected to rely upon the misrepresentations contained in those records in exercising its jurisdiction over Medtech.

COE could reasonably be expected to rely on all of these misrepresentations in exercising its jurisdiction over Medtech. For example, to maintain its recognition from the Department, COE "must demonstrate that it has standards for accreditation... that are sufficiently rigorous to ensure that the agency is a reliable authority regarding the quality of the education or training provided by the institutions or programs it accredits." 34 C.F.R. § 602.16(a). COE will meet this standard if its "accreditation standards effectively address the quality of the institution" in a number of areas, including "success with respect to student achievement... including, as appropriate, consideration of State licensing examinations, course completion, and *job placement rates" Id.* (emphasis added). Moreover, "the agency must have effective mechanisms for evaluating an institution's... compliance with the agency's standards." 34 C.F.R. § 602.17(a). COE may meet this requirement by, *inter alia,* "conduct[ing] at least one one-site review of the institution... during which it obtains sufficient information to determine if the institution... complies with [COE's] standards" *Id.* Each of the four overstatements of a program's Total Placement Rate constitutes a substantial misrepresentation, as does each report of the number of Completers Placed and each report of the number of Waivers. Moreover, Medtech maintained files which substantially misrepresented the outcomes of 17 allegedly placed students and nine allegedly waived students.

### 2. Placement Misrepresentations to the Department, to students, to prospective students, and to the public

Pursuant to the Department's Gainful Employment (GE) regulations at 34 C.F.R. §§ 668.6(b)(1)(iv), 668.41(d)(5), and 668.412, Medtech published online a Gainful Employment Disclosure Template ("GE Template") for each of the Programs. The Department's regulations require the GE Templates to be posted online and made available to prospective and enrolling

students.  34 C.F.R. §§ 668.412(c), (d), and (e).  Medtech's online GE Templates are available to
the public through publicly-accessible web pages.  Because the Department requires programs
receiving Title IV aid to report the information contained in the GE Templates,
misrepresentations in the GE Templates also constitute misrepresentations to the Department, as
well as violations of GE disclosure requirements.

The rates reported on each of the Program's GE Templates mirror the rates Medtech reported to
COE.  As explained *supra*, each of those rates overstated the respective program's true
placement rate.  Members of the public, including prospective students, could reasonably rely
upon the false data shown in the GE Templates to decide whether to enroll at Medtech.
Likewise, current students could reasonably rely upon that false data to decide whether to
continue their enrollment at Medtech, and the Department could reasonably rely upon it in a
number of ways, including determining whether Medtech was in compliance with state agency
and accreditor requirements and in deciding whether to conduct program reviews.  Therefore,
each of the placement rate misrepresentations on the four GE Templates constitutes a substantial
misrepresentation to the public, to prospective students, to current students, and to the
Department.

## II.    MEDTECH'S VIOLATION OF THIRD PARTY SERVICER REPORTING REQUIREMENTS IS A BREACH OF ITS FIDUCIARY DUTY TO THE DEPARTMENT AND DEMONSTRATES A LACK OF ADMINISTRATIVE CAPABILITY

As part of its Assessment, the Department found that Medtech contracted with Placement
Verifiers, LLC (Placement Verifiers) to verify placement of its completers.  The contract
between Medtech and Placement Verifiers (the Contract) is dated December 6, 2013.  Some of
the reported job placements and Waivers analyzed as part of the Department's Assessment were
allegedly verified by Placement Verifiers, while Medtech allegedly verified others using its own
staff.

A "third-party servicer" includes an entity that "conducts[s] activities required by the provisions
governing student consumer information services in subpart D of [34 C.F.R. Part 668]."  34
C.F.R. § 668.2.  Included among the Subpart D reporting requirements are job placement rates.
34 C.F.R. § 668.41(d)(5).  Because Medtech used Placement Verifiers as a third-party servicer,
Medtech should have reported its use of Placement Verifiers to the Department, and the Contract
should have contained a number of provisions to protect the Department from fraud.  34 C.F.R. §
668.25.  Medtech never reported the arrangement to the Department, and the Contract contained
none of the required protections.  Notably, had the Contract contained the language required by
34 C.F.R. § 668.25, Placement Verifiers would have been required to report to the Department
"any information indicating there is reasonable cause to believe that the institution might have
engaged in fraud…" 34 C.F.R. § 668.25(c)(2).

Instead of containing these safeguards, Medtech chose to enter into a contract that actually paid
Placement Verifiers per "verification."  Placement Verifiers was therefore incentivized to report
more verifications, which in turn allowed Medtech to report more "placements" and higher job

*Mr. William Winkowski*
*Medtech College*
*Page 10*

placement rates. The regulatory violations arising out of the Contract, therefore, are not merely technical infractions. "To begin and to continue to participate in any Title IV program, an institution shall demonstrate to the Secretary that the institution is capable of adequately administering that program under each of the standards established in this section." 34 C.F.R. §668.16. Factors the Department considers in determining whether an institution is capable of adequately administering Title IV programs include (1) whether the institution "[a]dministers the Title IV programs in accordance with all statutory provisions of or applicable to Title IV of the HEA [and] all applicable regulatory provisions prescribed under that statutory authority..." (34 C.F.R. § 668.16(a)); (2) the use (or misuse) of third-party servicers in determining whether the institution used an "adequate number of qualified persons to administer" its Title IV programs (34 C.F.R. § 668.16(b)(2)(vii)); and (3) whether the institution "[a]dministers Title IV programs with adequate checks and balances in its system of internal controls" (34 C.F.R. § 668.16(c)(1)).

Here, Medtech's contract with Placement Verifiers was entered into in violation of the regulatory provisions outlined above, it constitutes a misuse of third party servicers which in turn evidences a paucity of qualified persons to administer Title IV programs, and by its very terms it shows a troubling disregard for the checks and balances required in 34 C.F.R. § 668.25 and elsewhere to correctly administer a taxpayer-funded program. In sum, in addition to constituting a breach of the fiduciary duty Medtech owes the Department, the arrangement between Medtech and Placement Verifiers evidences Medtech's lack of administrative capability to administer Title IV programs.

Should Medtech have factual evidence to dispute the Department's findings and demonstrate their inaccuracy, Medtech may submit that evidence via overnight mail to me at the following address:

> Administrative Actions and Appeals Service Group
> U.S. Department of Education
> Federal Student Aid/Program Compliance
> 830 First Street, NE (UCP-3, Room 84F2)
> Washington, DC 20002-8019

If any such material is received by *August 5, 2016* it will be reviewed and Medtech will be notified if the recertification denial will be modified, rescinded, or left in place. If Medtech does not submit such material by that date, the denial of recertification will be effective July 31, 2016. The Multi-Regional and Foreign School Participation Division will then contact you concerning the proper procedures for closing out Medtech's Title IV program accounts.

USA SOI 105

*Mr. William Winkowski*
*Medtech College*
*Page 11*

In the event that Medtech submits an application to participate in the Title IV, HEA programs in the future, that application must address the deficiencies noted in this letter. If you have any questions about this letter, you may contact Kerry O'Brien at 303-844-3319.

Sincerely,



Susan D. Crim
Director
Administrative Actions and Appeals Service Group

Enclosure

cc:    Dr. Gary Puckett, Executive Director, COE, via puckettg@council.org
       DC Education Licensure Commission via angela.lee@dc.gov
       MD Higher Education Commission via jennie.hunter-cevera@maryland.gov
       VA State Council for Higher Education via peterblake@schev.edu
       Department of Defense, via osd.pentagon.ousd-p-r.mbx.vol-edu-compliance@mail.mil
       Department of Veteran Affairs, via INCOMING.VBAVACO@va.gov
       Consumer Financial Protection Bureau, via CFPB_ENF_Students@cfpb.gov

SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is made by and between DeVry University (OPE ID Number 01072700) ("DVU"), 3005 Highland Parkway, Downers Grove, Illinois 60515, and the United States Department of Education (the "Department") acting through the Chief Enforcement Officer at Federal Student Aid (collectively "the Parties"), and is effective the latest date opposite the signatures below ("Effective Date").

RECITALS

**WHEREAS**, DVU is a school participating in the Federal student aid programs authorized pursuant to Title IV of the Higher Education Act of 1965, as amended, 20 U.S.C. § 1070 *et seq.* ("Title IV, HEA programs"); and

**WHEREAS**, DVU received a request for documents and information on August 28, 2015 from the Department's Multi-Regional and Foreign School Participation Division of the Federal Student Aid Office; and

**WHEREAS**, the Department issued a Notice of Intent to Limit to DVU on January 27, 2016 (the "Notice"); and

**WHEREAS**, DVU timely filed a written request for a hearing contesting the Notice on February 12, 2016, and the Notice is now the subject of a Federal Student Aid proceeding entitled *In the Matter of DeVry University*, Docket No. 16-07-O (the "Limitation Action"); and

**WHEREAS**, the Parties have endeavored to resolve this matter and have engaged in good faith negotiations for that purpose; and

**WHEREAS**, the Parties now desire to settle this matter.

**NOW, THEREFORE**, in consideration of the mutual promises and the performance of the actions described herein and other good and valuable consideration, the receipt and sufficiency of which the Parties hereby acknowledge, the Parties agree as follows:

1. DVU agrees to the following:

    a.  To the extent DVU has not already done so, DVU will immediately cease publishing or otherwise using the Since 1975 Representation and will not resume publishing or otherwise using the Since 1975 Representation. As used in this Agreement, "Since 1975 Representation" means any representation, regardless of manner, form or means of utterance or publication by DVU to a student, prospective student, accrediting agency, state agency, the Secretary of Education ("Secretary"), or any member of the public stating or suggesting the graduate employment outcomes for DVU graduates since 1975. Without limitation, the phrase "Since 1975 Representation" shall include representations that state that (1) since 1975, 90% (or some close variation thereof) of DVU graduates system-

1

USA SOI 107

wide in the active job market were employed in career-related positions within 6 months of graduation; or (2) since 1975, 90% (or some close variation thereof) of DVU graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation. The phrase "Since 1975 Representation" shall exclude any representation of graduate employment outcomes for DVU graduates that does not cumulatively include DVU graduates since 1975.

b. DVU will not make any representations to a student, prospective student, accrediting agency, state agency, the Secretary, or any member of the public that are based, in whole or in part, on the post-graduation employment outcomes of any student who graduated from DVU between 1975 and October 1980.

c. DVU certifies that it has taken or will take steps, as identified in Exhibit A, to remove certain past uses or publications by DVU and third parties of the Since 1975 Representation.

d. To the extent DVU makes any representations to any student, prospective student, accrediting agency, state agency, the Secretary, or member of the public that are based, in whole or in part, on graduate employment rates, DVU will possess and maintain graduate-specific data to substantiate such representations and will make such graduate-specific data available to the Department upon request. As used herein, "graduate-specific data" shall mean all information about individual graduates, individually and in the aggregate, necessary to support such a representation and includes graduate names, social security numbers, student ID numbers, graduation dates, degrees earned (*e.g.*, bachelors, associates, masters), programs or majors (*e.g.*, business administration, technical management), specializations or other concentrations (if applicable), and information regarding both pre- and post-graduation employment, including employer name, occupation, position title, hours worked, salary, start date, full or part time status, and whether the position is funded by DVU, and any other information necessary to substantiate the truthfulness of the representation. Without limitation, "graduate-specific data" shall include:

    i. To the extent necessary to substantiate the truthfulness of the representation, all student files relating to students or graduates whose graduate employment information serves as a basis for the representation, including student files relating to students or graduates who are part of a cohort of students as to which the representation pertains, but whose information is nonetheless excluded from the calculation for any reason;

    ii. All documentation collected or maintained by DVU necessary to substantiate the truthfulness of the representation, including its employees, contractors, and agents, relating to the employment of any such student before, during, and after the student's graduation from DVU and maintained in DVU's Registrar or Career Services files;

USA SOI 108

    iii. All communications or documents necessary to substantiate the truthfulness of the representation reflecting communications between DVU, including its employees, contractors, and agents, with any student or graduate regarding post-graduation employment;

    iv. All documents obtained by DVU relating to any audit, survey, analysis, or other review contracted for or by DVU, relating to any representations that are based, in whole or in part, on graduate employment outcomes;

    v. All other evidence on which DVU relies to substantiate the facts underlying any representation about the employability of DVU graduates, including, without limitation, representations about the employment rates of DVU graduates.

e. DVU will maintain information sufficient to establish the methodology it used to formulate any representations regarding post-graduation employment outcomes of DVU students and make such information available to the Department upon request. As used herein "information sufficient to establish the methodology" shall include, without limitation, detailed information about the methodology used to categorize students for purposes of any representations including, as appropriate, the methodology used to determine whether a graduate was employed in his or her field of study, the methodology used to assess the differences, if any, between pre-enrollment or pre-graduation employment, on the one hand, and post-graduation employment, on the other, and the methodology used to determine the veracity of any information compiled by DVU employees or agents responsible for compiling information and making such determinations. Without limitation, "information sufficient to establish the methodology" shall also include:

    i. All internal or external publications, including, without limitation, Career Services Manuals, training materials, guidelines, and instructions, that describe, detail, or relate to the methodology used by DVU to calculate or create such representation based, in whole or in part, on graduate employment rates; and

    ii. All other evidence on which DVU relies to substantiate the methodology underlying any representation about the employability of DVU graduates, including, without limitation, representations about the employment rates of DVU graduates.

f. With respect to the records and information required to be maintained pursuant to Paragraphs 1(d) and 1(e) of this Agreement, DVU shall maintain such records for a period not less than six (6) years following the last making of the representation triggering an obligation in those Paragraphs.

USA SOI 109

g. For a period of six years from the Effective Date, DVU will engage a qualified, independent, third-party ("Third Party") to review the records and information relating to DVU graduates from January 2017 and beyond required to be maintained pursuant to Paragraphs 1(d) and 1(e) of this Agreement and DVU's plans to maintain such records for the period required by Paragraph 1(f) of this Agreement. The Third Party shall issue a Report, on no less than an annual basis, that confirms DVU has satisfied, in all material respects, its responsibilities under Paragraphs 1(d) and 1(e) of this Agreement relating to DVU graduates from January 2017 and beyond, and has implemented policies designed to achieve and maintain compliance with Paragraph 1(f) of this Agreement. This Report: (A) shall identify the information that DVU has provided to the Third Party, including a listing and brief description of all representations DVU has made (since the most recent report provided pursuant to this Paragraph) to any student, prospective student, accrediting agency, state agency, the Secretary, or member of the public that are based, in whole or in part, on graduate employment rates, and the steps that the Third Party has taken to confirm DVU's compliance with Paragraphs 1(d) and 1(e), and its policies to comply with Paragraph 1(f), of this Agreement; (B) is provided to the Director of Enforcement at Federal Student Aid or his or her designee; and (C) is accompanied by a statement by the Third Party affirming that, to the knowledge of the Third Party, the Report does not contain any false, fictitious, or fraudulent information, or omit any material fact. In the event DVU is unable to secure the engagement of a Third Party to provide the Report prescribed under this Paragraph 1(g) after exhausting all reasonable good faith efforts to do so, the Parties agree to work cooperatively to amend this Paragraph to accomplish their shared objective of obtaining a third-party report. In such event, DVU will provide the Department with a written report describing the steps taken to secure such an engagement, the reasons for DVU's inability to secure such an engagement, and the names of any Third Party actually retained for the purpose of providing the Report required by this Paragraph.

h. For a period of six years from the Effective Date, and on no less than an annual basis, DVU will provide the Department a certification attesting to DVU's compliance with Paragraphs 1(d) and 1(e) of this Agreement, and its policies for complying with Paragraph 1(f) of this Agreement. Such certification shall: (A) identify and briefly describe to the Department all representations DVU has made (since the most recently provided certification pursuant to this Paragraph) to any student, prospective student, accrediting agency, state agency, the Secretary, or member of the public that are based, in whole or in part, on graduate employment rates; (B) affirm that DVU has not knowingly excluded from the graduate-specific data required to be maintained pursuant to Paragraph 1(d) any other information created or maintained by DVU that could reasonably be used to substantiate a representation subject to Paragraph 1(d); (C) be provided to the Director of Enforcement at Federal Student Aid or his or her designee; and (D) acknowledge that the provision of any false, fictitious, or fraudulent information, or the omission of any material fact, may subject DVU to criminal, civil or

USA SOI 110

administrative penalties for fraud, false statements, false claims, or other violations of law.

i.  Within thirty days of the Effective Date, DVU will prominently post on the home page of its website in a simple and meaningful manner, the following language ("Disclosure Language"), to be maintained for two years:

> *DeVry University previously advertised that "Since 1975, 90% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation." The U.S. Department of Education has asserted that the records maintained by DeVry University for the period 1975-1983 were not sufficient to substantiate the Since 1975 Representation, and thus that DeVry University could not substantiate this representation to the extent required by law. Accordingly, the University agreed to cease making the Since 1975 Representation and post this notification on its website.*

j.  Within thirty days of the Effective Date, and for five years following the Effective Date, DVU must include the Disclosure Language in any and all enrollment agreements or other such documents memorializing the enrollment of a student at DVU.

k.  For a period of five years following the Effective Date, DVU will submit to the Department, to the attention of the Director of Enforcement, no later than ten days after the event described below, written notice of the occurrence of any of the following:

   i.  Any adverse action whatsoever, including, without limitation, written warnings, adverse factual determinations, show cause orders, lawsuits filed, probation and similar actions, taken against DVU by an accrediting agency, State authorizing agency, Federal or State agency, or any other civil or criminal law enforcement agency, or any civil case (including an arbitration) filed by a private party relating to representations made by DVU regarding the employability of its graduates (including representations that are based, in whole or in part, on graduate employment rates), and any judgments rendered in such case; or

   ii.  DVU's receipt of a subpoena, civil investigative demand, or other inquiry by an accrediting agency, State authorizing agency, Federal or State agency, or any other civil or criminal law enforcement agency relating to representations made by DVU regarding the employability of its graduates (including representations that are based, in whole or in part, on graduate employment rates).

