1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA and          No.  2:13-cv-01697-KJM-KJN
     STATE OF CALIFORNIA, ex rel.
12   REBECCA HANDAL, et al.,

13              Plaintiffs,                 ORDER

14          v.

15   CENTER FOR EMPLOYMENT
     TRAINING, et al.,
16
                Defendants.
17

18          Qui tam relators and plaintiffs Rebecca Handal, Dina Dominguez, Elicia A.

19   Fernandez and Christine Stearns ("relators") allege defendants Center for Employment Training

20   ("CET"), Jennifer Cruickshank and Shirley Johnson submitted false certifications to the

21   government in order to obtain government funding, violating the False Claims Act ("FCA"), its

22   California counterpart, the California False Claims Act ("CFCA"), and other state laws.

23   Defendants have moved for summary judgment.  As explained below, the court DENIES in part

24   and GRANTS in part the motion.

25   I.     BACKGROUND

26          CET is a nonprofit corporation that provides postsecondary educational training

27   services, including, as relevant here, a Medical Assistant Program ("MA Program").  Undisputed

28
                                              1

Material Fact ("UMF")[1] 14, 16.  The relators are four former CET students who were enrolled in CET's MA Program at its Sacramento campus from August 29, 2011, at the earliest, through June 19, 2012, at the latest.  UMF 57, 62, 67, 68.  Each relator used federal loans to pay CET's tuition. DF 141, 236, 318, 387.

The FCA permits private individuals to sue on behalf of the United States government any individual or company who has knowingly presented a false or fraudulent claim to the government.  *United States ex rel. Anderson v. Northern Telecom, Inc.*, 52 F.3d 810, 812–13 (9th Cir. 1995).  Here, the relators contend CET and the individual defendants falsely certified compliance with the Higher Education Act ("HEA"), 20 U.S.C. §§ 1070, *et seq.*, to obtain Title IV government funding for CET's MA Program.  First Am. Compl. ("FAC"), ECF No. 7; Prior Order, ECF No. 61.

Title IV established various student loan and grant programs to assist eligible students in obtaining a post-secondary education.  UMF 1.  To receive Title IV funding or permit its students to receive such funding, an educational institution must enter into a Program Participation Agreement ("PPA") with the Secretary of the United States Department of Education ("Department").  UMF 2.  Each PPA requires the signing educational institution to obtain accreditation from an accrediting agency recognized by the Department and to certify that the institution will comply with the HEA and all statutory and regulatory provisions governing Title IV programs.  UMF 2-3.

CET signed a PPA with the Department on February 18, 2009.  UMF 15; PPA, Defs.' Ex. [2] E.  The relators contend CET obtained government funding for its MA Program by falsely certifying compliance with Title IV requirements in two principal ways.  First, the relators submit that CET and the individual defendants did not provide prospective and current CET

_____

[1] The court identifies and treats as undisputed only those facts the parties have mutually identified as undisputed, as confirmed in the relators' response to defendants' statement of undisputed material facts, ECF No. 91-1 at 1-57.  The court refers to facts on which the parties do not agree as Disputed Facts ("DF").

[2] Citations to "Defs.' Ex." refer to exhibits attached to Kathleen M. Rhoads' Declaration, ECF No. 87.

2

students the employment, placement, fee and debt disclosures required to receive Title IV funds.[3] Second, the relators argue CET and the individual defendants misrepresented the nature of CET's Sacramento MA Program, violating Title IV's prohibition on misleading and deceptive marketing practices.[4]

Defendant Shirley Johnson was the only CET admission advisor with whom each relator interacted before enrolling in the MA Program. UMF 47. The relators have testified that when they were prospective students, Johnson misrepresented the relators' likelihood of finding employment after graduation and misrepresented the nature of the MA Program. DF 131-35, 224-28, 319-22-25, 370-78. For example, Relator Stearns testified that when she was a prospective student, Johnson erroneously told her CET's job placement rate was 78 percent. DF 227. Relator Handal testified that Johnson told her the placement rate was 80 percent. DF 319. Relators Dominguez and Fernandez testified they were impressed by the placement rates Johnson disclosed, which they both recall as being high, but neither recalls the exact number Johnson provided. DF 136-37, 371-72. Johnson herself testified she informed prospective students that CET had a 77 percent graduation rate and a 56 percent job placement rate, though those numbers represented CET-wide statistics, not statistics specific to the MA Program. DF 513-14; *see* UMF 72 & Defs.' Ex. O. CET concedes it did not make required program-specific disclosures when

/////

---

[3] A participating educational institution must disclose: (1) the most recent available data concerning employment statistics and graduation statistics if job placement rates are advertised, as well as information necessary to substantiate the advertisement's truthfulness 34 C.F.R. § 668.14(b)(10)(i); (2) occupations that the program prepares students to enter, 34 C.F.R. § 668.6(b)(1)(i); (3) tuition and fees charged and costs of books and supplies, 34 C.F.R. § 668.6(b)(1)(iii); (4) placement rates of graduates, 34 C.F.R. § 668.6(b)(1)(iv); (5) median loan debt incurred by students who completed the program, 34 C.F.R. § 668.6(b)(1)(v); (6) financial assistance available, 34 C.F.R. § 668.41(d)(1); and (7) program-specific placement and employment  information, accompanied by identification of the source and methodology for the information, 34 C.F.R. § 668.41(d)(5).