2.  Within 30 days of the Effective Date of this agreement, DVU shall post a letter of credit ("LOC") for the benefit of the Department in the amount of $68,435,908, which is

USA SOI 111

approximately equal to ten percent of the Title IV, HEA program funds disbursed by DVU in the 2014-2015 award year.

a. The LOC will be adjusted annually to remain at a level equal to ten percent of DVU's Title IV, HEA program disbursements in the preceding fiscal year, but in no event shall the LOC be less than $68,435,908. The LOC shall expire on the fifth anniversary of its issuance. Pursuant to lender requirements, the LOC may contain an annual expiration date and allow for automatic renewal. Should DVU fail to renew or replace the LOC within ten (10) days prior to any interim expiration with a new LOC that becomes effective immediately upon the expiration of the extant LOC (so as not to create any lapse in an LOC), the Department may call the extant LOC and fund the funds in an escrow account at the Department pending a determination of the extent to which those funds will be used in accordance with Paragraph 2(b) of this Agreement.

b. The LOC posted pursuant to this Agreement will be deemed to satisfy any and all requirements for DVU to post an LOC triggered by the past performance requirement of financial responsibility under 34 C.F.R. § 668.174(a)(1) based on the settlement of the Notice.

c. The LOC will permit the Department to draw against the letter of credit only under the following circumstances, and in any case only after such action has been finally determined to be justified under a process in which DVU is afforded all the rights and protections to which it is entitled:

   i. To pay refunds of institutional or non-institutional charges owed to or on behalf of current or former students of DVU, whether DVU remains open or has closed;

   ii. To provide for the "teach-out" of students enrolled at DVU at the time of the closure of DVU, including with respect to activities conducted pursuant to a "teach out agreement," as that term is defined in 34 C.F.R. § 602.3, and/or other services reasonably designed to facilitate the transition of such students to another educational program, such as funding transfer fees, transcript costs, and similar expenses; and

   iii. To pay any fines, penalties, or liabilities whatsoever owing to the Secretary arising from acts or omissions by DVU in violation of Title IV, HEA program requirements, including the violation of any agreement entered into by DVU with the Secretary regarding the administration of Title IV, HEA programs. Without limitation, this shall include any liability owed to the Secretary pursuant to Section 455(h) of the HEA, 20 U.S.C. §1087e(h), or any regulation promulgated thereunder.

d. As used in this Agreement, "Covered Conduct" shall mean conduct regarding DeVry's substantiation, or lack thereof, for the Since 1975 Representation.

USA SOI 112

"Covered Conduct" shall exclude any conduct other than that regarding DVU's substantiation for the Since 1975 Representation and shall also exclude conduct relating to DVU's use of any other representation, including other representations related to post-graduation outcomes of DVU students, irrespective of whether such representation was made as part of the *We Major in Careers* campaign. Covered conduct shall also exclude any conduct that may form a basis for a determination by the Secretary that DVU has engaged in substantial misrepresentation pursuant to 34 C.F.R. Part 668 Subpart F or 20 U.S.C. § 1094(c)(3).

3.  The Parties agree that the settlement of the Notice constitutes a condition of past performance as set forth in 34 C.F.R. § 668.174(a)(1). DVU will therefore participate in the Title IV, HEA programs under provisional certification through April 1, 2018, provided that:

    a.  The Department retains the right to revoke DVU's provisional certification for cause, consistent with the procedural requirements set out in 34 C.F.R. § 668.13(d) and the provisional program participation agreement attached hereto as Exhibit B. The provisions set forth in Paragraph 3(b) below shall not apply to any revocation action taken by the Department.

    b.  Before taking any action regarding DVU's eligibility under or participation in the Title IV, HEA programs other than a revocation pursuant to 34 C.F.R. § 668.13(d), or before imposing any fine, penalty, or liability against DVU, irrespective of whether such fine, penalty, or liability is imposed using the processes afforded in 34 C.F.R. Part 668 Subpart G or following a Final Program Review Determination or Final Audit Determination (and subject to appeal rights under 34 C.F.R. Part 668 Subpart H), the Department will:

        i.  Provide DVU written notice specifying the Department's basis for such action; and

        ii.  Afford DVU an opportunity to challenge the action through a proceeding pursuant to 34 C.F.R. Part 668, Subparts G or H, as applicable, with all attendant rights;

        iii.  Written notice, as that phrase is used in Paragraph 3(b)(i) of this Agreement may be satisfied by the Department's issuance of a Final Program Review Determination or Final Audit Determination.

    c.  DVU will have until six-months after the last day of DVU's fiscal year to submit its audited financial statements and an independent compliance audit, consistent with 34 C.F.R. § 668.23.

    d.  The Department shall process all applications for programs and locations as it would in the ordinary course and without undue delay.

USA SOI 113

    e. Other than as expressly set forth herein, the Department shall not impose growth or other conditions or restrictions on DVU's participation in the Title IV, HEA programs due to the Covered Conduct, or arising from the Notice or the settlement of the Notice. Except as otherwise provided by law, the Department is not otherwise limited in its authority to impose such conditions or restrictions.

    f. Except as otherwise provided herein, no person or entity exercising substantial control over DVU as determined under 34 C.F.R. § 668.174 shall be required to submit a financial guarantee to the Department as a condition of initial provisional certification, or due to the Covered Conduct, or arising from the Notice or the settlement of the Notice.

4. DVU accepts and acknowledges that for five years after the effective date of this Agreement and following the expiration of the Provisional Program Participation Agreement executed pursuant to Paragraph 3 of, and concurrently with, this Agreement, the condition of past performance resulting from the settlement of the Notice may result in DVU's certification to participate in Title IV, HEA programs only under an alternative standard set forth in 34 C.F.R. § 668.175.

5. Notwithstanding any other provision of this Agreement, nothing in this Agreement shall restrict the Department from considering the Covered Conduct when devising or implementing a remedy for any conduct by DVU (which is not within the Covered Conduct) that violates Title IV of the HEA or any regulation promulgated thereunder.

6. The Department will not impose conditions on the timing of disbursement of aid or documentation requirements due to the Covered Conduct, other than requiring DVU, at the Department's sole discretion, to participate in the Title IV, HEA programs under a method of payment no more restrictive or burdensome than Heightened Cash Monitoring 1 status, set forth at 34 C.F.R. § 668.162(d)(1). Except as so stated, the Department retains the sole discretion to determine the method under which the Secretary provides Title IV, HEA program funds pursuant to 34 C.F.R. § 668.162.

7. The Department agrees to accept the commitments made by DVU in this Agreement in full and final resolution of all matters, present or future, based on the Covered Conduct, or arising out of the Notice or the Settlement of the Notice. The Department agrees that it shall not institute, direct, maintain, continue or join any action of any nature, including but not limited to any civil or administrative monetary claim against DVU, or any DVU entities and related parties, arising from or based on the Covered Conduct, the act of settlement, or this Agreement.

8. DVU releases the Department (together with its agents and employees) from any claims, known and unknown, suspected and unsuspected, including claims for attorneys' fees, costs, and expenses of every kind and however denominated, that DVU has asserted or could assert against the Department (together with its agents and employees) concerning the Covered Conduct, the Department's investigation into the Covered Conduct, the

Department's bringing of the Limitation Action, or the Department's actions in prosecuting the Limitation Action.

9.  Within five days of the Effective Date, the Parties agree that they shall jointly enter a motion to dismiss the Limitation Action with prejudice.

10. This Agreement does not waive, compromise, restrict, or settle any past, present, or future actions by the Department pursuant to 34 C.F.R. Part 668, Subparts G and H that are not arising from or based on the Covered Conduct or this Agreement.

11. This Agreement does not waive, compromise, restrict, or settle any past, present, or future violations by DVU, its Trustees, Officers, or employees of the criminal laws of the United States or any action initiated against DVU, its Trustees, Officers, agents, or employees for civil fraud against the United States.

12. DVU neither admits nor denies any wrongdoing regarding the Covered Conduct.

13. The Parties will each bear their own costs in connection with this action and this Agreement.

14. All signatories to this Agreement acknowledge that they have read this Agreement and have freely and voluntarily executed it after having consulted with counsel and received the advice of counsel as to its effect.

15. Each individual signing this Agreement warrants that he or she has full authority to do so. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which shall constitute one and the same agreement.

16. Neither Party will contest the enforceability of this Agreement in a future proceeding.

17. A breach of this Agreement by DVU shall constitute a breach of DVU's standard of care and diligence in administering Title IV programs, a breach of any Program Participation Agreement in effect at the time of the breach, and cause for revocation pursuant to a provisional Program Participation Agreement.

18. This Agreement, including the Exhibits attached hereto, sets forth the entire agreement and understanding of the Parties relating to the subject matter herein and supersedes all prior or contemporaneous discussions, understandings, and agreements, whether oral or written, between them relating to the subject matter hereof.

USA SOI 115

10/13/16

Date

Robert Paul
President
DeVry University

10/13/16

Date

Robert S. Kaye
Chief Enforcement Officer
Federal Student Aid
U.S. Department of Education

*[Signature Page to Settlement Agreement]*

10



**DEC 6 - 2016**

Mr. Jeffrey Myhre                                   Sent Via UPS
President                                          Tracking #: 1ZA879640197808011
Minnesota School of Business
1401 West 76th Street, Suite 500
Richfield, MN 55423-3841

Re:  Denial of Recertification Application to Participate in the Federal Student Financial
Assistance Programs – Minnesota School of Business, 1401 West 76th Street, Suite 500,
Richfield, Minnesota 55423; OPE ID: 00464600.

Dear Mr. Myhre:

The U.S. Department of Education (Department) has reviewed the application for
recertification submitted by Minnesota School of Business (MSB) to continue to participate in
the student financial assistance programs authorized pursuant to Title IV of the Higher
Education Act (HEA) of 1965, as amended, 20 U.S.C. §§ 1070 *et seq.* (Title IV programs).
MSB's most recent Program Participation Agreement (PPA) expired on December 31, 2015.
MSB, however, timely submitted its recertification application prior to that date. As a result,
the Department extended MSB's PPA on a month-to-month basis while evaluating the
application and related matters. *See* 34 C.F.R. § 668.13(b)(2).

For purposes of evaluating a recertification application, the Department reviews an
institution's performance as a participant in Title IV programs and must ensure that the
institution has met the standards of administrative capability, has complied with Title IV
program requirements, and has operated under the high standards of care, trust, and diligence
required of a fiduciary. A denial of an institution's recertification application is warranted if
the Department determines that an institution does not meet all requirements and standards set
forth in Title IV and regulations issued thereunder. HEA § 498, 20 U.S.C. § 1099c; 34 C.F.R.
§ 668.13.   In reaching a decision on MSB's recertification application, the Department
reviewed all materials submitted by MSB in support of its application.  The Department also
reviewed other relevant documents, including those associated with the litigation captioned
*Minnesota v. Minnesota School of Business, Inc. d/b/a Minnesota School of Business and
Globe University, Inc. d/b/a Globe University*, No. 27-CV-14-12558, Fourth Judicial District



Federal**Student** Aid
An OFFICE of the U.S. DEPARTMENT of EDUCATION
Administrative Actions and Appeals Service Group
830 First St., N.E. Washington, D.C. 20002-8019
StudentAid.gov

USA SOI 117

of Minnesota (2016).[1]    Some of these documents are enclosed with this letter and are incorporated herein by reference.    Students and employees are referenced throughout this letter by the number assigned to them in the Student/Employee Crosswalk enclosed with this letter.    References to trial exhibits are references to the exhibit numbered in the trial named above.    References to the trial transcripts are references to the transcripts in the trial named above.

The Department's review of the materials described above establishes that: (1) MSB has been judicially determined to have committed fraud involving Title IV program funds; (2) MSB made substantial misrepresentations about the nature of its criminal justice program and the employability of the graduates of that program; and (3) MSB made substantial misrepresentations about its students' ability to transfer credits earned at MSB to other institutions.    Consequently, MSB's application for recertification is denied.

As a result of this denial of its recertification application, MSB is no longer eligible to participate in the Title IV programs, effective December 31, 2016.    *See* 34 C.F.R. § 668.13(b)(2).    Specifically, this includes: Federal Pell Grant (Pell Grant), Federal Supplemental Educational Opportunity Grant (FSEOG), Iraq and Afghanistan Service Grants (IASG), Teacher Education Assistance for College and Higher Education (TEACH) Grant, Federal Work-Study (FWS), Federal Perkins Loan (Perkins Loan), and William D. Ford Federal Direct Loan (Direct Loan). The Direct Loan program includes the Federal Direct Stafford/Ford Loan Program, the Federal Direct Unsubsidized Stafford/Ford Loan program, and the Federal Direct PLUS Program.

## I.    MSB IS INELIGIBLE TO PARTICIPATE IN TITLE IV PROGRAMS BECAUSE IT HAS BEEN JUDICIALLY DETERMINED TO HAVE COMMITTED FRAUD INVOLVING TITLE IV PROGRAM FUNDS

An institution that has been judicially determined to have committed fraud involving Title IV program funds is not eligible to participate in Title IV programs.    HEA § 102(a)(4)(B), 20 U.S.C. § 1002(a)(4)(B); 34 C.F.R. § 600.7(a)(3)(ii).    "The phrase 'judicially determined to have committed fraud' means that a court of competent jurisdiction has made such a finding." Institutional Eligibility Under the Higher Education Act of 1965, as Amended, 59 Fed. Reg. 22324-01, 22,329 (Feb. 10, 1994).

On July 22, 2014, the State of Minnesota sued MSB under several theories, including a violation of the Minnesota Consumer Fraud Act (CFA), which, in relevant part, prohibits "[t]he act, use, or employment by any person *of any fraud*, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact

---

[1] According to documentation MSB has provided to the Department regarding its ownership structure, Minnesota School of Business, Inc., is the owner of Minnesota School of Business, OPEID 00464600.

*Mr. Jeffrey Myhre*
*Minnesota School of Business*
*Page 3*

been misled, deceived, or damaged thereby." Minn. Stat. § 325F.69, subd. 1 (emphasis added).