[4] These regulations bar participating educational institutions and their representatives from making substantial misrepresentations, 34 C.F.R. § 668.71(b)-(c), regarding (1) the nature of the program, 34 C.F.R. § 668.72(a)-(n); (2) financial charges, 34 C.F.R. §668.73; and (3) the employability of graduates, 34 C.F.R. § 668.74; *see* 20 U.S.C. § 1094(c)(3)(A)-(B).

the relators were prospective students. UMF 74. It is undisputed that disclosures made to prospective students were generated by CET's corporate office. UMF 40, 51-52.

After the relators enrolled in the MA Program, they testify they were provided with a Performance Fact Sheet disclosing a 56 percent job placement rate. DF 155, 224-25, 320. In October or November 2011, after the relators had enrolled in the MA Program, defendant Jennifer Cruickshank presented each relator with a revised disclosure form generated by CET corporate, providing program-specific disclosures for the first time. UMF 52, 74-75, Defs.' Ex. P. The relators testified the new document disclosed a job placement rate lower than the 56 percent figure Johnson provided earlier, and Stearns and Handal specifically testified the new document disclosed a job placement rate of approximately 30 percent for the MA Program. DF 161-67, 227, 321-22, 373-74. The relators further testified that Cruickshank required students to sign the revised disclosures, despite their protests. Rels.' Ex.[5] 3 at 3-033, Rels.' Ex. 4 at 4-067, Rels.' Ex. 5 at 5-054, Rels.' Ex. 8 at 8-041.

Further, although CET contends Johnson provided each relator with a document disclosing fees owed in addition to tuition, DF 111-12, Rhoads Decl. Defs.' Ex. N (form), Johnson testified she told prospective students the fee for books was "optional." Defs.' Ex. M at M-8 – M-10; *see* DF 376-78. The relators also testified CET did not provide supplies that were essential to MA Program instruction, including thermometers and blood draw equipment, or that the classroom medical equipment was broken, requiring CET instructors to attempt to explain, rather than demonstrate, how the equipment worked and to use pictures of medical instruments rather than actual instruments. DF 197-98, 299-300, 346, 413-18.

As noted, defendants move for summary judgment. Mot., ECF No. 85-1.[6] The relators oppose, Opp'n, ECF No. 91, and defendants filed a reply, Reply, ECF No. 92-2. The United States, which declined to intervene, ECF No. 24, submitted a statement of interest concerning the motion, Gov't St., ECF No. 94, to which defendants responded, Resp. to Gov't

---

[5] Citations to "Rels.' Ex." refer to exhibits attached to Anthony M. Ontiveros' Decl., ECF No. 91-3.

[6] When citing to the parties' briefs, the court uses ECF page numbers, not the briefs' internal pagination.

St., ECF No. 98. After a November 17, 2017 hearing attended by plaintiffs' counsel Anthony Ontiveros and Vincente Tennerelli and defendants' counsel Larry Gondelman, the court submitted the motion for summary judgment and the motion to strike, described below. For reasons explained below, the court DENIES in part and GRANTS in part defendants' motion for summary judgment.

## II.        REQUESTS TO EXCLUDE EVIDENCE

Each party objects to the other party's evidence. *See* Rels.' Obj., ECF No. 91-2; Defs.' Resp., ECF No. 92; Defs.' Mot. to Strike, ECF No. 93; Rels.' Opp'n to Strike, ECF No. 97; Mot. to Strike Reply, ECF No. 99. The court resolves these disputes below, as necessary.

### A.        Relators' Objections – Lacey Report and Exhibit Authentication

The relators argue defense expert Aaron Lacey's report is not properly authenticated because it is not accompanied by an affidavit or declaration from Lacey. Rels.' Obj. at 1-2; *see* Lacey Report, Defs.' Ex. A. Defendants have provided Lacey's deposition testimony authenticating his report, MOOTING the relators' first objection. *See* Defs.' Resp. at 12-13, Resp. Ex. A. The relators also object to a host of defendants' exhibits as unauthenticated. Rels.' Obj. at 4-25. Relators produced many of the exhibits to which they object and rely on purely technical grounds rather than arguing defendants' exhibits cannot ultimately be presented in admissible form. *See id.* The court OVERRULES these objections. *See Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) ("While the evidence presented at the summary judgment stage does not yet need to be in a form that would be admissible at trial, the proponent must set out facts that it will be able to prove through admissible evidence."); *Burch v. Regents of Univ. of California*, 433 F. Supp. 2d 1110, 1120 (E.D. Cal. 2006) ("When evidence is not presented in an admissible form in the context of a motion for summary judgment, but it may be presented in an admissible form at trial, a court may still consider that evidence.") (emphasis and citations omitted).

The relators further argue the Lacey Report provides an impermissible legal conclusion in determining CET's alleged noncompliance is "typically viewed as routine, minor, and insubstantial," an opinion he purports to offer "within a reasonable degree of legal certainty."