On September 8, 2016, following a multi-week trial, Judge James Moore of Minnesota's Fourth Judicial District issued "Findings of Facts, Conclusions of Law, and Order" (collectively, the "Order") in which he found that the evidence presented by the State was "*sufficient to establish fraud and*/or deception in the marketing of Defendants' Criminal Justice program." Order at 110, Conclusions of Law ¶ 14 (emphasis added). The court also found that numerous MSB students were injured by this fraud, and many of the students received Title IV funds to pay for the program.[2] Order at 111-13, Conclusions of Law ¶¶ 16-20. Based in part on these factual and legal findings and conclusions, the court found that MSB's "actions in promoting [its] Criminal Justice Program . . . constitute violations of Minn. Stat. §§ 325F.69, subd. 1" Order at 131, Conclusions of Law ¶ 1.

The Order, therefore, constitutes a judicial determination that MSB has committed fraud involving Title IV funds.[3] Pursuant to HEA § 102(a)(4)(B), 20 U.S.C. § 1002(a)(4)(b), and 34 C.F.R. §§ 600.7(a) and 668.13(a), MSB is ineligible to participate in Title IV programs and may not be recertified for participation in those programs.

---

[2] Of the 15 students mentioned in on pages 111-13 (¶¶ 16, 19) of the Order, 14 received Title IV funds. In addition, numerous students who swore about MSB's misrepresentations via affidavit received Title IV funds.
[3] In addition to the court's express determination of fraud with respect to MSB, the Department also notes that the court held MSB jointly liable for the fraudulent conduct of Globe University). The court found that "[a]lthough Globe and MSB are separate corporate entities, they have shared management and share certain resources. Defendants are commonly owned by the Myhre family. Jeff Myhre serves as Defendants' Chief Executive Officer ("CEO"), Terry Myhre serves as President, and Kaye Myhre serves as Vice President. Defendants also share the same corporate management team, which has included but is not limited to: Vice President of Operations, Jeff Myhre (before being named CEO in late 2013 or early 2014); Chief Operating Officer ("COO"), Jeanne Herrmann; Chief Admissions Officer, Roger Kuhl (through the fall of 2014); Chief Financial Officer ("CFO"), Ken McCarthy; Director of Institutional Quality and Effectiveness, Dr. Mitchell Peterson; and Executive Director of Enrollment Services, Seth Tesdall. *This management team or executive committee oversaw uniform operations of Globe and MSB campuses.*" Order at 5, Findings of Fact ¶ 13 (emphasis added) (internal citations omitted). Based upon those findings, the court held that "the evidence adduced at trial shows clearly that Defendants [MSB and Globe] were jointly operated and held themselves out to the public as separately titled, but factually indistinguishable entities." Order at 108-09, Conclusions of Law ¶ 10. Thus, the Court found that Globe and MSB were "jointly liable for their violations." *Id.* The Department notes that this shared management team is evidenced by the similarity of practices, including the substance of the misrepresentations made to prospective students regarding the nature of the two institutions' criminal justice program and the transferability of the institutions' credits, along with enrollment techniques such as pressuring students to enroll on their first visit. Accordingly, under these circumstances, the misrepresentations at each institution are buttressed by each other, as well as by the similar misrepresentations at the companion institution.

## II. MSB DEMONSTRATED A LACK OF ADMINISTRATIVE CAPABILITY AND BREACHED ITS FIDUCIARY DUTY TO THE DEPARTMENT BY SUBSTANTIALLY MISREPRESENTING THE NATURE OF ITS CRIMINAL JUSTICE PROGRAM AND THE EMPLOYABILITY OF THAT PROGRAM'S GRADUATES

In MSB's PPA, which took effect on January 15, 2010, MSB agreed to comply with all conditions specified therein, including compliance with all Title IV, HEA program requirements. PPA at 2; *see also* 20 U.S.C. § 1094(a)(1); 34 C.F.R. § 668.14. By entering into the PPA, MSB and its officers also accepted fiduciary responsibility in the administration of the Title IV programs. 34 C.F.R. § 668.82(a). As fiduciaries, the institution and officers must act with the highest standard of care and diligence in administering the Title IV programs, accounting to the Secretary for the funds received, and in not allowing officers or employees to make substantial misrepresentations. 34 C.F.R. §§ 668.82(a), (b). *See e.g., In re Warnborough College*, Dkt Nos. 95-164-ST, 96-60-SF (Aug. 9, 1996) (finding an institution in violation of the required fiduciary standard due to its failure to properly oversee an employee who made substantial misrepresentations to students). To "continue participating" in any Title IV program, a school must be "capable of adequately administering that program." 34 C.F.R. § 668.16. A school is not considered to have such administrative capability if the institution fails to "administer[] the Title IV, HEA programs in accordance with all statutory provisions of or applicable to Title IV of the HEA" and "all applicable regulatory provisions prescribed under that authority." 34 C.F.R. § 668.16(a).

Under the Department's regulations, "[s]ubstantial misrepresentations are prohibited in all forms," 34 C.F.R. § 668.71(b), and the Department may deny institutional participation applications, including recertification applications, when it determines that the institution has engaged in a substantial misrepresentation. 34 C.F.R. § 668.71(a)(3). A "misrepresentation" is:

> [a]ny false, erroneous or misleading statement an eligible institution, one of its representatives, or any ineligible institution, organization, or person with whom the eligible institution has an agreement to provide educational programs, or to provide marketing, advertising, recruiting or admissions services makes directly or indirectly to a student, prospective student or any member of the public, or to an accrediting agency, to a State agency, or to the Secretary. A misleading statement includes any statement that has the likelihood or tendency to deceive. A statement is any communication made in writing, visually, orally, or through other means. Misrepresentation includes the dissemination of a student endorsement or testimonial that a student gives either under duress or because the institution required the student to make such an endorsement or testimonial to participate in a program.

34 C.F.R. § 668.71(c).

A "substantial misrepresentation" is "any misrepresentation on which the person to whom it was made could reasonably be expected to rely, or has reasonably relied, to that person's detriment." *Id.* Substantial misrepresentations include misrepresentations made by the institution itself, or one of its representatives, regarding the nature of the institution's academic programs or the employability of the institution's graduates. 34 C.F.R. § 668.71(b). Substantial misrepresentations involving the nature of the institution's education program include misrepresentations concerning: "[t]he particular type(s), specific sources, nature and extent of its institutional, programmatic, or specialized accreditation," "whether a student may transfer course credits earned at the institution to any other institution," "whether the successful completion of a course of instruction qualifies a student . . . to perform certain functions in the States in which the educational program is offered or to meet additional conditions that the institution knows or reasonably should know are generally needed to secure employment in a recognized occupation for which the program is represented to prepare students," and the "appropriateness of its courses and programs to the employment objectives it states its programs are designed to meet." 34 C.F.R. §§ 668.72(a), (b)(1), (c), and (g). Substantial misrepresentations involving the employability of an institution's graduates include misrepresentations concerning "the institution's knowledge about the current or likely future . . . employment opportunities in the industry or occupation for which the students are being prepared," and "other requirements that are generally needed to be employed in the fields for which the training is required." 34 C.F.R. §§ 668.72(e), (f). Each substantial misrepresentation is a sufficient ground for the Department to deny MSB's recertification application.

The Department's review established that MSB substantially misrepresented to students and prospective students the ability of graduates of MSB's criminal justice program to become police officers and probation officers in the state of Minnesota. Moreover, by signing its PPA, MSB agreed that, because it advertised job placement rates as a means of attracting students to enroll in the institution,[4] it will make available to prospective students relevant State licensing requirements of the State in which the institution is located for any job for which an educational program offered by the institution is designed to prepare those prospective students. PPA at 4. 34 C.F.R. §§ 668.14(b)(10)(i), (ii); 20 U.S.C. § 1094(a)(8). Here, MSB affirmatively misrepresented them.

### A. MSB made substantial misrepresentations regarding the ability of its criminal justice program graduates to become Minnesota police officers.

In Minnesota, a person who is not eligible for reciprocity because of prior police service in another state may become a police officer only in one of two ways. First, a person may obtain a degree from a program designated by the Minnesota Peace Officer Standards and Training

---

[4] *See, e.g.,* Trial Ex. 202 (email from an admissions representative to a prospective student stating "the majority of our placement rates are 90%. That's tremendous!").

(POST) Board.  Minn. Stat. § 626.84, Minn. Rules 6700.0100, 6700.0300; Trial Ex. 0046 (listing POST Board designated programs); Trial Transcript 4/4/16 99:19-101:25, 131:4-14; 4/22/16 AM 17:10-18:2, 39:13-44:16; *see also* Order at 12, Findings of Fact ¶ 38. Second, a person may obtain a degree from a regionally-accredited institution and then complete a certified program of Professional Peace Officer Education (PPOE), commonly known as "skills training." *Id.*  MSB's criminal justice program does not meet the requirements for either of these options.  *First*, the program is not currently POST-approved, nor was it POST-approved at the time that MSB made representations regarding the ability of its graduates to become police officers.  *Second*, MSB is, and at all times relevant to this determination was, *nationally* accredited, not regionally accredited.[5]  Accordingly, an MSB graduate could not have used an MSB credential to become a police officer in Minnesota.  Moreover, at trial, Defendants' corporate manager of career services testified that these job titles were "not representative of the type of jobs that [MSB] criminal justice [graduates] are able to enter" because MSB's criminal justice program did not allow graduates to work as Minnesota police officers.  *See* Trial Transcript 4/13/16 PM 99:10-19.

Despite the inability of MSB graduates to use the MSB credential to become Minnesota police officers, MSB substantially misrepresented that its programs prepared students for such careers.  For example, in MSB's publicly posted Gainful Employment disclosure for its criminal justice bachelor's and associate's programs, MSB stated that those programs prepared students to be "First Line Supervisors/Managers of Police and Detectives," which, according to MSB, corresponded to the "O*Net Occupational Profile Code SOC: 33-1012.00." Trial Ex. 24.  But that career code, according to O*Net, included high-ranking law enforcement positions that were inaccessible based solely on an MSB credential.  *See* Trial Ex. 44 (highlighting sample positions of Chief of Police, Detective Sergeant, Lieutenant, Police Captain, and Police Sergeant).  Nevertheless, MSB opted to include these positions in its promotional materials.  *See, e.g.*, Trial Ex. 24.

Other MSB advertisements and webpages also contained false and misleading information that would deceive a prospective student to reasonably believe that the criminal justice programs provided a necessary credential for a career as a Minnesota police officer.  For instance, MSB published online testimonials from current criminal justice students asserting that they were working towards becoming sworn police officers.  Trial Ex. 76 (online question-and-answer style advertisement with a current MSB student who, when asked where he saw himself in five years, responded: "I thought a lot about… [working as a] local sheriff or even a state trooper").  Additionally, MSB ran banner-style online advertisements publicizing its criminal justice programs and featuring a person in a police officer's uniform.  *See, e.g.,* Trial Exs. 14, 70, 76 (webpages containing banner-style MSB advertisements with text "Interested in Criminal Justice?" next to photograph of a person in a police uniform).

---

[5] MSB's online program chair and former interim criminal justice dean, testified at Trial that he would inform MSB admissions representatives that MSB is "not a POST Board school," and that, if prospective students "want to become law enforcement officers in the State of Minnesota, [the admissions representatives] need to forward them to the POST Board website, where they can research the appropriate schools for that." *See* Trial Transcript 4/22/16 AM 18:16-19:23.

Another webpage contained the text, "When designing our criminal justice degrees, we went to the source. We called on seasoned professionals in security, *law enforcement*, the court system, and corrections to advise us on exactly what skills and knowledge they look for in job candidates. And you can be sure, as a graduate of Globe University/Minnesota School of Business criminal justice program, *you will have those qualifications.*" Trial Ex. 28 (emphasis added). Prospective students viewing these advertisements and webpages could reasonably assume that completing the criminal justice program could lead to employment in Minnesota as a police officer. Therefore, this advertising scheme, considered as a whole, constitutes a substantial misrepresentation. *Cf. In the Matter of Warnborough College*, U.S. Dep't of Educ. Dkt. Nos. 95-164-ST and 96-90-SF (Aug. 9, 1996) (reviewing various promotional materials and holding that, based upon those materials considered together, prospective students could be "reasonably convinced" that the institution was part of Oxford University and that the institution therefore committed a misrepresentation, notwithstanding that the promotional materials disclaimed that the institution was "independent").

Over the course of several years, MSB's admissions representatives and other personnel also misrepresented the abilities of MSB's graduates to obtain employment in Minnesota as police officers. In multiple cases involving students whom MSB's representatives knew were enrolling to become police officers, MSB's representatives wrongly informed the prospective students, or otherwise led these individuals to believe, that the MSB criminal justice program would allow them to become police officers in Minnesota, or that they could attend the "skills training" after completing the MSB program. Those statements constituted substantial misrepresentations, as none of those students were able to attend skills training, or otherwise become police officers in Minnesota. In all, the Department reviewed the sworn testimony of 29 students swearing to these substantial misrepresentations, including sworn affidavits and sworn testimony given by the students at trial.[6] *See* Enclosure 1.

---

[6] The court found that at some point in 2010, MSB inserted into its enrollment agreement a disclaimer indicating that criminal justice students were not eligible to become police officers in Minnesota. In MSB's role as a fiduciary of Title IV funds, it is incumbent upon the institution to not make substantial misrepresentations to Title IV recipients. Whether such misrepresentations are later disclaimed is immaterial to that duty. Likewise, after-the-fact contractual statements, especially when they are buried within a lengthy document, are generally insufficient to cure misrepresentations made to induce a person to enter the contract. *See, e.g., Giant Foods, Inc. v. FTC*, 322 F.2d 977, 986 (D.C. Cir. 1963), cert. dismissed, 376 U.S. 967, 84 (1964) (holding that a disclaimer in small print at the bottom of an advertisement did not cure deceptive language in the advertisement); *FTC v. EMA Nationwide*, 767 F.3d 611, 631-33 (6th Cir. 2014) (holding contractual disclaimers do not absolve seller's liability for false and deceptive practices). Here, the disclaimer was two sentences in an eight-page enrollment agreement, buried among such innocuous provisions as an acknowledgement of receipt for the student handbook and consent for use of the student's picture in advertisements. As the court stated, "Defendants' contractual disclaimer . . . was also ineffective and legally irrelevant as to liability for false and misleading statements made in advertising and by their admissions representatives. As the Court observed at summary judgment, even a contractual disclaimer that clearly contradicts prior misstatements does not prevent liability under [Minnesota's fraud laws]. . . The Court finds that the disclaimer regarding the Criminal Justice Program that was buried in the enrollment agreement was eclipsed by the emphatic and repeated claims to the contrary in Defendants' advertising and sales presentations" Order at 114-15, Conclusions of Law ¶ 23. Finally, the statements of many students indicate that MSB affirmatively avoided the disclaimer by telling the students they needed to quickly sign the enrollment agreement without a meaningful opportunity to review it, or risk losing their opportunity to enroll. *See, e.g.,* Student 41's Affidavit ¶ 3 ("MSB's admissions representative recommended that I enroll in

For instance, student 2 told MSB-Blaine's admissions representatives that she wanted to be a police officer. Trial transcript 4/11/16 AM Tr. 61:10-62:4. Likewise, on the first day of her criminal justice class, student 2 announced to instructors and classmates that she wanted to be a Minnesota police officer. *Id.* at 67:1-14. No one corrected her or told her this was not possible with an MSB criminal justice degree. *Id.* at 67:18-20. Not until halfway through her two-year program did she discover that MSB's criminal justice program was not POST-certified and satisfied none of the educational or training requirements needed to become a Minnesota police officer. *Id.* at 65:4-66:20. Yet, when she asked one of her instructors if this was true, he indicated that she could work in another state as a police officer and then return to Minnesota after accruing three to five years of experience. *Id.* at 67:24-68:11, 106:15-107:2. Student 2's instructor continued to lead her to believe that she could become a police officer through "loopholes." *Id.* at 70:22- 71:1. Similarly, in 2013, student 2 told another instructor that she was "stuck" because she wanted to be a police officer, and asked that instructor if there was any way that she could still become a police officer with an MSB criminal justice degree. *Id.* at 74:20-23. The instructor told her that she would be eligible to participate in skills training at Hibbing Community College (HCC), through a relationship that MSB had with HCC's law enforcement coordinator. *Id.* at 75:3-7. In an email, the instructor encouraged her to contact HCC's law enforcement coordinator "about attending [HCC's] 'skills training.'" Trial Ex. 0410-0130. However, HCC's law enforcement coordinator stated at trial that the instructor's statement was not true, and that graduates of MSB's criminal justice program were not eligible to enter skills training at HCC because Defendants' criminal justice program was not regionally-accredited or POST certified. Trial Transcript 4/4/16 106:16-25, 109:1-12, 113:4-114:3, 114:11-23. *See* Order at 73, Findings of Fact ¶¶ 127(d), (f). The testimony this student gave was subject to cross-examination by MSB, and the judge, sitting as trier-of-fact, found this student's testimony to be credible. Order at 75, Findings of Fact ¶ 127(h).