Rels.' Obj. at 3 (quoting Lacey Report at 18); *cf. Universal Health Servs., Inc. v. United States* ("*Escobar*"), 136 S. Ct. 1989, 1995 (2016) (FCA's materiality element cannot be satisfied "where noncompliance is minor or insubstantial"). The relators' concerns regarding Lacey's use of legal terminology may be renewed in a motion in limine. *See, e.g.*, *Monroe v. Griffin*, No. 14-CV-00795-WHO, 2015 WL 5258115, at \*7 (N.D. Cal. Sept. 9, 2015) (courts often find "an expert's use of 'judicially defined' and 'legally specialized' terms constitutes an expression of opinion on an ultimate issue of law") (citations omitted). At this juncture, the court considers Lacey's presentation of facts and opinions on materiality only to the extent they permissibly embrace an ultimate issue, *see* Fed. R. Evid. 704(a), but does not rely on Lacey's opinions as made with any degree of "legal certainty." With this clarification, the objection is OVERRULED.

### B.     Defendants' Motion to Strike

Defendants move to strike the relators' opposition brief and supporting documents, which were filed seven hours after the court's 4:00 p.m. filing deadline. Defs.' Mot. to Strike at 2. Defendants also move to strike plaintiff expert Steve J. Baker's declaration as an untimely rebuttal report. *Id.* at 2-4; *see* Baker Decl., ECF No. 91-9. Finally, defendants move to strike the relators' 74 pages of purportedly undisputed material facts as irrelevant and prejudicial. Defs.' Mot. to Strike at 4-6. The court discusses each issue below.

### 1.     Relators' Opposition Brief and Accompanying Documents

The relators explain scheduling and technical difficulties prevented them from timely filing their opposition. Rels.' Opp'n to Strike at 3-7. Although the relators suggest they were surprised by and unprepared to respond to the defendants' timely-filed motion for summary judgment, their surprise and lack of preparation is unreasonable in light of the court's longstanding scheduling order. *See id.* at 1 (noting defendants filed their motion on "the last day to file it"); *see also* ECF No. ECF No. 68 (Sept. 9, 2016 Sched. Order). Moreover, as discussed further below, the relators include an unnecessarily inflated list of purportedly undisputed facts with their opposition. In short, the relators have run afoul of this court's orders in numerous ways. Nonetheless, in the interest of reaching the merits and in the absence of any showing of prejudice, the court DENIES defendants' motion to strike the relators' opposition. The relators'

1  counsel are cautioned, however, that future noncompliance with this court's standing orders and

2  local rules may result in sanctions.

3  2.  The Baker Declaration

4  Defendants object to Baker's declaration, which purports to summarize Baker's

5  expert report.  Defs.' Mot. to Strike at 2-4.  Defendants argue relators are required to stand on

6  Baker's report, as submitted when the parties exchanged disclosures, rather than a declaration,

7  and further argue that Baker's disagreement with the Lacey Report's conclusions about the

8  materiality element is a belated and disguised rebuttal report.  *Id.*; *see* Baker Decl.  The court

9  agrees with both points.

10  The Baker declaration does not provide cross-references to the Baker report,

11  making it is unnecessarily difficult for defendants and the court to determine whether the

12  declaration is consistent with Baker's report.  The relators make no attempt to show the

13  documents are indeed consistent, but instead simply fault defendants for not identifying

14  inconsistencies and representing, without elaboration: "Mr. Baker's declaration closely tracks his

15  initial report."  Rels.' Opp'n to Strike at 8.  Moreover, the relators do not dispute defendants'

16  representation that the parties simultaneously exchanged reports and Baker never issued a rebuttal

17  report.  *See* Defs.' Mot. to Strike at 3.  By responding to the Lacey Report in his declaration, then,

18  Baker necessarily supplements his original report rather than merely summarizing that report.

19  *See* Baker Decl. ¶¶ 65-66 (discussing Lacey report and offering Baker's response).  The relators

20  have not shown that Baker's declaration does not impermissibly expand on his report.  The court

21  STRIKES the Baker declaration.

22  3.  The Relators' Additional Material Facts

23  Defendants note that relators, after responding to defendants' 124 undisputed facts,

24  present 477 additional "undisputed facts" and supporting evidence.  Defs.' Mot. to Strike at 4-5;

25  *see* Rels.' Sep. St., ECF No. 91-1 at 58-132.  Because the relators did not file a cross-motion for

26  summary judgment, defendants move to strike these purported undisputed facts as procedurally

27  irregular, largely irrelevant, and prejudicial to defendants, who were not afforded a proper

28  opportunity to respond.  Defs.' Mot. to Strike at 5-6.  The relators respond they "had a right to

present [evidence] . . . to rebut Defendants' unstated inference[s]," citing Local Rule 260.[7]  Rels.' Opp'n to Strike at 8-9.

The relators' argument is unpersuasive.  Local Rule 260(b) permits the relators to file a concise statement of disputed facts, not undisputed facts, and cannot be read to authorize the additional 477 purportedly undisputed facts the relators identify here.  *See* E.D. Cal. L.R. 260(b).  Moreover, the relators include facts that are plainly immaterial.  *See, e.g.*, DF 126 ("[Relator Dominguez's nephew's girlfriend] did not exactly recommend [CET's] program, but said Dominguez could go there full-time and finish quickly.").  This court is not obliged "to comb the record to find some reason to deny a motion for summary judgment," and it declines to do so here as to the relators' additional facts.  *See Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (citation omitted) (alteration in original).  Accordingly, the court considers only those relevant facts the relators specifically rely on in their opposition brief and strikes the rest.  Because defendants were on notice of those specific facts, they cannot reasonably claim prejudice.  Further, the court will not treat any of the relators' additional facts cited in their brief as "undisputed."  With these clarifications, defendants' motion to strike the relators' 477 additional facts is GRANTED IN PART and DENIED IN PART.