As with Student 2, MSB's admissions representatives made substantial misrepresentations to numerous other students that were not corrected until long into the program when instructors asked the students what they had hoped to do with their MSB degrees. Prior to beginning class one day, Student 16, who had already been assured by MSB-Elk River's admissions representatives that he could attend skills training to become a Minnesota police officer after graduating from MSB's criminal justice program, explained to his criminal justice instructor that he was interested in becoming a police officer. Trial Transcript 4/6/16 at 41:19-42:8. In

---

MSB's criminal justice associate's degree program that day, asking me how great it would be to be working in my new career in less than two years. My mom and I told him that we needed time to visit some other colleges. MSB's admissions representative said that MSB's criminal justice program filled up fast and told me that if I did not enroll that day, I likely would not get a spot."); Student 42's Affidavit ¶4 ("I told MSB's admissions representative that I was also considering Hennepin Technical College (Hennepin Tech). MSB's admissions representative encouraged me to apply to MSB right away, and told me that I could always transfer to Hennepin Tech if I did not like MSB. She rushed me through an enrollment agreement, and before I knew it, I was enrolled in MSB's criminal justice program and meeting with MSB's financial aid department"). When the misrepresentation comes from an individual holding themselves out to be an expert, such as MSB's "admissions representatives," the prospective student is even more entitled to rely upon it. *See, e.g.,* Restatement (Second) of Torts § 542(a) (1977).

*Mr. Jeffrey Myhre*
*Minnesota School of Business*
*Page 9*

response, the instructor provided words of encouragement, telling him that he could do anything because he had the type of personality with which most people would get along. *Id.* Near graduation, during a mock interview for a police officer job with another instructor at the school, Student 16 again stated his desire to become a police officer. *Id.* at 42:9-17, 48:5-7; *see also* Trial Ex. 0404-0019. This instructor told him the truth: that he would have to complete skills training at another school, such as [a local community college], in order to work as a police officer. 4/6/16 Tr. 48:17-49:1; *see* Order at 45, Findings of Fact ¶ 118(d). The testimony this student gave was subject to cross-examination by MSB, and the judge, sitting as trier-of-fact, found this student's testimony to be credible. Order at 46, Finding of Fact ¶ 118(g).

Other students swore to this same practice in affidavits. *See, e.g.,* Student 5's Affidavit ¶¶ 4-5 ("About halfway through my program, one of my instructors asked the class what we planned to do with our degrees. I told the class that I wanted to become a police officer. After class, my instructor pulled me aside and told me that I was at the wrong school if I wanted to become a police officer. She told me that MSB was not approved by the Minnesota Peace Officer Standards and Training (POST) Board, so a degree from MSB would not allow me to work as a police officer in Minnesota. She recommended that I transfer schools."); Student 21's Affidavit ¶ 4 ("About halfway through my program, one of my instructors, a former police officer, asked my classmates and I about our career goals. When I explained that I wanted to be a police officer, my instructor told me that I could not become a police officer with an MSB criminal justice degree because MSB was not approved by the Minnesota Peace Officer Standards and Training Board."); Student 29's Affidavit ¶¶ 9-10 ("About two weeks later, I had a substitute professor in one of my classes. He introduced himself as the former Program Chair and asked us about our career goals. I again told the class I was going to be a cop. The substitute professor responded that I was at the wrong school if I wanted to be a cop and moved on to the next student. I had a hard time paying attention for the rest of the class. I could not stop thinking about the substitute professor's comment, and I stayed after class to talk to him. He told me that MSB did not have the kind of accreditation needed to take POST Board training in Minnesota, a requirement to becoming a police officer. I was very upset and told the professor that this could not be true, explaining how I had told MSB so many times I wanted to be a cop. The professor seemed troubled and told me he would look into this issue for me.").

In additional cases, other MSB instructors failed to correct the substantial misrepresentations that the admissions counselors had made to the students.[7]

---

[7] Viewed in the context of the circumstances, these failures by MSB officials to correct substantial misrepresentations made by other MSB officials constitute additional violations of the obligation not to make substantial misrepresentations. In addition, the instructors' silence in these cases had the practical effect of causing students to remain at MSB longer than they otherwise may have, leading MSB to draw, under false pretenses, additional Title IV funds. Such conduct is inconsistent with the fiduciary obligation owed to the Department by MSB.

For example, Student 28 met with multiple MSB-Saint Cloud admissions representatives who told him he could become a Minnesota Conservation Officer, which is a specialized form of Minnesota Police Officer and carries the same prerequisites, by graduating from MSB's criminal justice program and then attending skills training. Trial Transcript 4/7/16 6:21-16:3. After enrollment, Student 28 became president of MSB-St. Cloud's criminal justice club. *Id.* at 18:5-12. Through this club, he attended field trips to different law enforcement facilities in the state. *Id.* at 18:8-12. His criminal justice coursework included direct instruction on police work. *Id.* at 18:13-22. Globe and MSB's blog, which was published on their website, featured student 28's statements. *Id.* at 20:8-21:8; Trial Ex. 0913. Within the blog, Student 28 said, "I would like to be a Conservation Officer after I am done with school." Trial Ex. 0913-0002. After providing this information for purposes of the blog post, no one from MSB told Student 28 that his degree would not enable him to work as a conservation officer or corrected his blog statements to include the requirements to become a conservation officer in Minnesota. Trial Transcript 4/7/16 at 23:16-24:1. At the beginning of each of his MSB courses, Student 28 informed both his instructors and his classmates of his career goal of becoming a conservation officer. *Id.* at 25:3-17. The testimony this student gave was subject to cross-examination by MSB, and the judge, sitting as trier-of-fact, found this student's testimony to be credible. Order at 60, Findings of Fact ¶ 122(j).

Military veterans were also induced to enroll by false promises of being able to become police officers. These student-veterans did not learn that their MSB degrees would not allow them to become police officers until after they had exhausted all or much of their G.I. Bill benefits. Student 6's Affidavit ¶ 7 ("I remain disappointed I wasted thousands of dollars of my G.I. Bill benefits at MSB"); Student 22's Affidavit ¶ 7 ("I graduated with my MSB criminal justice bachelor's degree in less than three years in 2012 with about four months of my 36 months of Post-9/11 G.I. bill funding remaining").

> **B. MSB made substantial misrepresentations regarding the ability of graduates of its associate's programs to become probation officers in Minnesota.**

In Minnesota, probation officers are employed by a county or by the State Department of Corrections. Those entities use one of three "delivery systems" for probation services: (1) the Department of Corrections ("DOC") delivery system, which is utilized by 28 counties; (2) the County Probation Officer ("CPO") delivery system, which is utilized by 27 counties and adheres to the educational standards for probation officers set by the Department of Corrections; and (3) the Community Corrections Act ("CCA") delivery system, which the remaining 32 counties utilize. Each of those delivery systems requires a person to have obtained a bachelor's degree to be a probation officer. Trial Transcripts 4/7/16 109:1-111:9, 111:10-114:13, 116:12-117:5, 118:7-9, 120:19-121:6; 123:15-124:20, 125:20-23, 127:24-129:19; Trial Ex. 0043; *see also* Order at 13-14, Findings of Fact ¶¶ 42-44. Therefore, only MSB's bachelor's programs could directly lead to employment as a probation officer.

Nevertheless, MSB urged many students whom it knew to be enrolling to become probation officers to enroll in one of MSB's associate programs and claimed that those programs were a

good fit for that goal. In all, the Department reviewed the testimony, given either through affidavit or at trial, of 24 students who swore to these misrepresentations. *See* Enclosure 2.

For example, an MSB admission representative advised a prospective student, who informed the school's admission representative that she was enrolling to become a probation officer, to register for the school's criminal justice associate's degree. Student 34's Affidavit ¶ 4. The admissions representative also advised her that MSB's credits would transfer "anywhere." *Id.* ¶ 5. Relying on these representations, the student enrolled in the program. This student did not complete her MSB degree. She later learned that she would have had to complete a bachelor's degree to apply to be a probation officer – a degree MSB did not even offer in criminal justice when she enrolled. *Id.* ¶ 4.

MSB urged another prospective student to enroll in the criminal justice associates program after the prospective student told an MSB admissions representative that she wanted to be a probation officer. Student 36's Affidavit ¶ 2. This student also told several MSB instructors about her career plans, but was never advised that she needed a bachelor's degree. *Id.* ¶ 4. She discovered that requirement through her own investigation near the end of her associate's program, after taking on significant student debt. *Id.* ¶ 6.

Another student, who was enrolled in MSB's paralegal program, was advised by her academic advisor to switch to MSB's associates in criminal justice program after telling her academic advisor that she wanted to be a probation officer. Student 48's Affidavit ¶ 4. MSB did not have a bachelor's in criminal justice program at the time that she switched, but her advisor told her that, if she ever wanted to get a bachelor's degree, she could transfer her MSB credits elsewhere. *Id.* She told some of her criminal justice instructors about her plans to become a probation officer, and was never advised that her associate's degree would not allow her to become one. *Id.* ¶ 5. As she began to look for jobs, she was surprised to learn that she needed a bachelor's degree to be a probation officer. *Id.* ¶ 7. She contacted MSB's career services department for help, and received job postings that were entry level, required no degree, and paid less than the job that she had held before enrolling at MSB. *Id.* ¶ 8. Heavily in debt, she withdrew from school and, along with her son, moved in with her parents. She enrolled in community college, but had to start her collegiate career over because the community college would not accept MSB's credits for transfer. *Id.* ¶¶ 11-13.

Student 35 swore under oath in her affidavit that: "During my first quarter, I decided that I wanted to use my MSB associate's degree to pursue a career as a probation officer. In almost every class, I told MSB's instructors during introductions that I wanted to become a probation officer. MSB's instructors never told me that I needed a bachelor's degree to become a probation officer in Minnesota. . . . After over two years at MSB, one of my instructors told my class that she was leaving MSB and recommended that we all do the same. She told us that MSB was not properly accredited and employers looked down on MSB's degrees. She told my class to leave MSB before it was too late, because we would never get good jobs with our MSB degrees. Concerned, I withdrew from MSB. Student 35's Affidavit ¶¶ 5, 6.

*Mr. Jeffrey Myhre*
*Minnesota School of Business*
*Page 12*

These substantial misrepresentations, upon which students relied when choosing to enroll at MSB, are incompatible with MSB's fiduciary duty to the Department and demonstrate the institution's lack of administrative capability.

### III.  MSB BREACHED ITS FIDUCIARY DUTY AND DEMONSTRATED A LACK OF ADMINISTRATIVE CAPABILITY TO THE DEPARTMENT BY SUBSTANTIALLY MISREPRESENTING TO STUDENTS AND PROSPECTIVE STUDENTS THE TRANSFERABILITY OF MSB CREDITS

MSB made numerous misrepresentations to prospective students about the ability of students to transfer credits earned at MSB to other institutions.[8]  These misrepresentations were made as early as 2007 and continued through at least 2014, were made at each MSB campus, and were made to students who enrolled in a variety of programs of study, including criminal justice, health sciences, paralegal, accounting, business, and massage therapy programs.  The individuals to whom MSB made these misrepresentations could reasonably have been expected to rely, or did in fact reasonably rely, on these misrepresentations to their detriment.  Accordingly, these misrepresentations constituted substantial misrepresentations. 34 C.F.R. §§ 668.71, 668.72(b)(1).

The non-transferability of MSB's credits is partly a function of MSB's accreditation by a national accreditor rather than a regional accreditor.  Credits earned at nationally accredited institutions often do not transfer to regionally accredited institutions.[9]  Thus, blanket statements MSB made to prospective students conflating national and regional accreditation, such as "because MSB is accredited, [the student] could complete a bachelor's degree at MSB or transfer [an MSB] associate's degree to another school to complete a bachelor's degree"

---

[8] On this issue, the court found in favor of MSB because, "[t]o the extent that witnesses were misinformed by admissions representatives by affirmative statements that credits would transfer, those statements were not authorized by Defendants." Order at 118, Conclusions of Law ¶ 33. This aspect of the court's decision is not dispositive to the Department's conclusion that MSB violated 34 C.F.R. § 668 Subpart F because, under those regulations, an institution is responsible for substantial misrepresentations made by its agents, irrespective of whether those substantial misrepresentations are "authorized." *See, e.g., In the matter of Philander Smith College*, U.S. Dep't of Educ. Dkt. No. 09-28-SA at 2 (Nov. 16, 2009) ("[A]n institution is fully responsible for the conduct of its employees. This Tribunal has consistently held that an institution is subject to liability arising from the conduct of its employees in administering Title IV expenditures even if the conduct is criminal."); *see also* 34 C.F.R. § 668.71(b) (establishing that a substantial misrepresentation can be made by "one of [an institution's] representatives").

[9] *See, e.g.*, Government Accountability Office, *Transfer Students: Postsecondary Institutions Could Promote More Consistent Consideration of Coursework by Not Basing Determinations on Accreditation*, GAO-06-22, (October 18, 2005) *available at*: www.gao.gov/products/GAO-06-22 (last visited December 1, 2016); U.S. Senate Committee on Health, Education Labor, and Pensions Majority Committee Staff Report and Accompanying Minority Committee Staff Views, *For Profit Education: The Failure to Safeguard the Federal Investment and Ensure Student Success* (July 30, 2012) *available at*: www.help.senate.gov/imo/media/for_profit_report/PartI-PartIII-SelectedAppendixes.pdf? (last visited December 1, 2016).

*Mr. Jeffrey Myhre*
*Minnesota School of Business*
*Page 13*

constitute substantial misrepresentations. Student 67's Affidavit ¶ 4. Likewise, many of the substantial misrepresentations at issue were made to prospective students who informed MSB that they were interested in transferring credits earned at MSB to an institution within the University of Minnesota or within the Minnesota State Colleges and University system. All of those institutions are accredited by the Higher Learning Commission, a regional accreditor, and MSB's credits did not transfer. In addition, in many cases, the prospective student asked MSB about the transferability of MSB's credits to a particular institution, and MSB misrepresented the transferability of MSB's credits to that institution. *Infra.* In those cases also, the MSB credits did not transfer.[10] In all, the Department reviewed affidavits prepared by 58 former MSB students and two former MSB employees swearing that MSB's representatives made substantial misrepresentations to them regarding the transferability of MSB's credits. *See* Enclosures 3 and 4.