III.    MOTION FOR SUMMARY JUDGMENT

A.    Legal Standard

A court will grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The "threshold inquiry" is whether "there are any genuine factual issues that properly can be

---

[7] In pertinent part, Local Rule 260 provides:

Any party opposing a motion for summary judgment or summary adjudication shall reproduce the itemized facts in the Statement of Undisputed Facts and admit those facts that are undisputed and deny those that are disputed, . . . .  The opposing party may also file a concise "Statement of Disputed Facts," and the source thereof in the record, of all additional material facts as to which there is a genuine issue precluding summary judgment or adjudication.

E.D. Cal. L.R. 260(b).

resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The moving party bears the initial burden of showing the district court "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Then the burden shifts to the non-movant to show "there is a genuine issue of material fact . . . ." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986). In carrying their burdens, both parties must "cit[e] to particular parts of materials in the record . . .; or show [] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1); *see also Matsushita*, 475 U.S. at 586 ("[the non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts"). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247-48.

In deciding summary judgment, the court draws all inferences and views all evidence in the light most favorable to the non-movant. *Matsushita*, 475 U.S. at 587-88. "Where the record taken as a whole could not lead a rational trier of fact to find for the [non-movant], there is no 'genuine issue for trial.'" *Id.* at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). District courts should act "with caution in granting summary judgment," and have authority to "deny summary judgment in a case where there is reason to believe the better course would be to proceed to a full trial." *Anderson*, 477 U.S. at 255. A trial may be necessary "if the judge has doubt as to the wisdom of terminating the case before trial," *Gen. Signal Corp. v. MCI Telecomms. Corp.*, 66 F.3d 1500, 1507 (9th Cir. 1995) (quoting *Black v. J.I. Case Co.*, 22 F.3d 568, 572 (5th Cir. 1994)), "even in the absence of a factual dispute[,]" *Rheumatology Diagnostics Lab., Inc v. Aetna, Inc.*, No. 12-05847, 2015 WL 3826713, at *4 (N.D. Cal. June 19, 2015) (quoting *Black*, 22 F.3d at 572).

B.    Discussion

The essential elements of FCA liability are: "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to

pay out money or forfeit moneys due." *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 899 (9th Cir. 2017), *cert. denied sub nom. Gilead Scis., Inc. v. U.S. ex rel. Campie*, No. 17-936, 2019 WL 113075 (U.S. Jan. 7, 2019) (citations omitted).

Defendants argue (1) the court's August 9, 2016 order on defendants' motion to dismiss, finding that "Relators' claims are based on CET's express false certifications," is incorrect because relators' claims fall soundly within the FCA's implied false certification theory; (2) the relators cannot satisfy the materiality element; (3) the relators cannot satisfy the scienter requirement; (4) the relators cannot demonstrate defendants' claims made specific representations about goods or services provided and failed to disclose noncompliance with material requirements; and (5) the relators cannot establish FCA liability for the individual defendants. The court denies summary judgment on the first four grounds but grants summary judgment on the fifth.

### 1. Express or Implied False Certification

Defendants argue the court erred in finding the "Relators' claims are based on CET's express false certifications" in its order on defendants' motion to dismiss. Mot. at 6 (quoting Prior Order at 9). Defendants urge the court to find, instead, that the relators' allegations constitute implied false certification claims, a theory the relators pled but the court did not reach. *See id.* Despite arguing the court's holding was clearly erroneous, Resp. to Gov't St. at 15, defendants have not moved for reconsideration. Further, at hearing, defendants stated that the court need not determine whether the relators' claims fall under the express or implied false certification designation at this stage of the proceedings, so long as the court applies the materiality standard set forth in *Escobar*, 136 S. Ct. at 2002, which it does below. With no formal motion for reconsideration before the court and no apparent need to resolve the dispute at this juncture to avoid prejudice to either party, the court declines to revisit its earlier determination.

### 2. Scienter

Defendants argue no reasonable jury could conclude CET acted with the requisite scienter to establish FCA liability. Mot. at 18-25. The court disagrees.

/////

10

FCA liability attaches only if the defendant acted "knowingly." 31 U.S.C. § 3729(a)(1). The FCA defines "knowingly" as when "a person, with respect to information— (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." *Id.* § 3729(b)(1)(A). Knowledge does not "require [] proof of specific intent to defraud," *id.* § 3729(b)(1)(B), but "'innocent mistakes, mere negligent misrepresentations and differences in interpretations' will not suffice to create liability." *United States v. Corinthian Colleges*, 655 F.3d 984, 996 (9th Cir. 2011) (quoting *U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1174 (9th Cir. 2006)); *see, e.g.*, *Campie*, 862 F.3d at 904 ("Had Gilead accidentally produced adulterated pills and unwittingly shipped them and requested payment from the government, the intent requirement under the False Claims Act would not be met."). The scienter element is "rigorous." *Escobar*, 136 S. Ct. at 2002.