Several of these affidavits are illustrative of MSB's misrepresentation. For example, in one case, MSB represented to a prospective Information Technology (IT) student at the Moorhead campus that MSB's credits would transfer to Minnesota State. At his initial meeting with the admissions representative, he said that the representative "encouraged me to enroll right away, telling me that if I did not like MSB, I could always transfer to another school. When I asked whether other schools accepted MSB's credits, MSB's admissions representative told me that other schools, including M State, would accept most of MSB's credits if I decided to transfer." Student 56's Affidavit ¶ 3. When this student did not enroll during his first visit to MSB, MSB's representatives "called me repeatedly, telling me that if I wanted a chance to enroll at MSB, I needed to return to campus within a week. I met with MSB's admissions

---

[10] At trial, MSB noted that the transferability of credits is ultimately the decision of the institution a student transfers to. That is correct, and had MSB's admissions representative made solely that statement and not affirmatively represented that MSB credits *would* transfer, it would not have been a misrepresentation. But MSB, as a fiduciary to the Department, may not falsely inform prospective students that credits *will* transfer, receive Title IV funds because of those students' attendance, and then claim that transferability is out of its control. Likewise, MSB's course catalogs, which were hundreds of pages long, contain disclaimers regarding the transferability of MSB credits to other institutions. Pro forma statements or disclaimers, buried within a document of hundreds of pages, do not cure otherwise deceptive messages, particularly when those deceptive messages were conveyed by a person such as an MSB admissions representative who holds themselves out as an expert. *Supra at* note 5. Moreover, according to affidavits of former MSB employees, MSB representatives affirmatively avoided the disclaimer contained in the course catalog, in this case by not providing the catalog to the prospective students until they were signing their enrollment agreements or thereafter. Affidavit of MSB Employee 1 ¶ 18 ("MSB's goal was to enroll as many students as possible, and quickly transition them to financial aid to fill out financial aid paperwork before they had time to think about their enrollment decision. MSB's practice was to have admissions representatives "recommend" students for acceptance and ask them to sign an enrollment agreement which was supposedly contingent on acceptance. As students signed the enrollment agreement, not beforehand, we would give them copies of MSB's Course Catalog, I never saw a student stop the enrollment process to review the dense catalog"); Affidavit of MSB Employee 2 ¶ 16 ("I was trained to have him sign an enrollment agreement in which he acknowledged that he had been given copies of MSB's Student Handbook and Course Catalog. We did not give students these materials before they signed the enrollment agreement, rather, we were trained to hand them the materials as they were signing the agreement. I never saw any students review these voluminous materials before signing the enrollment agreement, as the materials were provided while they were busy signing the enrollment agreement.").

*Mr. Jeffrey Myhre*
*Minnesota School of Business*
*Page 14*

representative the next week and told him that I did not want to start school until the fall. He pressured me to enroll right away, telling me that it would give me the opportunity to use more financial aid. Reluctantly, I enrolled in MSB's IT program and began classes in the spring of 2014." *Id.* ¶ 4. This student attempted to transfer the credits he earned at MSB to Minnesota State. *Id.* ¶ 8. Despite the assurances that MSB gave to the student, the credits did not transfer. *Id.*

Another student, who enrolled in a criminal justice associates degree program at the Shakopee campus in 2011, "told MSB's admissions representative that I was also considering Hennepin Technical College (Hennepin Tech). MSB's admissions representative encouraged me to apply to MSB right away, and told me that I could always transfer to Hennepin Tech if I did not like MSB. She rushed me through an enrollment agreement, and before I knew it, I was enrolled in MSB's criminal justice program and meeting with MSB's financial aid department." Student 42's Affidavit ¶ 4. This student later learned that Hennepin Tech, a constituent institution of the Minnesota State Colleges and University system, would not accept MSB's credits for transfer. *Id.* ¶ 5. She graduated, but was unable to find work in the criminal justice field. *Id.* ¶ 6. MSB proposed that she continue on in the school's criminal justice program and earn a bachelor's degree. *Id.* ¶ 7. This student was unable to take on more debt to enroll in the bachelor's program, and eventually found work as a car wash attendant and waitress. *Id.* ¶¶ 7-8.

A fourth student, who enrolled in the Brooklyn Park campus' Bachelors of Business Administration program in 2007, told the MSB admissions representative, "I may later want to return to the University of St. Thomas (St. Thomas), where I had previously attended college, to pursue a Master of Business Administration (MBA) degree and I asked whether St. Thomas would accept a bachelor's degree from MSB. MSB's admissions representative told me that because MSB was accredited, St. Thomas would accept a bachelor's degree from MSB if I later decided to pursue an MBA." Student 85's Affidavit ¶ 3. In 2013, this student graduated from MSB and applied to St. Thomas's MBA program. *Id.* ¶¶ 5-6. Yet St. Thomas did not accept the credits or degree earned at MSB for transfer into its MBA program. *Id.* This student "applied to many human resource and business management positions but I did not receive any job offers." *Id.* Instead, she took a job which "requires a high school diploma and pays $13.61 an hour." *Id.* ¶ 7.

\*     \*     \*     \*

The denial of recertification will be effective on December 31, 2016. Should MSB have factual evidence to dispute the Department's findings and demonstrate their inaccuracy, MSB may submit that evidence via overnight mail to me at the following address:

*Mr. Jeffrey Myhre*
*Minnesota School of Business*
*Page 15*

Administrative Actions and Appeals Service Group
U.S. Department of Education
Federal Student Aid/Enforcement
830 First Street, NE (UCP-3, Room 84F2)
Washington, DC 20002-8019

If any such material is received by December 20, 2016, the Department will review it and notify MSB if the recertification denial will be modified, rescinded, or left in place. There will be no additional opportunity for appeal or reconsideration. If the recertification denial remains in effect following the Department's review of such submission, or if the school opts not to make such a submission, the Chicago-Denver School Participation Division will then contact MSB concerning the proper procedures for closing out MSB's Title IV program accounts.

In the event that MSB submits an application to participate in the Title IV programs in the future, that application must address the deficiencies noted in this letter. If you have any questions about this letter, you may contact Kerry O'Brien at 303-844-3319.

Sincerely,

Susan D. Crim
Director
Administrative Actions and Appeals Service Group

Enclosures

cc:    Roger Williams, Interim President, ACICS, via rjwilliams@acics.org
       Betsy Talbot, Manager, Institutional Registration and Licensing, Minnesota Office of
           Higher Education, via betsy.talbot@state.mn.us
       VA State Council for Higher Education via peterblake@schev.edu
       Department of Defense, via osd.pentagon.ousd-p-r.mbx.vol-edu-compliance@mail.mil
       Department of Veteran Affairs, via INCOMING.VBAVACO@va.gov
       Consumer Financial Protection Bureau, via CFPB_ENF_Students@cfpb.gov



DEC 6 - 2016

Mr. Jeffrey Myhre                           Sent Via UPS
President                                   Tracking #: 1ZA879640195561620
Globe University
8089 Globe Drive
Woodbury, MN  55125-5408

Re:  Denial of Recertification Application to Participate in the Federal Student Financial
Assistance Programs – Globe University, 8089 Globe Drive, Woodbury, Minnesota 55125-
3388; OPE ID: 00464200.

Dear Mr. Myhre:

The U.S. Department of Education (Department) has reviewed the application for
recertification submitted by Globe University (Globe) to continue to participate in the student
financial assistance programs authorized pursuant to Title IV of the Higher Education Act
(HEA) of 1965, as amended, 20 U.S.C. §§ 1070 *et seq.* (Title IV programs). Globe's most
recent Program Participation Agreement (PPA) expired on December 31, 2015. Globe,
however, timely submitted its recertification application prior to that date. As a result, the
Department extended Globe's PPA on a month-to-month basis while evaluating the
application and related matters. *See* 34 C.F.R. § 668.13(b)(2).

For purposes of evaluating a recertification application, the Department reviews an
institution's performance as a participant in Title IV programs and must ensure that the
institution has met the standards of administrative capability, has complied with Title IV
program requirements, and has operated under the high standards of care, trust, and diligence
required of a fiduciary. A denial of an institution's recertification application is warranted if
the Department determines that an institution does not meet all requirements and standards set
forth in Title IV and regulations issued thereunder. HEA § 498, 20 U.S.C. § 1099c; 34 C.F.R.
§ 668.13.  In reaching a decision on Globe's recertification application, the Department
reviewed all materials submitted by Globe in support of its application.  The Department also
reviewed other relevant documents, including those associated with the litigation captioned
*Minnesota v. Minnesota School of Business, Inc. d/b/a Minnesota School of Business and
Globe University, Inc. d/b/a Globe University*, No. 27-CV-14-12558, Fourth Judicial District



Federal Student Aid
An OFFICE of the U.S. DEPARTMENT of EDUCATION
Administrative Actions and Appeals Service Group
830 First St., N.E. Washington, D.C. 20002-8019
StudentAid.gov

USA SOI 132

of Minnesota (2016).[1]    Some of these documents are enclosed with this letter and are
incorporated herein by reference.    Students and employees are referenced throughout this
letter by the number assigned to them in the Student/Employee Crosswalk enclosed with this
letter.    References to trial exhibits are references to the exhibit numbered in the trial named
above.    References to the trial transcripts are references to the transcripts in the trial named
above.

The Department's review of the materials described above establishes that: (1) Globe has
been judicially determined to have committed fraud involving Title IV program funds; (2)
Globe made substantial misrepresentations about the nature of its criminal justice program
and the employability of the graduates of that program; and (3) Globe made substantial
misrepresentations about its students' ability to transfer credits earned at Globe to other
institutions.  Consequently, Globe's application for recertification is denied.

As a result of this denial of its recertification application, Globe is no longer eligible to
participate in the Title IV programs, effective December 31, 2016.    *See* 34 C.F.R. §
668.13(b)(2).      Specifically, this includes: Federal Pell Grant (Pell Grant), Federal
Supplemental Educational Opportunity Grant (FSEOG), Iraq and Afghanistan Service Grants
(IASG), Teacher Education Assistance for College and Higher Education (TEACH) Grant,
Federal Work-Study (FWS), Federal Perkins Loan (Perkins Loan), and William D. Ford
Federal Direct Loan (Direct Loan). The Direct Loan program includes the Federal Direct
Stafford/Ford Loan Program, the Federal Direct Unsubsidized Stafford/Ford Loan program,
and the Federal Direct PLUS Program.

## I.    GLOBE IS INELIGIBLE TO PARTICIPATE IN TITLE IV PROGRAMS BECAUSE IT HAS BEEN JUDICIALLY DETERMINED TO HAVE COMMITTED FRAUD INVOLVING TITLE IV PROGRAM FUNDS

An institution that has been judicially determined to have committed fraud involving Title IV
program funds is not eligible to participate in Title IV programs.  HEA § 102(a)(4)(B), 20
U.S.C. § 1002(a)(4)(B); 34 C.F.R. § 600.7(a)(3)(ii).  "The phrase 'judicially determined to
have committed fraud' means that a court of competent jurisdiction has made such a finding."
Institutional Eligibility Under the Higher Education Act of 1965, as Amended, 59 Fed. Reg.
22,324-01, 22,329 (Feb. 10, 1994).

On July 22, 2014, the State of Minnesota sued Globe under several theories, including a
violation of the Minnesota Consumer Fraud Act (CFA), which, in relevant part, prohibits
"[t]he act, use, or employment by any person *of any fraud*, false pretense, false promise,
misrepresentation, misleading statement or deceptive practice, with the intent that others rely
thereon in connection with the sale of any merchandise, whether or not any person has in fact

---

[1] According to documentation Globe has provided to the Department regarding its ownership structure, Globe
University, Inc., is the owner of Globe University, OPEID 00464200.

been misled, deceived, or damaged thereby." Minn. Stat. § 325F.69, subd. 1 (emphasis added).

On September 8, 2016, following a multi-week trial, Judge James Moore of Minnesota's Fourth Judicial District issued "Findings of Facts, Conclusions of Law, and Order" (the "Order") in which he found that the evidence presented by the State was "*sufficient to establish fraud and*/or deception in the marketing of Defendants' Criminal Justice program." Order at 110, Conclusions of Law ¶ 14 (emphasis added). The court also found that numerous Globe students were injured by this fraud, and many of the students received Title IV funds to pay for the program.[2] Order at 111-13, Conclusions of Law ¶¶ 16-20. Based in part on these factual and legal findings and conclusions, the court found that Globe's "actions in promoting [its] Criminal Justice Program . . . constitute violations of Minn. Stat. §§ 325F.69, subd. 1." Order at 131, Conclusions of Law ¶ 1.

The Order, therefore, constitutes a judicial determination that Globe has committed fraud involving Title IV funds.[3] Pursuant to HEA § 102(a)(4)(B), 20 U.S.C. § 1002(a)(4)(b), and 34 C.F.R. §§ 600.7(a) and 668.13(a), Globe is ineligible to participate in Title IV programs and may not be recertified for participation in those programs.

---

[2] Of the 15 students mentioned in on pages 111-13 (¶¶ 16, 19) of the Order, 14 received Title IV funds. In addition, numerous students who swore about Globe's misrepresentations via affidavit received Title IV funds.

[3] In addition to the court's express determination of fraud with respect to Globe, the Department also notes that the court held Globe jointly liable for the fraudulent conduct of Minnesota School of Business (MSB). The court found that "[a]lthough Globe and MSB are separate corporate entities, they have shared management and share certain resources. Defendants are commonly owned by the Myhre family. Jeff Myhre serves as Defendants' Chief Executive Officer ("CEO"), Terry Myhre serves as President, and Kaye Myhre serves as Vice President. Defendants also share the same corporate management team, which has included but is not limited to: Vice President of Operations, Jeff Myhre (before being named CEO in late 2013 or early 2014); Chief Operating Officer ("COO"), Jeanne Herrmann; Chief Admissions Officer, Roger Kuhl (through the fall of 2014); Chief Financial Officer ("CFO"), Ken McCarthy; Director of Institutional Quality and Effectiveness, Dr. Mitchell Peterson; and Executive Director of Enrollment Services, Seth Tesdall. *This management team or executive committee oversaw uniform operations of Globe and MSB campuses.*" Order at 5, Findings of Fact ¶ 13 (emphasis added) (internal citations omitted). Based upon those findings, the court held that "the evidence adduced at trial shows clearly that Defendants [MSB and Globe] were jointly operated and held themselves out to the public as separately titled, but factually indistinguishable entities." Order at 108-09, Conclusions of Law ¶ 10. Thus, the Court found that Globe and MSB were "jointly liable for their violations." *Id.* The Department notes that this shared management team is evidenced by the similarity of practices, including the substance of the misrepresentations made to prospective students regarding the nature of the two institutions' criminal justice program and the transferability of the institutions' credits, along with enrollment techniques such as pressuring students to enroll on their first visit  Accordingly, under these circumstances, the misrepresentations at each institution are buttressed by each other, as well as by the similar misrepresentations at the companion institution.

II.    **GLOBE DEMONSTRATED A LACK OF ADMINISTRATIVE CAPABILITY AND BREACHED ITS FIDUCIARY DUTY TO THE DEPARTMENT BY SUBSTANTIALLY MISREPRESENTING THE NATURE OF ITS CRIMINAL JUSTICE PROGRAM AND THE EMPLOYABILITY OF THAT PROGRAM'S GRADUATES**

In Globe's PPA, which took effect on December 18, 2012, Globe agreed to comply with all conditions specified therein, including compliance with all Title IV, HEA program requirements.  PPA at 3; *see also* 20 U.S.C. § 1094(a)(1); 34 C.F.R. § 668.14.  By entering into the PPA, Globe and its officers also accepted fiduciary responsibility in the administration of the Title IV programs. 34 C.F.R. § 668.82(a). As fiduciaries, the institution and officers must act with the highest standard of care and diligence in administering the Title IV programs, accounting to the Secretary for the funds received, and in not allowing officers or employees to make substantial misrepresentations. 34 C.F.R. §§ 668.82(a), (b); *see e.g., In re Warnborough College*, Dkt Nos. 95-164-ST, 96-60-SF (Aug. 9, 1996) (finding an institution in violation of the required fiduciary standard due to its failure to properly oversee an employee who made substantial misrepresentations to students).    To "continue participating" in any Title IV program, a school must be "capable of adequately administering that program." 34 C.F.R. § 668.16. A school is not considered to have such administrative capability if the institution fails to "administer[] the Title IV, HEA programs in accordance with all statutory provisions of or applicable to Title IV of the HEA" and "all applicable regulatory provisions prescribed under that authority." 34 C.F.R. § 668.16(a).

Under the Department's regulations, "[s]ubstantial misrepresentations are prohibited in all forms," 34 C.F.R. § 668.71(b), and the Department may deny institutional participation applications, including recertification applications, when it determines that the institution has engaged in a substantial misrepresentation.  34 C.F.R. § 668.71(a)(3).  A "misrepresentation" is:

> [a]ny false, erroneous or misleading statement an eligible institution, one of its representatives, or any ineligible institution, organization, or person with whom the eligible institution has an agreement to provide educational programs, or to provide marketing, advertising, recruiting or admissions services makes directly or indirectly to a student, prospective student or any member of the public, or to an accrediting agency, to a State agency, or to the Secretary. A misleading statement includes any statement that has the likelihood or tendency to deceive. A statement is any communication made in writing, visually, orally, or through other means. Misrepresentation includes the dissemination of a student endorsement or testimonial that a student gives either under duress or because the institution required the student to make such an endorsement or testimonial to participate in a program.