Viewing the evidence in a light most favorable to relators, there is a triable issue of material fact as to whether CET acted with reckless disregard by allegedly obtaining government funding without complying with Title IV requirements. Reckless disregard generally "require[s] proof of (1) a high degree of awareness of probable falsity or that (2) the defendant in fact entertained serious doubts as to a statement's truth." *Siebert v. Gene Sec. Network, Inc*, 75 F. Supp. 3d 1108, 1117 (N.D. Cal. 2014) (citing *Phx. Trading, Inc. v. Loops, LLC*, 732 F.3d 936, 944 (9th Cir. 2013)). A defendant who "'burie[s] his head in the sand and fail[s] to make simple inquiries which would alert him that false claims are being submitted," including refusing to familiarize himself with the requirements for government funding, may act in reckless disregard. *United States v. Bourseau*, 531 F.3d 1159, 1168 (9th Cir. 2008) (citing S. Rep. No. 99–345, at 21 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5286); *United States v. Mackby*, 261 F.3d 821, 828 (9th Cir. 2001) (finding managing director of medical clinic acted in reckless disregard or deliberate ignorance of Medicare requirements "[b]y failing to inform himself of [Medicare reimbursement] requirements, particularly when twenty percent of [the] Clinic's patients were Medicare beneficiaries"). Thus, "evidence suggesting that a defendant failed to take reasonable steps to ascertain and comply with regulatory requirements is a sufficient question of material

fact" to preclude summary judgment. *Hamilton v. Yavapai Cmty. Coll. Dist.*, No. CV-12-08193-PCT-GMS, 2018 WL 1784692, at *3 (D. Ariz. Apr. 13, 2018).

Here, CET argues the relators cannot satisfy the scienter requirement because CET's "practices negate scienter" and because lower-level CET employees' alleged misrepresentations cannot be imputed to CET. Mot. at 18-25. Those practices include the following: CET's CEO, Hermelinda Sapien, signed CET's PPA and reviewed and understood its provisions. UMF 29, 31. Sapien's duties include ensuring CET's compliance with all relevant rules and regulations, and she attends trainings "with a focus on the rules and regulations that govern" institutions like CET. UMF 29-30. CET also relies on its corporate financial aid department to track federal regulations governing Title IV programs and to conduct periodic audits to ensure CET campuses comply with relevant regulations. UMF 22-23. A third-party servicer assists CET with its Title IV obligations and advised CET in its compliance efforts with some of the provisions at issue here. UMF 20-21. In addition, CET hires an experienced accounting firm to audit its financial statements and conduct audits required under Title IV. UMF 17-19.

Despite these practices, the relators have introduced sufficient evidence that CET failed to take reasonable steps to ascertain and comply with regulatory requirements, precluding summary judgment on this element. For example, defendant Johnson, a CET recruiter for more than a decade, testified that CET never trained her on the substance of Title IV requirements, much less trained her to ensure recruiting practices were consistent with those requirements. *See* DF 489-95, 499. Instead, Johnson and other CET recruiters attended trainings "to improve in our sales, to understand what it takes to sell the program." Rels.' Ex. 11 at 11-016. The relators testify that when they were prospective students, Johnson provided them with inflated MA Program graduation and job placement rates, misrepresented the program's expenses and mischaracterized the quality of training and equipment available to program students. DF 136-37, 150, 153-55, 197-98, 225-26, 299-300, 319-25, 365-66, 371-78. Given the relators' evidence that CET never trained its recruiters to comply with Title IV requirements, a reasonable trier of fact

/////

could conclude that CET did not reasonably attempt to comply with Title IV payment requirements and thus acted in reckless disregard.

Moreover, there is evidence supporting an inference that CET corporate knowingly or recklessly created and distributed promotional materials that violated Title IV requirements. CET concedes it did not make the required program-specific disclosures when the relators were prospective students.  UMF 74; *see* DF 513-14 (Johnson testified she informed prospective students CET had 77% graduation and 56% job placement rates, though those numbers represented CET-wide statistics, not statistics specific to the MA Program).  Further, CET's corporate office generated all forms distributed to students and the relators contend that at least some of those forms contained material misrepresentations regarding CET and its MA Program. *See* UMF 40, 50-51; DF 155, 159, 161, 320-22.  Johnson testified CET's 2010 and 2012 catalogs advertised, "All books, supplies and equipment necessary for completion for this program will be provided by CET," and she made the same representation to "[e]very student that's enrolled in the medical system," while the relators testified they were required to pay for books and necessary equipment was often unavailable.  Rels.' Ex. 11 at 11-047-048; DF 154, 308, 377.

In short, a juror reasonably could conclude CET had serious doubts as to the truth of its statements attesting to its compliance with Title IV requirements.  This evidence likewise supports relators' calling into question CET's certifying executives' practices, including relying on CET's Financial Aid Director to ensure CET complied with Title IV requirements without making similar assurances with respect to CET's recruitment staff.  Rels.' Ex. 13[8] at 13-021-22 ("[T]he department of financial aid maintains the file on the program participation agreement, and I – I also have that.  And . . . they bring to my attention any – any concerns or problems.").

Viewing the evidence in the light most favorable to the relators, there is sufficient evidence of scienter to survive defendants' motion for summary judgment.

/////

/////

_____

[8] Although the relators cite Sapien's deposition excerpts as Exhibit 12 and the cover page indicates "Exhibit 12," the exhibit is paginated as Exhibit 13.

3.    <u>Materiality</u>

Defendants argue the relators cannot establish that CET's alleged regulatory violations are material to the government's decision to pay and defendants are thus entitled to summary judgment.  Mot. at 11-16.  The court here again finds summary judgment is not warranted.