*Mr. Jeffrey Myhre*
*Globe University*
*Page 5*

34 C.F.R. § 668.71(c).

A "substantial misrepresentation" is "any misrepresentation on which the person to whom it was made could reasonably be expected to rely, or has reasonably relied, to that person's detriment." *Id.* Substantial misrepresentations include misrepresentations made by the institution itself, or one of its representatives, regarding the nature of the institution's academic programs or the employability of the institution's graduates. 34 C.F.R. § 668.71(b). Substantial misrepresentations involving the nature of the institution's education program include misrepresentations concerning: "[t]he particular type(s), specific sources, nature and extent of its institutional, programmatic, or specialized accreditation," "whether a student may transfer course credits earned at the institution to any other institution," "whether the successful completion of a course of instruction qualifies a student . . . to perform certain functions in the States in which the educational program is offered or to meet additional conditions that the institution knows or reasonably should know are generally needed to secure employment in a recognized occupation for which the program is represented to prepare students," and the "appropriateness of its courses and programs to the employment objectives it states its programs are designed to meet." 34 C.F.R. §§ 668.72(a), (b)(1), (c), and (g). Substantial misrepresentations involving the employability of an institution's graduates include misrepresentations concerning "the institution's knowledge about the current or likely future . . . employment opportunities in the industry or occupation for which the students are being prepared," and "other requirements that are generally needed to be employed in the fields for which the training is required." 34 C.F.R. §§ 668.72(c), (f). Each substantial misrepresentation is a sufficient ground for the Department to deny Globe's recertification application.

The Department's review established that Globe substantially misrepresented to students and prospective students the ability of graduates of Globe's criminal justice program to become police officers and probation officers in the state of Minnesota. Moreover, by signing its PPA, Globe agreed that, because it advertised job placement rates as a means of attracting students to enroll in the institution, it will make available to prospective students relevant State licensing requirements of the State in which the institution is located for any job for which an educational program offered by the institution is designed to prepare those prospective students. PPA at 5; 34 C.F.R. §§ 668.14(b)(10)(i), (ii); 20 U.S.C. § 1094(a)(8). Here, Globe affirmatively misrepresented Minnesota's licensing requirements for police and probation.

### A. Globe made substantial misrepresentations regarding the ability of its criminal justice program graduates to become Minnesota police officers

In Minnesota, a person who is not eligible for reciprocity because of prior police service in another state may become a police officer only in one of two ways. First, a person may obtain a degree from a program designated by the Minnesota Peace Officer Standards and Training (POST) Board. Minn. Stat. § 626.84, Minn. Rules 6700.0100, 6700.0300; Trial Ex. 0046 (listing POST Board designated programs); Trial Transcript 4/4/16 99:19-101:25, 131:4-14;

4/22/16 AM 17:10-18:2, 39:13-44:16; *see also* Order at 12, Findings of Fact ¶ 38. Second, a person may obtain a degree from a regionally-accredited institution and then complete a certified program of Professional Peace Officer Education (PPOE), commonly known as "skills training." *Id.* Globe's criminal justice program does not meet the requirements for either of these options. *First,* the program is not currently POST-approved, nor was it POST-approved at the time that Globe made representations regarding the ability of its graduates to become police officers. *Second*, Globe is, and at all times relevant to this determination was, *nationally* accredited, not regionally accredited.[4] Accordingly, a Globe graduate could not have used a Globe credential to become a police officer in Minnesota. Moreover, at trial, Defendants' corporate manager of career services testified that these job titles were not representative of jobs entered into by Defendants' graduates because Defendants' criminal justice programs did not allow graduates to work as Minnesota police officers. *See* Trial Transcript 4/13/16 PM 99:10-19 (testimony from Globe's corporate manager of career services, a role which she served in for both Globe and MSB concurrently).

Despite the inability of Globe graduates to use the Globe credential to become Minnesota police officers, Globe substantially misrepresented that its programs prepared students for such careers. Globe advertisements and webpages contained false and misleading information that would lead a prospective student to reasonably believe that the criminal justice programs provided a necessary credential for a career as a Minnesota police officer. For instance, Globe published online testimonials from current criminal justice students asserting that they were working towards becoming sworn police officers. *See, e.g.,* Trial Exs. 11 (banner-style Globe advertisement with text "Make the world a better place" under a photograph of a person in a police uniform); 14 (banner-style Globe advertisement with text "Interested in Criminal Justice?" next to photograph of a person in a police uniform); 83-85 (three mobile-device web browser advertisements containing photographs of persons in police uniforms and the text "make a difference with a degree in criminal justice," "advancing a career in law enforcement starts with the right degree," and "become a criminal justice professional," respectively).

Another webpage contained the text, "When designing our criminal justice degrees, we went to the source. We called on seasoned professionals in security, *law enforcement*, the court system, and corrections to advise us on exactly what skills and knowledge they look for in job candidates. And you can be sure, as a graduate of Globe University/Minnesota School of Business criminal justice program, *you will have those qualifications*." Trial Ex. 28 (emphasis added). Another claims that "If you're interested in working in law enforcement, the court system or corrections, the multidisciplinary field of criminal justice can lead down may different career paths. A degree in criminal justice is useful in a wide variety of positions including:  -Police officer -Probation officer." *See* Trial Ex. 34. Prospective

---

[4] Globe's online program chair and former interim criminal justice dean testified at trial that he would inform Globe admissions representatives that Globe is "not a POST Board school," and that, if prospective students "want to become law enforcement officers in the State of Minnesota, [the admissions representatives] need to forward them to the POST Board website, where they can research the appropriate schools for that." *See* Trial Transcript 4/22/16 AM 18:16-19:23.

*Mr. Jeffrey Myhre*
*Globe University*
*Page 7*

students viewing these advertisements and webpages could reasonably assume that completing the criminal justice program could lead to employment in Minnesota as a police officer. Therefore, this advertising scheme, considered as a whole, constitutes a substantial misrepresentation. *Cf. In the Matter of Warnborough College,* U.S. Dep't of Educ. Dkt. Nos. 95-164-ST and 96-90-SF (Aug. 9, 1996) (reviewing various promotional materials and holding that, based upon those materials considered together, prospective students could be "reasonably convinced" that the institution was part of Oxford University and that the institution therefore committed a misrepresentation, notwithstanding that the promotional materials disclaimed that the institution was "independent").

Over the course of several years, Globe's admissions representatives and other personnel also misrepresented the ability of Globe's graduates to obtain employment in Minnesota as police officers. In multiple cases involving students whom Globe's representatives knew were enrolling to become police officers, Globe's representatives wrongly informed the prospective students, or otherwise led these individuals to believe, that the Globe criminal justice program would allow them to become police officers in Minnesota, or that they could attend the "skills training" after completing the Globe program. Those statements constituted substantial misrepresentations, as none of those students were able to attend skills training, or otherwise become police officers in Minnesota. In all, the Department reviewed the sworn testimony of seven students swearing to these substantial misrepresentations, including sworn affidavits and sworn testimony given by the students at trial.[5] *See* Enclosure 1.

---

[5] The court found that at some point in 2010, Globe inserted into its enrollment agreement a disclaimer indicating that criminal justice students were not eligible to become police officers in Minnesota. In Globe's role as a fiduciary of Title IV funds, it is incumbent upon the institution to not make substantial misrepresentations to Title IV recipients. Whether such misrepresentations are later disclaimed is immaterial to that duty. Likewise, after-the-fact contractual statements, especially when they are buried within a lengthy document, are generally insufficient to cure misrepresentations made to induce a person to enter the contract. *See, e.g., Giant Foods, Inc. v. FTC,* 322 F.2d 977, 986 (D.C. Cir. 1963), cert. dismissed, 376 U.S. 967, 84 (1964) (holding that a disclaimer in small print at the bottom of an advertisement did not cure deceptive language in the advertisement); *FTC v. EMA Nationwide,* 767 F.3d 611, 631-33 (6th Cir. 2014) (holding contractual disclaimers do not absolve seller's liability for false and deceptive practices). Here, the disclaimer was two sentences in an eight-page enrollment agreement, buried among such innocuous provisions as an acknowledgement of receipt for the student handbook and consent for use of the student's picture in advertisements. As the court stated, "Defendants' contractual disclaimer… was also ineffective and legally irrelevant as to liability for false and misleading statements made in advertising and by their admissions representatives. As the Court observed at summary judgment, even a contractual disclaimer that clearly contradicts prior misstatements does not prevent liability under [Minnesota's fraud laws]. . . . The Court finds that the disclaimer regarding the Criminal Justice Program that was buried in the enrollment agreement was eclipsed by the emphatic and repeated claims to the contrary in Defendants' advertising and sales presentations" Order at 114-15, Conclusions of Law ¶ 23. Finally, the statements of many students indicate that Globe affirmatively avoided the disclaimer by telling the students they needed to quickly sign the enrollment agreement without a meaningful opportunity to review it, or risk losing their opportunity to enroll. *See, e.g.,* Student 8's Affidavit ¶ 4 ("I explained to Globe's admissions representative that I was on my first college visit, and told him that I wanted to look at several other colleges to make sure I was choosing the right one. I also told him that I needed some time to think about whether it was the best time to enroll in college because I was working and raising a young child. Globe's admissions representative told me that if I wanted to make sure I got a spot in Globe's criminal justice program, I needed to enroll that day. He said that Globe's programs filled up quickly, and he would be hesitant to recommend me at a later date if I could not commit to continuing my education that day"); Student 9's Affidavit ¶ 6 ("I told Globe's

*Mr. Jeffrey Myhre*
*Globe University*
*Page 8*

For example, Student 7 testified at trial that he informed a Globe admissions representative over the telephone that his career goal was to become a Minnesota police officer. Trial Transcript 4/5/16 211:6-21, 212:4-5; 4/6/16 2:9-23. On that phone call, Student 7 agreed to come to Globe's campus for an in-person meeting. At that meeting, the student told a different Globe admissions representative that he wanted to become a police officer, and was assured that he would be able to do so by completing skills training after graduating from Globe's criminal justice program. Trial Transcript 4/5/16 212:13-215:14. The student testified that he "thought [he] was on the right track." *Id.* at 214:23. His coursework pertained to police work and his instructors had experience as Minnesota police officers. *Id.* at 220:4-221:21. Becoming a Minnesota police officer was even discussed among students on one of his program's interactive "Blackboard" discussion boards. *Id.* at 218:15-219:24. Student 7 testified that none of his instructors advised him that he could not become a Minnesota police officer with a degree from Globe. *Id.* at 218-220. After graduating, he attempted to enroll in the skills training at Metropolitan State University, a public university in Minnesota. Metropolitan State University's representative informed him that his Globe credential did not allow him to begin skills training, and he would have to begin his criminal justice studies over if he wanted to be eligible for that training. *Id.* at 230:15-232:7; 4/6/16 4:4-5:3. The testimony this student gave was subject to cross-examination by Globe, and the judge, sitting as trier-of-fact, found this student's testimony to be credible. Order at 44, Findings of Fact ¶ 117(j).

As with Student 7, Globe's admissions representatives made substantial misrepresentations to other students when instructors asked the students what they had hoped to do with their Globe degrees that were not corrected until long into the program. Student 4, the first person in her family to attend college, enrolled in Globe's criminal justice associate program after being assured by Globe's admissions representatives that it could lead to her being a police officer in Minnesota. Trial Transcript 4/6/16 141:19-142:22. Not until after having been enrolled for at least a year did this student learn – from a friend – that Globe's credits would not allow her to attend skills training and become a police officer. *Id.* at 151:23-155:12. The testimony this student gave was subject to cross-examination by Globe, and the judge, sitting as trier-of-fact, found this student's testimony to be credible. Order at 50, Findings of Fact ¶ 120(h).

Other students swore in affidavits to the same practice of admissions representatives making substantial misrepresentations regarding the ability of Globe graduates to become police officers in Minnesota. *See, e.g.,* Student 2's Affidavit ¶ 2 ("Globe's admissions representative recommended that I enroll in Globe's associate degree criminal justice program and told me that unlike other schools, Globe's classes were taught by instructors with real-world

---

admissions representative that I needed some time to think about enrolling, and planned to look at several other schools. Globe's admissions representative told me that Globe's classes filled up fast, and if I wanted to be sure I got a spot for the next quarter, I needed to enroll that day. She asked me why I would wait to make a better life for my daughter and me. Feeling pressured, I agreed to enroll in Globe's associate degree criminal justice program"). When the misrepresentation comes from an individual holding themselves out to be an expert, such as Globe's "admissions representatives," the prospective student is even more entitled to rely upon it. *See, e.g.,* Restatement (Second) of Torts § 542(a) (1977).

experience. He told me that after earning this degree, I could complete a criminal justice bachelor's degree, which would allow me to apply to police officer skills training and become a police officer"); Student 3's Affidavit ¶ 2 ("Based on my interests, Globe's admissions representative recommended that I enroll in Globe's associate degree criminal justice program. She said that unlike other schools, Globe offered hands-on learning and experienced industry professionals that taught classes. Based on Globe's recommendation, I enrolled in its associate degree criminal justice program."); Student 6's Affidavit ¶¶ 3-4 ("I told Globe's admissions representative that I wanted a career as a game warden. I told her that to apply for game warden positions, I needed to first become a licensed Minnesota police officer. . . . Globe's admissions representative told me that Globe was the perfect school for me, because it offered both veterinary technician and criminal justice programs.").

Military veterans were also induced to enroll by false promises of being able to become police officers. These student-veterans did not learn that their Globe degrees would not allow them to become police officers until after they had exhausted all or much of their G.I. Bill benefits. *See* Student 1's Affidavit ¶ 8 ("I remain troubled that I wasted six months and thousands of dollars of my G.I. Bill benefits at Globe."); Student 5's Affidavit ¶ 10 ("It is disappointing to have spent three years and over $65,000 of my hard-earned G.I. Bill money on degrees from Globe that have proved worthless.").

### B. Globe made substantial misrepresentations regarding the ability of graduates of its associate's programs to become probation officers in Minnesota

In Minnesota, probation officers are employed by a county or by the State Department of Corrections. Those entities use one of three "delivery systems" for probation services: (1) the Department of Corrections ("DOC") delivery system, which is utilized by 28 counties; (2) the County Probation Officer ("CPO") delivery system, which is utilized by 27 counties and adheres to the educational standards for probation officers set by the Department of Corrections; and (3) the Community Corrections Act ("CCA") delivery system, which the remaining 32 counties utilize. Each of those delivery systems requires a person to have obtained a bachelor's degree to be a probation officer. Trial Transcripts 4/7/16 109:1-111:9, 111:10-114:13, 116:12-117:5, 118:7-9, 120:19-121:6, 123:15-124:20, 125:20-23, 127:24-129:19; Trial Ex. 0043; *see also* Order at 13-14, Findings of Fact ¶¶ 42-44. Therefore, only Globe's bachelor's programs could directly lead to employment as a probation officer.

Nevertheless, Globe urged students whom it knew to be enrolling to become probation officers to enroll in one of Globe's associate programs and claimed that those programs were a good fit for that goal. In all, the Department reviewed the testimony, given either through affidavit or at trial, of three students who swore to these misrepresentations. *See* Enclosure 2.

Student 8 testified that she wanted to become a juvenile probation officer so that she could give her son a better life and be a youth mentor. Trial Transcript 4/7/16 64:20-65:10. She expressed that desire to an admissions representative at Globe's Woodbury campus, who told her that Globe would be a "perfect fit" for her and recommended the school's criminal justice

associate's program. *Id.* at 67:2-68:13. This representative told her that Globe had "several connections in the criminal justice field . . . so [she] would be able to have a job placement after . . . graduating" as a juvenile probation officer. *Id.* at 68:6-10, 69:3-15. This student took on tens of thousands of dollars in debt to obtain her associate's degree, which did not make her eligible to become a probation officer. Student 8's Affidavit ¶ 6. She "currently work[s] as a personal banker, a job that does not require a college degree. [Her] Globe education has not bettered [her] life or [her] son's, but saddled [them] with thousands of dollars of debt." *Id.* ¶ 9. The testimony this student gave was subject to cross-examination by Globe, and the judge, sitting as trier-of-fact, found this student's testimony to be credible. Order at 63, Findings of Fact ¶ 123(g).