The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).  "This materiality requirement descends from 'common-law antecedents.'" *Escobar*, 136 S. Ct. at 2002 (citation omitted).  Even where "a requirement is expressly designated a condition of payment, . . . . [w]hat matters is . . . whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision."  *Id.* at 1996.  Materiality "cannot be found where noncompliance is minor or insubstantial."  *Id.* at 2003.

a.    <u>Funds Conditioned on Compliance</u>

In determining whether the alleged fraud was material to the government's payment decision, the court may consider whether and how significantly the government's payment was conditioned on compliance.  *United States Ex Rel. Rose v. Stephens Inst.*, 909 F.3d 1012, 1020 (9th Cir. 2018).

In *Stephens*, for example, the government conditioned payment of Title IV funds on compliance with the incentive compensation ban in three distinct ways: through statute, regulation and contract.  *Id.*  This "triple-conditioning" of funds was not dispositive on the materiality issue, "but it [was] certainly probative evidence of materiality."  *Id.*

Here, both the relators and the government contend CET violated the government's express conditions of payment, establishing materiality, though neither party elaborates on their arguments much.  *See* Opp'n at 24-25 ("Relators [sic] First Amended Complaint describes the many ways that Defendants violated HEA requirements, particularly with regard to non-disclosures and misrepresentation of required data and information."); Gov't St. at 5 ("Each school's eligibility for Title IV funds 'is explicitly conditioned, in three different

/////

14

ways, on compliance with' the regulatory provisions listed in each PPA, including the provisions Relators contend Defendants violated.") (quoting *Hendow*, 461 F.3d at 1175).

In their brief, the relators rely primarily on 34 C.F.R. §§ 668.71 & 668.72, which prohibit eligible institutions and their representatives from engaging in substantial misrepresentations concerning the nature of a program, its financial charges or the employability of its graduates. *See* Mot. at 23, 25. The court notes that 20 U.S.C. § 1094 permits the Department to "suspend or terminate the eligibility status" of an institution, or impose a civil penalty of up to $25,000 for each violation, when it determines the "eligible institution has engaged in substantial misrepresentation of the nature of its educational program, its financial charges, or the employability of its graduates . . . ." 20 U.S.C. § 1094(c)(3)(A)-(B); *see United States ex rel. Lynn v. Delta Career Educ. Corp.*, No. CV-15-719-PHX-SMM, 2017 WL 2455210, at *7-8 (D. Ariz. Mar. 15, 2017) (noting relationship between 34 C.F.R. § 668.6(b) and 20 U.S.C. § 1094(c)(3)). Although not dispositive on the issue of materiality, these provisions tend to suggest the government conditioned CET's continued Title IV eligibility on compliance with the substantial misrepresentation ban. *See Stephens*, 909 F.3d at 1020.

Elsewhere in their briefing, though inexplicably omitted from their materiality discussion, the relators note in passing that defendants' allegedly deficient and belated disclosures violated 34 C.F.R. § 668.14(b)(10)(i). *See* Opp'n at 20, 22. That regulation, like 20 U.S.C. § 1094 and CET's PPA, expressly requires:

> [A]n institution that advertises job placement rates as a means of attracting students to enroll . . . , [to] make available to prospective students, at or before the time of application . . . the most recent available data concerning employment statistics, graduation statistics, and any other information necessary to substantiate the truthfulness of the advertisements.

34 C.F.R. § 668.14(b)(10)(i); 20 U.S.C. § 1094(a)(8); PPA at E-3. As in *Stephens*, this triple-conditioning of Title IV funds is probative evidence of materiality. *See Stephens*, 909 F.3d at 1020.

/////

/////

### b. Past Department Acts

The court must also "consider how the Department has treated similar violations," looking to three scenarios outlined in *Escobar* for guidance and "examin[ing] the particular facts of [the instant] case." *See Stephens*, 909 F.3d at 1020-21 (citing *Escobar*, 136 S. Ct. at 2003-04). Here, *Escobar*'s first two scenarios are inapplicable. First, there is no "evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance" with the requirements at issue here, and so "that inquiry does not factor into [the] analysis." *See id.* at 1021 (quoting *Escobar*, 136 S. Ct. at 2003). Second, because there is no indication "the Department has paid 'a particular claim in full despite its actual knowledge that' a payment condition was violated, which would constitute "very strong evidence that [the condition was] not material," *Escobar*'s second scenario does not guide the court's analysis. *See id.* (quoting *Escobar*, 136 S. Ct. at 2003) (emphasis omitted); *see id.* ("The record does not establish that, during the relevant time period, the Department had actual knowledge that Defendant was violating the incentive compensation ban."). The third scenario, whether the government "regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, [which] is strong evidence that the requirements are not material," is at issue here. *See id.* (quoting *Escobar*, 136 S. Ct. at 2003-04) (emphasis omitted).

Here, CET's materiality argument turns on its expert's analysis of dozens of Department of Education Final Program Review Determinations ("FPRDs") responding to educational institutions' noncompliance, bolstered by other Department data and the Department's prior Program Review Report finding CET failed to comply with other requirements not at issue here. Mot. at 11-14; *see* UMF 5-6 (describing program review process). The court reviews each argument in turn below, and concludes a triable issue of material fact remains as to whether the provisions at issue here are material.