Student 9 decided to return to school after having her first child to provide a better life for them and to be a role model to the child. Student 9's Affidavit ¶ 2. "Globe's admissions representative told [her] that Globe's criminal justice associate degree program would give [her] the skills and education [she] needed to become a probation officer or corrections officer." *Id.* ¶ 5. This student graduated from Globe and learned that she needed a bachelor's degree to become a probation officer. *Id.* ¶ 7. Instead, "[she] was hired as a corrections officer, only to find out that after spending over $30,000 on [her] MSB associate's degree, [she] did not need a college degree to work as a corrections officer." *Id.* She was unable to transfer her Globe credits to complete a bachelor's degree elsewhere and cannot afford to start her studies over. *Id.* ¶ 10.

Student 10 visited Globe University's Minneapolis campus in 2009 and told the admissions representative he wanted to be a probation officer. Student 10's Affidavit ¶ 3. In response, "Globe's admissions representative recommended Globe's associate criminal justice degree program because it would allow [him] to enter the workforce in two years or less. Based on Globe's presentation, [he] enrolled in its criminal justice associate degree program." *Id.* At graduation, Globe convinced the student to continue on into its bachelor's in criminal justice program, saying that "additional education would make [him] even more attractive to potential employers." *Id.* ¶ 4. This student, originally expecting to be employable as a probation officer after two years, ended up spending four years at Globe and spending $40,000 on a degree. *Id.* ¶ 5. He has been unable to find a job in the criminal justice field and is unemployed. *Id.*

These substantial misrepresentations, upon which students relied when choosing to enroll at Globe, are incompatible with Globe's fiduciary duty to the Department and demonstrate the institution's lack of administrative capability.

*Mr. Jeffrey Myhre*
*Globe University*
*Page 11*

### III.    GLOBE BREACHED ITS FIDUCIARY DUTY AND DEMONSTRATED A LACK OF ADMINISTRATIVE CAPABILITY TO THE DEPARTMENT BY SUBSTANTIALLY MISREPRESENTING TO STUDENTS AND PROSPECTIVE STUDENTS THE TRANSFERABILITY OF GLOBE CREDITS

Globe made numerous misrepresentations to prospective students about the ability of students to transfer credits earned at Globe to other institutions.[6] These misrepresentations were made as early as 2007 and continued through at least 2014, were made at each Globe campus, and were made to students who enrolled in a variety of programs of study, including criminal justice, health sciences, paralegal, accounting, business, and massage therapy programs. The individuals to whom Globe made these misrepresentations could reasonably have been expected to rely, or did in fact reasonably rely, on these misrepresentations to their detriment. Accordingly, these misrepresentations constituted substantial misrepresentations. 34 C.F.R. §§ 668.71, 668.72(b)(1).

The non-transferability of Globe's credits is partly a function of Globe's accreditation by a national accreditor rather than a regional accreditor. Credits earned at nationally accredited institutions often do not transfer to regionally accredited institutions.[7] Thus, blanket statements Globe made to prospective students conflating national and regional accreditation, such as "because Globe is an accredited school, other schools would accept Globe's credits" constitute substantial misrepresentations. *See, e.g.,* Student 14's Affidavit ¶ 4. Likewise, some of the substantial misrepresentations at issue were made to prospective students who informed Globe that they were interested in transferring credits earned at Globe to an

---

[6] On this issue, the court found in favor of Globe because, "[t]o the extent that witnesses were misinformed by admissions representatives by affirmative statements that credits would transfer, those statements were not authorized by Defendants." Order at 118, Conclusions of Law ¶ 33. This aspect of the court's decision is not dispositive to the Department's conclusion that Globe violated 34 C.F.R. § 668 Subpart F because, under those regulations, an institution is responsible for substantial misrepresentations made by its agents, irrespective of whether those substantial misrepresentations are "authorized." *See, e.g., In the matter of Philander Smith College,* U.S. Dep't of Educ. Dkt. No. 09-28-SA at 2 (Nov. 16, 2009) ("[A]n institution is fully responsible for the conduct of its employees. This Tribunal has consistently held that an institution is subject to liability arising from the conduct of its employees in administering Title IV expenditures even if the conduct is criminal."); *see also* 34 C.F.R. § 668.71(b) (establishing that a substantial misrepresentation can be made by "one of [an institution's] representatives").

[7] *See, e.g.,* Government Accountability Office, Transfer Students: Postsecondary Institutions Could Promote More Consistent Consideration of Coursework by Not Basing Determinations on Accreditation, GAO-06-22, (October 18, 2005) *available at* www.gao.gov/products/GAO-06-22 (last visited December 1, 2016); U.S. Senate Committee on Health, Education Labor, and Pensions Majority Committee Staff Report and Accompanying Minority Committee Staff Views, For Profit Education: The Failure to Safeguard the Federal Investment and Ensure Student Success (July 30, 2012) *available at*: www.help.senate.gov/imo/media/for_profit_report/PartI-PartIII-SelectedAppendixes.pdf? (last visited December 1, 2016).

institution within the University of Minnesota or within the Minnesota State Colleges and University system. All of those institutions are accredited by the Higher Learning Commission, a regional accreditor, and Globe's credits did not transfer. In addition, in some cases, the prospective student asked Globe about the transferability of Globe's credits to a particular institution, and Globe misrepresented the transferability of Globe's credits to that institution. *Infra.* In those cases also, the Globe credits did not transfer.[8] In all, the Department reviewed affidavits prepared by nine former Globe students swearing that Globe's representatives made substantial misrepresentations to them regarding the transferability of Globe's credits. *See* Enclosure 3.

Several of these affidavits are illustrative of Globe's misrepresentation. For example, in one case, a student hoping to become a domestic violence advocate asked specifically whether Globe's credits would transfer to other schools, because this student had been warned by a family member that they might not. Student 11's Affidavit ¶ 4. Globe's admissions representatives told her that "Globe was fully accredited, so [she] would have no trouble transferring schools or continuing her education elsewhere. . . . Reassured, [she] enrolled in Globe's criminal justice associate's program." *Id.* This student later tried to transfer her Globe credits to three other schools in Minnesota, and each school refused to accept the Globe credits for transfer. *Id.* ¶ 6.

Another student visited Globe's Minneapolis campus with his father and told the admissions representative that his goal was to earn an associate's degree in computer science and later transfer those credits to the University of Minnesota or another public institution to complete

---

[8] At trial, Globe noted that the transferability of credits is ultimately the decision of the institution a student transfers to. That is correct, and had Globe's admissions representative made solely that statement and not affirmatively represented that Globe credits *would* transfer, it would not have been a misrepresentation. But Globe, as a fiduciary to the Department, may not falsely inform prospective students that credits *will* transfer, receive Title IV funds because of those students' attendance, and then claim that transferability is out of its control. Likewise, Globe's course catalogs, which were hundreds of pages long, contain disclaimers regarding the transferability of Globe credits to other institutions. Pro forma statements or disclaimers, buried within a document of hundreds of pages, do not cure otherwise deceptive messages, particularly when those deceptive messages were conveyed by a person such as a Globe admissions representative who holds themselves out as an expert. *Supra* note 5. Moreover, according to affidavits of former Defendants' employees, the companies' representatives affirmatively avoided the disclaimer contained in the course catalog by not providing the catalog to the prospective students until they were signing their enrollment agreements or thereafter. *See, e.g.,* Employee 1's Affidavit ¶ 17, Enclosure 4 ("MSB's goal was to enroll as many students as possible, and quickly transition them to financial aid to fill out financial aid paperwork before they had time to think about their enrollment decision. MSB's practice was to have admissions representatives "recommend" students for acceptance and ask them to sign an enrollment agreement which was supposedly contingent on acceptance. As students signed the enrollment agreement, not beforehand, we would give them copies of MSB's Course Catalog, I never saw a student stop the enrollment process to review the dense catalog."); Employee 2's Affidavit ¶ 16, Enclosure 4 ("I was trained to have him sign an enrollment agreement in which he acknowledged that he had been given copies of MSB's Student Handbook and Course Catalog. We did not give students these materials before they signed the enrollment agreement, rather, we were trained to hand them the materials as they were signing the agreement. I never saw any students review these voluminous materials before signing the enrollment agreement, as the materials were provided while they were busy signing the enrollment agreement.").

*Mr. Jeffrey Myhre*
*Globe University*
*Page 13*

a bachelor's degree. Student 13's Affidavit ¶ 3. The admissions representative told this student that "Globe's computer science program was recognized by state universities and [he] would have no problem transferring his credits to another school to complete a bachelor's degree. Based on Globe's presentation, [he] signed [] up for Globe's associate degree computer science program that day. " *Id.* ¶¶ 4, 5. Partway through his studies, Globe discontinued its computer science program. *Id.* ¶ 6. This student attempted to transfer his credits to the University of Minnesota and Minneapolis Technical and Community College. *Id.* ¶7. Those institutions "told [the student] that it would not take any of Globe's credits because Globe was not properly accredited." *Id.* Now, "[i]f and when [the student] decides to return to college, he will have to start all over." *Id.* ¶ 9.

*    *    *    *

The denial of recertification will be effective on December 31, 2016. Should Globe have factual evidence to dispute the Department's findings and demonstrate their inaccuracy, Globe may submit that evidence via overnight mail to me at the following address:

Administrative Actions and Appeals Service Group
U.S. Department of Education
Federal Student Aid/Enforcement
830 First Street, NE (UCP-3, Room 84F2)
Washington, DC 20002-8019

If any such material is received by December 20, 2016, the Department will review it and notify Globe if the recertification denial will be modified, rescinded, or left in place. There will be no additional opportunity for appeal or reconsideration. If the recertification denial remains in effect following the Department's review of such submission, or if the school opts not to make such a submission, the Chicago-Denver School Participation Division will then contact Globe concerning the proper procedures for closing out Globe's Title IV program accounts.

In the event that Globe submits an application to participate in the Title IV programs in the future, that application must address the deficiencies noted in this letter. If you have any questions about this letter, you may contact Kerry O'Brien at 303-844-3319.

Sincerely,

Susan D. Crim
Director
Administrative Actions and Appeals Service Group

Enclosures

*Mr. Jeffrey Myhre*
*Globe University*
*Page 14*

cc:    Roger Williams, Interim President, ACICS, via rjwilliams@acics.org
       Betsy Talbot, Manager, Institutional Registration and Licensing, Minnesota Office of
            Higher Education, via betsy.talbot@state.mn.us
       David Dies, Executive Secretary, Wisconsin Educational Approval Board,
            via david.dies@eab.wisconsin.gov
       Melody Schopp, Secretary of Education, South Dakota Department of Education
            via melody.schopp@state.sd.us
       VA State Council for Higher Education via peterblake@schev.edu
       Department of Defense, via osd.pentagon.ousd-p-r.mbx.vol-edu-compliance@mail.mil
       Department of Veteran Affairs, via INCOMING.VBAVACO@va.gov
       Consumer Financial Protection Bureau, via CFPB_ENF_Students@cfpb.gov

USA SOI 145



DEC 3 0 2016

Mr. Jeffrey Myhre                                Sent Via
President                                        Tracking #:  1ZA879640191299789
Minnesota School of Business
1401 West 76th Street, Suite 500
Richfield, MN 55423-3841

Re:  Affirmation of Denial of Recertification Application to Participate in the Federal Student
Financial Assistance Programs – Minnesota School of Business, 1401 West 76th Street, Suite
500, Richfield, Minnesota 55423; OPE ID: 00464600.

Dear Mr. Myhre:

On December 6, 2016, the U.S. Department of Education (Department) informed Minnesota
School of Business (MSB) that its application for recertification to participate in the student
financial assistance programs authorized pursuant to Title IV of the Higher Education Act of
1965, as amended, 20 U.S.C. §§ 1070 *et seq.* (Title IV, HEA programs), was denied (Denial
Letter).  In the Denial Letter, the Department found that MSB was ineligible to participate in
Title IV, HEA programs because it had been judicially determined to have committed fraud
involving Title IV, HEA programs and because MSB breached its fiduciary duty to the
Department and demonstrated a lack of administrative capability by making substantial
misrepresentations regarding the nature of its criminal justice program, the employability of that
program's graduates, and the ability of MSB's students to transfer academic credits earned at
MSB to other institutions.  These findings demonstrated that MSB did not meet the participation
requirements and standards set forth in Title IV and regulations issued thereunder.

The Department provided MSB an opportunity to present any factual evidence to dispute the
Department's findings and demonstrate their inaccuracy.  On December 20, 2016, MSB
submitted a seven-page request for reconsideration of the Denial Letter (Reconsideration
Request) and, in the alternative, requested that the Department delay the effective date of its
decision for thirty days.  For the reasons that follow, the Department denies those requests.  This
affirmation constitutes the final agency action on this matter.

MSB makes four principal arguments in support of its requests, which the Department addresses
in turn.  The first argument suggests legal or policy deficiencies with the Department's
determination.  The other three arguments made by MSB are equitable in nature and assert that if



USA SOI 146

MSB closes, MSB's students would be unable to attend the school of their choice, that MSB's employees will lose their jobs, and that the Department's actions "tarnish the degrees" of MSB alumni. Each of these arguments is addressed below, beginning with MSB's assertion about the legal and policy deficiencies of the determination.

*First*, MSB asserts that the state court's finding that there is evidence "sufficient to establish fraud and/or deception in the marketing of [MSB's] criminal justice program" is not a judicial determination of fraud under 34 C.F.R. 600.7(a)(3)(ii). Notably, MSB concedes that "the judicial determination in the district court of the State of Minnesota is sufficient to satisfy the Department's regulatory standard[.]" Reconsideration Request at 5. As MSB admits, the state court Order is a judicial determination that MSB has committed fraud involving Title IV, HEA programs. In addition to the language MSB quoted in the Reconsideration Request, the court also found that "the causal nexus between [MSB's] fraudulent misrepresentations is established by the evidence," Order at 112, that "[MSB's] fraudulent practices in advertising and promoting [its] Criminal Justice program... caused damage," Order at 113, and that the "damage that flows from [MSB's] fraud is inevitable and foreseeable." *Id.* Likewise, the Court found MSB to have violated the Minnesota Consumer Fraud Act, Minn. Stat. § 325F.68 *et seq.* (CFA). Order at 111. The CFA prohibits "[t]he act, use, or employment by any person *of any fraud*, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby." Minn. Stat. § 325F.69, subd. 1 (emphasis added). Likewise, the Court found that "[t]o prove a claim under the CFA, a plaintiff must prove *an actionable fraud or misrepresentation* and intent to induce reliance on that misrepresentation." Order at 106. Conclusions of Law ¶ 6. In finding for the State on its CFA claim, the court determined that MSB had done so.

MSB also contends that because the State of Minnesota, and not individual students, was the plaintiff in this case, that the Order does not constitute a judicial determination of fraud under the statute and regulations. MSB further suggests that the Court's application of a "preponderance of the evidence" standard of proof also suggests that the Order is somehow not a "judicial determination of fraud." MSB points to no legal authority to support either of these propositions, and the Department is unaware of any. Rather, "[t]he phrase 'judicially determined to have committed fraud' means that a court of competent jurisdiction has made such a finding." Institutional Eligibility Under the Higher Education Act of 1965, as Amended, 59 Fed. Reg. 22324-01, 22,329 (Feb. 10, 1994). The identity of the plaintiff and standard of proof applied by the court are irrelevant.