### 1. The Lacey Report

The Lacey Report, defendants argue, establishes that the government does not treat the alleged violations as material. Mot. at 12-13. First, Lacey reviewed 44 FPRD letters issued

by the Department between April 13, 2012 and January 18, 2017, addressing 169 findings of educational institutions' noncompliance with Title IV provisions related to those at issue here. Lacey Report at A-13; *see* UMF 6-8. Of those 169 noncompliance findings, 13 concerned an institution's inadequate provision of consumer information, 1 concerned misrepresentation of information, and none related to an institution's inadequate instruction, facilities or equipment. Lacey Report at A-13; *see also id.* at A-14 (noting Department's list of its top ten Program Review findings across institutions in 2015 indicates 80 of the Department's 2,266 identified deficiencies in 2015, or 3.5% of total deficiencies, concerned "Consumer Information Requirements Not Met," but none appear to have concerned inadequate instruction, facilities or equipment). In its handling of these 13 instances of noncompliance with the provisions at issue in this case, Lacey opines that the Department "typically" did not issue sanctions, such as a "fine, limitation, suspension, or termination." *Id.* at A-14. Rather, in 12 of 13 cases, the Department required the noncompliant institution to "revise and update [its] related policies and disclosures," and, in the thirteenth case, referred a finding concerning the noncompliance to the Administrative Actions and Appeals Service Group, though the Department did not provide information as to whether that Group acted on the referral. *Id.* at A-14 – A-15.

Second, Lacey opines the provisions at issue are immaterial because although the Department places institutions on "heightened cash monitoring" when it deems "a more careful review of [Title IV] disbursements" necessary, none of the institutions placed on heightened cash monitoring as of March 1, 2017 was monitored because of the noncompliance at issue here. *Id.* at A-11, A-15; *but see id.* at A-15 – A-16 (acknowledging Department's identified bases for heightened cash monitoring are "vague"; noncompliance with provisions at issue here could account for up to 12% of heightened cash monitoring classifications).

Third, although the Department issued 137 fines over a six-year period, Lacey observes that none of the fines, as indicated in publicly available data, was clearly attributable to the asserted noncompliance. *Id.* at A-16. Finally, in 67 Title IV Program revocation letters issued by the Department from March 9, 2009 through December 27, 2016, 61 percent identified an institution's loss of accreditation as "the sole basis for the Department's revocation action" and

one cited the institution's failure to provide students with "books and kits they had specifically contracted to receive," among other grounds. *Id.* at A-16 – A-17. But the Department never cited an institution's noncompliant disclosure as the basis for revocation. *Id.*

From his review of Department documents and data, Lacey opines the Department would likely regard the alleged noncompliance at issue here as "routine, minor, and insubstantial" and "would not . . . refuse an institution's claims for Title IV Program payments" because of the noncompliance. *Id.* at A-17 – A-18 (emphasis omitted). Thus, in Lacey's opinion, the asserted noncompliance is immaterial to the government's decision to pay.

## 2. The United States' Evidence

Responding to the Lacey Report, the United States in its Statement of Interest takes the position that numerous Department communications demonstrate "the Department actively investigates whether institutions are complying with the regulations at issue and has imposed significant penalties – including refusing to recertify multiple institutions for continued participation in the Title IV program – based in part on violations of those requirements." Gov't St. at 7. Although Lacey received these communications, he declined to address them. *Id.* (*comparing* Lacey Report at A-23 – A-26 *with* Tenerelli Decl., Ex. 1, ECF No. 94-1 at 1, 18, 34, 87, 96, 107, 117, 132, 146, 150).

The United States' submission significantly undermines Lacey's conclusions and could lead a reasonable juror to reject Lacey's opinions. The United States' evidence includes Department letters addressing institutions' mandatory disclosures and prohibited misrepresentations, both at issue here. *See, e.g.,* Tenerelli Decl., Ex. 1 at 18-29 (notifying Heald College that Department intended to impose $29,665,000 fine in part for Heald's "misrepresenting its placement rates to current and prospective students . . ., and by failing to comply with federal regulations requiring the complete and accurate disclosure of its placement rates."); *id.* at 94 (denying Marinello School of Beauty recertification, citing in part Marinello's misrepresentation concerning its educational programs, staff qualifications, training, equipment and materials). The Department's actions, evidenced through these documents, call into question

/////

Lacey's conclusion that the Department regards inadequate disclosures and misrepresentations of material information as insubstantial or unworthy of Department action.

Moreover, the Ninth Circuit recently clarified that the government may "demonstrate that requirements . . . are material without directly limiting, suspending, or terminating schools' access to federal student aid." *Stephens*, 909 F.3d at 1022 (finding Department's responses to institutions' violation of the incentive compensation ban, including ordering institutions to take corrective action, issuing penalties, requiring institutions to repay improperly awarded funds or reaching settlement agreements with offending institutions constituted evidence Department "did not allow schools simply to continue violating the ban while receiving Title IV funds"). This clarification is at odds with defendants' suggestion that anything short of "[t]ermination or demand for repayment by the Department" cannot demonstrate materiality. *See* Mot. at 12.

In sum, the United States has presented evidence that can be used at trial to challenge defendants' materiality argument: "By its actions, the government has plainly demonstrated that the alleged violations are not material." *See* Mot. at 8 (footnote omitted). This evidence would permit a reasonable factfinder to conclude that, by its actions, the Department has demonstrated it values compliance more than the Lacey Report indicates and significantly enough to render such compliance material under the FCA.