*Second*, MSB also requested reconsideration of the Department's determination that it breached its fiduciary duty and showed a lack of administrative capability by making numerous substantial misrepresentations to students and prospective students as to the nature of MSB's criminal justice program and the employability of that program's graduates, *see* Reconsideration Request at Part IV (2), and as to the transferability of credits earned at MSB, *see* Reconsideration Request at Part IV (3). MSB wrongly conflates the litigation in Minnesota state court with the Department's own review of the underlying evidence of the misrepresentations. With respect to the substantial misrepresentations MSB made regarding the nature of the criminal justice program and the employability of that program's graduates, MSB alleges that it cannot appeal

until the district court issues its final order and judgment.[1]  Whether MSB could or should have appealed the Order is irrelevant to the Department's determination that MSB violated the Department's substantial misrepresentation regulation found at 34 C.F.R. § 668.71 *et seq.* because that determination was predicated not on the Order itself, but on the Department's review of the underlying evidence.  To the extent that MSB's argument bears on the Department's determination that MSB is ineligible for participation in the Title IV, HEA programs, under 34 C.F.R. § 600.7(a)(3)(ii), the Department is not required to wait for an institution that was judicially determined to have committed fraud involving Title IV, HEA programs to exhaust all appeals.  Rather, the Department may determine that an institution is ineligible when "a court of competent jurisdiction has [determined that the institution committed fraud involving Title IV, HEA programs]."  Institutional Eligibility Under the Higher Education Act of 1965, *supra.*

As to the substantial misrepresentations MSB made regarding the transferability of its credits, MSB notes that the Minnesota court found in MSB's favor on that claim.  Notably, MSB does not deny that it made substantial misrepresentations to students and prospective students regarding the transferability of credits.  Rather, it repeatedly emphasizes the district court's opinion that those substantial misrepresentations did not amount to "widespread, systematic deception."  However, an institution need not engage in "widespread, systematic deception" in order to violate the Department's regulatory prohibition against making substantial misrepresentations.  In fact, the Department specifically addressed MSB's arguments in the Denial Letter itself:

> "[o]n this issue, the court found in favor of MSB because, "[t]o the extent that witnesses were misinformed by admissions representatives by affirmative statements that credits would transfer, those statements were not authorized by Defendants."  Order at 118, Conclusions of Law ¶ 33.  This aspect of the court's decision is not dispositive to the Department's conclusion that MSB violated 34 C.F.R. § 668 Subpart F because, under those regulations, an institution is responsible for substantial misrepresentations made by its agents, irrespective of whether those substantial misrepresentations are "authorized." *See, e.g., In the Matter of Philander Smith College,* U.S. Dep't of Educ. Dkt. No. 09-28-SA at 2 (Nov. 16, 2009) ("[A]n institution is fully responsible for the conduct of its employees. This Tribunal has consistently held that an institution is subject to liability arising from the conduct of its employees in administering Title IV expenditures even if the conduct is criminal."); *see also* 34 C.F.R. § 668.71(b) (establishing that a substantial misrepresentation can be made by "one of [an institution's] representatives")."

Denial Letter at 12, footnote 8.

---

[1] MSB also paradoxically states that the Department was wrong to note that a disclaimer regarding the criminal justice program was buried in a catalog "hundreds of pages long," then admits in the same paragraph that "the catalog itself is approximately 200 pages every time it is published."  Reconsideration Request at 5.

*Mr. Jeffrey Myhre*
*Minnesota School of Business*
*Page 4*

For this reason, the Department's determination that MSB made substantial misrepresentations is not founded solely on the existence of the Order. As explained at length in the Denial Letter, the Department's independent examination of the underlying evidence revealed 111 misrepresentations which the Department determined violated 34 C.F.R. 668.71 *et seq.* and MSB's Program Participation Agreement.[2] In addition, the Department concluded that the criminal justice program's advertising scheme substantially misrepresented to prospective students that they could become police officers in Minnesota as a result of an MSB criminal justice credential. Denial Letter at 6-7. While the Department reviewed much of the same underlying evidence as the Minnesota court, the Department's determination that MSB violated the Department's misrepresentation regulations is independent of the conclusions drawn by the Minnesota court regarding Minnesota law.

As noted above, the remaining three arguments by MSB are equitable in nature and allege that, if MSB closes, MSB's students would be unable to attend the school of their choice, that MSB's employees will lose their jobs, and that the Department's actions "tarnish the degrees" of MSB alumni. MSB's arguments are unavailing. *First*, the Denial Letter ends MSB's participation in Title IV, HEA programs. It does not require MSB to close. *Second*, the Denial Letter simply identifies MSB's substantial misrepresentations and other regulatory violations. The consequences identified by MSB are attributable to MSB's own violations and not the Department's actions.

*    *    *

In light of the Department's denial of MSB's reconsideration request, the Department is also denying, as moot, MSB's request to delay the effective date of the recertification denial.

Should MSB submit an application to participate in the Title IV, HEA programs in the future, that application must address the deficiencies noted in this letter. Please direct any questions about this letter to Kerry O'Brien at 303-844-3319.

Sincerely,

*Susan D. Crim*

Susan D. Crim
Director
Administrative Actions and Appeals Service Group

cc:   Roger Williams, Interim President, ACICS, via rjwilliams@acics.org
      Betsy Talbot, Manager, Institutional Registration and Licensing, Minnesota Office of
          Higher Education, via betsy.talbot@state.mn.us
      Department of Defense, via osd.pentagon.ousd-p-r.mbx.vol-edu-compliance@mail.mil
      Department of Veteran Affairs, via INCOMING.VBAVACO@va.gov
      Consumer Financial Protection Bureau, via CFPB_ENF_Students@cfpb.gov

---

[2] As stated in the Denial Letter, 53 such substantial misrepresentations involved the nature of the criminal justice program and the employability of that program's graduates, and 58 involved the transferability of MSB's credits.



DEC 3 0 2016

Mr. Jeffrey Myhre                                    Sent Via UPS
President                                            Tracking #: 1ZA879640194205598
Globe University
8089 Globe Drive
Woodbury, MN  55125-5408

Re:  Affirmation of Denial of Recertification Application to Participate in the Federal Student
Financial Assistance Programs – Globe University, 8089 Globe Drive, Woodbury, Minnesota
55125-3388; OPE ID: 00464200.

Dear Mr. Myhre:

On December 6, 2016, the U.S. Department of Education (Department) informed Globe
University (Globe) that its application for recertification to participate in the student financial
assistance programs authorized pursuant to Title IV of the Higher Education Act of 1965, as
amended, 20 U.S.C. §§ 1070 *et seq.* (Title IV, HEA programs), was denied (Denial Letter).  In
the Denial Letter, the Department found that Globe was ineligible to participate in Title IV, HEA
programs because it had been judicially determined to have committed fraud involving Title IV,
HEA programs and because Globe breached its fiduciary duty to the Department and
demonstrated a lack of administrative capability by making substantial misrepresentations
regarding the nature of its criminal justice program, the employability of that program's
graduates, and the ability of Globe's students to transfer academic credits earned at Globe to
other institutions.   These findings demonstrated that Globe did not meet the participation
requirements and standards set forth in Title IV and regulations issued thereunder.

The Department provided Globe an opportunity to present any factual evidence to dispute the
Department's findings and demonstrate their inaccuracy.   On December 20, 2016, Globe
submitted a seven-page request for reconsideration of the Denial Letter (Reconsideration
Request) and, in the alternative, requested that the Department delay the effective date of its
decision for thirty days.  For the reasons that follow, the Department denies those requests.  This
affirmation constitutes the final agency action on this matter.

Globe makes four principal arguments in support of its requests, which the Department addresses
in turn.   The first argument suggests legal or policy deficiencies with the Department's
determination.  The other three arguments made by Globe are equitable in nature and assert that,



Federal**Student**Aid
An OFFICE of the U.S. DEPARTMENT of EDUCATION
Administrative Actions and Appeals Service Group
830 First St., N.E. Washington, D.C. 20002-8019
StudentAid.gov

USA SOI 150

if Globe closes, Globe's students would be unable to attend the school of their choice, that Globe's employees will lose their jobs, and that the Department's actions "tarnish the degrees" of Globe alumni.    Each of these arguments is addressed below, beginning with Globe's assertions about the legal and policy deficiencies of the determination.

*First*, Globe asserts that the state court's finding that there is evidence "sufficient to establish fraud and/or deception in the marketing of [Globe's] criminal justice program" is not a judicial determination of fraud under 34 C.F.R. 600.7(a)(3)(ii).  Notably, Globe concedes that "the judicial determination in the district court of the State of Minnesota is sufficient to satisfy the Department's regulatory standard[.]" Reconsideration Request at 5.  As Globe admits, the state court Order is a judicial determination that Globe has committed fraud involving Title IV, HEA programs.  In addition to the language Globe quoted in the Reconsideration Request, the court also found that "the causal nexus between [Globe's] fraudulent misrepresentations is established by the evidence," Order at 112, that "[Globe's] fraudulent practices in advertising and promoting [its] Criminal Justice program… caused damage," Order at 113, and that the "damage that flows from [Globe's] fraud is inevitable and foreseeable." *Id.*  Likewise, the Court found Globe to have violated the Minnesota Consumer Fraud Act, Minn. Stat. § 325F.68 *et seq.* (CFA).  Order at 111.  The CFA prohibits "[t]he act, use, or employment by any person of *any fraud*, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby." Minn. Stat. § 325F.69, subd. 1 (emphasis added).  The Court found that "[t]o prove a claim under the CFA, a plaintiff must prove *an actionable fraud or misrepresentation* and intent to induce reliance on that misrepresentation." Order at 106.  Conclusions of Law ¶ 6.  In finding for the State on its CFA claim, the court determined that Globe had done so.

Globe also contends that because the State of Minnesota, and not individual students, was the plaintiff in this case, that the Order does not constitute a judicial determination of fraud under the statute and regulations.  Globe further suggests that the Court's application of a "preponderance of the evidence" standard of proof also suggests that the Order is somehow not a "judicial determination of fraud."    Globe points to no legal authority to support either of these propositions, and the Department is unaware of any.  Rather, "[t]he phrase 'judicially determined to have committed fraud' means that a court of competent jurisdiction has made such a finding." Institutional Eligibility Under the Higher Education Act of 1965, as Amended, 59 Fed. Reg. 22324-01, 22,329 (Feb. 10, 1994).  The identity of the plaintiff and standard of proof applied by the court are irrelevant.

*Second*, Globe also requested reconsideration of the Department's determination that it breached its fiduciary duty and showed a lack of administrative capability by making numerous substantial misrepresentations to students and prospective students as to the nature of Globe's criminal justice program, and the employability of that program's graduates, *see* Reconsideration Request at Part IV (2), and as to the transferability of credits earned at Globe, *see* Reconsideration Request at Part IV (3).  Globe wrongly conflates the litigation in Minnesota state court with the Department's own review of the underlying evidence of the misrepresentations. With respect to the substantial misrepresentations Globe made regarding the nature of the criminal justice program and the employability of that program's graduates, Globe

alleges that it cannot appeal until the district court issues its final order and judgment.[1]  Whether Globe could or should have appealed the Order is irrelevant to the Department's determination that Globe violated the Department's substantial misrepresentation regulation found at 34 C.F.R. § 668.71 *et seq.* because that determination was predicated not on the Order itself, but on the Department's review of the underlying evidence.  To the extent that Globe's argument bears on the Department's determination that Globe is ineligible for participation in the Title IV, HEA programs, under 34 C.F.R.§ 600.7(a)(3)(ii), the Department is not required to wait for an institution that was judicially determined to have committed fraud involving Title IV, HEA programs to exhaust all appeals.  Rather the Department may determine that an institution is ineligible when "a court of competent jurisdiction has [determined that the institution committed fraud involving Title IV, HEA programs]."  Institutional Eligibility Under the Higher Education Act of 1965, *supra.*

As to the substantial misrepresentations Globe made regarding the transferability of its credits, Globe notes that the Minnesota court found in Globe's favor on that claim.  Notably, Globe does not deny that it made substantial misrepresentations to students and prospective students regarding the transferability of credits.  Rather, it repeatedly emphasizes the district court's opinion that those substantial misrepresentations did not amount to "widespread, systematic deception."  However, an institution need not engage in "widespread, systematic deception" in order to violate the Department's regulatory prohibition against making substantial misrepresentations.  In fact, the Department specifically addressed Globe's arguments in the Denial Letter itself:

> "[o]n this issue, the court found in favor of Globe because, "[t]o the extent that witnesses were misinformed by admissions representatives by affirmative statements that credits would transfer, those statements were not authorized by Defendants." Order at 118, Conclusions of Law ¶ 33.  This aspect of the court's decision is not dispositive to the Department's conclusion that Globe violated 34 C.F.R. § 668 Subpart F because, under those regulations, an institution is responsible for substantial misrepresentations made by its agents, irrespective of whether those substantial misrepresentations are "authorized." *See, e.g., In the Matter of Philander Smith College*, U.S. Dep't of Educ. Dkt. No. 09-28-SA at 2 (Nov. 16, 2009) ("[A]n institution is fully responsible for the conduct of its employees. This Tribunal has consistently held that an institution is subject to liability arising from the conduct of its employees in administering Title IV expenditures even if the conduct is criminal."); *see also* 34 C.F.R. § 668.71(b) (establishing that a substantial misrepresentation can be made by "one of [an institution's] representatives")."

Denial Letter at 11, footnote 6.

---

[1] Globe also paradoxically states that the Department was wrong to note that a disclaimer regarding the criminal justice program was buried in a catalog "hundreds of pages long," then admits in the same paragraph that "the catalog itself is approximately 200 pages every time it is published." Reconsideration Request at 5.

*Mr. Jeffrey Myhre*
*Globe University*
*Page 4*

For this reason, the Department's determination that Globe made substantial misrepresentations is not founded solely on the existence of the Order. As explained at length in the Denial Letter, the Department's independent examination of the underlying evidence revealed 19 misrepresentations which the Department determined violated 34 C.F.R. 668.71 *et seq* and Globe's Program Participation Agreement.[2] In addition, the Department concluded that the criminal justice program's advertising scheme substantially misrepresented to prospective students that they could become police officers in Minnesota as a result of a Globe criminal justice credential. Denial Letter at 6-7. While the Department reviewed much of the same underlying evidence as the Minnesota court, the Department's determination that Globe violated the Department's misrepresentation regulations is independent of the conclusions drawn by the Minnesota court regarding Minnesota law.

As noted above, the remaining three arguments by Globe are equitable in nature and allege that, if Globe closes, Globe's students would be unable to attend the school of their choice, that Globe's employees will lose their jobs, and that the Department's actions "tarnish the degrees" of Globe alumni. Globe's arguments are unavailing. *First*, the Denial Letter ends Globe's participation in Title IV, HEA programs. It does not require Globe to close. *Second*, the Denial Letter simply identifies Globe's substantial misrepresentations and other regulatory violations. The consequences identified by Globe are attributable to Globe's own violations and not the Department's actions.

*    *    *

In light of the Department's denial of Globe's reconsideration request, the Department is also denying, as moot, Globe's request to delay the effective date of the recertification denial.

Should Globe submit an application to participate in the Title IV, HEA programs in the future, that application must address the deficiencies noted in this letter. Please direct any questions about this letter to Kerry O'Brien at 303-844-3319.

Sincerely,

Susan D. Crim
Director
Administrative Actions and Appeals Service Group

cc:    Roger Williams, Interim President, ACICS, via rjwilliams@acics.org
Betsy Talbot, Manager, Institutional Registration and Licensing, Minnesota Office of
    Higher Education, via betsy.talbot@state.mn.us
David Dies, Executive Secretary, Wisconsin Educational Approval Board,
    via david.dies@eab.wisconsin.gov

---

[2] As stated in the Denial Letter, 10 such substantial misrepresentations involved the nature of the criminal justice program and the employability of that program's graduates, and 9 involved the transferability of Globe's credits.

*Mr. Jeffrey Myhre*
*Globe University*
*Page 5*

Melody Schopp, Secretary of Education, South Dakota Department of Education
via melody.schopp@state.sd.us
Department of Defense, via osd.pentagon.ousd-p-r.mbx.vol-edu-compliance@mail.mil
Department of Veteran Affairs, via INCOMING.VBAVACO@va.gov
Consumer Financial Protection Bureau, via CFPB_ENF_Students@cfpb.gov