### 3. CET's Prior Program Review

Defendants also argue that the Department's August 6, 2013 program review report finding CET violated multiple Drug-Free Schools and Communities Act ("DFCA") requirements demonstrates that the alleged violations here are immaterial. Specifically, because the Department found CET did not make necessary DFCA disclosures but also did not revoke CET's funding eligibility or fine CET, defendants argue, "[t]his FPRD confirms that a citation of an institution for a failure to disclose information . . . is not material to the government's decision to pay." Mot. at 13-14. Nothing in the record suggests the Department views the DFCA disclosure requirement and the disclosure requirements at issue in this case as interchangeable or of equal importance. The court rejects this conclusory argument.

c.      Magnitude

"The False Claims Act is not an all-purpose antifraud statute, or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Escobar*, 136 S. Ct. at 2003 (quotation marks, internal citation omitted). Accordingly, materiality cannot be found "where noncompliance is minor or insubstantial." *Id.*

Here, the relators have introduced sufficient evidence to create a triable factual issue as to whether the noncompliance alleged here was material. A reasonable juror could conclude, based on the relators' evidence, that CET produced materials that misled students regarding material aspects of the MA Program, never trained its recruitment personnel on CET's legal obligations and limitations with respect to the program, and otherwise did not ensure CET was able to comply with the provisions CET certified it would abide by to obtain Title IV funds. These contentions, if believed, could lead a reasonable trier of fact to conclude the violations were material.

4.      Specific Representations about Goods or Services Provided and Misleading Half-Truths

To establish an implied false certification claim, a plaintiff must show (1) "the claim does not merely request payment, but also makes specific representations about the goods or services provided"; and (2) "the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Escobar*, 136 S. Ct. at 2001 (footnote omitted).

To the extent this requirement applies to the relators' claims, CET is not entitled to summary judgment. Here, when CET submits a claim for payment to the Department, it is specifically making the following representations: (1) CET is a Title IV eligible institution, (2) providing qualifying educational services (3) to a Title IV eligible student. If relators' allegations are believed, a reasonable trier of fact could conclude CET's claims constitute misleading half-truths: CET represents it is eligible to participate in Title IV programs and that representation is misleading because CET's noncompliance renders it ineligible. *See, e.g.,* *Stephens*, 909 F.3d at 1018 (finding triable issue of material fact as to whether defendant

educational institution advanced misleading half-truths when it "specifically represented [in Federal Stafford Loan Certification forms] that the student applying for federal financial aid is an 'eligible borrower' and is 'accepted for enrollment in an eligible program'" but did not disclose its "noncompliance with the incentive compensation ban").

### 5. Individual Defendants

Defendants argue there is no evidence the individual defendants, Johnson and Cruickshank, are liable under the FCA. Here, the court agrees.

FCA liability extends to those "who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government" or "actually submitted the claim forms." *Mackby*, 261 F.3d at 827 (citations, emphasis, internal quotation marks omitted). To be liable under the FCA, however, the individual defendants must have played a "role in making a false statement to the United States government." *See Corinthian Colleges*, 655 F.3d at 998 (allegation that individuals "monitored [defendant's] recruiter compensation practices" insufficient to state an FCA claim without additional allegation that individuals "participated in certifying HEA compliance to the [Department] for the purpose of receiving federal funds").

The individual defendants have introduced evidence showing neither Cruickshank nor Johnson were aware of or involved in submitting the allegedly false claims to the government. DF 41-44 (Cruickshank); UMF 53-56 (Johnson). The relators do not dispute the evidence as to Johnson. As to Cruickshank, the relators cite only Sapien's very general testimony confirming that "the center director [of each CET campus] is responsible for seeing to it that the school is operated in accordance with the rules and regulations and guidelines that govern post-secondary schools." *See* Rels.' Responses to DF 41-44. Sapien's testimony does not create a triable issue of material fact as to Cruickshank's liability. Assuming Cruickshank was responsible for ensuring CET Sacramento complied with the governing rules, regulations, and guidelines, this does not support an inference Cruickshank "participated in certifying HEA compliance to the Department for the purpose of receiving funds." *See Corinthian*, 655 F.3d at 998. Cruickshank declares under penalty of perjury that she "had no involvement with or

knowledge of the terms of" CET's PPA with the Department, CET's A-133 audits, the process of obtaining Title IV funds, and "did not participate in any manner in certifying compliance with [HEA] laws and regulations . . . ." Defs.' Ex. L ¶¶ 2-6. The relators have not countered this evidence. Accordingly, on this record no reasonable juror could conclude that Cruickshank or Johnson knowingly assisted CET in causing the government to pay claims grounded in fraud. *See Mackby*, 261 F.3d at 827; *Corinthian*, 655 F.3d at 998.

The motion for summary judgment is GRANTED as to Cruickshank and Johnson.

IV.    <u>CONCLUSION</u>

In conclusion, defendants' motion to strike is GRANTED in part and DENIED in part and defendants' motion for summary judgment is GRANTED with respect to Cruickshank and Johnson but DENIED as to CET. The court SETS a final pretrial conference for March 22, 2019 at 10:00 a.m. with a joint pretrial conference statement due March 1, 2019.

This resolves ECF Nos. 86 and 93.

IT IS SO ORDERED.

DATED:  February 1, 2019.

_____
UNITED STATES DISTRICT JUDGE